IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ATM FEE ANTITRUST LITIGATION, _____/ This Document Relates To: ALL ACTIONS _____/ | No. C 04-02676 CRB<br><br>**MEMORANDUM AND ORDER** |

Multiple motions and rounds of briefing are currently pending before the Court. These papers, however, cloud the critical legal question presented in this case: whether the fixed interchange fee in the Star ATM network is an impermissible agreement to fix prices. For the reasons set forth below, the Court hereby TERMINATES the motions currently pending before it. The Court further ORDERS the parties to proceed forthwith with any discovery necessary to elucidate the plausible procompetitive justifications that might be advanced in support of the fixed interchange fee. Following discovery, the parties may file another motion for summary judgment on the question of whether the fixed interchange fee constitutes an unreasonable restraint of trade in violation of the Sherman Act.

**BACKGROUND**

This putative class action was brought by several ATM cardholders ("Plaintiffs") against the companies that administer the Star ATM network, as well as against several commercial banks that are members of that network (collectively, "Defendants"). Plaintiffs

allege that Defendants have colluded to set the price of the interchange fee that a bank pays when its customers use ATM machines owned by other institutions. They argue that this collusion constitutes illegal price-fixing. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940).

On a motion to dismiss, this Court ruled that Plaintiffs had stated a viable claim for price-fixing. See Brennan v. Concord EFS, Inc., 369 F. Supp. 2d 1127 (N.D. Cal. 2005) (Walker, C.J.). Specifically, the Court held that Plaintiffs had stated a claim of "naked" price-fixing subject to analysis under the *per se* rule. See 369 F. Supp. 2d at 1133. The Court acknowledged Defendants' "theoretical" arguments that the fixed interchange fee was necessary to the very existence of the ATM network and that the fixing of the fee was ancillary to the procompetitive joint venture. Id. at 1133. But those arguments, the Court ruled, were not germane to a motion to dismiss. Instead, they were "intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage." Id. What mattered, said the Court, was that Plaintiffs had alleged in their complaint that no procompetitive justification existed for the price-fixing. Because it was required to accept that allegation as true, the Court denied the motion to dismiss. Id. at 1135.

Defendants then filed a motion for partial summary judgment. In this motion, they argued that they could not be held liable for any alleged price-fixing that occurred after February of 2001. They argued that the members of the Star network had transferred control over the interchange fee to another company at that time, and that subsequent decisions regarding the interchange fee were therefore merely "independent action," which is not proscribed by Section 1 of the Sherman Act. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) ("[T]here is a basic distinction between concerted and independent action . . . . Section 1 of the Sherman Act requires that there be [concerted action] in order to establish a violation. Independent action is not proscribed." (citation omitted)).

Subsequent to oral argument, the parties submitted additional rounds of briefing. The first round of briefing addressed an issue raised by this Court--to wit, the effect on this case, if any, of the Supreme Court's recent decision in Texaco, Inc. v. Dagher, 126 S. Ct. 1276

2

1  (2006). The second round of briefing was initiated by Defendant Suntrust Bank, which
2  requested permission to file a motion for reconsideration of the Court's previous ruling on
3  the motion to dismiss. Thus, there are ostensibly three questions currently pending before
4  the Court: (1) whether Defendants are absolved of liability by virtue of the fact that Concord
5  unilaterally set the interchange fee after February of 2001, (2) whether Dagher undermines
6  this Court's earlier decision to apply the *per se* rule to Plaintiff's complaint, and in a similar
7  vein, (3) whether this Court should revisit its ruling on the motion to dismiss.

## DISCUSSION

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. Read literally, this expansive language would prohibit nearly every agreement among business entities. After all, by definition, any contractual agreement *binds* an actor, either to perform or to refrain from performing certain tasks, and thereby *restrains* the actor, in one way or another, from acting freely in the marketplace. See Bd. of Trade of City of Chicago v. United States, 246 U.S. 231, 238 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.").

For this reason, the Supreme Court has long interpreted the Sherman Act as prohibiting only *unreasonable* trade agreements. That is, antitrust law prohibits only those commercial agreements with negative, anticompetitive effects, and not those agreements that serve beneficial, procompetitive purposes. See id. ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."); see also Nat'l Soc'y of Prof. Eng'rs v. United States, 435 U.S. 679, 690 (1978) ("The test . . . is whether the challenged contracts or acts 'were unreasonably restrictive of competitive conditions.'" (quoting Standard Oil Co. v. United States, 221 U.S. 1, 65-67 (1911) (Holmes, J.)).

In all price-fixing cases, then, the inquiry is the same: whether an agreement is reasonable when it is made between competitors and relates to the price of a certain good or service. Yet the courts do not describe the analytical framework in price-fixing cases in

3

precisely this fashion. Instead, they describe cases and claims as falling under one of a number of rules.

First, there is the *per se* rule. This rule is essentially a statement that an agreement to fix a price is, at least as a legal matter, *never* reasonable. When courts invoke this rule, they use fierce rhetoric that condemns any agreement regarding prices as illegal, regardless of the circumstances. As the Supreme Court stated in Socony-Vacuum, "price-fixing agreements are unlawful *per se* under the Sherman Act and no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." 310 U.S. at 218. Second, there is the rule of reason. When courts invoke this rule, they find that more thorough analysis of the alleged price-fixing agreement is necessary. Cases fall under this rule when there is a putative procompetitive effect to the alleged agreement that might make *per se* analysis inappropriate. Courts eschew the rigid prohibition on restraints of prices, for example, where a set price is viewed as "necessary" for a given product to exist at all. See Broadcast Music, Inc v. Columbia Broadcasting Sys., Inc., 441 U.S. 1 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.").[1] Courts frequently have a hard time determining what rule to apply in a given case. As one treatise on antitrust states, "the analytical categories articulated by the courts are protean concepts that change and evolve with time and competitive experience and are anything but bright lines of demarcation." William C. Holmes, Antitrust Law Handbook § 2:9, at 192 (2006).

