Joseph R. Saveri (SBN 130064)
Hector D. Geribon (SBN 200410)
Daniel E. Barenbaum (SBN 209261)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000

Merrill G. Davidoff (Admitted *Pro Hac Vice*)
Bart D. Cohen (Admitted *Pro Hac Vice*)
Michael J. Kane (Admitted *Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ATM FEE ANTITRUST LITIGATION | Master File No. C04-2676 CRB |
| | **CLASS ACTION** |
| This Document Relates To:<br><br>ALL ACTIONS | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ALL DEFENDANTS TO PROVIDE DOCUMENTS RELEVANT TO PLAINTIFFS' FOURTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| | Date:        May 17, 2007<br>Time:        2:00 p.m.<br>Courtroom:   8<br>The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF ARGUMENT ...........................................................................2

III.    BACKGROUND ...................................................................................................5

    A.    Factual History. ..........................................................................................5

    B.    Procedural History. ....................................................................................6

    C.    Plaintiffs Have Satisfied Their Obligation To Meet-And-Confer With Each Defendant And Have Complied With The Court's Order To Conclude The Process By April 6, 2007 ...........................................................................7

IV.     ARGUMENT.........................................................................................................9

    A.    Plaintiffs Are Entitled To Discovery Regarding The Economics of ATM and Similar Networks..................................................................................9

    B.    The Court Should Order Defendants to Produce Material that Will Permit Plaintiffs to Assess the Effects on the Market if Defendants Stopped Fixing Interchange Fees. ......................................................................................12

        1.    Information As To ATM Networks Generally, and Similar Payment Systems, Will Permit Plaintiffs to Identify and Assess Alternatives to Fixed Interchange Fees. ..........................................................12

            a.    Documents Relating to ATM Networks Other Than Star ............14

            b.    Documents Relating To Acquired and Merged Entities ................15

            c.    Documents Relating to ATM Transaction Revenues and Costs........................................................................................16

            d.    Comparison To Other Types of Card Transactions ......................17

                i.     Point of Sale ..................................................................18

                ii.    On-Us ATM Transactions .................................................20

            e.    Information Regarding Government Investigations and Private Litigation Is Relevant. .......................................................20

            f.    Information Regarding ATM Networks In Foreign Countries Is Relevant. .......................................................21

        2.    Comprehensive Information About The Star Network Is Relevant...........22

        3.    Plaintiffs Are Entitled To Discovery For The Entire Time Period That Star Network Has Existed...............................................................22

            a.    Plaintiffs Are Entitled Historical Information Because It Provides Evidence Relevant To Defendants' Proffered Pro-Competitive Justifications.............................................................22

            b.    Plaintiffs Are Entitled To Discovery To The Present Time Because It Provides Evidence Relevant To Defendants' Proffered Pro-Competitive Justifications.......................................24

            c.    Duty To Supplement ..................................................................26

        4.    Defendants Must Produce Discovery Collected Since December 1, 2006 In Native Format As Required By The Amended Federal Rule .......27

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

V.     CONCLUSION.................................................................................................................28

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4   *Ariz. v Maricopa Cty Med. Soc'y*,
5       457 U.S. 332 (1982) ..................................................................................................13

*Battiste v. Virgin Islands Telephone Corp.*,
6       2006 WL 2589448 (D.V.I. Aug. 3, 2006)...............................................................26

7   *Board of Trade of Chicago v. United States*,
        246 U.S. 231 (1918) ....................................................................................................9

8   *Brennan v. Concord EFS, Inc.*,
        369 F. Supp. 2d 1127 (N.D. Cal. 2005) ............................................................12, 24

9   *Caines v. City of New York*,
        2003 WL 151993 (S.D.N.Y. Jan. 21, 2003) ............................................................25
10

11  *Continental Ore Co. v. Union Carbide and Carbon Corp.*,
        370 U.S. 690 (1962) ..................................................................................................23

12  *Cory v. Aztec Steel Bldg, Inc.*,
        225 F.R.D. 667 (D. Kan. 2005)..................................................................................13

13  *DIRECTV, Inc. v. Trone*,
        209 F.R.D. 455 (C.D. Cal. 2002) ..............................................................................12

14  *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*,
        95 F.R.D. 398 (S.D.N.Y. 1982) ...........................................................................23, 24
15

16  *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
        476 U.S. 447 (1986) ..................................................................................................16

17  *Freeman v. San Diego Ass'n of Realtors*,
        322 F.3d 1133 (9th Cir. 2003) .......................................................................2, 16, 24

18  *Hosp. Bldg. Co. v. Tr. of Rex Hosp.*,
        425 U.S. 738 (1976) ..................................................................................................10

19  *Humphreys v. Regents of the Univ. of Cal.*,
        2006 WL 870963 (N.D. Cal. Apr. 3, 2006) ..............................................................11
20

21  *In re ATM Fee Antitrust Litig.*,
        2006 WL 2061300 (N.D. Cal. Jul. 24, 2006)...........................................................19

22  *In re ATM Fee Antitrust Litig.*,
        2006 WL 3462794 (N.D. Cal. Nov. 30, 2006) .........................................................22

23  *In re Auto. Refinishing Paint Antitrust Litig.*,
        229 F.R.D. 482 (E.D. Pa. 2005) ................................................................................13

24  *In re Domestic Air Transp. Antitrust Litig.*,
        141 F.R.D. 534 (N.D. Ga. 1992)................................................................................13
25

26  *In re Milk Prods. Antitrust Litig.*,
        84 F. Supp. 2d 1016 (D. Minn. 1997)........................................................................13

27  *In re Payment Card Interchange Fee &*
        *Merchant Discount Fee Litigation*,
        2007 WL 121426 (E.D.N.Y. Jan. 12, 2007) .......................................................27, 28
28

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Plastic Additives Antitrust Litig.*,
2004 WL 2743591 (E.D. Pa. Nov. 29, 2004) .......................................................10

*John McClelland & Assoc., Inc. v. Medical Action Indus., Inc.*,
2006 WL 3314630 (D. Kan. Nov. 13, 2006) ........................................................26

*Johnson & Johnston v. R.E. Serv.*,
2004 WL 3174428 (N.D. Cal. Nov. 2, 2004) ..................................................11, 12

*Jones v. Deutsche Bank AG*,
2006 WL 648369 (N.D. Cal. Mar. 10, 2006)........................................................11

*Moon v. SCP Pool Corp.*,
232 F.R.D. 633 (C.D. Cal. 2005) .........................................................................10

*Moulton v. AmeriCredit Fin. Servs., Inc.*,
2005 WL 1522237 (N.D. Cal. Jun. 28, 2005) ......................................................10

*NCAA v. Bd. of Regents*,
468 U.S. 85 (1984) ............................................................................................2, 13

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .............................................................................................10

*Quonset Real Estate Corp. v. Paramount Film Distr. Corp.*,
50 F.R.D. 240 (S.D.N.Y. 1970) ......................................................................23, 24

*Ruiz v. Hamburg-American Line*,
478 F.2d 29 (9th Cir. 1973) .................................................................................10

*San Francisco Bay Area Rapid Transit District v. Spencer*,
2007 WL 421336 (N.D. Cal. Feb. 5, 2007) .........................................................26

*Surfvivor Media, Inc. v. Survivor Productions*,
406 F.3d 625 (9th Cir. 2005) ...............................................................................10

*Woods v. Kraft Foods, Inc.*,
2006 WL 2724096 (E.D. Cal. Sept. 22, 2006)......................................................26

**RULES**

Federal Rules of Civil Procedure
26(b)(1) ................................................................................................................10
26(1)(7) ................................................................................................................26
34(b)......................................................................................................................27

**TREATISES**

Baker, Donald I., Brandel, Roland E., and Pannabecker, James H., THE LAW OF
ELECTRONIC FUND TRANSFER SYSTEMS, "Retail Banking Competition, Card
Products and Systems" ¶24.07(5)(c) (2006) .........................................................17

MOORE'S FEDERAL PRACTICE 3D (Matthew Bender 3d Ed.)
' 26.131[3] ...........................................................................................................26

**REGULATIONS**

16 C.F.R. §§ 801.40(a), 802.41 (1996).........................................................................19

1  I.    **INTRODUCTION**

2        On January 8, 2007, Plaintiffs served on Defendants Plaintiffs' Fourth Set of Requests for

3  Production of Documents ("Plaintiffs' Fourth Set").[1]  Plaintiffs' Fourth Set is directly responsive

4  to this Court's November 30, 2006 Memorandum and Order ("November 30 Order"), and the

5  December 15, 2006 status conference ("December 15 Hearing"); that is, the Court ordered the

6  parties to proceed with "any discovery necessary to elucidate the plausible pro-competitive

7  justifications that might be advanced in support of the fixed interchange fee."  November 30

8  Order at 1 (attached as Exh. A to Declaration of Joseph R. Saveri in Support of Motion to Compel

9  Appending Court-File Documents ("Saveri Court-File Decl.")).  Further, during the December 15

10 Hearing, the Court made clear that discovery should not be confined to any legal theory—

11 particularly Defendants' legal theory—but rather should address liability issues generally so as to

12 enable Plaintiffs and the Court to assess Defendants' alleged pro-competitive justifications.  *See*

13 December 15, 2006 Hr'g Tr., at 8-10 (Saveri Court-File Decl., Exh. B).  Moreover, in response to

14 Defendants' efforts to restrict discovery, the Court permitted inquiry into "the context of how the

15 industry itself works."  *Id*. at 10.

16        Notwithstanding the Court's clear direction, Defendants have sought to impose strict

17 limitations on the scope of discovery.  Defendants have demanded that discovery should be

18 confined by their view of the relevant facts, their view of the law, and their view of Plaintiffs'

19 allegations.  This stance is all the more untenable because Defendants' proffer did not actually

20 explain why Defendants believe their fixing ATM interchange fees benefits *competition*, but

21 rather simply declared that it benefits *Defendants.  See* March 23, 2007 Supplemental Joint Case

22 Management Conference Statement, at 1-4 (Saveri Court-File Decl., Exh. B) (also attaching

23 Defendants' March 1, 2007 Preliminary Identification of Pro-competitive Justifications for the

24 Setting of a Default System-Wide Interchange Fee for the Star ATM Network).

25

26 _____

27 [1] Plaintiffs propounded a single set of requests to Bank of America, Citibank, JPMorgan Chase, SunTrust, Wachovia and Wells Fargo (the "Bank Defendants") and a similar set on Concord and First Data Corp. (the "Network Defendants").  Declaration of Joseph R. Saveri in Support of

28 Motion to Compel Appending Relevant Discovery Requests And Responses ("Saveri Disc. Decl."), Exhs. A and B.

1    Accordingly, Plaintiffs hereby move for an order:  (1) disallowing various wholesale,

2    categorical limitations Defendants seek to impose on the scope of discovery; and (2) compelling

3    Defendants to produce, in full, all discoverable material requested by Plaintiffs' Fourth Set.[2]

4    **II.    <u>SUMMARY OF ARGUMENT</u>**

5    Defendants have improperly refused to produce certain relevant categories of discovery.

6    Each of Plaintiffs' requests is calculated to obtain materials that will enable Plaintiffs and the

7    Court to assess Defendants' justifications for fixing ATM interchange fees and to determine the

8    likely effects if the Defendants were to cease fixing prices.

9    Indeed, as settled antitrust doctrine holds, the natural effect of price-fixing—of which

10   Star's fixed interchange fees are an example—is to place an artificial constraint on competition,

11   to inflate prices, and to injure consumers.  *See NCAA v. Bd. of Regents*, 468 U.S. 85 (1984) (price

12   fixing is condemned as illegal because it "tends to restrict competition and reduce output");

13   *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (because of its

14   anticompetitive effects, "[n]o antitrust violation is more abominated than the agreement to fix

15   prices").  These harms are particularly likely here because fixed interchange fees no longer serve

16   any legitimate purpose.  Such a purpose may have arguably existed at one time, *i.e.*, to

17   compensate ATM owners when they had no means to agree on prices directly with consumers.

18   Once ATM owners could and did impose surcharges that cardholders could accept or reject at the

19   ATM terminal, that rationale was no longer valid.  In light of this history, Plaintiffs' Fourth Set

20   seeks, in various ways, to examine Defendants' proffered justifications to determine whether

21   there are viable alternatives to Defendants' price-fixing, and the effect these alternatives would

22   have on prices.  These alternatives include, but are not limited to, bilateral negotiations between

23   card-issuing banks and ATM owners over interchange fees, a possibility which Defendants

24   acknowledge, and elimination of interchange fees, a possibility which Defendants pretend does

25   not exist.

26

27

28   _____

[2] As explained *infra* footnote 5, Plaintiffs' motion to compel is directed to all Defendants and
specifies the disputes relevant to each Defendant.

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

1    Defendants have made discovery difficult with regard to these issues. First, Defendants

2   dedicated their proffer of so-called pro-competitive justifications almost entirely to unsupported

3   conclusions about how fixed interchange fees may benefit Defendants, while largely ignoring any

4   explanation of how fixed interchange fees benefit competition or consumers. Second,

5   Defendants' proffer addresses only why fixing interchange fees may be preferable to bilateral

6   negotiations, but offers no reason why they are preferable to eliminating interchange fees entirely.

7   Now, when Plaintiffs seek discovery on these issues, Defendants resist producing significant

8   responsive material, arguing, under Defendants' view of the law and Defendants view of the

9   relevant facts, the discovery is beyond the issues raised in their proffer. Of course, at the

10   appropriate time Defendants may well make arguments, however implausible, that their proffer is

11   adequate. But those arguments are premature and insufficient to preclude the relevant discovery.

12    Plaintiffs should be permitted discovery as to facts that support their view of Defendant's

13   alleged pro-competitive justifications under Plaintiffs' view of the law. That discovery includes

14   information regarding fees, costs and revenues associated with ATM transactions, how those

15   numbers have changed over the time period covered by Defendants' proffer, and how they vary

16   across different ATM networks and different payment systems. That information will permit

17   Plaintiffs and the Court to determine whether any alleged pro-competitive effects of Defendants'

18   price-fixing are in fact illusory, and whether the actual result of Defendants' price-fixing is to

19   harm competition and consumers.

20    For purposes of this motion, Defendants' refusal to comply with their discovery

21   obligations can be summarized by the following questions and answers:

22    1.    Should Defendants be required to produce material regarding networks

23   other than Star?

24    Yes. Relevant information regarding networks other than Star includes (1) the amounts of

25   interchange fees and related fees, and (2) analysis, strategies, and discussion of interchange fees

26   and related fees. This information may permit Plaintiffs to compare the Star network to other

27   networks and, thereby, to assess the effects on competition if Defendants were to cease fixing

28   prices.

1    2. Should Defendants be required to produce material provided to the

2 government or in connection with relevant private litigation?

3   Yes.  To the extent they discuss markets relevant to this litigation, materials Defendants

4 submitted pursuant to the Hart-Scott-Rodino Act would necessarily address and analyze

5 competition.  So may materials from private litigation, which also may include statements in

6 pleadings or under oath that may contradict or estop Defendants' claims here.

7    3. Should Defendants be required to produce material regarding ATM

8 networks in foreign countries?

9   Yes.  Plaintiffs are entitled to this real world evidence reflecting how ATM networks have

10 been or can be structured in ways other than Star.

11    4. Should Defendants be required to produce material from the inception of

12 the Star network to date?

13   Yes.  Since Defendants' justifications apply on their face from the inception of Star to

14 date, Plaintiffs are entitled to discovery for the same period.  Moreover, evidence regarding the

15 amounts of fees, costs, and revenues over time will help Plaintiffs and the Court assess the effect

16 on prices and other aspects of competition, if Defendants were to stop fixing ATM interchange

17 fees.

18    5. Should Defendants be required to produce materials regarding entities

19 Defendants acquired?

20   Yes.  Defendants concede that this information is in their possession, custody, or control.

21 With respect to Concord and First Data, the acquired entities operated other networks and possess

22 discoverable information regarding those networks, including material that may pre-date the

23 effective date of the acquisitions.[3]

24    6. Should Defendants be required to produce material collected since

25 December 1, 2006 in native format as required by the effective Federal Rules of Civil Procedure?

26

27   [3]  With respect to the Bank Defendants, the relevant acquired and merged entities possessed
relevant information regarding analysis, strategies, discussion of interchange fees and related fees

28 by virtue of their management of or membership in other networks (*see* 1 above).  At this time,
Plaintiffs and the Bank Defendants have not concluded their negotiations as to this subject matter.

Yes.  Producing electronically-stored information in the native format in which it was kept is appropriate, where producing it in another form would remove or degrade electronic search capabilities and other salutary aspects of the native format.

Because the information Plaintiffs have requested in each of these categories is reasonably calculated to lead to the discovery of admissible evidence regarding the existence, or lack thereof, of any plausible pro-competitive justifications, Plaintiffs' motion to compel should be granted.

## III.    BACKGROUND

### A.    Factual History.

Defendants' ongoing agreement to abide by a fixed interchange fee for transactions in the Star ATM network is a violation of Section 1 of the Sherman Act.  ATM owners receive interchange fees when an ATM cardholder who has an account—for example, at Bank of America—withdraws cash from an ATM owned by another entity—for example, Wachovia.  In this "Foreign ATM Transaction," the Star network fixes the interchange fee that Bank of America must pay Wachovia.  Bank of America then imposes a foreign ATM fee on the cardholder, which consists of the interchange fee and a mark-up.  Wachovia may also impose on the cardholder a surcharge for the transaction.  On each transaction, the Star network receives compensation in the form of a switch fee from the card-issuing bank, Bank of America.  Star also receives annual membership fees tied to the volumes of transactions over the network.  In certain transactions, ATM owners may also assess an additional surcharge, which is disclosed to cardholders at the ATM.  Star may also assess an additional convenience fee paid by the ATM owner where there is a surcharge.

The following diagram depicts some of the fees that arise from a typical transaction when an ATM cardholder withdraws cash from an ATM that the cardholder's bank does not own:

**FIGURE A**

**FOREIGN ATM TRANSACTION
FEE FLOW**



Amounts of fees shown are representative examples.

As the diagram suggests, there are plausible alternatives to fixed interchange fees. Card-issuers and ATM owners might freely negotiate interchange fees, or interchange fees might be eliminated, as they serve no apparent purpose now that ATM owners can, via competitively set surcharges, agree directly with cardholders as to their compensation.

**B.     Procedural History.**

The Court's November 30 Order terminated certain then-pending motions, and ordered the parties to proceed with "*any* discovery necessary to elucidate the plausible pro-competitive justifications that might be advanced in support of the fixed interchange fee." November 30 Order, at 1 (emphasis added). During the December 15 Hearing, the Court stated, "I want to find out what were the economic justifications of this arrangement. It appears to me that that is something that will be sought by the plaintiffs in discovery." Dec. 15, 2006 Hr'g Tr., at 4. The Court made clear that discovery should not be confined to Defendants' legal theories, but rather should enable Plaintiffs to test Defendants' alleged pro-competitive justifications under their own view of the law. *Id.* at 8-10.

During the December 15 Hearing, the Court refused to stay discovery and instructed Defendants to tender by March 1, 2007 a statement of pro-competitive justifications for Star's fixed interchange fees. *See* Dec. 15, 2006 Hr'g Tr., at 9-17. The Court also instructed Plaintiffs

to issue new written discovery, rather than seek materials responsive only to Plaintiffs'

outstanding discovery requests, to which Defendants had previously refused to respond.  To that

end, Plaintiffs served the Fourth Set on the Defendants on January 8, 2007 (attached as Exhibits

A and B to the Saveri Disc. Decl.).  Pursuant to the amended Federal Rules of Civil Procedure

which become effective December 1, 2006, Plaintiffs requested all electronic information stored

in its native format.  On February 13, 2007, Defendants served boilerplate objections and refusals

to produce responsive materials (Saveri Disc. Decl., Exhs. C through I).  On the following day,

Plaintiffs initiated a lengthy meet-and-confer process, which included three meet-and-confer

sessions with all Defendants, and multiple sessions with each Defendant individually.  At the

March 23, 2007 Case Management Conference, the Court ordered the process completed by

April 6, 2007.

> ### C.   Plaintiffs Have Satisfied Their Obligation To Meet-And-Confer With Each Defendant And Have Complied With The Court's Order To Conclude The Process By April 6, 2007

Pursuant to Local Rule 37, Plaintiffs' counsel have engaged in extensive, good- faith

meet-and-confer discussions with counsel for each Defendant.  After several weeks of discussions

and communications, the parties have not been able to resolve their fundamental disagreements

regarding the scope of relevant discovery.

On February 14, 21 and 26, 2007, all the parties participated in joint, bi-coastal, in-person

and telephonic meet-and-confer sessions regarding Plaintiffs' Fourth Set.  *See* Declaration of

Joseph R. Saveri In Support Of Motion To Compel All Defendants To Provide Documents

Relevant To Plaintiffs' Fourth Set Of Requests For Production Of Documents ("Saveri Decl."),

¶ 4.  Plaintiffs memorialized those discussions in letters dated February 16 and March 15, 2007.

Saveri Decl., Exhs. J and N.  Following the February 26, 2007 conclusion of the parties' joint

sessions, on February 28, 2007, Plaintiffs sent separate letters to the Bank Defendants and

Network Defendants requesting that each Defendant provide times and dates they would be

available to meet and confer individually with Plaintiffs, and inviting all Defendants to identify

any Defendant-specific topics that might require additional discussion.  Saveri Decl., Exhs. L and

M.  No Defendant identified any specific topics they wished to raise at any time within two weeks

1    after receiving that letter.  In their February 28 letter, Plaintiffs identified four broad categories of

2    topics that Plaintiffs would be prepared to discuss during individual meet-and-confer sessions

3    with Defendants.  Saveri Decl., Exhs. L and M.

4         Beginning March 16, 2007, Plaintiffs conducted 20 Defendant-specific telephonic meet-

5    and-confer sessions.[4]  The substance of the Defendant-specific meet-and-confer sessions was

6    memorialized in numerous letters.  Saveri Decl., Exhs. R through TT.  Certain Defendants

7    confirmed their positions in letters some of which they served within hours of the close of

8    business on April 6 (Saveri Decl., Exhs. V, Y, FF, QQ and TT).

9         During the course of the meet-and-confer sessions, Defendants disclosed for the first time

10   in this litigation certain key details regarding the nature of their document retention policies, data

11   retrieval capabilities and steps they had taken to locate and produce relevant materials.

12   Significantly, Defendants revealed for the first time that, some time around the summer of 2005,

13   they had gathered thousands of pages of documents *Defendants* believed were within the potential

14   scope of discovery.  While Defendants' subsequent steps are far from clear, they have indicated

15   that they converted some subset of those documents into electronic format (some from paper, like

16   emails, and some from out of their native electronic format), and prepared them for production.

17   Inexplicably, they have since withheld a significant portion of those materials from production.

18   Later, in April of 2006, when the Court ordered that discovery should be limited to issues raised

19   by the Defendants' then-pending motions for summary judgment, Defendants apparently

20   reviewed those documents again, and selected and produced a smaller set.

21        Although as a result of the above process, the parties were able to narrow areas of dispute,

22   they did not resolve certain critical disputes as to the scope of relevant discovery.

23

24

25

---

26   [4] These meet-and-confer discussions took place between Plaintiffs and each Defendant as
     follows:  Bank of America (March 19 and April 3)(Saveri Decl., ¶ 9); Citibank (March 22 and
27   March 30) (Saveri Decl., ¶ 7); Concord/First Data (March 16, March 28, March 30 and April 4)
     (Saveri Decl., ¶ 6); JPMorgan (March 15 and April 5) (Saveri Decl., ¶ 8); SunTrust (March 20,
28   April 4, April 5 and April 6) (Saveri Decl., ¶ 11); Wachovia (March 20, March 27 and April 3)
     (Saveri Decl., ¶ 10); and Wells Fargo (March 19, April 2 and April 5) (Saveri Decl., ¶ 12).

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

IV.     **ARGUMENT**

A.      **Plaintiffs Are Entitled To Discovery Regarding The Economics of ATM and Similar Networks.**

Defendants' refusal to produce certain types of information relevant to any pro-competitive justifications for Star's fixed ATM interchange fee is baseless.[5]  The Court's determination as to the scope of relevance in this case should be guided by the Supreme Court's seminal decision in *Board of Trade of Chicago v. United States*, 246 U.S. 231 (1918), which described the type of evidence relevant to the effects on competition of an agreement to restrain trade:

> To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.*, 246 U.S. at 238-39.

Along these lines, Plaintiffs and the Court may not be able to assess whether fixed interchange fees promote or suppress competition without information reflecting how the market for ATM services functions or would function in the absence of fixed interchange fees.  Highly relevant to this effort is historical information regarding fees, revenues, and costs over time for Star and other ATM networks, both in the United States and abroad, and information regarding other payments systems similar to ATM transaction networks.  These types of information should reveal any justifications Defendants and others have proffered for interchange fees outside of the litigation context.  More fundamentally, this information will allow Plaintiffs and the Court to predict how the market would respond if Defendants were to remove the fixing of ATM interchange fees as a constraint on market forces.  The most likely result would be to enhance competition, driving down prices to consumers—the ATM cardholders.  Plaintiffs might

---

[5] Plaintiffs' motion to compel is directed in general to all Defendants, with specific issues of contention in regard to particular Defendants as described in the chart appended to this memorandum as Appendix A.  All discovery requests and responses are appended to the Saveri Discovery Declaration.

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

1  demonstrate this result by comparing the total fees consumers paid on foreign ATM transactions

2  before and after Star permitted surcharging, assessing the correlation in other ATM networks

3  between the amount of interchange fees and the total fees consumers pay for foreign ATM

4  transactions in light of market conditions (costs, revenues, and other data), or comparing on-us

5  ATM transactions, which generally entail no interchange fees and are free to cardholders, with

6  foreign ATM transactions.  In short, this information is essential to Plaintiffs' efforts to

7  demonstrate the impact on competition if Defendants were to cease fixing interchange fees.

8  Pursuant to Federal Rule of Civil Procedure 26(b)(1), Plaintiffs are entitled to discovery

9  "regarding any matter, not privileged that is relevant to claims or defenses of any party."  *Id.*

10  (emphasis added).  For purposes of discovery, information is relevant if it is "reasonably

11  calculated to lead to the discovery of admissible evidence."  *Surfvivor Media, Inc. v. Survivor*

12  *Productions*, 406 F.3d 625, 635 (9th Cir. 2005) (citations omitted).  Because discovery "is

13  designed to help define and clarify the issues," *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340,

14  351 (1978), courts "permit wide-ranging discovery of information even though the information

15  may not be admissible at the trial."  *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal.

16  2005); *see also Surfvivor Media, Inc.*, 406 F.3d at 635 ("In determining relevancy for discovery

17  purposes," district courts are afforded broad discretion).[6]  Broad discovery is particularly

18  appropriate in antitrust cases where the evidence of Defendants' unlawful conduct is largely

19  within their control.  *See Hosp. Bldg. Co. v. Tr. of Rex Hosp.*, 425 U.S. 738, 746 (1976); *In re*

20  *Plastic Additives Antitrust Litig.*, 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) ("It is well-

21  settled that courts presiding over antitrust cases generally take a liberal view of relevance in

22  determining the scope of discovery.").

23  Defendants seek to limit discovery to the facts they claim are relevant to determining the

24  existence of a plausible pro-competitive justification.  In doing so, they ignore their own

_____

25  [6] The purpose of discovery is to prevent undue surprise at trial by developing the facts underlying

26  the parties' claims and defenses.  *Ruiz v. Hamburg-American Line*, 478 F.2d 29, 33 (9th Cir. 1973); *Moon*, 232 F.RD. at 636 ("the purpose of discovery is to remove surprise from trial

27  preparation so the parties can obtain evidence necessary to evaluate and resolve the dispute"); *Moulton v. AmeriCredit Fin. Servs., Inc.*, 2005 WL 1522237, at *4 (N.D. Cal. Jun. 28, 2005)

28  ("[T]he purpose of discovery is to 'facilitate open and evenhanded development of facts underlying a dispute.'" (citation omitted)).

1    submission, the applicable standard of discovery and the Court's Order.[7]  Defendants claim that

2    only limited information regarding ATM transactions which they seek to pick selectively from

3    their records is discoverable.

4            In contrast to the narrow limits they seek to impose on discovery, Defendants' proffer

5    (appended to the March 13, 20007 Supplemental Joint Case Management Conference Statement)

6    is general in nature and includes, within its scope, networks other than Star:

7    •    "The central benefit of an ATM network is to give ATM cardholders broader
          access to their deposits by allowing cash withdrawals from a greater number of
8         ATM machines than those owned or operated by the cardholder's bank." (¶ 1);

9    •    "For a network such as Star with thousands of members, there is no feasible
          alternative to the setting of a common default interchange fee." (¶ 2);
10

11   •    "A system that allows an ATM network to establish a default interchange fee
          permits the network to achieve an efficient balance of incentives to induce both
12        issuer and ATM owners to participate in the network." (¶ 4);

13   •    "Interchange fees are an important factor in competition between ATM networks."
          (¶ 5); and
14

15   •    "[A] joint-venture ATM network would be at a competitive disadvantage vis-à-vis
          proprietary networks if the antitrust laws were construed to prevent the joint
          venture from setting a default fee." (¶ 6).

16   Saveri Court-File Decl., Exh. C.

17           Defendants "may not refuse to produce [documents] based on [their] own factual and legal

18   conclusions as to the" theory of the case.  *Jones v. Deutsche Bank AG*, 2006 WL 648369, at *3

19   (N.D. Cal. Mar. 10, 2006); *see also Humphreys v. Regents of the Univ. of Cal.*, 2006 WL 870963,

20   at *2 (N.D. Cal. Apr. 3, 2006) ("defendants are not allowed to limit discovery based merely upon

21   their theory of the case.").  Further, Defendants bear the burden to establish that discovery should

22   be circumscribed.  *Johnson & Johnston v. R.E. Serv.*, 2004 WL 3174428, at *2 (N.D. Cal. Nov. 2,

23   2004).  That burden is not met unless the party resisting discovery supports its objections with

24

25   [7] Defendants appear to base their refusal to consider all options on an untenable interpretation of
     the effect of Judge Walker's *denial* of Defendants' motion to dismiss.  Oddly, they have asked
26   this Court to overturn Judge Walker's *holding*—that Plaintiffs' complaint alleges a *per se*
     violation of the antitrust laws—but suggest that Judge Walker's *dicta* binds this Court, in that he
27   suggested that eliminating interchange fees was not a viable alternative to fixed fees for antitrust
     purposes.  Plaintiffs will demonstrate the errors in Defendants' legal position at an appropriate
28   time.  That time has not yet come.  At present, Defendants' view of the law should not confine
     discovery designed to support Plaintiffs' position on these very legal issues.

1    detailed facts and explanations sufficient to demonstrate that the requested discovery is not

2    relevant, or is otherwise improper or unwarranted.  *Id.* ("a party objecting to discovery on the

3    basis of vagueness, overbreadth, oppression or burden must state specific facts in support of its

4    objection."); *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (party resisting

5    discovery bears burden of showing that it should not be allowed and of explaining and supporting

6    its objections).

7         Finally, Defendants' attempt to circumscribe discovery violates the Court's order

8    permitting wide-ranging discovery.  Dec. 15, 2006 Hr'g Tr., at 8-10 (Saveri Court-File Decl.,

9    Exh. B) (discovery should not be confined to Defendants' legal theories, but rather should enable

10   Plaintiffs to test Defendants' alleged pro-competitive justifications under their own view of the

11   law).  Plaintiffs' discovery requests are narrowly tailored to obtain information relating to "any

12   discovery necessary to elucidate the plausible pro-competitive justifications that might be

13   advanced in support of the fixed interchange fee."  Nov. 30 Order, at 1.  Because Defendants

14   refuse to provide such discovery, judicial intervention is required.

15   **B.**   **The Court Should Order Defendants to Produce Material that Will Permit**
16         **Plaintiffs to Assess the Effects on the Market if Defendants Stopped Fixing**
         **Interchange Fees.**

17        **1.**   **Information As To ATM Networks Generally, and Similar Payment**
18             **Systems, Will Permit Plaintiffs to Identify and Assess Alternatives to**
             **Fixed Interchange Fees.**

19        Where a joint venture engages in price-fixing, information regarding competition and

20   conditions in the industry is relevant to demonstrate that fixed prices are not necessary to the

21   "achievement of the joint venture's pro-competitive benefits."  *Brennan v. Concord EFS, Inc.*,

22   369 F. Supp. 2d 1127, 1135 (N.D. Cal. 2005).  Industry information provides a clear point of

23   comparison to the conduct at issue.  Such information is relevant whether it supports or

24   contradicts Defendants' asserted justifications.  Here, Defendants assert that an ATM network

25   cannot exist without fixed interchange fees.  That assertion cannot be assessed solely by

26   discovery regarding Star or absent an analysis of other ATM networks and payment systems.

27        The Supreme Court has recognized the relevance of industry information in assessing the

28   validity of pro-competitive justifications for price-fixing.  For example, in *Ariz. v Maricopa Cty*

1   *Med. Soc'y*, 457 U.S. 332 (1982), the Supreme Court rejected defendants' asserted pro-

2   competitive justification, after assessing the industry as a whole.  The Court rejected defendants'

3   asserted justification, *inter alia*, because an analysis of the industry revealed that price-fixing was

4   not necessary to provide defendants' services.  *Id.* at 353 & n. 26.  Similarly, in *NCAA v. Bd. of*

5   *Regents*, 468 U.S. 85 (1984), the Supreme Court rejected defendants' assertion that it was

6   necessary to limit the number of televised NCAA football games to maintain competitive balance

7   based, in part, on other aspects of negotiations regarding the broadcast of football games, as well

8   as on comparisons with similar agreements in other NCAA sports.  *NCAA*, 468 U.S. at 114-19.

9       Consistent with these precedents, this Court has also recognized that discovery regarding

10  the industry is relevant, stating:

11          I'm doing so, so you understand, to try to give the Plaintiffs the
            opportunity to flesh out the circumstances, the factual context in
12          which we could take a look at all of these so-called "pro-
            competitive justifications." . . . [T]he problem is sometimes a—you
13          don't understand the impact or the merit of the so-called pro-
            competitive justification, or lack thereof, until it's in the context of
14          how the industry itself works . . . ."

15  Dec. 15, 2006 Hr'g Tr., at p. 10 (Saveri Court-File Decl., Exh. B).[8]

16

17      Defendants have refused to produce certain categories of information based on spurious

18  arguments that the discovery is too broad in scope.  Each is addressed below.  In addition,

19  Defendants have raised a burden argument equally applicable to each request.[9]  To the extent that

20  Defendants have asserted that searching for these materials is burdensome, that objection is

21  _____

22  [8] Courts routinely permit discovery of industry-related information, without limiting it to the
    narrow set of sub-markets or market participants directly implicated by a plaintiff's allegations.
    *See In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 496 (E.D. Pa. 2005) (requiring
23  non-party trade association to produce market information, including defendants' market shares);
    *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1027 (D. Minn. 1997) ("Pricing, quantity,
24  and marketing data for milk and milk products surely are relevant to a claim of price-fixing.");
    *NASDAQ*, 929 F. Supp. at 725 (ordering defendants to produce information "related to the
25  operation and structure of the NASDAQ market."); *In re Domestic Air Transp. Antitrust Litig.*,
    141 F.R.D. 534, 556 (N.D. Ga. 1992) ("[I]nformation concerning hubs and airports not named in
26  the Amended Complaint is relevant to the issues in this litigation.").
    [9] "[C]onsiderable hardship and possibility of injury to the business of the party from whom
27  discovery is sought does not itself require denial of the motion."  *Cory v. Aztec Steel Bldg., Inc.*,
    225 F.R.D. 667, 672 (D. Kan. 2005); *see also New Park Entm't*, 2000 WL 62315, at *3
28  ("discovery in antitrust litigation is most broadly permitted and the burden or cost of providing
    the information sought is less weighty a consideration than in other cases").

1   without merit.  This is especially so because Defendants claim largely to have long ago collected

2   some of the responsive materials.  Nonetheless, Plaintiffs have offered to limit Defendants' search

3   for responsive documents to high-level custodians who have decision-making responsibility or

4   have relationships with other networks.  *See, e.g.*, Saveri Decl., Exh. N, at 1.  These custodians

5   are limited in number and would reasonably be expected to have generated or received copies of

6   the relevant materials in the ordinary course of business.

7                  a.      <u>Documents Relating to ATM Networks Other Than Star</u>

8           Defendants' asserted pro-competitive justifications should be analyzed by reference to

9   ATM networks other than Star.[10]  Information about those ATM networks can reveal the viability

10  of alternatives to Star's price-fixing.  This is so if the other ATM networks have discussed,

11  analyzed, or implemented any alternatives.  But it is also true even if those networks have simply

12  charged interchange fees set at different levels.  Plaintiffs seek the information necessary to

13  compare Star to other networks in regard to various ATM fees, costs, and revenues, together with

14  the processes for setting the amounts of their interchange fees, and the historical levels of those

15  fees.  *See, e.g.*, Appendix A (summary of issues that apply to each defendant); *see, e.g.,* Bank

16  Requests 3-5 (non-Star networks), Bank Requests 5 and 24 (costs and revenues), Bank Request

17  11 (on-us transactions).  This information may permit Plaintiffs to demonstrate the effects of

18  various fees on one another and, thereby, the impact on competition of a change from price-fixing

19  to freely negotiated interchange fees or the elimination of them.[11]  If, for example, some networks

20  have lower interchange fees than Star or have eliminated them, and if card-holders pay lower fees

21  for foreign ATM transactions routed through those networks, that may provide valuable evidence

22

23  _____

24  [10] Defendants asserted justification expressly relates to the industry in general, and not just Star.
    For example, Defendants proffer states:  "a system that allows an ATM network to establish a
    default interchange fee permits the network to achieve an efficient balance of incentives to induce
25  both issuers and ATM owners to participate in the network" and that "a joint-venture ATM
    network would be at a competitive disadvantage vis-à-vis proprietary networks if the antitrust
26  laws were construed to prevent the joint venture from setting a default fee."  (¶¶ 4, 6).
    [11] In the cases of the Bank Defendants, such discovery would include material regarding non-Star
27  networks (like MAC, Pulse, Honor, NYCE, Plus (operated by Visa) and Cirrus (operated by
    Mastercard)).  In the case of Star itself, these materials would include materials regarding
28  networks Concord or First Data own or have owned (MAC, Honor, NYCE), and networks Star
    has identified as its competitors (including Plus and Cirrus).

1   that Star's inflated interchange fees harm competition and, as a result, harm consumers.

2   Discovery is necessary to explore this and similar possibilities.

3        Nevertheless, certain Defendants have refused to produce this information.  They will

4   agree to produce documents regarding Star that are otherwise discoverable and that happen to

5   mention other ATM networks, but they refuse to provide information that pertains only to those

6   other ATM networks.  *See, e.g.*, Saveri Decl., Exhs. N, P, X (Citibank), and JJ (Wachovia).

7        Defendants' arguments regarding relevance are unpersuasive.  They fail to recognize that

8   Plaintiffs are entitled to comparative information to determine the economic effects if Defendants

9   stopped fixing prices.  Similarly unpersuasive are their claims regarding the burden of this

10  discovery.  First, as noted above, there is no tenable claim of burden for the materials gathered in

11  2005, readied for production and then withheld from Plaintiffs.  *See supra*, at 8, 13-14.  Second,

12  as to new material, not previously gathered, Plaintiffs have proposed to limit the search to a finite

13  list of custodians likely to possess the responsive materials.  *See* March 15, 2007 letter from

14  Joseph Saveri and Bart Cohen to All Defense Counsel (attached to the Saveri Decl. as Exhibit N).

15                   **b.**      **Documents Relating To Acquired and Merged Entities**

16       Plaintiffs have sought to ensure that Defendants search for relevant documents, including

17  documents in the possession of entities closely related to or combined with the named

18  Defendants.  These include entities with which the named Defendants have merged or which the

19  named Defendants acquired.  The Network Defendants in particular refuse to produce material

20  related to three Star competitors—MAC, Honor and NYCE—that it acquired, in whole or in part,

21  claiming that the burden of doing so far outweighs the relevance of those materials, and that

22  Plaintiffs agreed at some point in 2006 not to pursue those materials at any point in the case.[12]

23  Those arguments are both misplaced for the same reason.  As to relevance, in 2007—well after

24  the purported agreement upon which the Network Defendants rely—they, along with other

25  Defendants, made those other networks relevant by referencing them no fewer than five times in

26  _____

27  [12] Plaintiffs do not dispute that they agreed to limits on the Network Defendants' productions with respect to prior discovery requests.  However, Plaintiffs do not share with Concord/First Data their view of the nature and any effect of those agreements.  More significantly, these agreements

28  do not serve to shield from discovery materials related to Defendants' proffer and relevant discovery the Court has ordered.

- 15 -

1  their March 1 proffer (Appended to Exh. C of Saveri Court-File Decl.).  By virtue of having

2  acquired those networks (including their books and records), the Network Defendants possess

3  information regarding their operations.  As for burden, here too, any burden argument is limited

4  to the extent such materials have already been gathered.  *See supra*, at 8, 13-14.

5                        **c.**     **Documents Relating to ATM Transaction Revenues and Costs**

6            One way of evaluating alleged pro-competitive justifications for fixed ATM interchange

7  fees is to compare the fees, revenues, and costs of ATM transactions over time.  For example, if

8  ATM interchange fees are unrelated to costs, that may tend to show those fees are inflated and

9  lack any pro-competitive justification.  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133,

10 1144-45 (9th Cir. 2003) (noting that a joint venture's costs for providing its services can be

11 relevant to establishing that the prices charged for those services are "intentionally fixed . . . at a

12 supra-competitive level," and that selecting an MLS fee that was "more than double the cost of

13 the most efficient association" was evidence that the fee was fixed at a supra-competitive level,

14 which harmed consumers).[13]  More generally, the relationship between fees and revenues, costs,

15 and profitability are fundamental to understanding market structure, conduct and performance,

16 and competitive conditions.  All of these economic factors may bear, ultimately, on the amount of

17 the fees paid by cardholders.

18           Plaintiffs therefore seek information regarding the costs, fees and revenues associated

19 with Foreign ATM Transactions.  Specifically, Plaintiffs propounded discovery requests seeking

20 information, over time, regarding:  (1) the costs of ATM transactions, machines and related

21 equipment, including changes in those costs, and (2) fees associated with ATM transactions,

22 including interchange fees, foreign ATM fees, switch fees and surcharges, and changes in those

23 fees.  *See, e.g.*, Appendix A (summary of issues that apply to each defendant); *see, e.g.,* Requests

24 3-5, and 24.  Certain Defendants have objected claiming that those revenue and costs are not

25 relevant to Defendants' asserted pro-competitive justification.  That argument is misplaced.

26

27

28
_____

[13] *See also Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (marginal cost of product is relevant to determining whether the price charged is supra-competitive).

1   Financial data relevant to predicting the effects of changes in the interchange fees are essential to

2   the Court's assessment of whether Defendants' price-fixing benefits or harms competition.

3         Certain Defendants have asserted that such information is also not discoverable on the

4   grounds that they have not claimed that costs justify a fixed interchange fee. *See, e.g.*,

5   Appendix A (summary of issues that apply to each defendant); *see, e.g.,* Letter from Rachel Jones

6   to Joseph Saveri and Bart Cohen (attached to the Saveri Decl. as Exh. O); Responses to Plaintiffs'

7   Requests Nos. 5 and 24 (attached to the Saveri Disc. Decl. as Exhs. C through I).  However, one

8   of Defendant Wells Fargo's attorneys in this action, Donald Baker, writes in his treatise, that the

9   primary purpose of an ATM interchange fee is to reimburse the ATM owner for the costs it incurs

10  in connection with foreign ATM transactions.  He further concludes that antitrust concerns

11  require the level of interchange fees be set based on costs.  2 Donald I. Baker, Roland E. Brandel,

12  and James H. Pannabecker, THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS, "Retail Banking

13  Competition, Card Products and Systems" ¶24.07(5)(c), pp. 24-109 (2006) (attached as Exh. BBB

14  to the Saveri Decl.).  Specifically, Mr. Baker states:

15            There are essentially two elements that can and should go into the
              board's decision in setting a 'reasonable' price: network member
16            costs and competition, especially intersystem competition.  The
              starting point is cost, that is, the reasonable cost members incur in
17            performing the functions the interchange fee is supposed to
              encourage. In the ATM environment, this will be the acquirer costs
18            related to foreign transactions. . . . The most prudent price-setting
              methodology begins with a cost study, as was done in *NaBANCO*.
19            A study can produce a fully allocated cost figure for the average
              transaction, which the network interchange fee is supposed to
20            subsidize (e.g., a foreign ATM transaction). This figure should be
              regarded as a ceiling on the interchange fee that a network could set
21            if it faced no effective competition. The cost study also can produce
              an incremental cost figure, that is, the point at which no
22            contribution is being made to general overhead, depreciation, and
              capital costs. This second amount would be the floor on how much
23            a network facing intensive intersystem competition could charge.

24  *Id*. at pp. 24-109-110.  Because cost is apparently a recognized key to the validity of interchange

25  fees, Defendants' refusal to produce that information is groundless.

26            **d.**      **Comparison To Other Types of Card Transactions**

27        Plaintiffs have propounded a number of document requests seeking information regarding

28  payment transactions, including Point of Sale ("POS") and on-us ATM transactions.  Defendants

1   improperly refuse to produce that information. *See, e.g.*, Appendix A (summary of issues that

2   apply to each defendant); *see, e.g.,* Point of Sale—Network and Bank Requests (and responses to)

3   Nos. 3-7, 13-18, 20-22; Network 27/Bank 30, Network 29/Bank 32, Network 30/Bank 33; *see,*

4   *e.g.,* On-Us—Network and Bank Requests (and responses to) Nos. 1, 6, 11, 25, and 26.

5   **i.**   **Point of Sale**

6   POS transactions are similar to foreign ATM transactions in important respects.[14]  One

7   significant similarity between ATM and POS is the cardholder's ability to withdraw cash from his

8   or her account.  One key difference is that ATM interchange fees are paid to the ATM owner,

9   whereas POS interchange fees are paid to the card-issuing bank.[15]  Any reasons or alleged

10  justifications for a structure in which interchange fees flow in the opposite direction from ATM

11  transactions are highly relevant.  Indeed, this odd inconsistency casts doubt on the need for ATM

12  owners to receive *any* interchange fees in ATM transactions, particularly given their ability to

13  impose surcharges.  Plaintiffs therefore seek information regarding POS transactions.

14  Defendants object to discovery regarding POS on relevance grounds, asserting, without

15  any analysis, that discovery is limited to ATM transactions, and that POS is not referenced in

16  either their proffered justifications or Plaintiffs' Amended Complaint.  *See, e.g.,* Appendix A

17  (summary of issues that apply to each defendant); *see, e.g.,* Network and Bank Responses to Nos.

18  3-7, 13-18, 20-22; Network 27/Bank 30, Network 29/Bank 32, Network 30/Bank 33.  Defendants

19  also refuse to produce documents relating to their consideration of bilateral agreements as to POS

20  interchange fees, unless they are related to their concurrent consideration of joining a network

21  that used bilaterally negotiated POS interchange fees – which may not in fact have existed at any

22  time.[16]

23  _____

24  [14] *See* page from First Data Corporation's Star Network website: "What the STAR® Network
    Means to You" (2007), *available at* http://www.star.com/what_the_star_network_means_-
    to_you.aspx.

25  [15] Compare with Figure 1, *supra*, at 6.

26  [16] Defendants' relevance objections are also wrong in light of their own assertion that the "central
    benefit of an ATM network is to give ATM cardholders broader access to their deposits by
    allowing cash withdrawals from a greater number of ATM machines than those owned or

27  operated by the cardholder's bank."  (Defendants' Proffer, ¶ 1).  Cardholders have similar access
    to their deposits when they use their debit cards, issued by Defendant Banks and others, to

28  withdraw cash as part of POS transactions over POS networks, such as the one operated by Star
    and others in which the Bank Defendants are members.

1       Finally, Plaintiffs seek information relating to any filings or proceedings pursuant to the

2   Hart-Scott-Rodino Act concerning POS.[17]  *See, e.g.,* Appendix A (summary of issues that apply

3   to each defendant); *see, e.g.,* Network and Bank Requests No. 16.  That information is

4   discoverable because issues regarding market definition, market structure, conduct and

5   performance would have been addressed in such filings.[18]  Defendants will not produce those

6   materials as they relate to POS.  However, the antitrust issues raised in materials Defendants will

7   not produce would be highly relevant to Defendants antitrust violations in this case.  For example,

8   any discussion of the structure, conduct, or performance of ATM or POS networks in general

9   could reveal how competition works in these markets and, as a result, the impact on cardholders

10  of changes in ATM fees and fee structures.

11      Again, the key issue is the Plaintiffs' ability to make comparisons.  In this case, POS may

12  help to predict the effects of changing the structure of foreign ATM transactions.  Moreover,

13  Defendants have made the impracticality of bilateral negotiations the centerpiece of their

14  proffered justifications.  Defendants' Proffer, ¶¶ 2-4 (appended to Exh. C of Saveri Court-File

15  Decl.).  Many of the same logistical issues would arise for bilaterally negotiated POS interchange

16  fees and bilaterally negotiated ATM interchange fees.  Information regarding one bears on the

17  other.  Indeed, Magistrate Judge Larson already ruled against Defendants regarding discovery of

18  material relating to POS on this basis.  *In re ATM Fee Antitrust Litig.*, 2006 WL 2061300, at *6

19  (N.D. Cal. Jul. 24, 2006) ("The Court finds that if the Bank Defendants could influence the

20  setting of other fees, that would tend to show that they could influence the Star ATM interchange

21  fee.").  Yet Defendants persist in raising the same groundless objections.  They should be

22  overruled once again.

23

24

25  [17] Plaintiffs have agreed to limit this request to materials regarding the "buy-side", in other words, the materials submitted by the acquirer.  Saveri Decl., Exh. N, March 15, 2007 Letter.

26  [18] Among other things, the Hart-Scott-Rodino Act requires pre-merger disclosures including "all studies, surveys, analyses, and reports . . . prepared by or for any officers or director(s) . . . for the

27  purpose of evaluating or analyzing the acquisition with respect to market shares, competition, markets, potential for sales growth or expansion in the product or geographic markets."  16

28  C.F.R. §§ 801.40(a), 802.41 (1996).  So-called "Second Requests" under the Act often entail or contain extensive interrogatories or document requests.

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

**ii.    On-Us ATM Transactions**

Plaintiffs seek limited information necessary to compare ATM on-us transactions to foreign ATM transactions, including costs, revenues and profits. *See, e.g.,* Appendix A (summary of issues that apply to each defendant); *see, e.g.,* Bank Requests No. 11. Certain Defendants have refused to produce that information, despite their claim that eliminating fixed interchange would have competitive consequences with regard to proprietary networks, when processing on-us transactions. *See* Defendants' Proffer ¶ 6 (appended to Exh. C of Saveri Court-File Decl.) ("a joint-venture ATM network would be at a competitive disadvantage vis-à-vis proprietary networks"). Generally, an on-us transaction involves an ATM owned or operated by a cardholder's own bank. It is ordinarily not processed through a network switch. Cardholders generally do not pay fees for such transactions. Cost and revenue information regarding on-us transactions would facilitate a comparison that may establish that fixed interchange fees merely increase what cardholders pay for foreign ATM transactions and are untethered to cost. As stated above, Wells Fargo's own attorney has argued that the interchange fees should compensate the ATM owner for the incremental cost associated with foreign ATM transactions. See *supra*, at 17. Discovery regarding on-us transactions may belie any cost-based explanation for foreign ATM transaction fees. In addition, it may show the correlation between ATM fees, the number of ATMs, the number of ATM transactions, and other market information may show what would happen if Defendants stopped fixing the interchange fees. Because on-us and foreign ATM transactions are similar in many ways—with the notable exceptions that only foreign ATM transactions involve fixed interchange fees and impose significant transactional charges on consumers—the requested information is relevant to the effect of fixed interchange fees on competition.

**e.    Information Regarding Government Investigations and Private Litigation Is Relevant.**

Plaintiffs seek information relating to government investigations, litigation and arbitrations, and transcripts of testimony or speeches regarding ATM and POS fees. Certain Defendants arbitrarily refuse to produce that information unless it relates specifically to antitrust

1   violations.  These materials would reveal Defendants' view of competition in the ATM market,

2   and may contain explanations of or alleged justifications for interchange fees, which Defendants

3   set forth under oath or as a matter of public record, that are inconsistent with their current

4   position.  Plaintiffs have attempted to limit the burden of searching for this requested information

5   through the identification of a custodian with knowledge as to these issues and a list of litigation

6   and arbitration proceedings.  *See, e.g.,* Appendix A (summary of issues that apply to each

7   defendant); *see, e.g.,* Network and Bank Requests Nos. 17-19; *see* March 15, 2007 letter from

8   Joseph Saveri and Bart Cohen to All Defense Counsel (attached to the Saveri Decl. as Exhibit N).

9   Plaintiffs have also limited such requests to exclude consumer disputes regarding Defendants'

10  failure to disclose their fees.  *See, e.g.,* Appendix A; *see, e.g.,* Bank Requests No. 19.

11  Nonetheless, Defendants categorically refuse to produce the material.

## f.      Information Regarding ATM Networks In Foreign Countries Is Relevant.

14          Plaintiffs seek information relating to ATM fees in countries other than the United States.

15  The Network Defendants have refused to produce any such material.[19]  *See, e.g.,* Appendix A

16  (summary of issues that apply to each defendant); *see e.g.*, Network Request No 13; Network

17  Response to No. 13 (attached to Saveri Disc. Decl as Exhibit C); and March 29, 2007 letter from

18  Brian Howie to Joseph Saveri and Bart Cohen (attached to Saveri Decl. as Exh. R).  Given that

19  Defendants' pro-competitive justifications are premised on the characteristics of ATM networks

20  in general, and do not rely on any distinctive qualities of Star, information about how foreign

21  ATM networks operate are discoverable for a variety of reasons.  It may suggest alternatives to

22  fixed interchange fees.  It also may show how fees, costs, revenues and the like interact,

23  permitting predictions regarding the effects of changes in or elimination of Star's interchange

24  fees.  Plaintiffs and the Court are entitled to this real world evidence regarding alternative ATM

25  network structures.  It may even demonstrate, for example, that ATM networks can exist without

26  interchange fees and the effect on cardholders when those fees are eliminated.

27

28
---

[19] In order to address any burden arguments, Plaintiffs have confirmed that they are only seeking documents in the files of United States offices.  Further, any burden associated with searching for those documents would be limited by use of a custodial search process. *See supra*, at 20-21.

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

2. **Comprehensive Information About The Star Network Is Relevant.**

Plaintiffs seek information relating to any consideration of or actual bilateral agreements regarding ATM Interchange Fees.  Certain Bank Defendants have refused to produce responsive information unless it relates to participation in a network that relies on bilaterally negotiated ATM interchange fees rather than fixed fees.  Defendants' position is groundless and particularly erroneous because Defendants have made the claim that bilateral agreements are not feasible the centerpiece of their proffered justifications.  Defendants' Proffer, ¶¶ 2-4.  Plaintiffs are entitled to all documents regarding the possibility of bilaterally negotiated interchange fees, actual agreements, or any other information that bears on whether bilaterally negotiated interchange fees are feasible alternative to fixed fees, regardless of whether it relates to a network that relies on such agreements, which may not even exist.

3. **Plaintiffs Are Entitled To Discovery For The Entire Time Period That Star Network Has Existed.**

a. **Plaintiffs Are Entitled Historical Information Because It Provides Evidence Relevant To Defendants' Proffered Pro-Competitive Justifications.**

The Court's November 30, 2006 Order requires Plaintiffs to address whether Star's fixed interchange fees have any pro-competitive effects in light of Defendants' categorical assertion that "the fixed interchange fee was necessary to the very existence of the ATM network." *In re ATM Fee Antitrust Litig.*, 2006 WL 3462794 at *1 (N.D. Cal. Nov. 30, 2006).  This requires an investigation into the initial establishment of Star's fixed interchange fees, and how the justifications for and effects of fixed interchange fees have changed over time, including, for example, when and why Star decided to retain fixed interchange fees after ATM Defendants began surcharging for foreign ATM transactions. To that end, certain of Plaintiffs' document requests seek discovery regarding fixed interchange fees starting from their inception, which Plaintiffs believe occurred near the beginning of January 1984. *See, e.g.,* Network Requests Nos. 3, 4, 6, 7, 10, 12, 13, 14, 21, 22-26, 28-30.

Indeed, Defendants were likely to be most explicit about the purposes of the fixed interchange fees—and effect of the fixed fees were likely to be most pronounced—in the early

- 22 -

1    years after Star first adopted them.  Yet remarkably, the Network Defendants assert that Plaintiffs

2    are not entitled to materials for that entire period.  These Defendants have agreed to produce

3    materials from 1984, when Star adopted fixed interchange fees, but refuse to produce materials

4    from 1985 through 1995—when there was widespread debate among experts as to the continued

5    need for such fees.  *See, e.g.,* Appendix A (summary of issues that apply to each defendant); *see*

6    *e.g.*, Network Responses to Request Nos. 3, 4, 6, 7, 10, 12, 13, 14, 21, 22-26, 28-30 (attached to

7    the Saveri Disc. Decl as Exhibit C); *see, e.g.*, February 16, 2007 letter from Joseph Saveri and

8    Bart Cohen to All Defense Counsel (attached to the Saveri Decl. as Exh. J).  Plaintiffs are entitled

9    to discovery concerning the entire history of Star's fixed interchange fee, including the facts

10   giving rise to its inception in 1984, and its economic impact and effect on the growth of the

11   network, including the number of members and of ATMs.

12        Concord's refusal to produce documents for the period from January 1, 1985 through

13   December 31, 1995 on relevance grounds is improper.  The relevant time period for discovery is

14   established by evidence pertinent to Plaintiffs' claims and the defenses raised by Defendants.

15   *Quonset Real Estate Corp. v. Paramount Film Distr. Corp.*, 50 F.R.D. 240, 241 (S.D.N.Y. 1970);

16   *see also Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 709-710)

17   (1962) (in antitrust price fixing cases, plaintiffs are entitled to discovery from the beginning of the

18   conspiracy).  In this case, a comparison of the prices paid by cardholders for foreign ATM

19   transactions before and after surcharges can help to show the interrelationship of the different

20   fees.  If, for example, surcharges eliminated the need for interchange fees, yet their advent did not

21   decrease the amount of interchange fees or foreign fees, that would suggest that retention of fixed

22   interchange fees was a means of inflating the overall cost to cardholders of foreign ATM

23   transactions.  Courts have permitted discovery dating back even before an antitrust violation to

24   permit this sort of comparison.

25        In *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 95 F.R.D. 398 (S.D.N.Y.

26   1982), plaintiff, a Volkswagen dealer, alleged that shortly after it obtained a Ford dealership in

27   May 1977, the defendant violated the antitrust laws.  Based on the plaintiff's May 1977

28   acquisition of the dealership, the defendant objected on relevance grounds to producing any

discovery predating January 1, 1977 relating to "the number of cars defendants had available for distribution, its method of allocation and its treatment of other dealers." *Id.* at 399.  The court rejected the defendant's relevance argument because it would have prevented the plaintiff from comparing the defendant's conduct for a period of time preceding the unlawful conduct with the unlawful conduct itself.  The court explained:  "[P]laintiff should be permitted to review information for a period preceding the creation of its dealership in order to present a full picture of defendant's conduct."  *Id.* at 398 (emphasis added); *see also New Park Entm't, L.L.C. v. Elec. Factory Concerts, Inc.*, 2000 WL 62315, at *2 ("The history of the defendants' activities will shed light upon their illegality"); *see also Quonset Real Estate*, 50 F.R.D. at 241 (permitting discovery going back years from "the earliest possible wrong").

To test Defendants' asserted pro-competitive justifications, Plaintiffs are entitled to evidence relating to the price level of ATM interchange fees (*i.e.*, historical prices, including any changes over time, and evidence reflecting how the Defendants made those pricing decisions).  This includes the participants in decisions regarding price, any analytical process for such decisions, how final decisions were made, and whether prices were set at and remained at supra-competitive levels.  This evidence will allow Plaintiffs to compare justification and effects over time, including, for example, the impact of changes in technology and changes in the industry.

Similarly, Plaintiffs seek discovery on the price of interchange fees over time.  Evidence that Defendants charged supra-competitive ATM interchange fees over any period of time would undermine their claim that they fix prices for pro-competitive reasons.  *See Freeman v. San Diego Ass'n of Realtors*, 322 F.2d  at 1144 (9th Cir. 2003) (noting that charging a fee "more than double the cost of the most efficient association" was evidence that the fee was fixed at a supra-competitive price); *Brennan*, 369 F. Supp. 2d at 1132 (plaintiffs are permitted to challenge the fixed nature of the interchange fee).

<blockquote>
<b>b.</b> <b><u>Plaintiffs Are Entitled To Discovery To The Present Time Because It Provides Evidence Relevant To Defendants' Proffered Pro-Competitive Justifications.</u></b>
</blockquote>

Certain Bank Defendants also refuse to search for and produce discovery since the time that they originally searched their files for responsive documents—approximately the summer of

2005 – through  December 31, 2006, while Concord refuses to produce information post 2004.[20]

*See, e.g.,* Appendix A (summary of issues that apply to each defendant) for Bank of America, Citibank, Wells Fargo, Wachovia, and Network Defendants.  Defendants seek to shield this material from discovery based on the agreements in regard to requests Plaintiffs issued in 2005 or on a specious assertion that it would be burdensome to re-search the files of custodians whose files were previously searched.  Plaintiffs never intended those agreements to bind them for the remainder of this litigation, particularly where Plaintiffs had no reason to anticipate that the case would at this stage be so far from resolution nearly three years after its commencement.  Moreover, much has changed since 2005 when Defendants say they searched for documents.  The Court has since ordered the parties to focus discovery on the alleged pro-competitive justifications for fixed interchange fees, and Plaintiffs have propounded their Fourth Set accordingly.  Any time limitations on discovery in the past should not apply automatically to new rounds of discovery conducted at the Court's direction.

Nevertheless, to address Defendants' concerns, Plaintiffs have proposed that Defendants need not produce any documents dated after December 31, 2006.  *See, e.g.*, April 6 letter from Bart Cohen and Joseph Saveri to Kirsten Daru and April 6, 2007 letter from Rachel Jones to Joseph Saveri and Bart Cohen (attached as Exhibits JJ and QQ, respectively, to the Saveri Decl.).  Plaintiffs are entitled to documents from 2006 because they will contain highly relevant information regarding the Defendants' purported pro-competitive justifications, including changes in the fees associated with ATM transactions, costs associated with these transactions, and other information regarding the relevant market, including recent advances in technology.  Recent competition to the ATM market in the form of alternative payment systems (*e.g.*, POS withdrawals) and their impact on volume, revenues, fees, and costs of ATM transactions are also highly relevant.[21]

---

[20] Defendants have also interposed a boilerplate assertion of burden and have failed to provide any sufficient additional factual basis beyond a conclusory assertion of the "disruption of business."  This is insufficient.  *See Caines v. City of New York*, No. 01 Civ. 7229 (RCC) (DFE) 2003 WL 151993, at *1 n.1. (S.D.N.Y. Jan. 21, 2003) (conclusory assertion of burden is "entitled to no weight whatsoever").

[21] Particularly pertinent is the structure of Star's operations in Canada, including its approach to interchange fees.  Indeed, the Network Defendants do not assert that these operations are

1    Defendants argument that discovery of current records will inconvenience currently

2    employees is also unavailing.  Absent any specific showing of undue burden, they should not be

3    permitted to withhold relevant evidence.

4                          c.        **Duty To Supplement**

5    Defendants' refusal to update their 2005 search for responsive documents is further

6    undercut by the Federal Rules of Civil Procedure requirement that a party has a "duty seasonably

7    to amend a prior response to an interrogatory, request for production, or request for admission if

8    the party learns that the response is in some material respect incomplete or incorrect and if the

9    additional or corrective information has not otherwise been made known to the other parties

10   during the discovery process or in writing." Fed. R. Civ. Proc. 26(1)(7).  This rule imposes a

11   general duty to supplement discovery responses.  *See Woods v. Kraft Foods, Inc.*, 2006 WL

12   2724096, at *7 (E.D. Cal. Sept. 22, 2006) (chastising party for trivializing his duty to seasonably

13   update his document production); *see also San Francisco Bay Area Rapid Transit District v.*

14   *Spencer*, 2007 WL 421336, at *4 (N.D. Cal. Feb. 5, 2007) (quoting Rule 26(e)); *John McClelland*

15   *& Assoc., Inc. v. Medical Action Indus., Inc.*, 2006 WL 3314630, at *2 (D. Kan. Nov. 13, 2006)

16   ("During discovery, parties are not required to continually request information from the opposing

17   party. Instead, the burden is on the opposing party to supplement its responses.").

18   Moreover, Defendants' obligation to supplement a document production is affirmative and

19   "continuing."  6 MOORE'S FEDERAL PRACTICE 3D ' 26.131[3] (Matthew Bender 3d Ed.); *see also*

20   *Battiste v. Virgin Islands Telephone Corp.*, 2006 WL 2589448, at *8 (D.V.I. Aug. 3, 2006)  ("The

21   documents had been requested since 2001 and [Defendant] had a continuing duty to supplement

22   Plaintiff's document production request since then.").  Once an employee's files are searched, the

23   duty to respond to discovery requests does not end:  "Rather, supplementation should be made at

24   appropriate intervals during the discovery period with special promptness as the trial date

25   approaches." *Id*. (citing the Advisory Committee Notes to Rule 26).  Defendants ignore this,

26   instead taking the position that they will not search for new information in files last searched

27

28   irrelevant.  Instead, they refuse to produce information because Star did not begin operating in
     Canada until 2006.  They should not be permitted to withhold information that may undermine,
     Defendants' current justifications, on the premise that it is itself too current.

1    nearly two years ago.[22]  Their claim seems to be that repeated searches are burdensome.  *See, e.g.,*

2    Appendix A (summary of issues that apply to each defendant) for Bank of America, Citibank,

3    Wells Fargo, Wachovia, and Network Defendants.  However, if this burden sufficed as a basis to

4    resist discovery, there would be no duty to supplement.

5              **4.       Defendants Must Produce Discovery Collected Since December 1, 2006
                          In Native Format As Required By The Amended Federal Rule**

6

7              Plaintiffs served their Fourth Set on January 8, 2007.  Pursuant to amended Federal Rule

8    of Civil Procedure 34(b), Plaintiffs specified that the responsive electronic documents be

9    produced in native format.[23]  The effective date of the published amendments is December 1,

10   2006.  The Supreme Court Order promulgating the recent amendment to the Federal Rules

11   provides that the amendments shall be applicable "insofar as just and practicable" to all pending

12   cases.  *See* United States Supreme Court, Order adopting Amendments to the Federal Rules of

13   Civil Procedure dated April 12, 2006, http://www.supremecourtus.gov/orders/courtorders/-

14   frcv06p.pdf.  Defendants contend that they can ignore the new Rules.  They refuse to produce

15   electronically stored information in native format, as it was maintained and used.  *See, e.g.,*

16   Appendix A (summary of issues that apply to each defendant); *see, e.g.* February 6, 2007 letter

17   from Eric Lyttle to Joseph Saveri and February 19, 2007 letter from Eric Lyttle to Michael Kane

18   (attached as Exhs. WW and YY, respectively, to the Saveri Decl.).  Instead, Defendants insist on

19   converting this information into a different form.  The converted form is more expensive and

20   more difficult to organize and search than native format, and fails to include all the information

21   embodied in the native format.  As Defendants are well aware, courts applying the new Federal

22   Rules have rejected these very arguments.  In *In re Payment Card Interchange Fee & Merchant*

23   *Discount Fee Litigation*, 2007 WL 121426 (E.D.N.Y. Jan. 12, 2007), a case including a number

24   of the same defendants as does this action, the court held that amended Rule 34(b) applies to

25   document requests served before the effective date of the amendment.  2007 WL 121426 at *3.  It

26   _____
     [22] This argument is lacking because, at most, it applies to documents for which Defendants have
27   previously searched, not documents which Defendants admit they must produce and for which
     they have not yet searched.
28   [23] The document request may "specify the form or forms in which electronically stored
     information is to be produced."  Fed. R. Civ. Proc. 34(b).

     PLAINTIFFS' MPA ISO MOTION TO COMPEL
     MASTER FILE NO. C04-2676 CRB

1   further required the production of electronically stored information in native format on the

2   grounds that a party responding to discovery requests cannot "elect to produce a 'reasonably

3   usable' form [of] electronic data rather than produce the information as kept in the ordinary

4   course of business" if doing so "removes or significantly degrades" the electronic search

5   capabilities of the native form of the document.  *Id*. at *4.  Thus, the court held that electronically

6   stored information, including email, should be produced in native format, and not in another form

7   of the producing party's choice.  *Id*.

8          Plaintiffs in this action have not asked Defendants to reformat or reproduce electronically-

9   stored information that they initially collected and formatted in the summer of 2005.  Plaintiffs

10  are willing to abide by the parties' November 2005 agreement regarding cost-sharing and

11  addressing certain protocols for documents dated up until December 1, 2006.  However, for

12  electronic documents dated after that time,[24] Plaintiffs request that they be produced in native

13  format as required by amended Rule 34(b).

14  **V.**    **CONCLUSION**

15         For the reasons stated above, Plaintiffs respectfully request that their motion to compel be

16  granted.

17  Dated: April 17, 2007                    Respectfully Submitted,

18                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

19

20                                           By:_____*/s/ Joseph R. Saveri*_____
                                                         Joseph R. Saveri

21
                                             Joseph R. Saveri (SBN 130064)
22                                           Hector D. Geribon (SBN 200410)
                                             Daniel E. Barenbaum (State Bar No. 209261)
23                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                             275 Battery Street, 30th Floor
24                                           San Francisco, CA  94111-3339
                                             (415) 956-1000
25

26

27

---

28  [24] Plaintiffs have asked Defendants to identify which materials were gathered in 2005, but
    Defendants refuse.  *See, e.g.*, Saveri Decl., Exh. J, at 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Merrill G. Davidoff (Admitted *Pro Hac Vice*)
Bart D. Cohen (Admitted *Pro Hac Vice*)
Michael J. Kane (Admitted *Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

*Co-Lead Counsel for Plaintiffs*

PLAINTIFFS' MPA ISO MOTION TO COMPEL
MASTER FILE NO. C04-2676 CRB

# APPENDIX A

| DEFENDANT | RELEVANT DISCOVERY ISSUE | LOCATION OF ARGUMENT IN BRIEF | LOCATION OF REQUESTS IN FOURTH SET |
|---|---|---|---|
| **BANK OF AMERICA** | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Bank Request Nos. 3-5,16-19, 21, 32, 33 |
| | Bilaterally Negotiated Interchange Fees | V(B)(2) | Bank Request No. 32 |
| | Information since prior search of files | V(B)(3)(b); V(B)(3)(c) | All Bank Requests for Custodians whose Files Previously Searched |
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |
| **JPMORGAN/BANK ONE** | Information Regarding Non-Star Networks | V(B)(1)(a) | Bank Request Nos. 3-4 (only as to fees other than ATM Interchange), 6-7, 14, 22, 33 |
| | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Bank Request Nos. 3-5, 7, 14, 16-19 21-22, 32, 33 |
| | Bilaterally Negotiated Interchange Fees | V(B)(2) | Bank Request No. 32 |
| | Documents Comparing to on-us ATM Transactions | V(B)(1)(d)(ii) | Bank Request No. 11 |
| | Information Regarding Government Investigations and Private Litigations | V(B)(1)(e) | Bank Request Nos. 17-19 |

- 1 -

| DEFENDANT | RELEVANT DISCOVERY ISSUE | LOCATION OF ARGUMENT IN BRIEF | LOCATION OF REQUESTS IN FOURTH SET |
|---|---|---|---|
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |
| **CITIBANK** | Information Regarding Non-Star Networks | V(B)(1)(a) | Bank Request Nos. 1-4, 6-7, 12, 21-22, 33 |
| | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Bank Request Nos. 3-5, 7, 14, 16-19 21-22, 33 |
| | Documents Comparing to on-us ATM Transactions | V(B)(1)(d)(ii) | Bank Request No. 11 |
| | Information Regarding Government Investigations and Private Litigations | V(B)(1)(e) | Bank Request Nos. 17-19 |
| | Information since prior search of files | V(B)(3)(b); V(B)(3)(c) | All Bank Requests for Custodians whose Files Previously Searched |
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |
| **SUNTRUST** | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |

| DEFENDANT | RELEVANT DISCOVERY ISSUE | LOCATION OF ARGUMENT IN BRIEF | LOCATION OF REQUESTS IN FOURTH SET |
|---|---|---|---|
| **WACHOVIA** | Information Regarding Non-Star Networks | V(B)(1)(a) | Bank Request Nos. 1-4, 6-7, 12, 21-22, 31-33 |
| | Documents Relating To ATM Transaction Revenue and Cost | V(B)(1)(c) | Bank Request Nos. 5, 24 |
| | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Bank Request Nos. 3-5, 7, 14, 16-19 21-22, 32, 33 |
| | Bilaterally Negotiated Interchange Fees | V(B)(2) | Bank Request No. 32 |
| | Documents Comparing to on-us ATM Transactions | V(B)(1)(d)(ii) | Bank Request No. 11 |
| | Information Regarding Government Investigations and Private Litigations | V(B)(1)(e) | Bank Request Nos. 17-19 |
| | Information since prior search of files | V(B)(3)(b); V(B)(3)(c) | All Bank Requests for Custodians whose Files Previously Searched |
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |
| **WELLS FARGO** | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Bank Request Nos. 3-5, 7, 14, 16, 19 21-22, 32, 33 |
| | Documents Comparing to on-us ATM Transactions | V(B)(1)(d)(ii) | Bank Request No. 11 |

- 3 -

| DEFENDANT | RELEVANT DISCOVERY ISSUE | LOCATION OF ARGUMENT IN BRIEF | LOCATION OF REQUESTS IN FOURTH SET |
|---|---|---|---|
| | Information Regarding Government Investigations and Private Litigations | V(B)(1)(e) | Bank Request Nos. 17-19 |
| | Information since prior search of files | V(B)(3)(b); V(B)(3)(c) | All Bank Requests for Custodians whose Files Previously Searched |
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Bank Requests |
| | | | |
| CONCORD/FIRST DATA | Documents Relating To Acquired and/or Merged | V(B)(1)(b) | Network Request Nos. 3, 4, 6, 7, 10-13, 15-18, 21-23, 29 |
| | Documents Relating To ATM Transaction Revenue and Cost | V(B)(1)(c) | Network Request No. 24 |
| | Documents Comparing to Point of Sale Transactions | V(B)(1)(d)(i) | Network Request Nos. 3-5, 7, 14, 16-19, 21-22, 30 |
| | Information Regarding ATM Networks in Foreign Countries | V(B)(1)(f) | Network Request No. 13 |
| | Historical Information From 1985-1995 | V(B)(3)(a) | Network Requests Nos. 3, 4, 6, 7, 10, 12, 13, 14, 21, 22-26, 28-30 |
| | Information since 2004 | V(B)(3)(b); V(B)(3)(c) | All Network Requests |
| | Information collected after December 1, 2006 in native format | V(B)(4) | All Network Requests |

614569.5