1  SONYA D. WINNER (SBN 200348)
   JAMES R. ATWOOD (SBN 044798)
2  TARA M. STEELEY (SBN 231775)
   COVINGTON & BURLING LLP
3  One Front Street, 35th Floor
   San Francisco, CA  94111
4  Telephone: (415) 591-6000
   Facsimile:  (415) 591-6091
5  swinner@cov.com

6  Attorneys for Defendant
   BANK OF AMERICA CORPORATION
7
   ROBERT S. STERN (SBN 68240)
8  W. STEPHEN SMITH (*pro hac vice*)
   GREGORY B. KOLTUN (SBN 130454)
9  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
10 Los Angeles, CA  90013-1024
   Telephone:  (213) 892-5200
11 Facsimile:  (213) 892-5454
   rstern@mofo.com
12
   Attorneys for Defendant
13 JPMORGAN CHASE BANK, N.A.,
   Successor-in-interest to BANK ONE, N.A.
14
   (*additional counsel and parties listed on signature page*)
15

16              UNITED STATES DISTRICT COURT

17        FOR THE NORTHERN DISTRICT OF CALIFORNIA

18              SAN FRANCISCO DIVISION

19
   In re ATM FEE ANTITRUST          Civil Case No.:  C04-2676 CRB
20 LITIGATION
                                    **MOTION AND MEMORANDUM IN
21                                  SUPPORT OF BANK DEFENDANTS'
                                    MOTION FOR SUMMARY JUDGMENT
                                    ON PLAINTIFFS' PER SE CLAIM**
22
   This Document Relates To:        Date:        October 5, 2007
23                                  Time:        10 a.m.
                                    Courtroom:   8
24      All Actions                 The Honorable Charles R. Breyer

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

TABLE OF RECORD MATERIALS .................................................................................... vi

NOTICE OF MOTION AND MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

II.     PROCEDURAL BACKGROUND ............................................................................... 3

III.    FACTUAL BACKGROUND ....................................................................................... 6

        A.      The Purpose and Function of an ATM Network ............................................... 6

        B.      The Differing Interests of Network Participants .............................................. 7

        C.      The Purpose of Network Rules, Including Rules on Interchange ..................... 9

        D.      Star's Background and Competitive Environment .......................................... 10

IV.     ARGUMENT .............................................................................................................. 12

        A.      The Determination of Whether a *Per Se* Analysis Applies Is an Issue
                of Law for the Court and Requires Assessment of Whether the
                Challenged Conduct Is, in Light of Judicial Experience, Plainly
                Anticompetitive. ............................................................................................. 12

        B.      The Setting of Star's Interchange Fee Has Little in Common with the
                Type of Price Fixing Normally Condemned as *Per Se* Illegal and Is
                Not "Plainly Anticompetitive." ...................................................................... 15

        C.      There Are Plausible Procompetitive Justifications for Setting a
                Network-Wide Default Interchange Fee............................................................ 19

                1.      A Network-Wide Default Interchange Fee Is an Essential Term
                        of the Integrated Agreement that Makes It Possible to Offer the
                        ATM Network's Product. ..................................................................... 20

                2.      Establishing the Interchange Fee at the Network Level
                        Promotes the Procompetitive Purposes of the Network. ....................... 22

                        a)      A Network Interchange Fee Balances the Conflicting
                                Interests of Network Members to Increase the Network's
                                Output. ...................................................................................... 22

                        b)      A Common Interchange Fee Enables the Network to
                                Compete Effectively with Other Networks. ............................... 23

                        c)      The Procompetitive Benefits of a Network Interchange
                                Fee Are Not Vitiated by Deployer Surcharging. ........................ 25

3.   Interchange Fees Could Not Be Set Through Bilateral Agreement Without Undermining the Procompetitive Benefits of the Network. ........................................................................ 26

a)   Bilateral Negotiations Are Not Feasible. ..................................... 26

b)   Bilateral Negotiations Would Undermine Universal Acceptance and Diminish Network Output. ............................... 28

D.   Plaintiffs' *Per Se* Claim Cannot Survive Based on a Theory that the Star Interchange Fee Should Be Set at Zero. ....................................................... 30

V.   CONCLUSION ........................................................................................................ 32

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................. 12

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982) ............................................................................................ 15, 17

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979) ................................................................ 12, 13, 16, 17, 27, 28

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ......................................................................................... 2, 32

*Betkerur v. Aultman Hospital Association*,
    78 F.3d 1079 (6th Cir. 1996) ................................................................................... 17

*Brennan v. Concord EFS, Inc.*,
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) ......................................................... passim

*Buffalo Broadcasting Co. v. America Society of Composers, Authors & Publishers*,
    744 F.2d 917 (2d Cir. 1984) ................................................................................... 27

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988) ................................................................................................ 23

*California Dental Association v. FTC*,
    526 U.S. 756 (1999) ..................................................................................... 13, 14, 15

*Chicago Prof'l Sports, Ltd. Partnership v. NBA*,
    95 F.3d 593 (7th Cir. 1996) ..................................................................................... 31

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) ....................................................................................... 12, 23, 29

*Craftsmen Limousine, Inc. v. Ford Motor Corp.*,
    363 F.3d 761 (8th Cir. 2004) ................................................................................... 14

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002) ..................................................................................... 25

*Freeman v. San Diego Association of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ................................................................................. 17

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    127 S. Ct. 2705 (2007) ......................................................................................... passim

*Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................ 19

*Mid-South Grizzlies v. NFL*,
    720 F.2d 772 (3d Cir. 1983) .................................................................................... 23

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ..................................................................................24

*National Bancard Corp. v. Visa U.S.A., Inc.*,
   596 F. Supp. 1231 (S.D. Fla. 1984),
   *aff'd*, 779 F.2d 592 (11th Cir. 1986) ...........................16, 17, 18, 20, 21

*Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*,
   472 U.S. at 294 (1985) ...........................................................................14, 15

*Paladin Associates v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003)..................................................................14

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*,
   259 F. Supp. 2d 992 (N.D. Cal. 2003)....................................................18

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributings*,
   637 F.2d 1376 (9th Cir. 1981)...........................................................14, 32

*Rothery Storage & Van Co. v. Atlas Van Lines*,
   792 F.2d 210 (D.C. Cir. 1986)..................................................................29

*Southtrust Corp. v. Plus System, Inc.*,
   913 F. Supp. 1517 (N.D. Ala. 1995) .......................................................18

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) ......................................................................13

*Sylvania Inc. v. Continental T.V., Inc.*,
   537 F.2d 980 (9th Cir. 1976), *aff'd*, 433 U.S. 36 (1977)......................15

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ..........................................................2, 13, 14, 15, 17

*United States v. Brown*,
   936 F.2d 1042 (9th Cir. 1991)..................................................................13

*United States v. Trenton Potteries Co.*,
   273 U.S. 392 (1927) ..................................................................................16

*United States v. Visa U.S.A., Inc.*,
   163 F. Supp. 322 (S.D.N.Y. 2001),
   *aff'd*, 344 F.2d 229, 238 (2d Cir. 2003)................................................18

*White Motor Co. v. United States*,
   372 U.S. 253 (1963) ..................................................................................13

*Worthen Bank & Trust Co. v. NationalBankAmericard Inc.*,
   485 F.2d 119 (8th Cir. 1973) ...................................................................18

## STATUTES

Fed. R. Civ. P. 56.......................................................................................1, 12

Sherman Act, 15 U.S.C. § 1.....................................................................*passim*

1

**MISCELLANEOUS**

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*,
      ¶ 1906d, ¶ 1903b (2d ed. 2003) ..............................................................................13, 27, 31

1

2

**TABLE OF RECORD MATERIALS**

3

| Source | Cited as |
|---|---|
| Declaration of Dennis F. Lynch in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Per Se Claim (August 3, 2007) | Lynch Dec. |
| Declaration of Richard L. Schmalensee (August 2, 2007) | Schmalensee Dec. |
| Declaration of Ronald V. Congemi in Support of Concord EFS, Inc.'s and First Data Corporation's Motion for Summary Judgment on Plaintiffs' *Per Se* Claim (August 2, 2007)* | Congemi Dec. |
| Declaration of Elizabeth Lynn in Support of Concord EFS, Inc.'s and First Data Corporation's Motion for Summary Judgment on Plaintiffs' *Per Se* Claim (August 2, 2007)* | Lynn Dec. |
| Declaration of Brian D. Wallach in Support of Concord EFS, Inc.'s and First Data Corporation's Motion for Summary Judgment on Plaintiffs' *Per Se* Claim (August 3, 2007)* | Wallach Dec. |
| Declaration of Jennifer Haag in Support of Motion for Summary Judgment on Plaintiffs' Per Se Claim (August 2, 2007) | BAC Dec. |
| Declaration of David C. Cohen in Support of Bank Defendants' Motion for Summary Judgment (July 27, 2007) | Chase Dec. |
| Declaration of Jeffrey Pearlberg (August 2, 2007) | Citibank Dec. |
| Declaration of Kerry Brashears in Support of Bank Defendants' Motion for Summary Judgment (August 1, 2007) | SunTrust Dec. |
| Declaration of Ralph A. Perry in Support of Bank Defendants' Motion for Summary Judgment on Plaintiffs' Per Se Claim (July 30, 2007) | Wachovia Dec. |
| Declaration of Edward M. Kadletz (August 2, 2007) | Wells Dec. |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* Filed separately with Concord EFS, Inc.'s Motion for Summary Judgment on Plaintiffs' *Per Se* Claim

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 5, 2007, at 10:00 a.m. in the

courtroom of the Honorable Charles R. Breyer, United States District Court for the Northern

District of California, San Francisco Division, 450 Golden Gate Ave., Courtroom 8, 19th Floor,

San Francisco, California, or at such date and time as the Court may otherwise direct,

Defendants Bank of America Corporation, Citibank, N.A., JPMorgan Chase Bank, N.A.,

SunTrust Bank, Inc., Wachovia Corporation, Wachovia Bank, N.A., Wells Fargo & Co., Wells

Fargo Bank, N.A., and Servus Financial Corporation (collectively, "Bank Defendants") will

move the Court for summary judgment on Plaintiffs' First Amended Complaint ("FAC").

The Bank Defendants seek summary judgment pursuant to Fed. R. Civ. P. 56 on

the grounds that the FAC does not challenge a naked, obviously anticompetitive restraint to

which the *per se* rule applies, and that there are plausible procompetitive justifications for

establishing a network-wide default interchange fee.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs claim that the interchange fee that members of the Star ATM network

pay to one another in connection with the clearance – or "interchange" – of transactions over the

network is *per se* unlawful.  Plaintiffs accordingly seek to apply in this case the most draconian

antitrust doctrine, which calls for the categorical condemnation of a business practice with

virtually no fact-specific consideration of its actual impact on competition.  In doing so,

plaintiffs seek to bar an internal fee that has been an integral part of ATM network operations

from the inception of the industry and that is employed by each of the dozens of ATM networks

operating in the United States today.  Not only are the network rules on interchange fees

essential – and thus universal – among such networks, but the payment of interchange fees

serves numerous procompetitive purposes, enhancing the efficiency and coverage of the

network.  The alternative –  bilateral negotiations on interchange fee terms among the thousands

of network members – is simply infeasible.

1    Over the course of the past year, the United States Supreme Court has issued a

2    series of rulings (all, notably, post-dating the denial of the Rule 12 motions in this case)

3    reconfirming that the *per se* rule applies in only very limited circumstances and that antitrust

4    liability requires a showing of true harm to competition.  *See Texaco Inc. v. Dagher*, 547 U.S. 1

5    (2006) (holding that the *per se* rule does not apply to the pricing decisions of a joint venture);

6    *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 127 S. Ct. 2705 (2007) (overruling prior

7    decisions authorizing application of *per se* rule to minimum resale price maintenance); *cf. Bell*

8    *Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) (rejecting, as insufficient to impose

9    enormous discovery burdens of an antitrust case, claim resting on conclusory allegations of

10   conduct that could simply represent normal competitive behavior).

11   Particularly in light of these recent rulings, it is now beyond dispute that the *per*

12   *se* rule applies only in cases involving conduct that, based on prior judicial experience, is so

13   plainly anticompetitive – so absolutely lacking in even plausible procompetitive justifications –

14   that it can be condemned without the in-depth consideration and balancing of competitive

15   impacts that is conducted in the standard antitrust rule-of-reason analysis.  That situation does

16   not exist here.

17   The setting of interchange fees by an ATM network is not the type of conduct

18   that judicial experience has shown to be virtually always anticompetitive; to the contrary, courts

19   have consistently considered internal network fees only under the antitrust rule of reason, and

20   have found them lawful under that standard.  This is hardly surprising, as ATM interchange fees

21   have for decades played an important role in an industry that has provided enormous

22   convenience to consumers and has enabled small banks with few branches to compete against

23   their large, multi-state rivals.  It is, to say the least, a giant leap even to suggest that a routine,

24   pervasive practice that has never been found unlawful by any court should now be considered

25   *per se* unlawful.

26   Moreover, there are many procompetitive justifications for an ATM network

27   interchange fee.  A default network interchange fee is necessary in order to retain the "universal

28   acceptance" principle that is critical to the functioning of the network.  Under that principle,

1    each ATM owner in the network must accept cards issued by each bank in the network.  But

2    before the owner of an ATM will agree to disburse cash to an ATM cardholder with whom it

3    has no relationship, it must be assured of the terms under which it will be repaid by the

4    cardholder's bank.  The interchange fee – the payment received by the ATM owner from the

5    card issuer for serving the issuer's customer – is one of those terms.  If network-wide rules did

6    not provide these terms, they necessarily would be left to bilateral negotiations among (in the

7    case of Star) 5,400 network members, and the failure of any pair of negotiators to reach

8    agreement would undermine the network's central element of universal acceptance.  This

9    alternative of bilateral negotiations among thousands of Star members simply is not feasible.

10   Without a common default interchange fee, therefore, it is highly questionable whether the Star

11   network could operate at all, at least with anything like its current scope.

12           The network-wide interchange fee also enables the Star network to address the

13   varied, and often competing, interests of its members and to provide incentives for both ATM

14   card issuers and ATM owners to participate in the network so as to expand its scope and make it

15   more useful to consumers, thereby increasing its output (the number of transactions over the

16   network).  In addition, the fee enhances competition by permitting the network to compete with

17   other ATM networks for members, volume, and transactions.

18           It is not sufficient, in their attempt to sustain their categorical attack on the

19   network-wide interchange fee, for plaintiffs simply to dispute the weight of some of these

20   justifications or to contend that, on balance, such justifications are outweighed by supposed

21   anticompetitive impacts of the challenged fee.  Any such argument would simply present a

22   question under the rule of reason.  For current purposes, the mere presence of plausible

23   procompetitive justifications removes this case from the *per se* realm and requires entry of

24   summary judgment for defendants.

25   **II.     PROCEDURAL BACKGROUND**

26           Plaintiffs' original complaint in this case was filed on July 2, 2004; their First

27   Amended Complaint ("FAC"), which was identical in all respects germane here, was filed May

28   25, 2005.  In the FAC, plaintiffs challenge a particular payment made between members of the

Star ATM network when one member (the ATM "owner" or "deployer") accepts at its ATM machine a card issued by another member (the "issuer") and disburses money to the issuer's customer.  In settling such a transaction – called a "foreign ATM transaction" (because the customer is using an ATM that is "foreign" to her own bank) – the issuer repays the deployer the amount disbursed to the customer, adding to that amount a small additional sum referred to as the "interchange fee."  The default amount of the interchange fee is established by network rule and is applicable to all withdrawal transactions routed over the network.  *See* FAC ¶¶ 1-2.

The FAC names, in addition to the current corporate owners of the Star network, six "bank defendants" that are alleged to have been former owners, as well as members, of Star.[1]  The FAC alleges that the Star ATM interchange fee was established by defendants in their capacities as owners and/or members of Star.  FAC ¶ 66.  The FAC further alleges that, with the advent of surcharging (separate charges by the deployer to the ATM cardholder), there is no longer any need for interchange fees, which accordingly have become *per se* unlawful under Section 1 of the Sherman Act.  FAC ¶¶ 69, 78.

Defendants moved to dismiss the complaint on the ground that it failed to allege a cognizable *per se* claim – the only antitrust claim asserted.[2]  Chief Judge Walker denied that motion.  His analysis was summarized in a subsequent order of this Court as follows:

> "The Court acknowledged Defendants' 'theoretical' arguments that the fixed interchange fee was necessary to the very existence of the ATM network and that the fixing of the fee was ancillary to the procompetitive joint venture.  But those arguments, the Court ruled, were not germane to a motion to dismiss.  Instead, they were 'intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.'  *What mattered, said the Court, was that Plaintiffs had alleged in their complaint that no procompetitive justification existed for the*

---

[1]     FAC ¶¶ 14-19.  Several of the named defendants are not currently members of the Star network; some are not even banks.  However, these issues are not material to this motion, which assumes (solely for purposes of argument) that all of the "bank defendants" are members of the network and participate in charging and receiving the fees at issue here.  References here and in the supporting declarations to particular entities by their common names (e.g., "Citibank," "Bank of America," etc.) leave these issues to one side for purposes of this motion.

[2]     *See* FAC ¶ 78.  At the hearing on the Rule 12 motions, plaintiffs confirmed that they intended to pursue only a *per se* theory of liability.  Jan. 26, 2005 Tr. at 12.

*price-fixing.*  Because it was required to accept that allegation as true, the Court denied the motion to dismiss."

Memo. and Order (Dkt. 360) at 2 (Nov. 30, 2006) (emphasis added and internal citations omitted).[3]

Shortly after the ruling on the motion to dismiss, Concord filed a motion for partial summary judgment, joined by the other defendants, on the ground that, as of February 2001, the Star network ceased to be owned by a group of banks but instead was operated by Concord as a proprietary network, and that after that date Star's members had no control over the Star interchange fee.  (Dkt. 150.)  At the hearing on Concord's motion, the Court invited new briefing on the impact on this case of the Supreme Court's decision in *Dagher*.

On November 30, 2006, the Court issued a Memorandum and Order that "terminated" Concord's motion and directed the parties to return their attention to the fundamental question of whether the *per se* rule applies to this case.  The Court observed that "if Defendants can set forth evidence to support plausible, procompetitive justifications for their agreement to fix the interchange fee," then the *per se* rule would not apply.  Mem. and Order at 5.  The Court accordingly directed the parties "to engage in any discovery to explore any plausible procompetitive justifications" for the agreement to fix the interchange fee – discovery that "need not be extensive" – following which the Court would consider a motion for summary judgment on that issue.  *Id.* at 6-7.[4]

_____

[3]      Chief Judge Walker expressly rejected any possible argument by plaintiffs that there could be no interchange fees at all on Star transactions –  *i.e.*, that the fee had to be set at zero.  *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005).  Any such claim, he observed, could not possibly state a claim under Section 1, which focuses on the *method* of setting a price (by agreement) rather than the *amount* of the resulting price.  *Id.*  He accordingly "proceed[ed] – as must plaintiffs to maintain a *per se* case – on the premise that a challenge to the 'fixed interchange fee' is a challenge not to the fee's existence but to the *fixed* nature of the fee; that is, plaintiffs challenge the fix*ing* of the interchange fee."  *Id.* at 1132 (emphasis in original).

[4]      The Court did not purport substantively to deny Concord's motion or to hold that there has been any ongoing "agreement" on the interchange fee following Concord's acquisition of Star.  Defendants accordingly read this portion of the Court's Memorandum and Order as requiring the parties to address the issue of plausible procompetitive justifications, accepting the continuing existence of an agreement *arguendo*.  In fact, no such agreement has existed since at least February 2001; for this separate and independent reason, Section 1 simply does not apply (continued…)

## III.   FACTUAL BACKGROUND

In the context of an ATM network, the term "interchange" refers to the settlement of a transaction between the issuer and the ATM owner, facilitated through the network.  Congemi Dec. ¶ 9.[5]   An ATM "interchange fee" is a fee paid by the issuer, through the network, to the deployer for the right to make the deployer's ATM available to the issuer's customer.  *Id.*[6]

### A.   The Purpose and Function of an ATM Network

ATMs provide consumers a service that was not available before their introduction:  quick and easy access to cash from a consumer's bank account, at any hour of every day.  Lynch Dec. ¶ 14.  Before ATM *networks* arose, the convenience offered by any individual bank was limited by that bank's ability to make the substantial investment needed to install and operate multiple ATMs.  Lynch Dec. ¶¶ 16- 17; Congemi Dec. ¶ 3.

The financial services industry in the United States has many thousands of commercial banks, thrifts, credit unions, and other types of depository institutions (collectively referred to herein as "banks").  Many of these banks are small, with limited geographical coverage, and have limited resources to invest in ATMs.  Lynch Dec. ¶ 12.  To provide geographically ubiquitous financial services to consumers in this highly fragmented market, the banking industry has traditionally relied upon cooperative arrangements, including ATM networks.  Through such networks, a customer of a small community bank in Truckee,

---

to this case from that date, regardless of whether the challenged fee has any procompetitive justifications.

[5]    A full identification of the declarations cited and relied upon in this Motion is supplied in the Table of Record Materials provided at p. vi.

[6]    There are other fees, not challenged by plaintiffs here, that may also be associated with an ATM transaction.  In most cases, the issuer pays a switch fee to the network for each transaction.  In addition, separate and apart from the network arrangements, the deployer may (but will not always) elect to charge a surcharge, in the amount of its own choosing, to the cardholder.  Also independently, the issuer may (but often does not) choose to charge a "foreign ATM fee" to the cardholder for performing the transaction at a "foreign" ATM instead of one supplied by the issuer bank.  *See* FAC ¶¶ 1-2; Congemi Dec. ¶ 12; Lynch ¶ 32; BAC Dec. ¶ 11; Chase Dec. ¶ 9; Citibank Dec. ¶ 10; SunTrust Dec. ¶ 10; Wells Dec. ¶ 13.

California, for example, can obtain seamless and ready access to cash from her account at an ATM in Florida at any time of the day or night.

ATM networks exist to make this broad access, and the resulting convenience to banking customers, possible.  Every ATM network (including Star) serves, at a minimum, one basic function:  to provide an operational and contractual structure that allows issuers to offer their customers the use of ATMs owned by other network participants.  Operationally, the network is the intermediary between the network participants and assumes responsibility for "switching" the transaction.[7]  The network also sets the contractual terms for the transaction.  In nearly all cases, the issuer and the deployer are contractual strangers.  For a network such as Star, with thousands of members, bilateral contracts between each pair of issuers and deployers is not practical.  So the network substitutes its rules for such direct contractual agreements.  Lynch Dec. ¶¶ 17, 49.

Plaintiffs concede the procompetitive benefits of an ATM network.  *See* FAC ¶ 54 ("the advantage in participating in an ATM Network is that a Bank's depositors are thereby able to use ATMs at many more locations than one Bank alone could support.").  Indeed, they agree that ATM network access is not just procompetitive, it has become essential for banks today:  "a bank must offer access to other banks' ATMs to provide its depositors with convenient access to their accounts."  *Id.*

## B.    The Differing Interests of Network Participants

In addition to the consumer, there are three participants in a foreign ATM transaction:  the issuer, the deployer, and the network, each of which has a markedly discrete set of interests.  Congemi Dec. ¶ 10; *see* Lynch Dec. ¶ 17.  The first group of Star members consists of the banks that issue ATM cards to their depository customers.  There is a wide variety of such

---

[7]    Switching refers to the routing of electronic messages from an ATM operator to the bank that issued the card that is used in a transaction.  In a typical network transaction, the ATM deployer sends a message to the network indicating that a cardholder has asked to withdraw cash.  The network sends the message to the card-issuing bank for authorization.  Once the network receives authorization, it then routes the message back to the deployer, which proceeds with the transaction.   Lynch Dec. ¶ 18.

1   issuers, which in turn often have very different business strategies and interests.  But for each of

2   them, the dominant motivation for membership in ATM networks is to make ATMs accessible

3   to that bank's own customers, so as to enhance the bank's ability to compete for depositors.

4   Schmalensee Dec. ¶ 12; Lynch Dec. ¶ 20; BAC Dec. ¶ 6; Chase Dec. ¶ 3; Citibank Dec. ¶ 4;

5   Wachovia Dec. ¶ 5; SunTrust Dec. ¶ 5; Wells Dec. ¶ 5.  The extensive ATM base that a network

6   provides represents a resource that would be economically impossible for any single bank to

7   offer.  Access to that resource benefits the customers of all card-issuing members but is

8   particularly beneficial to those of mid-sized and smaller bank participants, whose ability to

9   deploy ATMs lags far behind that of their large nationwide competitors.  Lynch Dec. ¶¶ 16-17;

10   *see* FAC ¶ 54.

11       Star also has thousands of deployer participants.  In the early years of ATM

12   networks, virtually all deployers were banks, and many network participants today are still both

13   issuers and deployers.[8]  However, in recent years there has been a rise in the number of ATMs

14   deployed by entities that are not financial institutions.  Lynn Dec. ¶ 9; Lynch Dec. ¶ 33.  These

15   include so-called "independent sales organizations" ("ISOs") that own and deploy ATMs but do

16   not have any depositors and do not issue ATM cards.  Lynn Dec. ¶ 7.  Indeed, the second-largest

17   ATM operator in the Star network is an ISO.  *Id.* ¶ 9.  There also are many small ISOs with only

18   a handful of ATMs.  *Id.*  The principal interest of ISOs is to maximize the revenues that can be

19   gained from usage of their ATMs by the cardholder customers of other network participants.

20   Lynch Dec. ¶ 35; Schmalensee Dec. ¶ 13.

21       The third participant in a network transaction is the ATM network itself.  The

22   network facilitates the completion of ATM transactions between members and establishes the

23   conditions under which those transactions will take place.  The network receives its revenues

24   primarily through per-transaction switch fees; its principal focus is therefore on maximizing the

25

26   [8]       Lynch Dec. ¶¶ 15-16.  Most card-issuer banks of any significant size have at least some

27   ATMs.  However, many smaller financial institutions do not invest in ATMs, and even some
    larger banks have elected to rely heavily on network membership in lieu of substantial

28   investment in ATMs of their own.  *Id.* ¶ 16.

1   number of transactions conducted over its system.  Congemi Dec. ¶ 20; Lynch Dec. ¶ 44.  There

2   are two general forms in which ATM networks are organized.  In the first form, which was the

3   one most commonly adopted in the early days of ATM networks, the network is owned by its

4   members, or by some group of members.  Star was, until February 2001, a member-owned

5   network.  The other type of network is a proprietary network, which is owned and operated by a

6   single entity.  Since February 2001, Star has been a proprietary network owned by Concord.

7   Congemi Dec. ¶ 7; *see* Lynch Dec. ¶¶ 20, 38.

8         **C.**     **The Purpose of Network Rules, Including Rules on Interchange**

9         The terms of participation in Star and the responsibilities of each participant –

10  including the terms of the interchange function – are established through Star's Network

11  Operating Rules ("Rules").  Each participant agrees as a condition of participating in the

12  network to be bound by the Rules.  Congemi Dec. ¶¶ 11-12; *see* Wallach Dec. Ex. I.  The Rules

13  cover not only the principles for interchange of the tens of millions of transactions handled

14  annually by Star, but also such matters as signage, record retention, technical requirements for

15  ATMs, required minimum service offerings, minimum hours of availability, branding of ATM

16  cards issued and ATMs deployed by participating members, liability for fraudulent transactions,

17  card embossing, and performance standards.  In establishing these rules, the network considers

18  their economic consequences to each of its participants and seeks to balance them in a way that

19  enhances network participation by both issuers and deployers.  Lynn Dec. ¶ 5; Lynch Dec.

20  ¶¶ 24-25; *see also* Schmalensee Dec. ¶¶ 15, 26-27.

21        The most critical interchange principles in the Rules are those of universal

22  acceptance and guaranteed reimbursement.  Under the first, the issuer is guaranteed that every

23  ATM nationwide that displays the Star logo will accept its cards.  Under the second, the

24  deployer is guaranteed that it can safely accept every ATM card with a Star logo and disburse

25  money to the issuer's customer with an assurance of repayment.  Congemi Dec. ¶ 15; Lynch

26  Dec. ¶¶ 26-28.  In order to provide these guarantees, the Rules must address the terms under

27  which the deployer will be repaid, including *when* and *how much*.  The Rules could simply

28  provide for repayment of the exact amount disbursed to the cardholder.  Or the Rules could

1   provide for repayment with either a mark-up or a discount, with the deployer receiving either

2   slightly more or slightly less than the amount disbursed.  This mark-up or discount is commonly

3   referred to as an "interchange fee."  Schmalensee Dec. ¶¶ 22-23; Lynch Dec. ¶¶ 26-27.

4   The Star Rules provide for a positive interchange fee flowing to the deployer.[9]

5   This fee, paid by the card issuer through the network, is designed to compensate the ATM

6   owner for making its ATMs available to the issuer's customers, and to provide an incentive for

7   the deployer to incur the costs and risks of deployment.  Schmalensee Dec. ¶ 20; Lynn Dec. ¶ 6.

8   The heaviest net recipients of interchange fees are the ISOs, which pay no interchange fees and

9   only receive them.  Most card issuers – including nearly all of the bank defendants in this case

10  for virtually the entire class period – are "net issuers," *i.e.* they pay more in interchange fees

11  than they receive.  Lynn Dec. ¶¶ 10, 12; *see* BAC Dec. ¶ 10; Chase Dec. ¶ 8; Citibank Dec. ¶ 9;

12  Wachovia Dec. ¶ 9; Wells Dec. ¶ 12.

13  The Star network is not alone in its use of a common default interchange fee.

14  Throughout Star's existence – and continuing up through today – virtually all of the dozens of

15  ATM networks in this country have had rules providing for the payment of a positive default

16  interchange fee from the issuer to the deployer.  Lynch Dec. ¶¶ 29, 40;  Schmalensee Dec. ¶¶ 4,

17  20.

18              **D.    Star's Background and Competitive Environment**

19  At the time Star was created in 1984, ATMs were already a common

20  phenomenon throughout the United States, including in California.  Congemi Dec. ¶ 5.  But

21  there was no regional network in California, where the ATM environment was instead

22  ────────────────────

[9]    The amounts of the interchange fees established by the Rules are presumptive only; members are not prohibited from negotiating separate fee arrangements on a bilateral basis.  *See* Wallach Dec. Ex. 10.  Star has two levels of interchange fee, one for ATMs located on the premises of a network member, and another, higher fee for off-premises ATMs.  *Id*; Lynn Dec. ¶ 7.  This difference reflects the different economic considerations affecting deployers of the two types of ATMs.  On-premises ATMs are virtually all owned by card-issuing banks that deploy the machines at their branches, in large part for use by their own customers.  Card issuers may also deploy off-premises ATMs (which are typically more expensive to operate) in addition to those at their branches, but off-premises ATMs are the only machines deployed by ISOs. Lynn Dec. ¶ 7; *see* Lynch Dec. ¶ 33.

1    characterized by large state-wide proprietary ATM fleets owned by banks such as Bank of

2    America, Security Pacific, First Interstate Bank, and Wells Fargo.  For the smaller banks,

3    savings and loans, and credit unions that had to compete for consumer deposit accounts against

4    the large banks with their own proprietary ATM fleets, a shared regional network was essential.

5    A number of such smaller institutions in California therefore formed Star.  *Id.*  Over time, larger

6    banks joined the network, and it expanded from its California roots to cover a broader region of

7    the country.  *Id.* ¶ 6.

8            Through the late 1990's, Star continued to be a member-owned network,

9    supervised by a board of directors elected by member financial institutions, including (at various

10   points in time) representatives of the bank defendants in this case.  Most of the members of that

11   board were net issuers; ISOs were not represented on the Star board.  Congemi Dec. ¶ 6; Lynn

12   Dec. ¶¶ 7 n.1, 12.  Star was acquired by Concord on February 1, 2001.  From that point on, Star

13   has been operated and controlled exclusively by Concord.  Congemi Dec. ¶ 7.  Star now has

14   over 5,400 members, with 315,000 ATMs throughout the United States.  *Id.* ¶ 8; Lynn Dec. ¶ 4.

15           The ATM network industry is diverse and highly competitive, including at least

16   two national networks with larger memberships than Star and dozens of regional networks.

17   Congemi Dec. ¶ 13; Schmalensee Dec. ¶¶ 17-19, Lynch Dec. ¶¶ 38-46.  The competitive

18   success of an ATM network depends critically on the volume of transactions it processes.  ATM

19   networks therefore compete with each other for participants, and through those participants for

20   (1) greater geographic coverage and density of ATM deployment; (2) a larger number of

21   cardholders; and (3) more extensive use of the network for transaction processing.  Lynch Dec.

22   ¶ 22.[10]  Network competition has many dimensions, including standards, brand marketing, and

23   fees.  The interchange fee, in particular, must be set at a level that provides appropriate

24   incentives for both ATM deployers and card issuers to join the network.  If a network's

25

26   _____

     [10]      Many financial institutions and ISOs participate in multiple networks and retain
27   flexibility to vary the number of transactions they direct to each network.  Congemi Dec. ¶ 24;
     Lynch Dec. ¶ 43.  A network must therefore compete not just for members but also for the
28   transaction volume of its existing members.

1    interchange fees are not set at competitive levels, it will lose participants to other networks.

2    Lynch Dec. ¶ 39; Congemi Dec. ¶ 14; Schmalensee Dec. ¶ 46.

3    **IV.     ARGUMENT**

4                    As moving parties, defendants have the burden of showing, on the undisputed

5    material facts, that they are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56;

6    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Importantly, however, this Rule 56

7    formulation must be applied in the context of the legal theory at issue.  Here, the FAC alleges

8    that collective action by defendants to adopt a uniform interchange fee for Star ATM

9    transactions is illegal *per se*.  This presents a question of law, and plaintiffs cannot defeat

10   summary judgment simply by asserting that there are factual disputes as to whether the

11   procompetitive effects of the challenged conduct outweigh its asserted anticompetitive effects.

12   If anything, any such disputes *reinforce* the legal conclusion that this is not, and cannot be, a *per*

13   *se* case.

14          **A.     The Determination of Whether a *Per Se* Analysis Applies Is an Issue of Law
                     for the Court and Requires Assessment of Whether the Challenged Conduct**
15                   **Is, in Light of Judicial Experience, Plainly Anticompetitive.**

16                   Sherman Act § 1 claims are presumptively judged under the rule of reason, under

17   which a fact-intensive analysis is performed to determine whether a practice has actual

18   anticompetitive impacts and, if so, whether those impacts are outweighed by its procompetitive

19   benefits.  *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49-50 (1977).  This analysis

20   requires the court to consider "specific information about the relevant business" and "the

21   restraint's history, nature and effect."  *Leegin*, 127 S. Ct. at 2712.  The *per se* rule, in contrast, is

22   a highly truncated form of analysis that is applied to business conduct that has "manifestly

23   anticompetitive effects and lack[s] any redeeming virtue."  *Id.* at 2713 (citations omitted).

24   Applying the *per se* rule, such conduct is "conclusively presumed illegal without further

25   examination under the rule of reason."  *Broadcast Music, Inc. v. Columbia Broadcasting*

26   *System, Inc.,* 441 U.S. 1, 8 (1979) ("*BMI*").

27                   Because overly broad application of the *per se* rule can sweep in conduct that

28   actually benefits competition, the Supreme Court has emphasized that "[it] is only after

1    considerable experience with certain business relationships that courts classify them as *per se*

2    violations." *Id.* at 9 (citation omitted). *Per se* analysis is therefore reserved for a narrow

3    category of activities "that are so plainly anticompetitive that no elaborate study of the industry

4    is needed to establish their illegality." *Texaco v. Dagher*, 126 S. Ct. at 1279 (citation and

5    quotations omitted).

6            "Whether a plaintiff's alleged facts comprise a *per se* claim is normally a

7    question of legal characterization that can often be resolved by the judge on a motion to dismiss

8    or for summary judgment." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,

9    373 F.3d 57, 61 (1st Cir. 2004); *see also United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir.

10   1991) (decision of the district court to apply the *per se* rule was a question of law); 11 Phillip E.

11   Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b (2d ed. 2005) (although a court's

12   determination that the *per se* rule applies "might involve many fact questions, the selection of a

13   mode [of analysis] is entirely a question of law"). The question whether the challenged conduct

14   falls within the narrow *per se* realm is by necessity an issue of law for the Court because *per se*

15   rules derive from judicial experience and the embodiment of that experience in precedent – not

16   from fact issues within the province of the jury. *Id.*[11]

17           Because the *per se* rule applies only if it is obvious that a challenged practice

18   "has no purpose except stifling competition," *White Motor Co. v. United States*, 372 U.S. 253,

19   263 (1963), all the Court need determine to reject a *per se* claim is that the effects of the practice

20   on competition are potentially ambiguous and not plainly anticompetitive. If any such

21   ambiguity exists, *per se* analysis is inappropriate as a matter of law. *Id.*; *see also California*

22   *Dental*, 526 U.S. at 759 (rejecting *per se* treatment where anticompetitive effects of challenged

23   practice were not "intuitively obvious"). The Ninth Circuit made the same point in affirming

24   _____

25   [11]     Any associated policy issues are similarly for the Court to assess, even if those issues
     involve factual and economic analysis. *See, e.g.*, *Leegin*, 127 S. Ct. at 2714-16 (discussing

26   economic and policy issues associated with resale price maintenance); *Cal. Dental Ass'n v.*
     *FTC*, 526 U.S. 756, 771-78 (1999) (discussing the potential competitive effects of restrictions

27   on dental advertising); *BMI*, 441 U.S. at 21-24 (discussing the potential competitive effects of
     blanket music license that "developed … out of the practical situation in the marketplace").

28

summary judgment for the defendants in *Paladin Assoc's v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003):

> "When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate …. This is so because plausible arguments that a practice is procompetitive make us unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.'"

*Id*. at 1155 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)).[12]

Evidence that a challenged restraint has anticompetitive effects is *not* sufficient to salvage a *per se* claim on summary judgment. Such evidence would be relevant only to a rule of reason claim; in determining whether the challenged conduct is unlawful *per se*, questions of actual market impact are not even to be *considered.* For example, in *Texaco Inc. v. Dagher*, the Supreme Court reversed the Ninth Circuit and upheld the district court's grant of summary judgment for defendants on a *per se* claim, even though there were disputes as to whether the challenged conduct had anticompetitive effects. The Court held that, as a matter of law, the conduct under challenge – price fixing for a joint venture's product – did not fall in the *per se* category, and, if the plaintiffs felt that the pricing practice was anticompetitive, then they "should have challenged it pursuant to the rule of reason." 126 S. Ct. at 1280. Similarly, in *Northwest Wholesale Stationers*, the Court approved a grant of summary judgment on a *per se* theory while recognizing that "a more detailed factual picture of market structure" might support a rule-of-reason claim. 472 U.S. at 297-98.

Thus, the Court need not address at this stage whether Star's default ATM interchange has, on balance, procompetitive or anticompetitive effects. The issue is much

---

[12]     *See also Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs.*, 637 F.2d 1376, 1388 (9th Cir. 1981) (upholding summary judgment where the challenged conduct "cannot be said to be so plainly anticompetitive as to justify resort to a *per se* rule"); *Craftsmen Limousine, Inc. v. Ford Motor Corp.*, 363 F.3d 761, 774 (8th Cir. 2004) (if a restraint is "arguably rooted" on a legitimate justification, "this should remove the alleged agreement from the *per se* rule's realm"); s*ee generally Cal. Dental Ass'n*, 526 U.S. at 775 ("As a matter of economics [respondent's] view may or may not correct, but it is not implausible, and neither a court nor the Commission may initially dismiss it as presumptively wrong.").

1    narrower:  Is the common default interchange fee so obviously anticompetitive that it should be

2    condemned *per se*, or is it *potentially* either procompetitive or competitively neutral?  Even if

3    plaintiffs claim that the overall competitive effects of the challenged conduct are harmful, such

4    factual disputes are – for purposes of the present motion – immaterial, because those are

5    precisely the issues that should be resolved under the rule of reason.  *See Arizona v. Maricopa*

6    *County Med. Soc'y,* 457 U.S. 332, 343 (1982).[13]

7            **B.    The Setting of Star's Interchange Fee Has Little in Common with the Type**
             **of Price Fixing Normally Condemned as *Per Se* Illegal and Is Not "Plainly**
8            **Anticompetitive."**

9            Section C below demonstrates that the setting of a common default ATM

10   interchange fee is supported by plausible – indeed, compelling – procompetitive justifications.

11   This section, however, makes an even more basic point:  This case simply does not involve the

12   kind of naked, obviously anticompetitive restraint to which the *per se* rule applies.

13           The Supreme Court's recent decisions in *Leegin* and *Dagher* make clear that

14   agreements as to "price" are not inherently suspect, much less automatically subject to *per se*

15   condemnation.  Certain types of "naked" price-fixing have been found to be subject to the *per se*

16   rule.  But plaintiffs cannot invoke *per se* treatment simply by labeling the Star interchange fee as

17   "price fixing."  The *per se* rule applies only to "price fixing *in the antitrust sense.*"  *Dagher,* 126

18   _____

19   [13]        Again, *California Dental* is instructive:

20           "The point is not that the CDA's restrictions necessarily have the
             pro-competitive effect claimed by the CDA....  And it is also of
21           course possible that the restrictions might in the final analysis be
             anticompetitive.  The point, rather, is that the plausibility of
22           competing claims about the effects of the professional advertising
             restrictions rules out the indulgently abbreviated review to which
23           the Commission's order was treated.  The obvious anticompetitive
             effect that triggers abbreviated analysis has not been shown."

24   526 U.S. at 778.  *See also Northwest Wholesale Stationers*, 472 U.S. at 294 (if activities are
     "justified by plausible arguments that they were intended to enhance overall efficiency and
25   make markets more competitive," *per se* treatment is inappropriate); *Sylvania Inc. v.*
     *Continental T.V., Inc.,* 537 F.2d 980, 1000 (9th Cir. 1976) (*en banc*) ("Harsh and inflexible *per*
26   *se* rules should be applied when, and only when, a court has made a threshold examination of
     the economic effects of the challenged practice and has determined that it is clear that the
27   practice to be declared illegal *per se* has had a 'pernicious effect on competition' and a 'lack of
     any redeeming virtue.'") (citations omitted), *aff'd,* 433 U.S. 36 (1977) .

28

1   S. Ct. at 1280 (emphasis added).[14]  It has long been held *per se* illegal for a group of

2   competitors to agree to sell their individual goods to consumers at uniform prices.  *See, e.g.*,

3   *United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927).  Such a cartel is condemned *per se*

4   because it almost always decreases output or reduces competition in order to increase price.

5   *Leegin*, 127 S. Ct. at 2713.  In these cartel-type cases, one side of the market (typically,

6   producers) has, by agreement, ganged up against the other side (typically, consumers) to impose

7   higher prices.  That is price-fixing "in the antitrust sense."

8       No such arrangement exists here.  Plaintiffs do not claim that defendants have

9   agreed to fix the level of any fees that they charge to consumers.  Instead, the fee that is

10  supposedly "fixed" here is the fee that the bank defendants *charge each other* (and other Star

11  members) for providing interchange services *to each other* in the context of the service they

12  provide jointly through the Star network.  A few basic undisputed facts readily distinguish this

13  from the type of "price fixing" that is subject to *per se* treatment.

14      *First*, the interchange function that is the subject of the "price" at issue here is a

15  central feature of legitimate joint economic activity, in this case that of an ATM payment

16  network.  The legitimacy of the Star network itself is not in dispute.  As Chief Judge Walker

17  observed, "the complaint effectively concedes that Star is a joint venture that benefits

18  consumers and fosters competition among issuing banks by allowing smaller banks that cannot

19  afford to deploy a large number of ATMs nonetheless to compete with larger banks that do own

20  many ATMs."  *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1129-30 (N.D. Cal. 2005).

21  The very function of an ATM network is to facilitate "foreign" ATM transactions, which in turn

22  requires the *interchange* of monetary obligations between network members.  Schmalensee Dec.

23  ¶¶ 14, 22.  The challenged "price" here is simply the fee paid by issuers to deployers for

24  ─────────────────────

25  [14]     *See also BMI*, 444 U.S. at 9 ("When two partners set the price of their goods or services, they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act.");

26  *Leegin*, 127 S. Ct. at 2713 (whether to apply a *per se* rule is not a matter of "formalistic line drawing" bur rather must be based on "demonstrated economic effects"); *National Bancard*

27  *Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 599 (11th Cir. 1986) ("*NaBanco*") ("[W]hile some price fixing is *per se* illegal, other arrangements that literally fix prices are judged under the rule

28  of reason").

1    providing the issuers' customers access to the deployers' ATMs.  *Id.*  As the Supreme Court

2    said in *Dagher*, "it would be inconsistent with this Court's antitrust precedents to condemn the

3    internal pricing decisions of a legitimate joint venture as *per se* unlawful."  126 U.S. at 1280

4    (footnote omitted).  Rather, the Supreme Court held, if the plaintiffs wished to assert an antitrust

5    challenge to an arrangement of this kind, they "should have challenged it pursuant to the rule of

6    reason."  *Id.* (footnote omitted).[15]

7            *Second*, there is no judicial experience finding network-wide interchange fees to

8    be plainly anticompetitive.  As discussed above, "the *per se* rule is appropriate only after courts

9    have had considerable experience with the type of restraint at issue."  *Leegin*, 127 S. Ct. at

10   2713.[16]  Interchange fees of payment networks have been common in the economy for decades,

11   and they have never been found *per se* illegal.  To the contrary, there are multiple judicial

12   precedents on interchange fees and other internal arrangements of payment networks, and those

13   precedents uniformly reject *per se* treatment for such arrangements.  Indeed, courts that have

14   evaluated such arrangements under the rule of reason have typically found them to be lawful.

15           For example, in *NaBanco*, both the district court and the Eleventh Circuit not

16   only rejected a *per se* attack on Visa's collective credit card interchange fee, but held those fees

17   to be procompetitive and lawful under the rule of reason.  *National Bancard Corp. v. Visa*

18   _____

19   [15]     In denying the motion to dismiss in this case, Chief Judge Walker relied on the Ninth
     Circuit's now-overruled *Dagher* decision and on *Freeman v. San Diego Ass'n of Realtors*, 322

20   F.3d 1133 (9th Cir. 2003), in holding that a question existed as to whether the default
     interchange fee was "reasonably ancillary" to the procompetitive objectives of the network.  369

21   F. Supp. 2d at 1131-35.  The Supreme Court's *Dagher* decision established a different standard,
     holding that internal pricing decisions of a joint venture may be challenged only under the rule

22   of reason and that the ancillary restraints doctrine is relevant only in evaluating *nonventure*
     activities.  126 S. Ct. at 1280-81.  The record here shows indisputably that interchange is a core

23   activity of the joint venture, not a "nonventure" activity.  *See* Schmalensee Dec. ¶ 2, 4, 21-24,
     26-52.  *Freeman* is readily distinguishable. There, the defendants' decision to fix fees for

24   services that they provided individually, outside their joint venture, was neither a legitimate
     joint venture function nor in any way related to the legitimate purpose for which the venture was

25   created.  It was, instead, simply a naked agreement that eliminated competition between the
     venturers with respect to that separate function. 322 F.3d at 1140.

26   [16]     *See also BMI*, 441 U.S. at 9; *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 351
     n. 19 (1982) (*per se* treatment not justified "until the judiciary obtains considerable rule-of-

27   reason experience with the particular type of restraint challenged"); *Betkerur v. Aultman Hosp.

28   Ass'n*, 78 F.3d 1079, 1089 (6th Cir. 1996) (same).

1   *U.S.A., Inc.*, 596 F. Supp. 1231, 1252-56 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592, 598-603 (11th

2   Cir. 1986).  After carefully analyzing the function and impact of the interchange fee, the

3   *NaBanco* court found it to be supported by important procompetitive justifications, including its

4   role in promoting universal acceptance and permitting the network to function efficiently.

5   Indeed, the court concluded, the interchange fee represented a "'necessary' term, without which

6   the system would not function."  779 F.2d at 602.

7           The *NaBanco* court gave considerable weight to the fact that the interchange fee

8   was an internal fee between two "mutually dependent" members of a joint enterprise (*i.e.*, the

9   network).  *Id.* at 603 (observing that "the cardholder cannot use his card unless the merchant

10  accepts it and the merchant cannot accept the card unless the cardholder uses one").  Thus, in

11  contrast to a classic cartel arrangement in which participants impose agreed-upon prices on

12  consumers, interchange fees are an integral part of a complex web of "internal" arrangements

13  upon which the network's operations are based.  *See id.* at 602-03.  Having found the *per se* rule

14  inapplicable, the *NaBanco* court went on to analyze Visa's interchange fee under the rule of

15  reason and found it to be, on balance, procompetitive and lawful.  *Id.* at 604-05.

16          Other courts similarly have rejected application of the *per se* rule to the internal

17  arrangements of a payment network.  In *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.,* 259 F.

18  Supp. 2d 992, 1000 (N.D. Cal. 2003), Judge White, relying upon *NaBanco*, rejected application

19  of the *per se* rule to credit card interchange fees.  Similarly, in *Southtrust Corp. v. Plus System,*

20  *Inc.*, 913 F. Supp. 1517 (N.D. Ala. 1995), the court held the *per se* rule inapplicable to a

21  challenge to an ATM network's no-surcharge rule and then went on to find the restraint

22  procompetitive under the rule of reason.  In *United States v. Visa U.S.A., Inc.*, the Justice

23  Department agreed the rule of reason should apply to its challenge to network rules.  163 F.

24  Supp. 322, 343 (S.D.N.Y. 2001), *aff'd*, 344 F.2d 229, 238 (2d Cir. 2003).  *Cf. Worthen Bank &*

25  *Trust Co. v. NationalBankAmericard Inc.*, 485 F.2d 119 (8th Cir. 1973) (rejecting *per se* attack

26  on membership bylaw of bank credit card network).

27

28

1    Thus, far from there being an established body of judicial experience finding

2 interchange fees to be anticompetitive price-fixing "in the antitrust sense," the courts that have

3 previously addressed the issue have consistently found precisely the opposite.

4    *Third,* there is no logic in a claim that the defendant banks would have

5 established Star's ATM interchange fee for an anticompetitive purpose.  The defendant banks –

6 the entities accused of "fixing" this price – pay more in interchange fees than they receive.  It is

7 illogical to assume that the "conspirators" had an incentive to increase prices that would have

8 increased their own costs above the competitive level.  Schmalensee Dec. ¶ 61.[17]  If in fact

9 interchange fees were excessively high, the obvious beneficiaries were not the alleged members

10 of the conspiracy, but rather other Star participants that were net deployers, such as the ISOs,

11 which did not participate in the management of Star and are not alleged to be co-conspirators.

12 *Id.* ¶¶ 58-61; Lynn Dec. ¶ 7 n. 1.

13    Even in a rule-of-reason case, a plaintiff bears a heavy burden to establish the

14 illegality of an alleged antitrust conspiracy that is inherently implausible.  *Matsushita Elec.*

15 *Indus. Co., LTD. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (summary judgment

16 appropriate on antitrust conspiracy claim that was inherently implausible in light of defendants'

17 economic self-interest).  Where such implausibility exists, it follows that anticompetitive

18 impacts are surely not "obvious," and the *per se* rule cannot be applied.

19    **C.    There Are Plausible Procompetitive Justifications for Setting a Network-
         Wide Default Interchange Fee.**

20    Plaintiffs' *per se* claim fails as a matter of law for the separate and independent

21 reason that there are numerous plausible procompetitive justifications for Star's interchange fee

22 rule.

23

24

25 ────────────────────────

26 [17]    Plaintiffs seek to plug this logical gap by suggesting that the defendant banks purposely increased their own costs (by increasing interchange fees) so that they could benefit from passing those costs on to cardholders.  FAC ¶ 68.   But if the defendant banks had the ability to
27 increase their foreign ATM fees to cardholders, they would have been better off imposing those increases *without* simultaneously increasing their own costs.

28

**1.    A Network-Wide Default Interchange Fee Is an Essential Term of the Integrated Agreement that Makes It Possible to Offer the ATM Network's Product.**

An individual ATM network transaction is, by definition, a cooperative, interdependent product created by the card-issuing bank and the ATM owner within the overarching structure of the network.  That interdependence is a definitional characteristic of every network ATM transaction.  Schmalensee Dec. ¶ 26; *see NaBanco*, 779 F.2d at 603.  Given the need for cooperation, there must be an understanding between the issuer and the deployer as to the terms on which they agree to engage in transactions with each other, *i.e.*, interchange.  After all, the deployer is being asked to disburse cash to someone with whom it has no depository or other contractual relationship.

If the "network" consisted of only two banks, their understanding about the terms of the transaction would be set forth in a contract worked out in advance between them.  But the value of a network like Star lies in the fact that it has many members, in this case over 5,400.  Schmalensee Dec. ¶¶ 20, 29; Lynch ¶ 54; *see Brennan*, 369 F. Supp. 2d at 1129 ("an ATM network derives value from the participation of a large number of issuing banks and ATM owners").  In order for the network to function effectively, it must have a way to achieve agreement among all of these members so that any given transaction can be conducted seamlessly and without inconvenience to the consumer.  Star (like all other ATM networks) establishes this agreement on a network-wide basis through its Rules.  Congemi Dec. ¶ 11; Lynch Dec. ¶¶ 23-25.

Interchange is what makes it possible to offer the network's product, ATM services, to consumers.  Schmalensee Dec. ¶ 2.  And the interchange fee rule is integral to that interchange activity.  Absent an interchange fee rule, there would be no fee term in the contract among issuers and deployers governing the right of the former to offer their customers the use of the latter's ATMs.  *Id.*  Thus, the courts have recognized that the interchange fee is a critical term in the set of integrated rules that governs an interchanged transaction.  As the court found in *NaBanco*, "for a payment system like VISA to function, rules must govern the interchange of the cardholder's receivable.  The [interchange fee] represents one such rule establishing a

1    'necessary' term, without which the system would not function." 779 F.2d at 602 (footnote

2    omitted).

3            The *NaBanco* court particularly emphasized the critical connection between the

4    network-wide interchange fee and the principle of universal acceptance:

5            "The [interchange fee] is a mechanism by which VISA ensures
             the universality of its card, not a price fixing device to squeeze out
6            entrepreneurs…. [U]niversality of acceptance – the key element to
             a national payment system – could not be guaranteed absent
7            prearranged interchange rules.  Consequently, the restraint is 'a
             necessary consequence of the integration necessary to achieve
8            these efficiencies.' …  As such, it must be weighed under the rule
             of reason."

9

10   *Id.* (quoting *BMI*, 441 U.S. at 21).

11           Universal acceptance – the consumer's certainty that his or her card issued by a

12   member bank will be honored by all ATMs that carry the network's logo – is equally critical to

13   an ATM network, including Star.  Schmalensee Dec. ¶ 33; Congemi Dec. ¶ 15.   No rational

14   bank would participate in a network in which its cardholders could not rely on their bank's

15   network membership to ensure access to cash at any network location.  Lynch Dec ¶¶ 27-28; *see*

16   BAC Dec. ¶ 7; Chase Dec. ¶ 4; Citibank Dec. ¶ 5; Wachovia Dec. ¶ 7; SunTrust Dec. ¶ 7; Wells

17   Dec. ¶ 7.  Thus, the viability of the network depends on its ability to ensure universal

18   acceptance.  Congemi Dec ¶ 17; Schmalensee Dec ¶ 33; Lynch Dec. ¶ 27.

19           Universal acceptance, in turn, requires that members of the network agree in

20   advance that they will do business with each and every other member of the network.  However,

21   neither card issuers nor ATM deployers will agree to a universal acceptance rule unless they

22   know in advance the critical terms of the network transactions that they then will be obligated to

23   fulfill.  Among those terms is the amount, if any, that must be paid by the card issuer to the

24   deployer for accepting the ATM cards of the issuer's customers.  Lynch Dec ¶¶ 26-27; *see* BAC

25   Dec. ¶ 8; Chase Dec. ¶ 5; Citibank Dec. ¶ 6; SunTrust Dec. ¶ 8; Wachovia Dec. ¶ 8; Wells Dec.

26   ¶ 8.  An ATM owner must know, for example, if, upon disbursing $100 to another bank's

27   customer, it is guaranteed payment of $100, $95, $101, or some other amount.  Without advance

28

agreement on this point, the network participants would not commit to universal acceptance, and without that commitment, there could be no network.

### 2. Establishing the Interchange Fee at the Network Level Promotes the Procompetitive Purposes of the Network.

In addition to its importance in ensuring universal acceptance within the network, a common interchange fee serves the procompetitive justifications of increasing the number of transactions across the network and enabling Star to compete with other ATM networks.

#### a) A Network Interchange Fee Balances the Conflicting Interests of Network Members to Increase the Network's Output.

The core benefit of an ATM network to consumers is enhanced when the network expands both the number of ATMs belonging to the network and the number of card issuers whose customers use the network. A common default interchange fee helps achieve this procompetitive goal by enabling the network to offer economic incentives that induce both card issuers and ATM owners to participate in the network. Schmalensee Dec. ¶¶ 45-46, 59; Congemi Dec. ¶ 14.

The Star network has a diverse membership. It has members that issue cards but own no ATMs, members that own ATMs but issue no cards, and members that both issue cards and deploy ATMs. Congemi Dec. ¶ 18. The interest of a given network participant in the level of the interchange fee depends on its business model. For example, the second-largest ATM owner in the country is an ISO with more than 9,000 ATMs. It has no ATM cardholders and therefore only receives (and never pays) interchange fees. Lynch Dec. ¶¶ 33, 35; *see also* Lynn Dec. ¶¶ 9-10. It would therefore be interested in a higher interchange fee. At the other end of the spectrum are financial institutions that issue ATM cards to their customers and do not deploy ATMs (and therefore pay but never receive interchange fees). Examples of such members include small community banks, as well as "virtual banks" that interface with their customers via the internet but do not have any physical branches. Lynn Dec. ¶ 11. These members naturally would prefer lower interchange fees.

Between these two ends of the spectrum are many financial institutions that both issue cards and deploy ATMs. There is a wide divergence of interests even within this group.

1   Nearly all of the bank defendants in this action, for example, have been "net issuers" for

2   virtually the entire class period, meaning that they pay more (often substantially more) in

3   interchange fees than they receive.  Lynn Dec. ¶ 12; BAC Dec. ¶ 10; Chase Dec. ¶ 8; Citibank

4   Dec. ¶ 9; Wachovia Dec. ¶ 9; Wells Dec. ¶ 12.   But there are other financial institution

5   members that both pay and receive interchange fees and, on balance, receive more than they

6   pay.  Lynn Dec. ¶ 12.

7           The network seeks to establish interchange fees that balance the divergent

8   interests of its members in seeking to promote the scope of the network.  Because the network

9   earns its revenues primarily from transaction-based switch fees, output (measured in network

10  transactions) is vital to the network.  The network accordingly seeks to set interchange fees at

11  levels sufficient to encourage broad deployment of ATMs without unduly discouraging

12  participation by the card issuers whose customers use the network to perform transactions.  This

13  use of interchange to enhance output benefits consumers as well as the network, and is therefore

14  procompetitive.  Congemi Dec. ¶ 20; Schmalensee Dec. ¶ 46, 51-54, 56, 58-60.

15          **b)     A Common Interchange Fee Enables the Network to Compete
                     Effectively with Other Networks.**

16

17          Network interchange fees also serve the procompetitive purpose of promoting

    competition among ATM networks – that is, of promoting "inter-brand" competition, which is

18  "the primary concern of the antitrust laws…."  *Business Electronics Corp. v. Sharp Electronics*

19  *Corp.*, 485 U.S. 717, 726 (1988).  *See also Leegin*, 127 S. Ct. at 2715 (citing promotion of inter-

20  brand competition as reason for rejecting *per se* treatment of vertical price restraints);

21  *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52-59 (1977) (rejecting application of

22  *per se* rule to vertical non-price restraints, because such restraints could promote inter-brand

23  competition); *Mid-South Grizzlies v. NFL*, 720 F.2d 772, 786-88 (3d Cir. 1983) (recognizing

24  promotion of competition between professional sports leagues as a justification for restraint on

25  competition between members of single league).  The ability to control the level of interchange

26  fees allows the Star network to shape its product, to use interchange levels as a tool in attracting

27  an appropriate balance of issuers and ATM owners, and to plan intelligently in response to

28  competitive and other market pressures.  A network that did not have the ability to set network-

1   wide default interchange fees would be at a serious competitive disadvantage as compared to

2   other networks.  Congemi Dec. ¶ 21; Lynch Dec. ¶ 48; Schmalensee Dec. ¶¶ 46, 51-54, 56.

3          The ability to set a network-wide interchange fee is an important tool for

4   networks to compete in attracting deployers and issuers.  A network that has a relative shortage

5   of ATMs may elect to raise interchange fees to attract more ATMs to the network.  Conversely,

6   a network that has sufficient ATM coverage but lacks an adequate cardholder base could choose

7   to lower interchange fees in an effort to bring cardholders to the network.  Lynch Dec. ¶¶ 29, 36,

8   39-40.  Star has used interchange fee levels in precisely this manner.  For example, Star has

9   since its inception had a higher default ATM interchange fee for transactions conducted at "off-

10  premises" ATMs, which are the only ATMs operated by ISOs.  Congemi Dec. ¶ 21.  This is

11  designed specifically to attract off-premises deployers and to encourage deployment of off-

12  premises machines by existing members.  *Id.*  Other ATM networks have used interchange fees

13  in a similar manner.  Lynch Dec. ¶ 36.

14         Interchange fee levels are a significant point of comparison among the various

15  major ATM networks and are followed closely by issuers and deployers alike.  Congemi Dec.

16  ¶ 14; BAC Dec. ¶ 5; Chase Dec. ¶ 6; Citibank Dec. ¶ 7; SunTrust Dec. ¶ 6; Wachovia Dec. ¶ 6;

17  Wells Dec. ¶ 9; Lynch Dec. ¶¶ 40-44; Schmalensee Dec. ¶¶ 53-56.  If joint venture networks

18  were not able to establish interchange fees, such networks (and their members) would be at a

19  competitive disadvantage compared to proprietary networks.[18]  ISOs, for example, receive a

20  significant percentage of their revenue from interchange fees but do not pay them.  Lynch Dec.

21  ¶¶ 50-51.  If Star were unable to offer an interchange fee, a rational ISO would affiliate instead

22  with a proprietary network that provided that revenue stream.  *Id*; Schmalensee Dec. ¶¶ 45, 52.

23  Thus, Star's ability to compete with such networks would have suffered if it had not had the

24

25  [18]      As single firms, proprietary networks would not face antitrust restrictions on their ability
    to set interchange fees.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)
26  ("Independent action is not proscribed" by Section 1 of the Sherman Act.).  In fact, Star is itself
    a proprietary network, and so its own interchange fee should not, under current arrangements, be
27  subject to Sherman Act challenge for that reason alone.  As discussed in note 4 above, however,
    that point is set to one side for purposes of this motion.
28

ability to establish and adjust interchange fee levels.  Nor does it make any economic sense that the form of ownership of the two networks, which provide precisely the same product to consumers, should dictate which succeeds and which fails.  Schmalensee Dec. ¶¶ 59-60.

### c)   The Procompetitive Benefits of a Network Interchange Fee Are Not Vitiated by Deployer Surcharging.

Plaintiffs allege "the widespread adoption of Surcharges has eliminated any purported justification for Interchange Fees."  FAC ¶ 67.[19]  The "widespread adoption of surcharges," however, did not eliminate any of the procompetitive justifications underlying a common interchange fee discussed above.  For example, even where deployers can obtain compensation separately through surcharges, there is no less need for network members to agree on the terms on which network transactions will take place, including the interchange fee.  (*See* Section IV.C.1 above.)  In an environment with surcharges, network-set interchange also continues to serve the important functions of promoting inter-network competition and of permitting the network to take account of the varying interests of network members in seeking to enhance output.  Schmalensee Dec. ¶¶ 46, 51-52, 56.

Moreover, interchange fees allow networks and their members to pursue competitive options, favorable to consumers, that would not exist without interchange fees.  For instance, optional no-surcharge alliances have become increasingly prominent in the market in recent years.  Lynn Dec. ¶ 21.  These alliances benefit smaller banks and their customers by enabling the banks to compete on more equal terms with their larger rivals that own more ATMs.  Because interchange fees provide the only compensation for ATM deployers in a surcharge-free network, *id.*, such alliances would not be viable if the law prohibited a common interchange fee.  *See* Schmalensee Dec. ¶ 50.  Thus, interchange fees enhance competition by making possible an alternative for consumers that would not exist without them.  *See Fraser v.*

---

[19]   A "surcharge" is a charge that an ATM owner assesses upon a cardholder using its ATM (as opposed to the interchange fee, which is paid by the issuing bank).  Prior to 1996, many ATM networks prohibited ATM surcharges, and the revenue stream realized by most ATM deployers was restricted to interchange fees.  Beginning in the mid-1990s, network surcharge bans were lifted.  However, despite these rule changes, some financial institutions still did not surcharge, and many elect not to do so even today.  Lynch Dec. ¶¶ 32-34.

*Major League Soccer, L.L.C.*, 284 F.3d 47, 59 (1st Cir. 2002) ("Without the restrictions, MLS might not exist, or, if it did, might have larger initial losses and a shorter life.  This would hardly enhance competition.").

Finally, it is significant that, with the advent of surcharging after 1996, not a single ATM network in the United States abandoned the practice of network-wide interchange fees.  Interchange fee terms were maintained, not only by joint-venture networks such as Star, but also by proprietary networks whose revenue base was solely from switch fees and who had no incentive to maintain interchange fees if they served no useful purpose.  This historical fact supports the conclusion that interchange fees continued to serve important procompetitive purposes even when surcharging is an option.  Lynch Dec. ¶ 36; Schmalensee Dec. ¶¶ 4, 20, 60.

### 3. Interchange Fees Could Not Be Set Through Bilateral Agreement Without Undermining the Procompetitive Benefits of the Network.

If the Star network were legally prohibited from setting a common interchange fee, then all network members would be left to negotiate interchange fees on a bilateral basis.  As Judge Walker observed, any viable antitrust claim in this case must be based on a challenge, not to the *amount* of the interchange fee, but rather to the process through which it is established – "the fix*ing* of the interchange fee."  *Brennan*, 369 F. Supp. 2d at 1132.  Plaintiffs' claim must therefore offer a hypothetical alternative system that would "permit competitive (e.g., bilateral) negotiation of interchange fees among issuing banks and ATM owners."  *Id*.   Any such system would have debilitating effects on the network, would reduce ATM network competition and consumer ATM options, and hence would diminish consumer welfare.

### a) Bilateral Negotiations Are Not Feasible.

Given the sheer size of the Star network, it is simply not practical for it to rely wholly on a system of bilateral negotiations among its members.  If each combination of Star's 5,400 members were left to negotiate bilateral agreements on the interchange fee, approximately 14.6 million separate bilateral agreements would be needed to ensure the requisite universality.  *See* Schmalensee Dec. ¶ 29.  Even if it were physically possible to create such a massive collection of individual agreements, the inefficiencies associated with doing so would be immense.  Just the time and expense associated with negotiating so many agreements – even

leaving aside subsequent costs in administering such a system – would be prohibitive.  *Id.*

Because of the obvious infeasibility of bilateral negotiations in a network of any significant

scale, it is not surprising that every major ATM network in the United States relies upon a

common default interchange fee in lieu of bilateral negotiations.  Lynch Dec. ¶ 54.

The Supreme Court has recognized the procompetitive justifications for a

common fee in a similar context.  In *BMI*, the Court considered whether BMI committed a *per

se* violation of Section 1 of the Sherman Act by offering blanket licenses with a common

licensing fee for the musical works of thousands of composers.  *See BMI*, 441 U.S. at 4-6.  To

apply the *per se* rule to the issuance of blanket licenses, the Court stated, would ignore "the

practical situation in the marketplace: thousands of users, thousands of copyright owners, and

millions of compositions. Most users want unplanned, rapid, and indemnified access to any and

all of the repertory of compositions, and the owners want a reliable method of collecting for the

use of their copyrights."  *Id.* at 20.  In that situation, the Court explained:

> "A middleman with a blanket license was an obvious necessity if
> the thousands of individual negotiations, a virtual impossibility,
> were to be avoided. Also, individual fees for the use of individual
> compositions would presuppose an intricate schedule of fees and
> uses, as well as a difficult and expensive reporting problem for the
> user and policing task for the copyright owner."

*Id.*  Thus, the Court rejected application of the *per se* rule, holding that "the blanket license is

not a 'naked [restraint] of trade with no purpose except stifling of competition ….'"  *Id.*

(*quoting White Motor Co. v. United States*, 372 U.S. at 263).[20]  Here, too, Star serves as a

---

[20]    *See also Buffalo Broad. Co. v. Am. Soc'y of Composers, Authors & Publishers*, 744 F.2d
917, 932 (2d Cir. 1984) ("[A blanket] licensing system may be 'necessary' in the practical sense
that it is far superior to other alternatives in efficiency and thereby achieves substantial savings
of resources to the likely benefit of ultimate consumers, who usually end up paying whenever
efficient practices are replaced with inefficient ones."); 11 Areeda & Hovenkamp, *Antitrust Law*
¶ 1906d ("The result [in *BMI*] is that while (a) the restraint literally involved a sort of 'price
fixing,' (b) the output impact was overwhelmingly positive.  The latter followed because the
transaction costs of the blanket licensing arrangement were undoubtedly many dozens of times
lower than the transaction costs of individual negotiation for performance rights between single
licensors and prospective individual licensees such as radio stations.").

1   "middleman" that creates efficiencies and avoids the time and expense associated with

2   negotiating thousands – or millions – of bilateral agreements.[21]

### b)   Bilateral Negotiations Would Undermine Universal Acceptance and Diminish Network Output.

As discussed above, the principle of universal acceptance is fundamental to an ATM network.  A network such as Star, with thousands of members, could not achieve universal acceptance if it were forced to depend on bilateral negotiations, because it is unrealistic to expect that all 5,400 members could reach agreement with one another – or would even try to do so.

The interests of the network members diverge substantially, making it a certainty that many network participants would fail to reach agreement with all other network participants.  Indeed, requiring bilateral agreements between competitors in a cooperative venture such as an ATM network would have the *anti*-competitive effect of promoting a member's individual interest in maximizing its revenue (or minimizing costs) over the collective interest in expanding network access, output, and efficiency.  Absent a system-wide default interchange fee, any member in a bilateral system would have the ability to block admission of a new member simply by refusing to reach a bilateral agreement.  Schmalensee Dec. ¶ 30.

Consider, for example, the bargaining position of a large conventional bank ("Bank X") in a hypothetical bilateral negotiation with a new Internet bank ("I-Bank") that has no ATMs of its own.  It is in the collective interest of the network (and consumers generally) to attract I-Bank's participation and customer base.  In a bilateral negotiation with I-Bank, however, Bank X has little incentive to promote the business interests of an upstart competitor that could pose a long-term risk to its customer base.  Bank X could effectively block I-Bank's

---

[21]   The Star network resembles the arrangements at issue in *BMI* in other important respects as well.  Like the BMI and ASCAP consortiums at issue there, the Star network creates a new product – foreign ATM transactions – that would not exist in its absence.  At the same time, the network does not *eliminate* any products or competitive options that would exist in its absence.  Network members remain free, for example, to enter into bilateral agreements to establish different interchange terms if they wish to do so.  *See BMI*, 441 U.S. at 24 (pointing to ability of performers to negotiate individual licenses).

1   entry to the network by demanding a prohibitive interchange fee, or simply by refusing to

2   negotiate at all.  *Id.* ¶¶ 31, 35; Lynch Dec. ¶ 48.  This is the type of self-interested, opportunistic

3   behavior that cooperative ventures are entitled to prevent.  *See Rothery Storage & Van Co. v.*

4   *Atlas Van Lines,* 792 F.2d 210, 221-22 (D.C. Cir. 1986) (rules in cooperative venture intended

5   to avoid "free rider" effects, including taking unfair advantage of van line's "clearinghouse

6   service for the settlement of accounts among its affiliates"); *accord Continental T. V. v. GTE*

7   *Sylvania*, 433 U.S. at 55 ("Because of … the so-called 'free rider' effect, these services might

8   not be provided by retailers in a purely competitive situation, despite the fact that each retailer's

9   benefit would be greater if all provided the services than if none did.").

10              In the near-certain event that bilateral agreements did not result in complete

11   agreement among the network members, the network would face two choices.  The network

12   could attempt to survive without universal acceptance.  However, that would come with all of

13   the shortcomings discussed above, including customer uncertainty and inconvenience.  The

14   upshot would be the departure of card-issuing members seeking better service for their

15   customers (and then of deployers seeking a network with a broader base of issuers).

16   Schmalensee Dec. ¶¶ 31-33, 38; Lynch Dec. ¶ 28.  In the alternative, the network could expel

17   each member that did not reach agreement with every other member.  The result would be a

18   much smaller network consisting of only those members that managed to reach agreement with

19   all others.  That would deprive the network of one of its principal procompetitive benefits – its

20   breadth of coverage.  Lynch Dec. ¶ 49; Schmalensee Dec. ¶¶ 36-37.

21              Under the latter scenario, the divergent interests and unequal bargaining power of

22   network members in a bilateral system would have the likely effect of forcing many small

23   banks, credit unions, and small ATM deployers out of the network.  Even in the absence of

24   opportunistic behavior of the type discussed above, large banks with established ATM fleets

25   would have little incentive to invest the resources required to negotiate with multiple small

26   banks and ISOs, each of which contributes relatively little volume to the network.  If the large

27   institutions did agree to pursue bilateral arrangements with small entities, they likely would do

28   so only by offering the small banks or deployers contract terms substantially less favorable than

1  the "even playing field terms" they obtain under the current network rules.  This, along with the

2  increase in transaction costs, would force many smaller entities from the network.  Lynch Dec.

3  ¶ 49; Schmalensee Dec. ¶¶ 30-31, 38, 43.

4           But it is not only smaller participants who would leave the network.  Given the

5  availability of competing ATM networks, the increased costs and inefficiencies created by

6  mandating a bilateral regime would likely lead to the defection of nearly all financial institutions

7  with other options.  Lynch Dec ¶ 49; *see* BAC Dec. ¶ 9; Chase Dec. ¶ 7; Citibank Dec. ¶ 8;

8  SunTrust Dec. ¶ 9; Wachovia Dec. ¶ 10; Wells Dec. ¶ 11.[22]  Under this scenario, the Star

9  network could not reasonably hope to survive in anything like its current form or to serve

10 consumers in anything resembling the way it does today.

11      **D.**      **Plaintiffs' *Per Se* Claim Cannot Survive Based on a Theory that the Star**
              **Interchange Fee Should Be Set at Zero.**

12          Recognizing that it is not feasible to leave interchange fees to bilateral

13 negotiations, plaintiffs make the argument, already rejected by Chief Judge Walker, that

14 interchange fees should simply be eliminated.   As discussed above, there exist multiple

15 plausible – indeed, compelling – justifications for the existence of a positive network-wide

16 interchange fee.  Such a fee serves important procompetitive purposes in maximizing network

17 membership and output and in enabling Star to compete with other networks.

18          But even apart from these procompetitive justifications, any argument that the

19 Court should mandate elimination of ATM interchange fees suffers from a more fundamental

20 problem – it does not, and cannot, represent a legally cognizable antitrust claim.  As Chief Judge

21 Walker correctly held, arguing that interchange fees should be eliminated is the same as arguing

22 that the interchange fee should be "set at zero."  And that is not an antitrust claim.  369 F. Supp.

---

[22]     Such options would include membership in competing proprietary networks.
Alternatively, large banks might rely upon their own ATM fleets to deliver ATM access, form
limited alliances with other large institutions that bypassed a network entirely, or participate in
fewer networks, lessening inter-network competition.  Lynch Dec. ¶¶ 49, 55; Schmalensee Dec.
¶¶ 38-39.

1   2d at 1131-32; *Chicago Prof'l Sports, Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996)

2   ("*Bulls II*").

3           Plaintiffs assert that interchange fees are now *per se* illegal because ATM

4   deployers can charge consumers directly through surcharges.  Because surcharges make

5   interchange fees "unnecessary," plaintiffs contend, the Star Network should abolish interchange

6   fees by requiring that issuers pay only the amount their customers withdraw from an ATM,

7   prohibiting deployers from demanding any additional compensation from issuers.  *See* FAC

8   ¶ 67.  Thus, according to plaintiffs, Star should, in effect, mandate that its members clear

9   transactions at precisely the amount disbursed, *i.e.*, with an interchange fee of zero.

10          As Chief Judge Walker observed, any such argument necessarily concedes that

11  Star should mandate a single system-wide interchange fee.  In fact, what plaintiffs seek differs

12  from the status quo only in that they are asking this Court to impose – by judicial fiat – a zero

13  interchange fee, while the Star Network has decided that an interchange fee of 46 or 54 cents is

14  better for the operation of the network and its members.  This is not an antitrust claim.  If the

15  current system – a default of 46 cents, with the ability to negotiate a different amount bilaterally

16  – represented price-fixing, then a mandated network fee of zero would surely be price-fixing as

17  well.

18          The antitrust laws are not price regulation statutes, and courts applying the

19  antitrust laws cannot determine whether a fee is set at the correct amount.  *Bulls II*,  95 F.3d at

20  597 (noting that "the antitrust laws do not deputize district judges as one-man regulatory

21  agencies" and "[a] high price is not itself a violation of the Sherman Act."); *Brennan*, 369 F.

22  Supp. 2d at 1132 (explaining that plaintiffs' argument that interchange fees should be abolished

23  "is not an antitrust argument at all, for it amounts to a dispute over prices and competition law is

24  not concerned with setting a proper price."); 11 Areeda & Hovenkamp, *Antitrust Law,* at ¶

25  1903b ("'Regulatory' antitrust decrees are inimical to the general goal of the antitrust laws,

26  which is to create a competitive environment in which the market itself rather than a

27  government agency or tribunal directs a firm's production decisions.").

28

1    The antitrust laws do not *require* Star to fix the interchange fee at any level,

2  including zero.  Plaintiffs accordingly cannot, as a matter of law, prevail on a claim that

3  challenges as *per se* unlawful Star's failure to mandate that there be no interchange fee.

4  **V.    CONCLUSION**

5    "[T]he very nature of antitrust litigation should encourage summary disposition

6  of such cases when permissible."  *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs.*,, 637 F.2d

7  1376, 1381 (9th Cir. 1981) (citation omitted).  As this Court recently observed, "[p]articularly in

8  antitrust litigation, the long drawn out process of discovery can be both harassing and

9  expensive."  Order of June 26, 2007 (Dkt. 411) (citation omitted); *see also Twombly*, 127 S. Ct.

10  at 1966-67 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance

11  of discovery, but quite another to forget that proceeding to antitrust discovery can be

12  expensive.") (citation omitted); *Leegin*, 127 S. Ct. at 2718 (warning that loose application of *per

13  se* rules "may increase litigation costs by promoting frivolous suits against legitimate

14  practices").  This case has already generated substantial discovery and expense in pursuit of a

15  novel theory of antitrust liability that plainly has no merit.  Summary judgment is now

16  appropriate.

17                                Respectfully submitted,

18

19  Dated:  August 3, 2007                    /s/
                                    SONYA D. WINNER
20                                  JAMES R. ATWOOD
                                    TARA M. STEELEY
21                                  COVINGTON & BURLING LLP
                                    One Front Street, 35th Floor
22                                  San Francisco, CA 94111
                                    Telephone:  (415) 591-6000
23                                  Facsimile:  (415) 591-6091

24                                  Attorneys for Defendant BANK OF
                                    AMERICA CORPORATION

25  Dated:  August 3, 2007                    /s/
                                    ROBERT S. STERN
26                                  W. STEPHEN SMITH
                                    GREGORY B. KOLTUN
27                                  MORRISON & FOERSTER LLP
                                    555 West Fifth Street, Suite 3500
28                                  Los Angeles, CA  90013-1024
                                    Telephone:  (213) 892-5200

1          Facsimile:  (213) 892-5454

2          Attorneys for Defendant
           JPMORGAN CHASE BANK, N.A.,
3          Successor-in-interest to BANK ONE, N.A.

4

5
           Dated:  August_3, 2007          _____/s/_____
6                                          JAMES C. EGAN, JR.
                                           CARRIE M. ANDERSON
7                                          WEIL, GOTSHAL & MANGES LLP
                                           1300 Eye Street, N.W., Suite 900
8                                          Washington, D.C.  20005
                                           Telephone:  (202) 682-7000
9                                          Facsimile:  (202) 857-0940

10                                         Attorneys for Defendant CITIBANK, N.A.,
                                           Successor-by-merger to CITIBANK (WEST), FSB
11

12

13
           Dated:  August 3, 2007          _____/s/_____
14                                         STEPHEN V. BOMSE
                                           RACHEL M. JONES
15                                         ADAM J. GROMFIN
                                           HELLER EHRMAN LLP
16                                         333 Bush Street
                                           San Francisco, CA  94104
17                                         Telephone: (415) 772-6000
                                           Facsimile:  (415) 772-6268
18

19                                         Attorneys for Defendant SUNTRUST BANKS, INC.

20

21
           Dated:  August 3, 2007          _____/s/_____
22                                         JACK R. NELSON
                                           KIRSTEN J. DARU
23                                         REED SMITH LLP
                                           Two Embarcadero Center, Suite 2000
24                                         San Francisco, CA  94111
                                           Telephone:  (415) 543-8700
25                                         Facsimile:  (415) 391-8269

26                                         Attorneys for Defendants WACHOVIA
                                           CORPORATION and WACHOVIA BANK, NA
27

28

Dated:  August 3, 2007                    _____/s/_____
                                          DANIEL M. WALL
                                          JOSHUA N. HOLIAN
                                          LATHAM & WATKINS
                                          505 Montgomery Street, Suite 1900
                                          San Francisco, CA  94111
                                          Telephone:  (415) 391-0600
                                          Facsimile:  (415) 395-8095

                                          DONALD I. BAKER
                                          BAKER & MILLER
                                          2401 Pennsylvania Avenue, N.W., Suite 300
                                          Washington, D.C.  20037
                                          Telephone:  (202) 663-7820
                                          Facsimile:  (202) 663-7849

                                          Attorneys for Defendants
                                          WELLS FARGO & CO.,
                                          WELLS FARGO BANK, N.A.
                                          and SERVUS FINANCIAL CORP.

1

**SIGNATURE ATTESTATION**

2

I hereby attest that I have written permission to file the Motion and

3

Memorandum in Support of Bank Defendants' Motion for Summary Judgment on Plaintiffs' Per

4

Se Claim on behalf of each party whose signature is indicated by a "conformed" signature (/s/)

5

within this efiled document.

6

7

   Dated:  August 3, 2007                                _____/s/_____

8

                                           TARA M. STEELEY
                                         COVINGTON & BURLING LLP

9

                                         One Front Street, 35th Floor
                                         San Francisco, CA 94111

10

                                         Telephone: (415) 591-6000
                                         Facsimile: (415) 591-6091

11

                                         Attorneys for Defendant BANK OF

12

                                         AMERICA CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28