1   Jack R. Nelson (SBN 111863)
    Kirsten J. Daru (SBN 215346)
2   REED SMITH LLP
    Two Embarcadero Center, Suite 2000
3   San Francisco, CA  94111-3922
    jnelson@reedsmith.com
4   kdaru@reedsmith.com

5   **Mailing Address:**
    P.O. Box 7936
6   San Francisco, CA  94120-7936

7   Telephone:   415.543.8700
    Facsimile:   415.391.8269
8
    Attorneys for Defendants and Wachovia
9   Corporation and Wachovia Bank

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  | In re ATM FEE ANTITRUST LITIGATION | Master File No.: C04-2676 CRB |

15  **CLASS ACTION**

16  **DECLARATION OF DENNIS F. LYNCH
    IN SUPPORT OF DEFENDANTS'
17  MOTION FOR SUMMARY JUDGMENT
    ON PLAINTIFFS' PER SE CLAIM**

18  This Document Relates To:

19     ALL ACTIONS

    Date:          October 5, 2007
    Time:          10:00 a.m.
20  Courtroom:     8

21  Honorable Charles R. Breyer

22

23      I, Dennis F. Lynch, declare:

24

25      1.      I am a resident of New Canaan, Connecticut.  I am not affiliated with any of the

26  parties in this action.  I have been retained by the Defendants in this action to testify as an

27  independent expert regarding: (1) the history of U.S. payments networks and policies; (2) rationales

28  for the use of interchange fees in ATM networks in the United States; and (3) evaluation of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  alternative arrangements for interchanging transactions for networks, institutions and companies. I

2  make this declaration based on my own personal knowledge and experience and on facts personally

3  known to me and/or which I identify as having been provided to me for purposes of forming and

4  rendering the opinions set forth below.  The opinions set forth herein are my own and, if called as

5  witness, I could testify competently to each of the matters stated in this declaration.

6

7  **I**

8  **PERSONAL HISTORY AND QUALIFICATIONS**

9      2.     I hold Bachelors and Masters Degrees from the University of Rhode Island.

10

11      3.     I joined Fleet Bank in 1981.  My initial position at Fleet was in the Information

12  Systems division, where I was responsible for a variety of system development efforts.  I later

13  became a Senior Vice President of Fleet with responsibility for the business development and

14  marketing of self-service products (ATMs, card products, phone services, and emerging products)

15  throughout New York and New England.  I was with Fleet until 1994.

16

17      4.     From 1992 to 1994, I was a Director on the NYCE ATM Network Board.  I joined

18  NYCE full-time in 1994 as Executive Vice President and Chief Operating Officer.  I served as

19  President and Chief Executive Officer of NYCE Corporation from 1996 to 2004.  During my tenure,

20  NYCE grew from a Northeastern U.S.-focused company into an organization with a national

21  footprint, processing over 1.2 billion consumer payments serving 2100 financial institutions and over

22  1 million retailers.  At the time I left it, NYCE was one of the three largest surviving networks of the

23  original 200 "regional" ATM networks across the country.

24

25      5.     I was a founding Director of the New England-wide Yankee 24 ATM Network.  I

26  served as its Chairman from 1988 to 1990.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

6.      From 1996 to 2004, I served on the Executive Committee and the Board of the Electronic Funds Transfer Association (EFTA).

7.      I am a past Chairman of the Network Executive Council and have served on the Board of Directors of the Smart Card Forum and Everlink, a Canadian ATM network joint venture.

8.      I have a total over 25 years' experience in the ATM card products and payment solutions industry.

9.      In addition to relying upon my personal industry experience to prepare this declaration, I have undertaken the following to assist me in preparing the opinions set forth below:

      a.      I conducted a telephone interview of Elizabeth Lynn, who currently serves as the Senior Vice President of Strategy and Portfolio Management for First Data Debit Services; and

      b.      I reviewed the following documents:

          (i)      2005, 2006 and 2007 EFT Databooks;

          (ii)     2006 Kansas Federal Study on ATM and debit card industry;

          (iii)    STAR Operating Rules.

10.     I have not authored any publications within the last 10 years that relate to any of the subjects on which I have been asked to opine in this matter.  I was deposed by the justice department as part of its lawsuit blocking the 2003 proposed merger of FDC and Concord, but I have not otherwise testified as an expert witness in any action within the last four years.  To the best of my

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

ability to gather the information at this time, I have given the following presentations or speeches within the last 10 years:

     a.     Keynote address for the NYCE annual conference, 1996-2002;

     b.     Keynote address for the 2003 PSCU annual conference;

     c.     Presentation at the 2002 FDCC annual customer conference;

     d.     Presentation at the NACHA annual conference in 2000 (est.);

     e.     Keynote address at the annual ISO conference in 2001 (est.).

11.     I am being compensated for my time on this engagement at the rate of $650.00 per hour, plus reimbursement of my expenses.

## II

## OVERVIEW HISTORY OF ATMs AND ATM NETWORKS

12.     The financial services industry in the United States includes thousands of financial institutions such as commercial banks, savings & loans, savings banks, thrifts, credit unions and other types of depository institutions that provide deposit and cash withdrawal services to consumers.  For convenience only, I refer to all of these different types of entities collectively below as "banks."  Banks often have very different business strategies and interests.  While many banks are large and have hundreds of branches and thousands of ATMs across states, regions or the country, a substantial number are small and may have a single branch with no ATMs.

13.     Despite having widely differing strategies and positions in the industry, banks nonetheless have in recent decades relied upon cooperative, or "network," arrangements in order to

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PER SE CLAIM

provide geographically ubiquitous financial services to consumers via electronic systems. For example, networks of participating banks make it possible today for consumers to have cash access to their accounts at hundreds of thousands of ATMs across the U.S., or to use their credit and debit cards at millions of merchant locations throughout the country, even when the consumer's card is issued by a small or geographically remote bank. The Star ATM network involved in this action is just one of many examples of such a network.

**A.       Automated Teller Machines (ATMs)**

14.       Since the late 1970s the vast majority of banks have deployed ATMs in order to permit their customers to use an "ATM card" (or a "debit card") to electronically execute cash withdrawal transactions from the card-issuing bank. ATMs provide consumers with a service that was not available before their introduction - quick and easy access to cash from a consumer's deposit account, twenty-four hours a day, seven days a week.

15.       In the 1970s, almost all ATMs were located at or near a branch office of the bank that deployed them. The primary function of an ATM was to service the card-issuing bank's own customers by providing additional hours when they could withdraw cash from their accounts, without the need to add tellers or extend branch operating hours. As time passed, some banks also began installing ATMs at new locations separated from, and often physically distant from, their branch offices. These so-called "off-premises" ATMs (as opposed to "on-premises" ATMs located at a branch office) were typically located so as to increase customer access to withdrawal services without the need to build or operate an entire new branch.

16.       Today, most banks of any significant size deploy at least some ATMs. However, many smaller banks still do not make the capital and operating expense investment required to deploy ATMs. And, even for customers of banks that do deploy ATMs, the convenience of an ATM deployed by the bank is still limited by the bank's geographic footprint and investment capacity.

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Thus, the inherent limits on the number of ATMs that any one bank can efficiently deploy means

2    that consumers often do not have access to their own bank's ATM services outside the bank's

3    service area.  Even within that service area access can be, and often is, limited by the number and

4    location of the ATMs deployed by the bank.  To address this customer service issue, the industry

5    developed, and for decades now has relied upon, ATM networks to provide broadly accessible ATM

6    service to consumers throughout the United States (and the world).

**B.    ATM Networks**

17.    An ATM network is a system that allows the customer of one participating bank to

execute ATM transactions at ATMs owned or operated by any other network participant under

network-established conditions that are designed to assure reliability and certainty by prescribing

exactly how those transactions will take place.  An ATM network thus establishes a uniform set of

operating "rules" and administrative functions that: (a) electronically link all ATMs deployed by

entities that contract with the ATM network and make them all available for "real-time" transactions

conducted by any cardholder of any network-participating bank; and (b) obligate the entities

involved in the transaction to complete it upon pre-arranged conditions that assures each entity that

the other will perform its obligations when properly requested.  Thus, through an ATM network, an

ATM card-issuing bank (sometimes referred to in the industry as the "issuer") can offer to

consumers the ability to withdraw cash (or check an account balance or transfer funds between

accounts) at an ATM owned by another entity (sometimes referred to in the industry as the

transaction "acquirer")[1], even though the acquirer is unrelated to the consumer's bank and even

though their consumer's bank and the acquirer are contractual strangers.  An ATM network thus

provides a resource that would be economically impossible for any single bank, even the largest

banks, to offer to consumers.  Access to that resource benefits all banks participating in an ATM

---

[1] For the sake of simplicity, I use the term "ATM owner" in this declaration to refer to the entity that deploys, or operates, an ATM.  Most ATM owners are also the deployers of the ATM, but there are some examples of ATMs that are legally owned by one entity and yet deployed by another.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

network, but is particularly beneficial to the smallest banks, whose ability to deploy ATMs lags far behind that of their larger competitors.

18.     In a typical ATM network cash withdrawal transaction, the ATM owner sends a message to the network indicating that a cardholder has asked to withdraw cash.  The network sends the message to the card-issuing bank asking for authorization for the transaction.  The card-issuing bank transmits an immediate response back to the network, approving or denying the request.  The network then routes the message back to the ATM owner, which, upon approval, proceeds to dispense the cash requested.  No matter how far apart the ATM and the consumer's bank may be, and no matter what time of day the transaction occurs, this entire process is designed to take place within seconds so that the consumer is provided convenient and rapid access to her deposit account.

19.     The ATM network also establishes the binding conditions, or network "rules," under which this transaction takes place.  These rules, which I discuss in more detail below, govern – among many other things - the settlement of all network transactions, including the amount, timing and other conditions through which the ATM owner, having been asked to disburse cash at one of its ATMs to a cardholder of the issuer bank, is to receive payment for making that disbursement.  The ATM network's conditions thus substitute for a direct contractual agreement between the ATM owner and the card issuer by facilitating the promise of the issuer to provide appropriate payment to the ATM owner for providing a service to the consumer – the issuer's customer.  Through this network commitment, an ATM owner can disburse cash from its ATM, knowing that it will be paid by the issuer bank in accordance with a pre-arranged set of conditions.

## C.     Origins and Early Objectives of Networks

20.     The earliest ATM networks in the U.S. were formed as partnerships or joint ventures owned by small groups of banks looking to expand their customer services at a local or regional level so as to provide broader cash access to their consumers by enabling them to use ATMs that

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

were not owned or operated by the consumer's bank ("foreign ATMs"). Banks joined networks in order to enhance the ATM services offered to their own customers and to increase the bank's ability to compete for additional depositors. These motives were particularly important to smaller banks (including thrift institutions and credit unions) that had very limited branch office, or "on-premises," ATM deployment. The initial ownership structure of these networks was primarily associational in nature and not-for-profit by structure. While some networks were owned by a subset of the participating banks, a large number were owned or "shared" by every bank that belonged. In these cases all of the participating members typically had some voting rights, which might vary according to the type, size, or network transaction volume of the particular bank.

21.     Because ATMs were still a somewhat novel banking method for many consumers in the 1970's and into the 1980's, an overriding objective of early ATM networks was to build local brand recognition and consumer acceptance by attracting as many local banks as network participants as possible and, by doing so, to increase the numbers of cardholders, ATM machines and transactions within the network. This growth accomplished the complementary objectives of: (a) increasing the number of participating ATMs from which participating banks' customers could obtain cash; and (b) increasing the number of network transactions, and resulting "switch" revenue for the network,[2] thereby permitting the network to fund further growth for the benefit of its participating banks.

22.     As new networks were formed and grew and competed with one another, the success of each ATM network remained critically dependent on the volume of transactions it could attract and process. That required competition for banks and, through those banks, for: (1) greater geographic coverage and density of ATM deployment; (2) a larger number of cardholders; and (3) the use of the network for transaction processing.

---

[2] For every network ATM transaction, the card-issuing bank is required to pay a network-set "switch" fee to the network for facilitating and communicating the transaction between ATM owner and the card-issuer. These switch fees have varied in amount among networks, but in each case switch fees would be the network's principal source of revenue.

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**D.      The Development and Purposes of ATM Network Rules**

23.      At the outset, banks were encouraged to join networks by the adoption of a comprehensive set of network "ground rules" based on the understanding that each participating bank and its customers would be treated fairly and no single network participant could gain advantage at the expense of others.  This "level playing field" approach ran as well to a full range of requirements for network participation, including operations, technology, branding and pricing. Each bank in the network had to enter into a binding contract with the network that obligated the bank to abide by all of these rules.

24.      This comprehensive set of network operating rules allowed participating banks (which were themselves contractual strangers) to understand their obligations and to be able to properly set their expectations.  As a result, every card-issuing bank could trust that its customers' network-branded cards would always work in every network-branded ATM (sometimes referred to as "universal acceptance" and/or "full participation"), and every ATM owner could be assured, in advance, of the certainty of reimbursement for cash dispensed and payment of a fee for servicing the cardholder.  Further, every network participant, and thus consumers, could reasonably expect technical and operational reliability at every network ATM and within the network's switching, settlement and processing systems, such that every "foreign" ATM transaction would be processed in real-time and then ultimately settled and recorded accurately.

25.      I have reviewed the rules of the Star network, and they are generally similar to other ATM networks' rules with which I have been familiar in that they reflect a balancing of the obligations, rights, benefits and potential liabilities of all participants in the network.  Specifically, Star's rules regarding full participation and advance agreement on fees and reimbursement follow generally with historical and recent industry practice.

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

**E.    Linkage between Universal Acceptance and Interchange Fees**

26.    Universal acceptance requires that participants in a network agree in advance that they will honor all properly presented and authorized transactions from each and every other network participant.  All major U.S. ATM network rules with which I am familiar incorporate the principle of universal acceptance, *i.e.*, every ATM card issued by a participating bank must be accepted by every ATM owned by a participating bank or by a participating ISO.  A critical issue that all such rules must (and do) address to facilitate universal acceptance is the terms under which an ATM owner will be paid by the card-issuer bank in a foreign transaction.  The ATM owner must be certain of the timing and amount of payment before it will accept a "foreign" transaction through the network.

27.    In my experience, neither issuer banks nor ATM owners will agree to participate in an ATM network unless they know in advance all of the material terms of the network transactions they would be obligated to fulfill or entitled to receive.  Thus, the principle of universal acceptance in ATM network rules has always gone hand-in-hand in the industry with the principle that there must be certainty of the amount that must be paid by the card issuer bank to the ATM owner for accepting the issuer's cards—including the amount of the cash advanced and the amount of any fee for performing this service to the card-issuer bank for providing cash to that bank's customer.  This latter payment is usually described as the "interchange fee."  These acceptance, repayment and compensation principles have been long used, and are now embodied, in all the major ATM network rules in the U.S. of which I am aware.  In my experience and opinion, these principles cannot be separated by any network that seeks to compete effectively for participants.

28.    By contrast, if a bank's network branded/coded ATM cards were not universally accepted at all ATMs within the network, the bank's customer would likely be annoyed upon finding that her card did not ensure ready access to cash at an ATM location.  This would undermine the central benefit of the ATM network to consumers, and thus would not be accepted by the issuer

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    bank. Issuer banks would view anything less than universal acceptance as an inconvenience, or an

2    inferior product, for their customers and would take the position that they would be exposed to the

3    risk that their customers would switch their accounts to banks affiliated with an ATM network(s)

4    that offered greater certainty. Similarly, ATM owners would not agree to join an ATM network that

5    did not offer them advance certainty of payment for a foreign ATM transaction conducted through

6    the network. Neither would ATM owners agree to join an ATM network that did not offer universal

7    acceptance of network cards because such a circumstance could reduce the volume of successfully

8    completed ATM transactions while increasing the ATM owner's service costs associated with failed

9    transactions.

**F.       The Origin of ATM Interchange Fees**

29.        In order to compensate an ATM owner for handling a "foreign" cash withdrawal,

virtually every U.S. network has established, by rule, a system-wide interchange fee that is assessed

on the card issuer bank, added to the principal amount of the withdrawal and then passed, via the

network, to the ATM owner. In fact, the interchange fee was an important component of early ATM

network strategy because it was a form of compensation for the transaction cost borne by the ATM-

owning bank and (particularly for banks with large ATM fleets) for servicing a customer of a

competing bank. The ATM interchange fee was specifically used to attract ATM-owning banks to

join the network, thus increasing the number and locations of ATMs available to network

participants (and consumers) and concurrently increasing potential transaction flow for the network.

30.        Network membership from the outset involved: (1) banks that owned few ATMs and

thus typically paid more in total interchange fees for "foreign" ATM transactions by their customers

than the bank received from use of its ATMs by customers of other banks ("net issuers"); and (2)

banks that owned many ATMs and typically received total interchange fees that exceeded the total

amount of interchange fees that the bank paid out for its customers' foreign ATM transactions ("net

acquirers"). Thus each network had to try balance these competing interests when it set interchange

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    fees to try to encourage both net issuers and net acquirers to participate in the network.  Networks

2    typically did this by setting their interchange fee high enough to reasonably reward net acquirers, but

3    not so high as to discourage net issuers from joining the network.

4

5        31.    As the joint venture ATM networks have been sold to independent proprietors, these

6    new owners have continued to operate the networks with network-set interchange fees because they

7    believe that the use of such fees is the best way to compete for both card-issuing banks and ATM

8    owners.

9

10   **G.    Development of ATM Surcharges and the Resulting Growth of ISOs.**

11

12       32.    A "surcharge" is a charge that an ATM owner assesses directly upon an issuing

13   bank's cardholder at the time that a cash withdrawal transaction is processed (as opposed to the

14   interchange fee, which the networks require to be paid by the issuing bank to the ATM owner).

15   Prior to 1996, many ATM networks prohibited or restricted ATM surcharges, and thus the revenue

16   stream from foreign ATM transactions that was realized by most ATM owners was restricted to

17   interchange fees.

18

19       33.    Restrictions on surcharges had a limiting effect on deployment of ATMs, particularly

20   with respect to deployment of "off-premises" ATMs (*i.e.*, deployment at locations other than bank

21   branches), which are typically more expensive to operate than on-premises ATMs.  Beginning in the

22   mid-1990s, however, network surcharge restrictions were lifted.  Thereafter, as ATM owners saw an

23   opportunity to increase revenue from foreign transactions by combining interchange fees and

24   surcharges, the industry experienced an explosion of growth in ATM deployment.  In particular,

25   non-bank entrepreneurial organizations called ISOs (Independent Sales Organizations) began to

26   place thousands of ATMs in locations that previously could never support a business case for an

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

ATM based solely on revenue generated by ATM interchange fees.[3] These ATMs were not serving the customer base of any given bank. The business case for deployment of this new population of ATMs was the higher revenue suddenly available from the combination of ATM interchange and surcharge. Hence, ATMs appeared in geographies and venues never contemplated previously. This development in the ATM network industry created greater access to cash for consumers.

34.    Even after surcharging became permissible, many banks still did not surcharge, and some elect not to do so even today. And many banks, particularly smaller banks (including especially credit unions and thrifts), have sought, as a competitive measure, to attract and retain deposit customers through participation in "no surcharge" sub-networks in which the participants mutually agree not to surcharge each others' customers and also to provide reasonable notice of this "no-surcharge" opportunity. Finally, a recent trend in the industry is for banks, particularly small banks, to attempt to attract depositors by agreeing to "rebate," or credit back to their customers, any surcharge that the customer might have to pay to another entity for a foreign ATM transaction.

## I.    The Influence of Interchange Fees on Network Participation by ISOs

35.    ISOs, unlike card-issuing banks, have no cardholder customers for whom they seek access to the ATMs of other network members. All of their transactions are "foreign." Rather, ISOs have as their principal interest maximizing the revenues that can be gained from usage of their ATMs by the cardholder customers of card-issuing banks. Thus, the combination of interchange fees plus surcharge revenues tends to be more important to an ISO's ATM deployment decisions than is the case with a traditional bank, whose ATM deployment decisions are also affected by the competitive deposit-seeking advantage of providing more free "on us" transaction opportunities for its customers.

---

[3] Today, around half of the ATMs located in the United States are owned or operated by ISOs. Indeed, the second largest ATM owner in the United States is an ISO, with more than 9,000 ATMs.

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

36.     ATM interchange has always been part of the value equation that banks evaluate as they select networks, along with network proximity to a bank's core retail customer base, the mix of on-us and off-us traffic and other factors. With the introduction of ISOs, ATM interchange became an even more critical component for networks seeking to win business. Networks had to make certain that their ATM interchange fees were competitive for this new type of participant in the network. Indeed, a number of networks introduced segmentation in their interchange fees, creating an "off-premise" ATM interchange fee to assist in the recruitment of this new and rapidly growing segment of the ATM network participant base.[4] Thus, the introduction of surcharges did not lead to the elimination of network interchange fees. To the contrary, the competitive importance of interchange fees increased.

37.     From a network perspective, upon the introduction of surcharges and the rise of ISOs, competition for bank and ISO business (*i.e.*, transaction volume that generates switch fees) became much more complex than previously had been the case. Eleven years after the introduction of surcharges, the marketplace for the ISO community is complex and highly competitive. Foreign ATM activity is a slow growth/no growth business. Most all viable ATM locations are taken; retailers who rent space for ATMs also want a share of the transaction revenue. ISOs carefully evaluate every aspect of the ATM network relationship to ensure maximum benefit. As a result, interchange fee pricing has become an even more critical component of competitive strategy for networks than it had been in the early growth years, and it remains an ongoing competitive tool among networks vying for ISO business.

---

[4] On-premises ATMs are virtually all owned by card-issuing banks that deploy the machines at their branches, in large part for use by their own customers. Card issuers may also deploy off-premises ATMs, which are typically more expensive to operate, but off-premises machines are the only machines deployed by ISOs.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

J.    **Evolution of Modern Network Competition**

38.    While there are still a number of joint-venture ATM networks, today the major ATM networks have been acquired and are now owned by for-profit public companies that compete to deliver branded products and transactions services to banks, ISOs, and card-carrying consumers. The goal of these proprietary networks is to maximize network revenues generated from the switch fees that participants pay the network for routing and processing transactions. The former bank owners of the old joint venture networks have become the customers—often important customers— of these new proprietary networks.

39.    Network competition has many dimensions, including standards, brand marketing and fees. The interchange fee in particular must be set at a level that provides appropriate incentives for both ATM owners and card issuers. It is considerably higher than the "switch fee" that the card-issuer bank pays the network for each transaction initiated by one of the bank's customers. If a network's interchange fees are not set at competitive levels, it will be likely to lose some participants to other networks (*i.e.*, card-issuer banks that view the combined amount of the interchange fee and network switch fee as too high a total cost, or ATM owners that view the interchange fee as inadequate).

40.    Interchange fees are an integral part of a complex web of internal arrangements upon which a network's operations are based. For example, higher interchange fees encourage broader ATM deployment, particularly by ISOs. Thus, since its inception Star had a higher ATM interchange fee for off-premises ATMs to encourage increased ATM deployment. Other ATM networks have used interchange fees in a similar manner to compete for business and to add value to the network for banks and consumers. At NYCE, we segmented the interchange and created a higher fee for off-premise ATMs specifically to attract more ISOs to our network. We were successful in that effort.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

41.     As for banks, the networks must compete with increasingly complicated value proposition, as network service offerings, or potential offerings, expand.  Interchange fees have been a relatively stable part of those relationships, but their presence and a network's individual ability to control them remains a significant tool for use when competing against other networks, especially in the case of banks with large ATM populations.

42.     A network's ultimate competitive goal in its ATM business is to increase network traffic by offering ATM owners an active card base and by offering banks numerous, well-located ATMs to be available to consumers.  These interests must be balanced correctly for the network to survive.  For banks and ISOs both, interchange fee levels are one obvious point of comparison among the various major regional and national ATM networks and thus are a factor in the decisions they make about the networks in which they want to participate.

43.     Another competitive factor that networks take into account when setting interchange fees is that, in today's marketplace, major banks and ISOs belong to many networks to maximize their respective economic interests.  When a foreign transaction is made at an ATM, there is often an option as to which network to send the transaction for authorization and the card issuer bank generally gets to choose.  This is called "issuer routing," and major networks such as NYCE and STAR have policies permitting such a selection by an issuer bank.

44.     Issuer banks typically will instruct that their cardholder transaction be routed through the lowest cost network alternative.  Banks and ISOs that are "net acquirers" (they take in more network fees from acquiring ATM transactions than they pay out for cardholder activity – or, in the case of ISOs, have no cardholder activity) can drop or join networks to generate the highest return for their "acquiring" business.  In both these circumstances, the interchange fee amount often plays a significant role in the bank's or ISO's decision.  Maintaining control over that element of foreign ATM transactions thus remains critical to the ability of a network to compete for bank and ISO participants.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

45. Another element of the complex competitive landscape for networks today is the increasing prevalence of strategic negotiation with significant individual ISO and bank customers over the broad terms or the extent of their participation in a network (such as whether all operating subsidiaries of a bank holding company will join the network). Despite the competitive pressures that have led to such business-to-participant negotiations, however, the negotiations, and thus the network's ability to affect its membership and transaction volume (and its revenues and profits), remain within the control of the network and so the network can continue to accurately predict its business volume and operations and run itself accordingly. No network that wishes to compete effectively would want to entirely relinquish decisions about critical aspects of its operations to negotiations conducted strictly among its customers.

46. Competition among networks today is primarily directed at card issuers and ATM owners (both banks and ISOs)—but the ultimate beneficiaries are consumers. Today U.S. consumers have a greatly expanded population and variety of ATM locations to choose from; due to network universal acceptance and the overlap of network coverage they are assured that virtually every card works in every ATM.

### III

### OPINIONS REGARDING HYPOTHETICAL BILATERAL NEGOTIATION OF INTERCHANGE TERMS AND FEES

47. There are a number of possible scenarios for examining the impact on the ATM marketplace if I had to assume that a restriction were to be imposed that limited networks' ability to set and manage ATM interchange fees. For instance, such a restriction might be placed upon a single network, a group of networks (such as those operated as joint ventures) or the industry as a whole – with each circumstance generating different circumstances. I have attempted to summarize below what I considered some of the more likely business models that could evolve, or at least be attempted, as a result of an assumed interchange setting prohibition, and then to speak to how those changes could potentially impact the respective parties (banks, ISOs, networks and consumers.) At

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

the outset, however, I emphasize that even if one assumes such a prohibition somehow came to pass, it is difficult to construct a "what if" case in which consumers' convenience and access are not compromised, and the network marketplace as a whole is not rendered substantially less efficient.

### A.  A Single Network Alone Is Prevented From Setting a System-Wide Interchange Fee

48.     Based upon my experience in the ATM network industry, it is my opinion that a single network's loss of control over interchange fee pricing would place it at a significant disadvantage within an industry dominated by other networks that could operate with network-set interchange fees.  If a network (voluntarily or otherwise) required its members to reach separate bilateral agreements on the terms of foreign ATM transactions before such a transaction could occur between any two members, then unless 100% of the network members reached agreement and continuously maintained those agreements that network could not deliver on the industry standard commitment of "universal acceptance" of all of its members' ATM cards at all ATMs in the network.  Thus, whenever any two or more banks participating in the network were unable to reach or maintain agreements between or among them to honor cash withdrawal requests at their ATMs by other banks' customers, universal acceptance would be lost and the card-issuing participant banks' customers would lose foreign ATM options – options which they have by now learned to expect and rely on.  The same problem would also arise whenever any network participant tried to force unreasonable concessions from other participants or prospective participants in bilateral negotiations; the alternative to giving the concessions would be to end universal acceptance.

49.     Even if a network could achieve 100% bilateral agreements among its participants, it is my opinion that a network that required each ATM owner to have a separate and independent agreement with every card-issuing bank in the network in order to complete a foreign ATM cash withdrawal through the network would ultimately prove unworkable and would be unable to compete successfully with the other networks not restricted from system-wide interchange fees.  Any such network structure would involve large transaction costs and introduce material risk of error and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

service interruptions.  In all likelihood, banks would not be interested in pursuing such negotiations across all network participants given the time, expense and negligible return for the bank.  Moreover, the large differences in size and scale among banks would place small banks at a severe disadvantage as they attempted to reach bilateral agreement with large banks, and they could effectively be denied access or forced to pay exorbitant fees, and therefore would probably be unable or unwilling to participate in such a network.  It is therefore likely that the increased costs, inefficiencies and risks created by then trying to maintain a bilateral regime would have the practical result of causing banks to seek other, more efficient options (such as membership in proprietary networks that had network-set interchange fees).  Most banks and ISOs would either quickly or eventually leave such a "bilateral network" in favor of another network that could deliver on the implied commitment to consumers of universal acceptance and the associated economic predictability of a bank's or ISO's participation.  The "bilateral" network would then either disappear altogether over time, or possibly break into smaller networks.

50.     Finally, from the perspective of ISOs, which receive a significant percentage of their revenue from interchange fees but never pay them, if an individual network, such as Star, suddenly could not offer them any further interchange fee revenue, they would affiliate instead with proprietary networks that provided the ISO with that revenue stream in addition to surcharge opportunities.  (It is overly simplistic to believe that any ISO could or would try to make up for lost interchange fee revenue by simply raising surcharges.  ISOs may not wish to take the risk that consumers would be willing to pay the higher surcharges.  In any event, it would be easy for the ISO to make up the revenue simply by moving to a network that provided a system wide interchange fee.)

**B. Some Networks Are Prevented From Setting a System-Wide Interchange Fee**

51.     If one segment of the present ATM network industry, such as joint venture networks, were no longer able to establish system-wide interchange fees, it is my opinion that all such

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

networks (and their participants) would be at the same very serious competitive disadvantage that a single "bilateral network" would face when they compete against "system-wide fee" networks. Such a change in the industry would also reduce competition among networks on a much larger scale than placing a restriction against system-wide interchange fees on one network alone. Although predicting all of the effects on competition would be a complicated exercise, each such network, and the consumers who benefit from its product, would suffer from ultimately increased costs and from what I believe would become a splintered, smaller ATM network industry.

## C. All Networks Are Prevented From Setting a System-Wide Interchange Fee[5]

52.     Assuming that all networks could somehow be prevented from setting system-wide interchange fees, two network models might eventuate. The first would require direct bilateral negotiations over interchange fees between sets of network participants. For the reasons that I have already stated, the resulting change in the industry would likely be a larger number of much smaller networks and the disappearance of large networks. This would place consumers back into the less desirable position they were in decades ago, when there were few networks offering widespread geographic deployment of ATMs and consumers had to search for ATMs whose network brand matched the brand on their ATM card before they could be assured that their card would work in that ATM. In other words, requiring bilateral negotiation would at best result in fragmentation of today's large, geographically spread, mega-participant ATM networks, leaving smaller networks (either by geography or number of participants) that offered consumers fewer options for cash withdrawals from foreign ATMs. I also believe that a hallmark of such "devolved" networks would be the absence of hundreds of smaller banks, who could be frozen out of participation.

53.     A second network form that might arise in the event of an externally imposed

---

[5] This appears an extremely unlikely scenario which I offer simply for completeness of analysis. I am not sure how it could ever be achieved except by statute or perhaps some regulatory or enforcement agency. I simply assume this as a hypothetical and have no view as to whether this would be logical or legally coherent.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  complete prohibition on system-wide interchange fees might be one where the network rules simply

2  provided for reimbursement at par.[6]  Thus, the only compensation available under the network rules

3  to ATM owners for agreeing to undertake foreign transactions would come from surcharges.  In this

4  model, it is likely that all ISOs would attempt to raise their surcharges from current levels in order to

5  compensate for the loss of interchange fee revenue that they receive now.  Large banks with large

6  populations of ATM but relatively fewer cardholders (net acquirers) might well do the same

7  (although predicting the customer pricing behavior of banks in such a situation is less certain

8  because of the complexities of their strategies toward customer relationships), or they might enter

9  into reciprocal agreements with other large banks to maintain a lower level of surcharges for their

10  respective customers while elevating the surcharge amount only for other banks' customers in the

11  network. While the concept of universal acceptance could operate in this model, this would be the

12  model in which consumers would pay the highest surcharges – certainly higher than what they

13  presently pay.

**D. Impact on Networks and Consumers of Eliminating System-Wide Interchange Fees**

16  54.  The combination of universal acceptance of ATM cards within networks, the

17  increased size of networks over time and the fact most every bank and ISO belongs to at least one

18  regional and one national network has led to many consumers developing the confidence today that

19  they no longer need to even be aware of the network brand on their ATM card or to look for a brand

20  on an ATM in order to know that their card will work in any ATM anywhere.  However, if network

21  interchange fees, and thus the acceptance of cards within a network from ATM to ATM, depended in

22  any way on bilateral negotiation of interchange among network members, then universal acceptance

23  of cards within those networks would either disappear altogether or the only networks that could

24  offer universal acceptance would be those small enough to achieve, and maintain, 100% bilateral

25  agreements among its members.  In my opinion, the infeasibility of bilateral negotiations in a

---

[6] That is, networks would be permitted to require an effective interchange fee of zero but would not be permitted to set a non-zero interchange fee.

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   network of any significant scale is one of the principal explanations as to why every major ATM

2   network in the United States has always relied, and relies today, upon a common default interchange

3   fee in lieu of bilateral negotiations.

4

5       55.     For example, it is not unreasonable in my opinion to project that large banks with

6   established ATM fleets would have little incentive to invest the resources required to negotiate with

7   the vast number of smaller banks and ISOs in any network, each of which has relatively smaller

8   ATM fleets.  Such banks might well decide to give up the identifiable economic cost, and the harder-

9   to-calculate customer service benefit, of belonging to a network and instead rely solely upon their

10  own fleets to deliver ATM access to their customers.  Alternatively, they might form limited

11  alliances with one or more other large banks or ISOs and thus bypass networks entirely.  Whether

12  either result evolved from the competitive elimination of a single network or that of an entire

13  category of network, or an industry-wide compulsory change of business model, is immaterial; both

14  results would shrink the transaction volume of all networks over time and, ultimately, increase

15  network costs across the industry.

16

17      56.     No matter whether a restriction on system-wide interchange fees is network-specific,

18  category-specific or industry-wide, no one can precisely predict how changes to what is today a

19  mature, well-functioning and efficient payment system would play out, or what the reactions of each

20  of the stakeholders in the marketplace might be.  But it would not be at all unreasonable to predict

21  that the divergent interests and unequal bargaining power of banks in the introduction of any

22  bilateral system could force many small banks (including especially single branch institutions, credit

23  unions and thrifts) and small ATM owners out of a network.  Large institutions would not be likely

24  to offer small banks or ISOs contract terms as consistently favorable as the "even playing field

25  terms" existing under current network rules, and that, along with the increase in transaction costs due

26  to bilateral negotiation requirements, would force many smaller institutions from the network(s).

27  Also, if some segment of the population of vendors (banks, ISOs) that supply cash to consumers via

28  ATMs receive a "pay cut" (*i.e.,* lower or no interchange fees) they would likely seek to try to recoup

1   that revenue shortfall via increased surcharges.  Such a surcharge increase could result in some

2   number of consumers paying a higher fee for access to their funds while, at the same time, causing

3   some number of ATM owners to shut down their ATMs when they lose consumer traffic due to the

4   higher surcharge.

5

6       57.    ATM networks, and the entire industry, have evolved from their earliest days,

7   becoming increasingly complex.  The core objectives of universal acceptance, a "level playing

8   field," reliability and certainty for the network participants, and thus for consumers, remain critical

9   to the industry, however, and therefore any sudden externally-imposed change on a historically

10  important element of these systems is likely to have unanticipated and unintended consequences that

11  would be disruptive of the consumer benefits that ATMs presently supply.

12

13      I declare under penalty of perjury under the laws of the United States that the foregoing is

14  true and correct.

15

16      Executed at New Canaan, Connecticut on August 3, 2007

17

18                                                        Dennis F. Lynch

19

20

21

22

23

24

25

26

27

28

Master File No.: C04-2676 CRB                        — 23 —

DECLARATION OF DENNIS F. LYNCH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PER SE CLAIM

REED SMITH LLP
A limited liability partnership formed in the State of Delaware