---

[1] In some context, courts have also applied a so-called "quick look" rule. This rule is of more recent vintage and has come into existence as the result of several cases in which the Supreme Court took a cursory glance at the economic circumstances of conduct that was putatively illegal *per se* before ruling that the defendants had violated the relevant antitrust laws. In the words of Justice White, "[i]n each of these cases, which have formed the basis for what has come to be called abbreviated or 'quick look' analysis under the rule of reason, an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1984). Thus, in one price-fixing case, the Court ruled that a college football league could not require universities to charge minimum prices for broadcasting rights, even though the sports industry had been treated favorably in the context of other antitrust cases because of its peculiar characteristics. See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100-01 (1984).

4

In this case, Chief Judge Walker employed a *per se* analysis in reviewing Plaintiffs' complaint. He concluded that the *per se* rule was appropriate in the context of Defendants' motion to dismiss because he was compelled to accept Plaintiffs' allegations that there was no procompetitive justification for the fixed interchange fee. See Brennan, 369 F. Supp. 2d at 1131 (observing that Defendants' arguments about the necessity of a fixed interchange fee was "an inherently factual contention that cannot properly be resolved on a motion to dismiss"); id. (noting Plaintiffs' allegation that fixed interchanged fees "neither create a product that would not exist absent the fees nor enhance or promote competition in the ATM market," and holding that this allegation presented "a factual contention . . . that the court must accept . . . for purposes of the present motions"); id. at 1133 ("Whatever the merits of the [procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.").

But it does not follow from Chief Judge Walker's ruling that a *per se* analysis governs the case from here on out. Indeed, the Court is not in accord with what seems to be the parties' shared assumption that this case must hereafter be analyzed under the *per se* rule. To the contrary, if Defendants can set forth evidence to support plausible, procompetitive justifications for their agreement to fix the interchange fee, then the Court would have to examine their agreement under the rule of reason. See Dagher, 126 S. Ct. at 1280-81 & n.1; see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100-01 (1984); Broadcast Music, Inc v. Columbia Broadcasting Sys., Inc., 441 U.S. 1 (1979). Judge Walker's holding was merely that the complaint, on its face, had stated a viable claim for price-fixing because it had alleged that Defendants conspired, without any economic justification, to set a fixed price.

This Court agrees that at least some discovery is necessary to determine whether there procompetitive justifications really do exist for the fixed interchange fee, including inquiry into the manner in which the banks made their collective decision to set a fixed interchange fee; the structure of the fee agreement employed by the Star ATM network, which has evolved over time; and the characteristics of the relevant market. Only after such discovery

5

is conducted will the Court be in a position to weigh the putative procompetitive justifications for the banks' agreement. It is therefore unnecessary for the Court to review the motion to dismiss as such. Instead, the parties must address the plausible procompetitive justifications for the fixed interchange fee in the context of evidence about the actual character of the agreement.

All of the motions and briefs filed by the parties basically revolve around this crucial inquiry without tackling it head-on. Consider the issues currently pending: (1) whether the Court should reconsider the motion to dismiss, (2) whether Dagher requires application of the rule of reason, and (3) whether the case involves "concerted" or "independent action." Each of these ostensibly discrete issues addresses exactly the same concept--namely, whether there are plausible economic reasons to set a fixed interchange fee. But they approach this concept from different angles. The first issue tackles the idea most directly, by requesting this Court to apply the rule of reason based on the nature of the Star ATM network. The second approaches the same idea in a somewhat more oblique fashion, by discussing whether the Supreme Court's decision undermines Chief Judge Walker's *per se* analysis. And the third raises the same ideas--Defendants' argument that there has been no "concerted" action is cut from the same cloth as its argument that there is no liability for price-fixing, at least insofar as it requires an examination of whether the decision to set the interchange fee was made by a unitary economic actor. These two different arguments present what is substantially the same contention under antitrust law, only cast in a slightly different light.

The Court finds that it is inappropriate to adjudicate these discrete questions at this junction, given that they all present the same crucial issue in the case in piecemeal and indirect fashion. Instead, the Court directs the parties to engage in any discovery necessary to explore any plausible procompetitive justifications that may exist for the Defendants' agreement to fix the interchange fee. Such discovery need not be extensive, for many of the plausible arguments are found in the very nature and structure of the agreement itself, as to which all the parties by now have a thorough understanding. Upon the completion of any relevant discovery, the parties may bring another motion for summary judgment, at which

6

time the Court will again evaluate whether the alleged price-fixing agreement constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

## CONCLUSION

The motions currently pending before the Court all skirt the basic question presented by this case: whether any procompetitive aspects of Defendants' agreement to fix the interchange fee are sufficient to render that agreement a reasonable restraint of trade, or whether their compact must be condemned as unreasonable and therefore illegal. For this reason, the motions currently pending before the Court are hereby TERMINATED. The parties are here ORDERED to appear before the Court on Friday, December 15, 2006, at 8:00 a.m. for a status conference.

**IT IS SO ORDERED.**

Dated: November 30, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE