1   Joseph R. Saveri (SBN 130064)
    Hector Geribon (SBN 200410)
2   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
3   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
4
    Merrill G. Davidoff (Admitted *Pro Hac Vice*)
5   Bart D. Cohen (Admitted *Pro Hac Vice*)
    Michael J. Kane (Admitted *Pro Hac Vice*)
6   BERGER & MONTAGUE, P.C.
    1622 Locust Street
7   Philadelphia, PA 19103
    Telephone:  (215) 875-3000
8
    Co-Lead Counsel for Plaintiffs
9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13  In re ATM FEE ANTITRUST            Master File No. C04-2676 CRB
    LITIGATION
14                                     **CLASS ACTION**

15
                                       **[REDACTED] MEMORANDUM OF POINTS
16                                     AND AUTHORITIES IN OPPOSITION TO
                                       DEFENDANTS' MOTION FOR PARTIAL
17  This Document Relates To:          SUMMARY JUDGMENT ON PLAINTIFFS'
                                       *PER SE* CLAIM**
18  ALL ACTIONS
                                       Date:  March 7, 2007
19                                     Time: 10:00 a.m.
                                       Courtroom: 8
20                                     The Honorable Charles R. Breyer

21

22

23

24

25

26

27

28

743379.1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................. 1

II.    SUMMARY OF THE ARGUMENT ................................................... 5

III.   STATEMENT OF FACTS ................................................................ 12

       A.    Background. ......................................................................... 12

       B.    Star's Fixed ATM Fees. ....................................................... 13

       C.    The Advent of Surcharges. .................................................. 15

       D.    The Current Market Characteristics. .................................... 18

             1.    Consumer Sensitivity to Surcharges and Foreign Fees ............... 18

             2.    Benefits to Financial Institutions of Fixed Interchange. .............. 21

             3.    Alternatives to Fixed Interchange Fees. ........................................ 22

             4.    The Alleged Benefits of Fixed Interchange Fees. ......................... 23

IV.    HORIZONTAL PRICE-FIXING IS NOT PROCOMPETITIVE – AND IS *PER SE* ILLEGAL – UNLESS IT IS NECESSARY TO A JOINT VENTURE FOR SOME REASON OTHER THAN IT PROVIDES SUPRA-COMPETITIVE PRICES ........................................................ 25

       A.    *Freeman* and Other Precedent Supply the Appropriate Framework for Evaluating Defendants' Price-Fixing Arrangement. ........................... 25

       B.    Defendants Mischaracterize *Freeman* ........................................ 27

             1.    Horizontal Price-Fixing Remains *Per Se* Illegal. ......................... 27

             2.    Defendants' Need to Cooperate as to Some Matters Cannot Justify Unnecessary Horizontal Price-Fixing. .............................. 30

             3.    Courts Scrutinize Horizontal Price-Fixing, Regardless of Context or Industry. ...................................................................... 31

             4.    The Credit Card Interchange Cases Do Not Support Defendants' Position. ...................................................................... 34

V.     AT SUMMARY JUDGMENT, ANY GENUINE ISSUE OF MATERIAL FACT REQUIRES DENIAL OF DEFENDANTS' MOTION ....................... 37

VI.    DEFENDANTS' MOTION FAILS BECAUSE FIXED INTERCHANGE FEES ARE NOT NECESSARY AND RAISE PRICES ABOVE COMPETITIVE LEVELS. ................................................................. 41

       A.    Eliminating Star's Fixed Interchange Fees Is Viable. .............................. 42

             1.    Universal Acceptance Is Possible Without Fixed Interchange. ............... 46

             2.    Defendants' Position Is Internally Inconsistent. ......................... 47

             3.    Defendants' Position Contradicts The Law And Common Sense. ................................................................................. 47

             4.    Defendants Cannot Avoid The *Per Se* Rule By Pretending Star's Fixed Interchange Fees Are A "Default." ......................... 48

**TABLE OF CONTENTS**
(continued)

Page

B.    Defendants Fail To Explain Why Fixed Interchange Fees Have an Economic Effect Other Than by Raising Prices Above Competitive Levels. ................................................................................. 50

VII.    DEFENDANTS' JUSTIFICATIONS FOR FIXING INTERCHANGE FEES ARE NOT PROCOMPETITIVE AND REST ON DISPUTED FACTUAL ASSERTIONS ................................................................... 52

A.    Defendants Do Not Explain How Fixed Interchange Fees "Balance" the Interests Of Card-Issuers and ATM Owners in A Procompetitive Manner. .......................................................... 52

1.    The Ordinary Use Of "Balancing" In Two-Sided Markets Does Not Apply In This Case. ..................................... 52

2.    Any Novel Notion Of "Balancing" Would Violate The Antitrust Laws. ................................................................. 55

B.    Defendants Have Not Provided Evidence that Fixed Interchange Fees Encourage ATM Deployment, Promote Star's Operation and Growth, Maximize its Output, or Enable Star To Compete in a Procompetitive Manner. .......................................................... 55

1.    Defendants Cannot Justify Price-Fixing by the Beneficial Effects of Supra-Competitive Prices. .............................. 55

2.    The Antitrust Laws Promote Price Competition to Benefit Consumers, Not Price-Fixing to Benefit Competitors. ................ 56

3.    The Antitrust Laws Do Not Seek To Maximize Output Through Inefficient Price-Fixing. ...................................... 59

4.    Defendants Have Not Shown that Fixed Interchange Increases Output. ................................................................ 59

C.    The Evidence Contradicts Star's Claim That Defendants Adjust Fixed Interchange Fees to Serve Any Purpose. ........................ 59

D.    There Is No Inherent Value To "Surcharge Free" Networks ................ 60

VIII.    PLAINTIFFS ARE ENTITLED TO ADDITIONAL DISCOVERY BEFORE ANY RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. .................................................... 61

IX.    EVEN IF DEFENDANTS PREVAIL ON THEIR MOTION, PLAINTIFFS MAY PURSUE THEIR SECTION 1 CLAIM UNDER A QUICK LOOK OR RULE OF REASON ANALYSIS. .................................................... 63

X.    CONCLUSION ................................................................. 64

# TABLE OF AUTHORITIES

**Page**

### CASES

Adickes v. S.H. Kress & Co.
398 U.S. 144 (1970) ................................................................. 2, 37, 41

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 n. 5 (1986) ................................................................. 63

Arizona v. Maricopa County Med. Soc'y
457 U.S. 332 (1982) ................................................................. passim

Ass'n of Irritated Residents v. C & R Vanderham Dairy
435 F. Supp. 2d 1078 (E.D. Cal. 2006) ........................................ 63

Bazuaye v. INS
79 F.3d 118 (9th Cir. 1996) ........................................................... 63

Beacon Theatres, Inc. v. Westover
359 U.S. 500 (1959) ....................................................................... 39

Bell Atlantic Corp. v. Twombly
127 S.Ct. 1955 (2007) .................................................................... 40

Betkerur v. Aultman Hosp. Ass'n
78 F.3d 1079 (6th Cir. 1996) .......................................................... 33

Bhan v. NME Hosps., Inc.
929 F.2d 1404 (9th Cir. 1991) ........................................................ 33

Brennan v. Concord EFS, Inc.
369 F. Supp. 2d 1127 (N.D. Cal. 2005) .................................... passim

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.
441 U.S. 1 (1979) ..................................................................... passim

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.
429 U.S. 477 (1977) .................................................................. 5, 56

Buffalo Broadcasting Co., Inc. v. Am. Soc'y of Composers, Authors and
Publishers
744 F.2d 917 (2d Cir. 1984) ........................................................... 30

Burlington Northern Santa Fe Railroad Co. v. Assisiniboine and Sioux Tribes
323 F.3d 767 (9th Cir. 2003) .......................................................... 62

Business Electronics Corp. v. Sharp Electronics Corp.
485 U.S. 717 (1988) ....................................................................... 32

California Dental Ass'n v. FTC
526 U.S. 756 (1999) ....................................................................... 32

Catalano Inc. v. Target Sales, Inc.
446 U.S. 643 (1980) .......................................................... 32, 50, 57

Cedano-Viera v. Ashcroft
324 F.3d 1062 n.5 (9th Cir. 2003) ................................................. 63

Celotex Corp. v. Catrett
477 U.S. 317 (1986) ................................................................... 2, 37

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n
95 F.3d 593 (7th Cir. 1996).................................................................. 48

4

Compaq Computer Corp. v. Packard Bell Electronics Inc.
163 F.R.D. 329 n.20 (N.D.Cal.1995)..................................................... 57

5

Continental T.V., Inc. v. GTE Sylvania Inc.
433 U.S. 36 (1977).............................................................................. 32

6

Craftsmen Limousine, Inc. v. Ford Motor Co.
363 F.3d 761 (8th Cir. 2004)................................................................. 33

7

Crull v. GEM Ins. Co.
58 F.3d 1386 (9th Cir. 1995)........................................................ 5, 12, 64

8

Dairy Queen, Inc. v. Wood
369 U.S. 469 (1962)............................................................................ 39

9

Demile v. Belshe
1994 WL 519457 (N.D. Cal. Sept. 16, 1994) ......................................... 63

10

Fleitmann v. Welsbach Street Lighting Co.
240 U.S. 27 (1916).............................................................................. 39

11

Fraser v. Major League Soccer L.L.C.
284 F.3d 47 (1st Cir. 2002).................................................................. 30

12

Freeman v. San Diego Ass'n of Realtors
322 F.3d 1133 (9th Cir. 2003).......................................................... passim

13

FTC v. Indiana Fed'n Of Dentists
476 U.S. 447 (1986)............................................................................ 32

14

Goldfarb v. Virginia State Bar
421 U.S. 773 (1975)................................................................. 6, 30, 58

15

In re Hydrogen Peroxide Antitrust Litig.
240 F.R.D. 163 (E.D. Pa. 2007)............................................................ 50

16

In re Indus. Diamonds Antitrust Litig.
167 F.R.D. 374 (S.D.N.Y. 1996) ......................................................... 50

17

In re Liggett & Myers Tobacco Company, Inc.
56 F.T.C. 221 (1959)........................................................................... 57

18

In re Lovable Company
67 F.T.C. 1326 (1965).......................................................................... 57

19

In re Rubber Chemicals Antitrust Litig.
232 F.R.D. 346 (N.D. Cal. 2005)........................................................... 50

20

Knevelbaard Dairies v. Kraft Foods, Inc.
232 F.3d 979 (9th Cir. 2000)................................................................. 50

21

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.
127 S. Ct. 2705 (2007) ......................................................... 28, 31, 32, 59

22

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.
475 U.S. 574 (1986)............................................................................ 40

23

Metabolife International, Inc. v. Wornick
264 F.3d 832 (9th Cir. 2001)................................................................. 63

**TABLE OF AUTHORITIES**
(continued)

Page

N. Pac. Ry. Co. v. United States
   356 U.S. 1 (1958) ................................................................................................................ 25

Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.
   468 U.S. 85 (1984) ........................................................................................................ passim

Nat'l Elec. Contractors Ass'n, Inc. v. National Contractors Ass'n
   678 F.2d 492 (4th Cir. 1982) .............................................................................................. 48

Nat'l Soc'y of Prof'l Eng'rs v. United States
   435 U.S. 679 (1978) ............................................................................................... 3, 7, 9, 26

National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.
   596 F. Supp. 1231 (S.D. Fla. 1984)
   aff'd 779 F.2d 592 (11th Cir. 1986) ................................................................ 34, 35, 38, 46

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.
   210 F.3d 1099 (9th Cir. 2000) ................................................................................. 2, 37, 41

Northrop Corp. v. McDonnell Douglas Corp.
   705 F.2d 1030 (9th Cir. 1983) ............................................................................................ 32

Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.
   472 U.S. 284 (1985) ............................................................................................................ 33

Pacific Gas & Electric Co. v. City of Union City
   220 F. Supp. 2d 1070 (N.D. Cal. 2002) ............................................................................. 63

Paladin Assoc. v. Montana Power Co.
   328 F.3d 1145 (9th Cir. 2003) ............................................................................................ 33

Platte Anchor Bolt, Inc. v. IHI, Inc.
   352 F. Supp. 2d 1048 (N.D. Cal. 2004) ............................................................................. 64

Plymouth Dealers' Ass'n of N. Cal. v. United States
   279 F.2d 128 (9th Cir. 1960) .............................................................................................. 50

Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.
   259 F. Supp. 2d 992 (N.D. Cal. 2003) ............................................................................... 36

Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.
   637 F.2d 1376 (9th Cir. 1981) ............................................................................................ 33

Rothery Storage & Van Co. v. Atlas Van Lines, Inc.
   792 F.2d 210 (D.C. Cir. 1986) ........................................................................................... 33

SCFC ILC, Inc. v. Visa USA, Inc.
   36 F.3d 958 (10th Cir. 1994) .............................................................................................. 30

Sewell Plastics, Inc. v. The Coca-Cola Co.
   720 F. Supp. 1186 (W.D.N.C. 1988) ................................................................................. 33

Smith v. Marsh
   194 F.3d 1045 (9th Cir. 1999) ............................................................................................ 63

SouthTrust Corp. v. Plus Sys.
   913 F. Supp. 1517 (N.D. Ala. 1995) ............................................................................ 34, 36

Standard Oil Co. of Cal. v. Arizona
   738 F.2d 1021 (9th Cir. 1984) ............................................................................................ 39

**TABLE OF AUTHORITIES**
(continued)

Page

State of Nev. v. Watkins
  914 F.2d 1545 (9th Cir. 1990)................................................................. 63

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.
  373 F.3d 57 (1st Cir. 2004)..................................................................... 39

Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors
  786 F.2d 1400 (9th Cir. 1986)................................................................. 33

Teleflora LLC v. Florists' Transworld Delivery, Inc.
  2004 WL 2271602 (N.D. Cal. Oct. 5, 2004)........................................... 63

The Mid-South Grizzlies v. The Nat'l Football League
  720 F.2d 772 (3d Cir. 1983)................................................................... 33

United States ex rel. Giles v. Sardie
  191 F. Supp. 2d 1117 (C.D. Cal. 2000) ................................................. 63

United States v. Alston
  974 F.2d 1206 (9th Cir. 1992)................................................................... 1

United States v. Brown
  936 F.2d 1042 (9th Cir. 1991)........................................................... 39, 40

United States v. Masonite Corp.
  316 U.S. 265 (1942).......................................................................... 6, 58

United States v. Nat'l Ass'n of Real Estate Bds.
  339 U.S. 485 (1950)....................................................... 6, 30, 32, 58

United States v. Romm
  455 F.3d 990 (9th Cir. 2006).................................................................. 63

United States v. Topco Assoc., Inc.
  405 U.S. 596 (1971)................................................................ 10, 27, 57

United States v. Trenton Potteries, Co.
  273 U.S. 392 (1927).............................................................................. 60

White Motor Co. v. United States
  372 U.S. 253 (1963)........................................................................ 37, 38

**OTHER AUTHORITIES**

Steven C. Salop, Deregulating Self-Regulated Shared ATM Networks
  1 Econ. Innov. New Techn. 85 (1990) (Saveri Decl., Exh. 74) ................ 34, 46, 47

1

**TABLE OF AUTHORITIES**

2

**Page**

| Source | Cited as |
|---|---|
| **Declarations Submitted in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' *Per Se* Claim:** | |
| Declaration of Joseph R. Saveri | Saveri Decl. |
| Declaration of Gustavo Bamberger | Bam. Decl. |
| Declaration of Ravi Dhar | Dhar Decl. |
| Declaration of Alan Pohlman | Pohlman Decl. |
| **Declarations Submitted by Defendants in Support of Motion for Summary Judgment on Plaintiffs' *Per Se* Claim:** | |
| Declaration of Ronald V. Congemi (August 2, 2007) | Congemi Decl. |
| Declaration of Dennis F. Lynch (August 3, 2007) | Lynch Decl. |
| Declaration of Elizabeth Lynn (August 2, 2007) | Lynn Decl. |
| Declaration of Richard L. Schmalensee (August 2, 2007) | Schmal. Decl. |
| **Depositions** | |
| Deposition of Kerry L. Brashears (October 30, 2007) | Brashears Dep. |
| Deposition of Michael Clinard (October 16, 2007) | Clinard Dep. |
| Deposition of David C. Cohen (October 9, 2007) | Cohen Dep. |
| Deposition of Ronald V. Congemi (November 2, 2007) | Congemi Dep. |
| Deposition of Gerardo Garcia (October 16, 2007) | Garcia Dep. |
| Deposition of Jennifer Haag (October 30, 2007) | Haag Dep. |
| Deposition of Edward M. Kadletz (October 31, 2007) | Kadletz Dep. |
| Deposition of Dennis F. Lynch (November 6, 2007) | Lynch Dep. |
| Deposition of Elizabeth Lynn (October 30, 2007) | Lynn Dep. |
| Deposition of Jeffrey Pearlberg (November 13, 2007) | Pearl. Dep. |
| Deposition of Ralph A. Perry (October 4, 2007) | Perry Dep. |
| Deposition of Richard L. Schmalensee (November 9, 2007) | Schmal. Dep. |
| Deposition of James Walker (October 11, 2007) | Walker Dep. |

1    I.      **<u>INTRODUCTION</u>**

2              Antitrust law protects competition for the benefit of consumers.  No restraint of

3    trade poses a greater danger to competition – and of inflating prices to consumers – than price-

4    fixing among competitors.  For that reason, courts routinely condemn it as *per se* illegal, even in

5    the context of a joint venture, with only "very narrow" exceptions.  <u>Freeman v. San Diego Ass'n</u>

6    <u>of Realtors</u>, 322 F.3d 1133, 1150 (9th Cir. 2003) (quoting <u>United States v. Alston</u>, 974 F.2d 1206,

7    1209 (9th Cir. 1992)).

8              This litigation involves price-fixing among competitors regarding the fees at

9    automatic teller machines ("ATMs") in the Star Network.  The Court offered the Defendants the

10   opportunity to brief whether the fixing of Star's interchange fees has the kind of exceptional

11   procompetitive effect that would allow Defendants to evade the ordinary *per se* rule against

12   horizontal price-fixing.  November 30, 2006 Memorandum and Order (Dkt. 360) at 6-7.  Despite

13   this opportunity, Defendants have failed to show that their price-fixing falls within any of the

14   very narrow exceptions to the *per se* rule.

15             Out of concern for competition, Ninth Circuit authority holds that horizontal price-

16   fixing as part of a joint venture is procompetitive – and therefore not subject to the *per se* rule –

17   only if two conditions are both met:  (1) the price-fixing is necessary – or reasonably ancillary –

18   to a procompetitive joint venture's provision of a good or service; and (2) the price-fixing has an

19   economic impact other than by increasing prices above competitive levels.  <u>Freeman</u>, 322 F.3d at

20   1151 (to avoid *per se* condemnation, price-fixing must be "reasonably ancillary to the legitimate

21   cooperative aspects of the venture"); <u>Brennan v. Concord EFS, Inc.</u>, 369 F. Supp. 2d 1127, 1135

22   (N.D. Cal. 2005) ("The law is this: Horizontal restraints in the context of a procompetitive joint

23   venture remain unlawful *per se* unless they are necessary to (or, in certain formulations,

24   'reasonably ancillary to') the achievement of the joint venture's procompetitive benefits.").

25             Combining the <u>Freeman</u> framework with the rules for summary judgment,

26   Defendants' motion[1] should be denied if they fail to carry their initial burden of production, or if

27   _____

28   [1] The Bank Defendants and Network Defendants moved separately for summary judgment but
     they seek essentially the same relief and so Plaintiffs refer throughout to Defendants' motion

1    Plaintiffs raise genuine issues of material fact, regarding either of these two key issues.  *See*

2    Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102-03 (9th Cir.

3    2000) (discussing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v.

4    Catrett, 477 U.S. 317, 322 (1986)).

5                 Defendants have failed to meet their initial burden at summary judgment on either

6    issue.  "In order to carry its burden of production, the moving party must produce either evidence

7    negating an essential element of the nonmoving party's claim or defense or show that the

8    nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at

9    trial."  *Id.* at 1102.  Defendants have not made an initial showing that the *fixing* of Star's ATM

10   interchange fees is necessary, nor have they even denied that Star's fixed interchange fees raise

11   prices above competitive levels.  Indeed, their arguments for the effects of fixed interchange fees

12   implicitly depend on the fees raising prices in this manner.

13                Moreover, even if Defendants had carried their initial burden at summary

14   judgment, the evidence contradicts Defendants on both key points.  First, it establishes that the

15   Star ATM network could function perfectly well if it eliminated fixed interchange fees and if

16   ATM owners received compensation only through surcharging, an already prevalent practice in

17   which prices are set competitively.  Second, the evidence shows that the economic effect of the

18   fixed interchange fee has been to raise ATM prices above competitive levels.  This evidence is

19   fatal to Defendants' motion.

20                Defendants have deployed various strategies in the face of the overwhelming law

21   and evidence adverse to their position.  First, they use the "Chicken Little" defense – if

22   Defendants stopped fixing interchange fees, they claim, cardholders would no longer have access

23   to ATMs at all.  But this is untrue.  Defendants conflate the rules necessary for universal

24   acceptance – rules that allow Star cardholders to withdraw cash from any Star ATM – with the

25   fixing of interchange fees.  In reality, Star could eliminate any rule mandating fixed interchange

26   _____

27   ("Def.'s Mot.").  Where necessary, Plaintiffs refer separately to Motion and Memorandum in
     Support of Bank Defendants' Motion for Summary Judgment on Plaintiffs' *Per Se* Claim ("Bank
     Def.'s Mot.") and Motion and Memorandum in Support of Concord EFS, Inc.'s and First Data

28   Corp.'s Motion for Summary Judgment on Plaintiffs' *Per Se* Claim ("Network Def.'s Mot.").

fees and the ATM network could perform perfectly well.  No calamity would result even if, as Defendants argue, without *fixed* interchange fees, bilateral negotiations would be impracticable and Star's interchange fees would disappear entirely.  In that case, ATM owners could receive all of their revenues from competitively-set surcharges.  Defendants refuse to address this alternative – an alternative which explains why Defendants could cease fixing prices without the sky falling.

Defendants' second strategy is to ignore the fundamental tenet of antitrust law – the principle that efficiency should be promoted through competition.  Defendants do not deny that fixed interchange fees increase ATM owner revenues above competitive levels.  What they argue in effect is that those supra-competitive revenues have beneficial effects, including encouraging ATM deployment and promoting the "scope" of the network.  Bank Def.'s Mot. at 23.  But this argument is tantamount to a confession of liability.  Agreements to restrain competition and raise prices above competitive levels are illegal, even if inflated prices have some potentially beneficial effects.  Raising prices above competitive levels is a reason to condemn price-fixing, not a way to justify it.  Freeman, 322 F.3d at 1152 (discussing Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978)).

Defendants' third strategy is to pretend that courts will not condemn horizontal price-fixing as *per se* illegal unless they have condemned the precise arrangement before.  In effect, Defendants argue that courts decide whether to apply the *per se* rule case by case, industry by industry, rather than according to category of conduct.  The reality is that courts have determined that they have sufficient experience with horizontal price-fixing to scrutinize it, even in the context of a joint venture.  Freeman, 322 F.3d at 1151.  Antitrust defendants routinely make the argument that their particular industry is so complex that basic antitrust principles do not apply, and courts just as routinely reject that argument.  *See, e.g.*, Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332 (1982); Freeman, 322 F.3d at 1151 (finding that elements of novelty are irrelevant to whether support fees are fixed or set competitively).  Courts simply do not start from scratch every time they see horizontal price-fixing.

1    Defendants' fourth strategy is to deny they have any economic motivation to

2    "establish[] Star's ATM interchange fee for an anticompetitive purpose."[2]  Some of the large

3    banks, they assert, pay more interchange fees than they receive – so why would they want inflated

4    interchange fees?  And networks compete with one another to attract members – so why wouldn't

5    competition among networks drive inflated interchange fees from the market?

6    These arguments mistake how fixed interchange fees operate.  They benefit the

7    Bank Defendants:  as ATM owners these banks receive supra-competitive revenues; and as card

8    issuers they are able to recoup the interchange fees from cardholders through inflated foreign

9    fees.[3]  And, of course, entities that are purely ATM owners do not pay interchange fees at all.

10   The only real losers are cardholders.  They pay a higher total price for foreign ATM transactions

11   because they tend to be unaware of and less sensitive to hidden foreign fees – which are inflated

12   through fixed interchange fees – and to focus only on the surcharges that appear on the ATM

13   screen.[4]  Indeed, as Donald Baker, defense counsel in this case, testified before Congress, "The

14   whole idea of the interchange fee was to make the pricing between the ATM owner and the card-

15   issuer's bank invisible to the consumer, and thus encourage the consumers to use what was then a

16   relatively unfamiliar technique."[5]

17   Nor does competition among networks ameliorate the harm from fixed interchange

18   fees.  To the contrary, each network, in competing with other networks, has an incentive to gouge

19   consumers by maintaining fixed and hidden fees and to share the booty among its members.

20   Thus, raising prices to consumers through fixed interchange fees is as sensible in economic terms

21   as it is forbidden under antitrust law.[6]

22   _____

23   [2] Bank Def.'s Mot. at 19.
     [3] Bam. Decl.¶¶ 19-20.

24   [4] Bam. Decl. ¶¶ 11-16.
     [5] Saveri Decl., Exh. 14 at PLTF-039674 (Analysis of the Impact of ATM Double-Charges on

25   Consumers and Competition, 105th Cong. (1997) (Testimony of Donald Baker)); *See also* Saveri
     Decl., Exh. 15  (Hidden ATM Fees To Be Outlawed, theage.com at 1 (Sept. 1, 2007)) (noting

26   Australian plan to outlaw ATM interchange fees and quoting the Australian Reserve Bank: "The
     board also expects the removal of hidden interchange fees will lead to substantial reductions in,

27   and perhaps the abolition of, the 'foreign fees' that most banks currently charge their customers
     for using ATMs owned by another institution.").

28   [6] Bam. Decl. ¶¶ 49-52.

1      Defendants' final strategy – one that permeates their briefs – is to shift the focus

2   from the effects of price-fixing on consumers to its effects on competitors.  Defendants argue that

3   fixed interchange fees encourage ATM deployment, help Star to compete with other networks,

4   promote its growth, and serve the interests of its members.  Even if these claims were true, none

5   of them matter.  Antitrust laws protect competition, not competitors.  Brunswick Corp. v. Pueblo

6   Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the

7   protection of *competition*, not *competitors*.'").  Those laws ban above all else horizontal

8   agreements that inflate prices to consumers.  Fixed interchange fees raise ATM fees above

9   competitive levels.  For that reason, they cannot qualify as procompetitive and they are *per se*

10   illegal.

11      Finally, even if Defendants were to prevail at summary judgment, they are not

12   entitled to the relief they seek.  They have asked this Court to enter a final judgment in their

13   favor, even though their only argument is that their conduct is not *per se* illegal.  They have not

14   contended that their conduct is legal under a quick look or rule of reason theory.  Plaintiffs are

15   entitled to pursue liability under those theories, even if this Court were to rule they cannot

16   proceed under a *per se* theory.  Crull v. GEM Ins. Co., 58 F.3d 1386 (9th Cir. 1995).

17   **II.    SUMMARY OF THE ARGUMENT**

18      This case involves fixed fees – ATM interchange fees – that, whatever their

19   original utility, are nothing more today than a naked restraint of trade.  These fees remain fixed

20   only because they have gone unchallenged and because they provide a stream of income shielded

21   from competitive forces to banks and ATM owners, not because they are in any respect truly

22   procompetitive.

23      Banks began using ATMs because they are less expensive than tellers.  At first,

24   banks provided ATMs only for their own customers.  Later, however, they realized that they

25   could attract and retain more customer accounts if their customers could perform certain

26   transactions – particularly if they could withdraw cash – from ATMs owned by other banks,

27   giving rise to so-called "foreign" ATM transactions.  To facilitate ATM transactions, the banks

28   formed ATM networks within their geographic area of operation.  The networks facilitated

1  reimbursement of the ATM owner for the amount dispensed.  A mechanism was also necessary to

2  compensate ATM owners for dispensing cash to the card issuing bank's cardholders.  That

3  compensation was accomplished through a fee, known as an interchange fee, that the card issuing

4  bank paid to the ATM owner.  The interchange fee was intended to be cost-based and was agreed

5  upon by all members of the network.  The card issuing bank, in turn, incorporated the interchange

6  fee into a fee it charged its cardholder, called a foreign ATM fee.

7          Since mid-1996, the interchange fee has been unnecessary to the existence and

8  operation of ATM networks because of the widespread imposition of surcharges.  Surcharges are

9  fees for foreign ATM use which ATM owners negotiate directly with cardholders.  They are set

10  independently by ATM owners, based on the ATM owner's assessment of market conditions.  A

11  cardholder is notified of the amount of the surcharge on the ATM screen, as well as on a sign

12  posted by the ATM.  He or she can agree to pay the surcharge or simply walk away, perhaps to a

13  nearby ATM with a lower surcharge.  Surcharges, unlike fixed interchange fees, are therefore

14  subject to the ordinary price competition that antitrust laws are designed to facilitate.  Yet ATM

15  networks and their members – including Star – retained interchange fees and, far worse from an

16  antitrust perspective, continued to set and abide by uniform fixed interchange fees.  ATM owners

17  in the Star network are thus paid twice for the same foreign ATM transaction – once by a

18  competitively set fee (the surcharge) and once by a fee that is fixed by agreement (the interchange

19  fee).

20          On its face this conduct is a *per se* antitrust violation.  Star and its members are

21  engaging in horizontal price-fixing – fixing the price by which competitors (ATM owners) all

22  agree to abide.  *See* United States v. Masonite Corp., 316 U.S. 265, 276 (1942) ("Prices are fixed

23  when they are agreed upon."); United States v. Nat'l Ass'n of Real Estate Bds., 339 U.S. 485,

24  488-89 (1950); Goldfarb v. Virginia State Bar, 421 U.S. 773, 782 (1975).  Horizontal price-fixing

25  is illegal.  Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332 (1982); Freeman, 322 F.3d at

26  1144.  This rule generally applies to horizontal price-fixing by a joint venture.  Freeman, 322 F.3d

27  at 1150-1151.

28

1          The Ninth Circuit has held that such price-fixing is procompetitive – and therefore

2    falls outside the *per se* rule – only if it is both:  (1) necessary for a joint venture to provide a good

3    or service at all; *Id.; see also* <u>Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.</u>,

4    441 U.S. 1, 23 (1979) (cooperative arrangements among competitors not unlawful as price-fixing

5    schemes "where the agreement on price is necessary to market the product at all"); and

6    (2) facilitates the joint venture in some way other than by raising prices above competitive levels.

7    <u>Freeman</u>, 322 F.3d at 1152 (justifications that "depend on power over price for their efficacy" are

8    rejected "as a matter of antitrust policy"); <u>Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the</u>

9    <u>Univ. of Okla.</u>, 468 U.S. 85, 117 (1984) ("NCAA") (holding restraint of trade cannot be justified

10   "based on the assumption that competition itself is unreasonable"); <u>Nat'l Soc'y of Prof'l Eng'rs</u>,

11   435 U.S. at 693 (rejecting defense resting "on assumption that the agreement will tend to maintain

12   the price level"); <u>Brennan</u>, 369 F. Supp. 2d at 1135.  Defendants' motion should be denied

13   because Defendants have failed to carry their initial burden on either of these issues, and

14   Plaintiffs have raised genuine issues of material fact about each one.[7]

15         For purposes of Defendants' pending motion for summary judgment, they have not

16   denied that they have engaged in horizontal price-fixing regarding interchange fees, which are

17   part of the foreign fees that card issuing banks charge cardholders.[8]

18         Nor have Defendants shown that Star's fixed interchange fees are necessary.  Star

19   could function perfectly well, and Star ATM owners could be reimbursed for cash dispensed, if

20   the rule requiring payment of fixed interchange fees were eliminated.  Defendants have refused to

21   address this obvious possibility.  Instead they rest their entire case on a sophism – that eliminating

22   fixed interchange fees is the same as fixing fees at $0 and for this reason their fixing of a price at

23   whatever level they please is immune from antitrust scrutiny.  But Star could eliminate the rule

24   requiring payment of fixed interchange fees without fixing interchange fees at $0 or at any other

---

26   [7] Defendants ask the Court to ignore the summary judgment rules and to impose a new summary judgment standard that places on Plaintiffs, the parties opposing summary judgment, an extraordinarily high burden.  As discussed below, that is, of course, nonsense.  *See infra* Part V.

27   [8] Bank Def.'s Mot. at 5, note 4.  *See also* <u>In re ATM Fee Antitrust Litigation</u> (May 23, 2007), No.

28   C04-2676 CRB, 5: 10-11 ("there's no question we price fix").

1    amount.  Star could simply leave ATM owners and card issuers free to negotiate and pay

2    interchange fees between themselves, or not to do so if such fees would not be worth charging or

3    would be impractical.[9]  Defendants refuse to address this alternative based on just the kind of

4    formalistic reasoning this Court rejected in terminating Defendants' last motion for summary

5    judgment.[10]

6              Nor can Defendants prevail by pretending that Star's fixed interchange fees are a

7    "default" rather than mandatory.  Fixing a "default" fee is *per se* illegal, and, in any case, the term

8    "default" was apparently concocted by defense counsel, as it appears nowhere in the business

9    records produced by Star or the Bank Defendants.[11]

10             Defendants also have not shown that fixed interchange fees have an economic

11   effect in some way other than by providing ATM owners supra-competitive revenues.  In a

12   perfectly efficient market, one would expect interchange fees would have *no economic effect* –

13   competitive pressures would force ATM owners to decrease their surcharges by the amount of

14   interchange fees and would allow card issuers to increase foreign fees by the same amount.[12]

15   This lack of economic impact is known as neutrality.[13]  Some explanation of non-neutrality is

16   necessary, but Defendants provide none.[14]

17             Instead, Defendants' justifications for Star's fixed fees *assume* that interchange

18   fees *do* have an economic impact, including allegedly encouraging ATM deployment and

19   increasing output.[15]  However, Defendants do not explain why the fixed fees have this economic

20

21   _____

     [9] Defendants have argued that bilateral negotiations are not possible.  But, if so, that would mean
22   at most that, in the absence of price-fixing, interchange fees would disappear, not that they would
     be *fixed* at $0.  *See infra* Part VI.A.

23   [10] Memo. and Order (Dkt. 360) at 5-6 (Nov. 30, 2006).  *See also infra* Part VI.A.

     [11] It is telling that the Network Defendants – in contrast to the Bank Defendants – chose not to use
24   the term "default" anywhere in its brief in describing interchange fees. *See also infra* note 41.

     [12] Bam. Decl. ¶¶ 29-30.
25   [13] *Id.*

26   [14] *Id.* ¶ 31. *See also infra* Part VI.B.

     [15] Defendants argue, for instance, that interchange fees increase ATM deployment to the alleged
27   benefit of consumers.  Bank Def.'s Mot. at 22-23.  Such an argument rests on the fact that ATM
     owners receive more from surcharges plus interchange fees than they would from surcharges
28   alone, in the absence of fixed interchange fees.  Unless interchange fees increase ATM owner

1    impact.[16]  If this economic impact occurs because fixed interchange fees raise prices above

2    competitive levels, it is unacceptable under the antitrust laws.  Freeman, 322 F.3d at 1152; *see*

3    *also* NCAA, 468 U.S. at 117; Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 692-93.

4              The primary explanation for non-neutrality is that, unlike surcharges, interchange

5    and foreign fees are hidden from view.[17]  Consumers are more sensitive to surcharges – which

6    appear on the ATM screen at the time of the transaction – than to foreign fees – which are buried

7    in bank notices and bank statements.[18]  ATM owners can charge interchange fees on top of

8    surcharges without causing the kind of decrease in transaction volume that would occur if they

9    increased their surcharges by the amount of the interchange fees.  Thus, the natural tendency of

10   Star's fixed interchange fees is to raise ATM owner compensation above competitive levels,

11   Bam. Decl. ¶¶ 2, 4, 16, as Defendants implicitly concede.[19]  Meanwhile, card issuing banks can

12   recoup Star's interchange fees by increasing their foreign fees.[20]  The net result is to increase the

13   total fees cardholders pay by allowing ATM owners to share a portion of the hidden fee side of

14   the ATM transaction.  The total price of a foreign ATM transaction to a cardholder – the foreign

15   fee (which includes the interchange fee) plus the surcharge – goes up.  So do ATM owner

16   revenues, above the more competitive pricing levels that occur through surcharging.[21]

17             This explanation is fatal to Defendants' motion – and, indeed, to their case on the

18   merits.  Yet Defendants have not provided any plausible alternative account of the economic

19   impact of fixed interchange fees.[22]  Thus, on the two critical issues, Defendants have made no

20

21   _____

     revenues, there is no reason why ATM owners would deploy more ATM machines with
22   interchange than without it.  Bam. Decl. ¶¶ 30-31, 46.
     [16] Bam. Decl. ¶¶ 32-46.

23   [17] Bam. Decl. ¶¶ 13, 31; Dhar Decl. ¶ 11.  It is also easier for cardholders to choose between
     ATMs to seek low surcharges than between bank accounts to seek low foreign fees.  *See* Saveri
24   Decl., Exh. 74  (Steven C. Salop, Deregulating Self-Regulated Shared ATM Networks, 1 Econ.
     Innov. New Techn. 85, 93, n. 12 (1990)).

25   [18] Bam. Decl. ¶¶ 13-16; Dhar Decl. ¶¶ 11, 13-15.

     [19] Bam. Decl. ¶ 31.
26
     [20] Because interchange fees are fixed, they raise costs to all Star card-issuers, inflating foreign
27   fees across banks.  Bam. Decl. ¶ 10 & n. 10.

     [21] Bam. Decl. ¶¶ 2, 4, 16.
28   [22] Bam. Decl. ¶¶ 23-27.

1    meaningful effort to carry their initial burden at summary judgment.  For this reason alone their

2    motion fails.

3            Even if Defendants had carried their initial burden, their attempt to show the

4    purported benefits of fixed interchange fees is unsupported as a matter of law and as a matter of

5    fact.  Defendants claim that Star's fixed interchange fees benefit Star and its members in various

6    ways:  balancing the interests of card issuers and ATM owners, promoting Star's operation and

7    growth, maximizing Star's output, and enabling Star to compete with other networks.  As noted,

8    this claim fails as a matter of law, first, because the putative beneficial effects of Star's fixed

9    interchange fees occur only because those fixed fees increase ATM owner revenue above

10   competitive levels.  Second, *horizontal* price-fixing among *ATM owners* cannot be justified as a

11   way to facilitate competition among *networks*; horizontal price-fixing is simply *per se* illegal.

12   Brennan, 369 F. Supp. 2d at 1135 (discussing United States v. Topco Assoc., Inc., 405 U.S. 596

13   (1971) (horizontal price-fixing cannot be justified by interbrand competition)).[23]

14           Defendants' purported justifications for price-fixing also fail on the facts.  Most

15   important, Star and the other ATM networks each have an incentive to exploit imperfect

16   consumer knowledge to increase prices for foreign ATM transactions.[24]  This means that

17   competition between the networks encourages the use of fixed interchange fees to raise prices

18   above competitive levels.  And, again, the benefits of supra-competitive prices cannot justify

19   horizontal price-fixing.

20           Defendants' purported justifications also depend on various factual assertions that

21   are contradicted by the evidence.  This is true, for example, of Defendants' claim that they finely

22   calibrate interchange fees to "balance" the interests of card issuers and ATM owners, to maximize

23   output, to compete with other networks, and the like.  This alleged calibration is contradicted by

24   Star's failure to alter its fixed interchange fees in any significant way for decades as

25   circumstances have changed over time, and by testimony that establishes that Star attracts – and

26

27   _____

     [23] *See infra* Part VII.

28   [24] Bam. Decl. ¶¶ 12-16.

meets the needs of – its members primarily through other means, including adjusting switch fees, membership fees and signing bonuses.[25]

Indeed, virtually the only evidence Defendants offer in support of their motion are declarations, which the declarants have admitted were written largely by lawyers[26] and which contain numerous assertions regarding which the declarants have confessed a lack of personal knowledge.[27]  These deficiencies confirm what would be true anyway – Defendants' motion for summary judgment should be denied.

Moreover, Plaintiffs also have not had an adequate opportunity for discovery regarding the putative procompetitive benefits of Defendants' price-fixing.[28]

Finally, even if, despite these deficiencies, Defendants were to prevail on their motion, they would not be entitled to the relief they seek.  Defendants ask the Court to enter a final judgment based on their argument that their conduct is not *per se* illegal.  But this Court has

---

[25] See *infra* Part VII.

[26] Saveri Decl., Exh. 16  (Email from Defense counsel accompanying initial draft – "we put together" – of declaration of James Walker used in this case.); Saveri Decl., Exh.9 [Lynn Dep.] at 7:22-8:7 (admits outside counsel for Network Defendants wrote first draft of her sworn declaration), 9:12-16 (admits she made no changes to her declaration without consultation of Defendants' counsel), 10:8-15 (admits all changes to declaration were provided to her by Defendants' counsel); Saveri Decl., Exh. 11 [Perry Dep.] at 9:25-10:24 (admits he did not draft his sworn declaration and does not know who did); Saveri Decl., Exh. 1 [Brashears Dep.] at 110:11-13 (admits he did not draft his sworn declaration and does not know who did), 111:13-16 (admits he made no substantive changes to the draft of his sworn declaration provided by his counsel); Saveri Decl., Exh. 8 [Lynch Dep.] at 76:19-77:1 (█████████████████████████████████████████████████████████████); Saveri Decl., Exh. 4 [Congemi Dep.] at 153:12-21 (Asked about phrase in his sworn declaration, Congemi states: "It sounds rather poetic for me. . .  but I guess those are my words."); Saveri Decl., Exh. 10 [Pearl. Dep.] at 25:22-28:4 (████████████████████████████████████████████████).

[27] Saveri Decl., Exh. 7 [Kadletz Dep.] at 30:23-31:1 (████████████████████████████████████████████████████████), 67:3-17 (████████████████████████████████████████); Saveri Decl., Exh. 6 [Haag Dep.] at 239:15-240:1 (████████████████████████████████████████████████████████████); Saveri Decl., Exh. 3 [Cohen Dep.] at 159:8-20 (Asked if he knows "the justification or purpose of interchange fees on foreign ATM transactions is or has been," Cohen answers: "Yeah, I really don't know."); Saveri Decl., Exh. 9 [Lynn Dep.] at 153:5-157:7, 162:18-163:15 (no personal knowledge regarding banks' position on bilateral agreements and uniform interchange fees, or that surcharges would increase if interchange fees were eliminated, contradicting portions of her sworn declaration).

[28] See *infra* Part VIII.

1    already ruled that Plaintiffs have stated a claim under Section 1 of the Sherman Act. Brennan,

2    369 F. Supp. 2d 1127. Having done so, Plaintiffs may pursue that antitrust claim under any legal

3    theory, whether it is *per se*, rule of reason, or quick look. Crull v. GEM Ins. Co., 58 F.3d 1386

4    (9th Cir. 1995). Plaintiffs have made clear their intention to pursue their claims under all three

5    theories.[29] Thus, the most the Defendants can legitimately ask the Court to do is grant partial

6    summary judgment preventing Plaintiffs from pursuing a *per se* theory, but allowing Plaintiffs to

7    proceed under a rule of reason or quick look theory.[30]

8    **III.    STATEMENT OF FACTS**

9        **A.    Background.**

10                Banks introduced ATMs in the 1970s to dispense cash on bank premises and give

11   bank customers 24-hour access to their accounts while cutting costs, especially on human

12   tellers.[31] The industry later introduced off-premises ATMs and shared ATM networks – which

13   allowed cardholders wider access to ATMs via "foreign" ATM transactions, i.e., at ATMs not

14   owned by their bank.[32] At the outset, ATM networks compensated foreign ATM owners for such

15   transactions with a fixed interchange fee, intended to approximate the cost of a foreign ATM

16   transaction.[33]

17   _____

18   [29] *See, e.g.,* Memorandum of Points and Authorities in Support of Motion for Entry of Pretrial
     Scheduling Order Setting Master Litigation Schedule at 5 (filed June 12, 2007).

19   [30] *See infra* Part IX.

20   [31] Saveri Decl., Exh. 17 at 24-17 (Donald Baker and Roland Brandel, The Law of Electronic
     Fund Transfer Systems (2004).); Saveri Decl., Exh. 9 [Lynn Dep.] at 14:15-15:3 ("The initial

21   ATMs were deployed as a replacements for tellers. The object was to try to move transactions
     out of the branch that could be facilitated by an ATM rather than a human being … [ATMs were]

22   a lower cost way of providing transactions.").

     [32] Saveri Decl., Exh. 17 at 24-17.

23   [33] Saveri Decl., Exh. 14 at PLTF-039672 (Analysis of the Impact of ATM Double-Charges on
     Consumers and Competition: Hearing Before the S. Banking Comm., 105th Cong. (1997)

24   (Testimony of Donald Baker: "[N]etworks from the outset, established these interchange fees that
     were designed to compensate the bank for the cost of doing so, of letting the card in.")); Saveri

25   Decl., Exh. 18 at WFB044341 (

26

27                                                          ); Saveri Decl., Exh. 19 at
     ICBA006641 (Banks Reported That Use of Surcharge Fees Has Increased, 105th Cong. (1997)

28   (Prepared Testimony of the General Accounting Office citing statement of the Electronic Funds

**B.** **Star's Fixed ATM Fees.**

Among other pursuits, Star operates an ATM network.

[34] All Star members – including the Bank Defendants – have agreed to abide by the fixed interchange fee.[35] Card issuers can recoup their interchange costs by charging cardholders a foreign ATM fee for using another bank's ATM.[36]

Star's fixed interchange fee is "written in stone"[37] – that is, immutable and non-negotiable.[38]

---

Transfer Association: "Interchange was intended to reimburse ATM-operating banks for the incremental cost of making their ATMs available to other banks' customers.").

[34] Saveri Decl., Exh. 20 (

Saveri Decl., Exh. 21

Saveri Decl., Exh. 22                                    Saveri Decl., Exh. 23

Saveri Decl., Exh. 24

Saveri Decl., Exh. 25

[35] Saveri Decl., Exh. 26 at STAR00117643, STAR00117878

; Saveri Decl., Exh. 27 at STAR00112163, STAR00112194

; Saveri Decl., Exh. 28 at STAR00057792

Saveri Decl., Exh. 29 at WFB068996

; Saveri Decl., Exh. 30 at WFB069025

; see also infra notes 37-43.

[36] Saveri Decl., Exh. 11 [Perry Dep.] at 46:8-47:8 ("[The fee] was intended to recoup - - to recoup the cost of the interchange fee, plus charge the customer a little bit for the added value of using a foreign ATM."); Saveri Decl., Exh. 19 at ICBA006639 (Banks Reported That Use of Surcharge Fees Has Increased, 105th Cong. (1997) (Prepared Testimony of the General Accounting Office before Senate Banking Committee citing statement of the Electronic Funds Transfer Association: "Banks typically charge a fee for using a 'foreign' ATM because they incur additional costs such as network and interchange fees.")); Saveri Decl., Exh. 31 at WFB019785

; Saveri Decl., Exh. 32 at ST0008063-8064

).

[37] Saveri Decl., Exh. 4 [Congemi Dep.] at 95:21-96:6.

1 ██████████████████████████████████████[39] Defendants have not cited a single

2 instance in which a card issuer paid any amount other than Star's fixed interchange fee for a

3 foreign ATM transaction routed over the Star network.  The Bank Defendants, however,

4 repeatedly mischaracterize Star's fixed interchange fee a "*default* system-wide interchange fee."[40]

5 But this is a fiction created by Defendants' counsel. ███████████████████████

6 ████████████████████████████████████████████████████████████

7

8

---

9 [38] Saveri Decl., Exh. 8 [Lynch Dep.] 148:17-149:23 (████████████████████████

10 ████████████████████████████████████████████████████); ████████████████
Saveri Decl., Exh. 12 [Schmal. Dep.] at 105:15-18 (██████████████████████████████

11 ████████████████████████████████████); Saveri Decl.,
Exh. 9 [Lynn Dep.] at 192:5-193:9 (The 1985 Star Network Operating Rule 6.4 obligates
members to pay the interchange fee specified in the appendix, including the interchange fee);

12 Saveri Decl., Exh. 9 [Lynn Dep.] at 195:4-196:10 (The 1998 Star Network Operating Rule 7.4
obligates members to pay the interchange fee specified in the appendix, including the interchange

13 fee); Saveri Decl., Exh. 9 [Lynn Dep.] at 196:11-14 (Star's current rules require members to pay
interchange fees set by the network); Saveri Decl., Exh. 1 [Brashears Dep.] at 48:19-24, 131:9-14,

14 132:1-23 (Charging a different interchange fee than that set by Star is not an option; all Star rules,
including interchange, are mandatory rules; he does not know of any instance in which SunTrust

15 would have the ability to deviate from the rules); Saveri Decl., Exh. 5 [Garcia Dep.] at 97:25-
98:23 (Star's rules, including the charging of interchange, are mandatory); Saveri Decl., Exh. 6

16 [Haag Dep.] at 79:8-11 (████████████████████████████████████████
██████████████████).

17 [39] Saveri Decl., Exh. 7 [Kadletz Dep.] at 71:1-12 (████████████████████████████

18 ████████████████████████████████████████████████████████);
Saveri Decl., Exh. 3 [Cohen Dep.] at 163:15-20 (Bank One has never received an interchange fee

19 on Star ATM foreign transactions that deviated from the amount fixed by Star); Saveri Decl.,
Exh. 1 [Brashears Dep.] at 132:24-133:21 (Not aware of anyone at SunTrust discussing with

20 another financial institution the setting of a different interchange fee).

21 [40] Indeed, the genesis of Defendants' summary judgment motion is their filing in response to the
Court's request:  "Defendants' Preliminary Identification of Procompetitive Justifications for the

22 Setting of a *Default System-Wide Interchange Fee* for the Star ATM Network" dated March 1,
2007, Saveri Decl., Exh. 33 (emphasis added).

23

24

25

26

27

28

1    ▮▮▮▮▮▮▮▮▮▮[41]    Similarly, two high-ranking executives of Cardtronics, the largest

2    ATM owner in the United States,[42] had never heard the term at all.[43]

3                  The Star network itself does not derive revenue directly from ATM interchange

4    fees.[44] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮[45] Star's switch fees have been approximately $0.05 per transaction.[46]

6         **C.**    **The Advent of Surcharges.**

7                  For some time, the national ATM networks – Cirrus and Plus (which are owned by

8    MasterCard and Visa, respectively) – did not allow ATM owners to charge cardholders directly

9    through surcharges. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10

---

11   [41] Saveri Decl., Exh. 8 [Lynch Dep.] at 283:19-284:22 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮); Saveri Decl., Exh. 12 [Schmal. Dep.] at 22:3-18 (▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Saveri Decl.,
     Exh. 3 [Cohen Dep.] at 237:15-238:12 (He heard the term "default interchange" only in

14   conjunction with this case; other than through defense counsel, he has never heard of the concept
     of "default interchange"); Saveri Decl., Exh. 10 [Pearl. Dep.] at 263:24-264:6 (▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Saveri Decl., Exh. 13 [Walker Dep.] at 18:11-19;
     19:2-11 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮); Saveri Decl., Exh. 6 [Haag Dep.] at 216:21-217:18 (▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

17   [42] Saveri Decl., Exh. 34 at 17 (2008 EFT Data Book).

18   [43] Saveri Decl., Exh. 5 [Garcia Dep.] at 37:10-11; Saveri Decl., Exh. 2 [Clinard Dep.] at 56:10-12.

19   [44] Saveri Decl, Exh. 4 [Congemi Dep.] at 25:2-11 (The ATM interchange fee "flows as a pass-
     through between issuing and acquiring financial institutions."); Saveri Decl., Exh. 35 at
     STAR00045082 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮"); *see also* Saveri Decl., Exh. 3 [Cohen Dep.] at 79:8-14 (Interchange fee is paid

22   from the issuer to the acquirer); Saveri Decl., Exh. 11 [Perry Dep.] at 39:11-12 (In the ATM
     world, the interchange fee is paid by the card issuer to the ATM owner bank); Saveri Decl., Exh.

23   10 [Pearl. Dep.] at 55:14-22 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

24   [45] Saveri Decl., Exh. 26 at STAR00117878 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮); Saveri Decl., Exh. 27 at STAR00112194 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   ▮▮▮); Saveri Decl., Exh. 28 at STAR00057792 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Saveri Decl., Exh. 29 at

27   WFB068996 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Saveri Decl.,
     Exh. 30 at WFB069025 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

28   [46] Congemi Decl. ¶ 12.

[47]

[48] Yet neither interchange fees nor foreign fees decreased.[49] So, without any increase in per transaction cost to provide foreign ATM services, ATM owners revenues increased significantly.[50]

---

[47] Saveri Decl., Exh. 36 at ST0009756; Saveri Decl., Exh. 37 at CBW0041608.

[48] Saveri Decl., Exh. 38 at PLTF-041626 (1999 ATM Deployer Study Executive Summary); Saveri Decl., Exh. 39 at ST 0012142 (
Saveri Decl., Exh.1 [Brashears Dep.] at 47:1-3, 52:6-10 (ATM interchange fees increase ATM owner's revenue; surcharging is a way for banks to generate additional revenue from ATM transactions).

[49] Lynn Decl. ¶ 14 (Star's interchange fee remained the same from 1990 through 2003.); Saveri Decl., Exh. 40 at 3 (2001 U.S. Public Interest Research Group Surcharge Survey shows the average foreign fee increased from $1.01 in 1996 to $1.39 in 2001.).

[50] Indeed, at the time surcharging became prevalent, ATM transaction costs on the whole were decreasing. Saveri Decl., Exh. 41 at STAR00028275 (
).

[51] Some Bank Defendants do not charge foreign fees to certain account holders, who are not part of the purported California Damages Class or non-California Damages Class. FAC, ¶¶ 44-45.

[52] Schmal. Decl. ¶ 11 ("For transactions at another bank's ATMs, she will often, but not always, incur a surcharge set by the ATM owner; she also may incur a 'foreign fee' from her bank for using a foreign ATM…"); Saveri Decl., Exh. 42 at STAR 00079895

); Saveri Decl., Exh. 43 at CBW0054930 (
); Saveri Decl., Exh. 31 at WFB019785 (

); Saveri Decl., Exh. 44 at WFB020259 (

"); Saveri Decl., Exh. 18 at WFB044341 (

"); Saveri Decl., Exh. 45 at STAR00124827 (Chart summarizing ATM transactions); Saveri Decl., Exh. 46 at B1-0072951 (
).

The rescission of the ban on surcharging resulted in a wave of ATM deployment.[57]
A new breed of ATM owner emerged that did not issue cards, the Independent Service
Organization ("ISO").[58]

---

[53] Pohlman Decl. ¶¶ 76-80; Saveri Decl., Exh. 47 at ICBA007536 (                        ); Saveri Decl., Exh. 48 at WACHB177971 (                        ); see also infra Part VI.A.

[54] Saveri Decl., Exh. 49 at WFB004027 (                        ); Saveri Decl., Exh. 50 at WFB004271 (                        ); Saveri Decl., Exh. 51 at STAR00124391 (                        ); Saveri Decl., Exh. 44 at WFB020259 (                        )

[55] Saveri Decl., Exh. 52 at STAR 00109371 (                        ).

[56] Saveri Decl., Exh. 8 Dep.] at 204:21-207:5.

[57] The total number of ATMs in the United States in 1998 grew by 34 percent over 1996. Saveri Decl., Exh. 38 at PLTF 041627 (1999 ATM Deployer Study); Pohlman Decl.¶¶ 69-70.

[58] Pohlman Decl. ¶ 71; Saveri Decl., Exh. 38 at PLTF41627-29 (1999 ATM Deployer Study).

[59] Pohlman Decl. ¶ 72; Saveri Decl., Exh. 39 at ST00012143 (                        ); Saveri Decl., Exh. 53 at ST0025007 (                        ); Saveri Decl., Exh. 54 at ST0012307 (                        ); Saveri Decl., Exh. 55 at ST0009344 ("                        ); Saveri Decl., Exh. 56 at STAR00029466 (                        ); Saveri Decl., Exh. 57 at CBW0056951 (                        ); Saveri Decl., Exh. 1 [Brashears

ATM owners continue to collect both interchange fees and surcharges.

[60]

**D.    The Current Market Characteristics.**

**1.    Consumer Sensitivity to Surcharges and Foreign Fees**

[61]

[62]

[63]

[64]

[65]

[66]

---

Dep.] at 168:21-169:6 (Brashears testified that in 2002 the market was saturated with ATMs in the areas where SunTrust owned ATMs).

[60] Saveri Decl., Exh. 40 at 3 (2001 U.S. Public Interest Research Group Surcharge Survey); Saveri Decl., Exh. 58 at STAR 00124586 (                                    ).

[61] Bam. Decl., ¶¶ 2, 4, 16.

[62] Pohlman Decl. ¶ 67; Saveri Decl., Exh. 59 at 6-54 ("ATM operators are prevented from charging excessive fees by the competitive market to provide cash access to consumers."); Saveri Decl., Exh. 60 at B1-0065626 (                                    ); Saveri Decl., Exh. 39 at ST0012149 (

); *see also* Saveri Decl., Exh. 3 [Cohen Dep.] at 205:16-206:4 (

); Saveri Decl., Exh. 11 [Perry Dep.] 43:20-44:5 (                                    ); Saveri Decl., Exh. 13 [Walker Dep.] at 65:13-65:25

).

[63] Bam. Decl. ¶¶ 8-16; Pohlman Decl. ¶¶ 38-39, 43-48; *see supra* note 35.

[64] Dhar Decl. ¶ 11; *see also* Saveri Decl., Exh. 6 [Haag Dep.] at 86:22-87:14 (                                    ); *see also infra* note 69.

[65] Saveri Decl., Exh. 58 at STAR00124730.

[66] Saveri Decl., Exh. 37 at CBW0041611; *see also* Saveri Decl., Exh. 61 at WACHB176986 (

); Saveri Decl., Exh. 62 at B1-0051577 (

---

██████████████████████████████████████████[67]   ATM owners thus set

surcharges in a relatively competitive context.  They adjust surcharges based on a variety of

factors while competing with one another to provide foreign ATM transactions.[68]

As Defendants are aware, consumers are far less sensitive to foreign ATM and

interchange fees.[69]  In 1997, Donald Baker, counsel of record for Wells Fargo in this litigation,

testified before the U.S. Senate Banking Committee: "The whole idea of the interchange fee was

to make the pricing between the ATM owner and the card-issuer's bank invisible to the

consumer."[70]  In his written submission he further stated that, compared to surcharges, foreign

ATM fees "do not seem to be quite as visible and annoying to consumers."[71]  Star founder and

former CEO Ronald Congemi testified at his deposition in this case that more than half of the

consumers in a Star-sponsored survey were not aware whether they were charged foreign ATM

fees at all.[72]  Thus, many cardholders are not aware of or sensitive to foreign fees – which are not

---

[67] Saveri Decl., Exh. 62 at BI-0051577, BI-0051579 (██████████████████████████████

████████████████████████████████

██████████████████████); Saveri Decl., Exh. 63 at ST0008951-8952 ██████████

██████).

[68] Saveri Decl., Exh. 59 at 6-54 ("ATM operators are prevented from charging excessive fees by the competitive market to provide cash access to consumers.").

[69] Dhar Decl. ¶ 11.

[70] Saveri Decl., Exh. 14 at PLTF-039674 (Analysis of the Impact of ATM Double-Charges on Consumers and Competition: Hearing Before the S. Banking Comm., 105th Cong. (1997) (Testimony of Donald Baker)).  Congress has never taken action approving fixed ATM interchange fees – or exempting them from federal antitrust laws.  See also Saveri Decl., Exh. 15 (Hidden ATM Fees To Be Outlawed, theage.com at 1 (Sept. 1, 2007)) (noting Australian plan to outlaw ATM interchange fees and quoting the Australian Reserve Bank:  "The board also expects the removal of hidden interchange fees will lead to substantial reductions in, and perhaps the abolition of, the 'foreign fees' that most banks currently charge their customers for using ATMs owned by another institution.").

[71] Saveri Decl., Exh. 64 at PLTF039984 (Analysis of the Impact of ATM Double-Charges on Consumers and Competition: Hearing Before the S. Banking Comm., 105th Cong. (1997) (Prepared Testimony of Donald Baker)).

[72] Saveri Decl., Exh. 4 [Congemi Dep.] at 165:21-166:13; see also Saveri Decl., Exh. 12 [Schmal. Dep.] at 163:4-9 ("████████████████████████████████████████████

████████████); Saveri Decl., Exh. 65 at BAC054774 (███████████████████████

█████████████████████████); Saveri Decl.,

743379.1

1    displayed at the ATM[73] and are instead buried in bank statements or in bank notices received days

2    or weeks after an ATM transaction.[74]

3            Because they are mandatory, all card issuers pay interchange fees, which raise card

4    issuer costs across the market and inflate foreign fees.[75]   In effect, fixed interchange fees allow

5    ATM owners to obtain a portion of the hidden – foreign fee – side of the ATM transaction.  The

6    result is to increase the price to consumers for foreign ATM transactions – the foreign fee plus the

7    surcharge – above competitive levels.[76]

8            The difference between consumer sensitivity to surcharges and foreign fees would

9    have significant implications if Star were to eliminate its fixed interchange and if ATM owners

10   were to receive revenue only through surcharges.  Surcharges would increase little, if at all,

11   because consumers would react strongly to higher surcharges.[77]  Any sharp increase in surcharges

12   would result in a significant decrease in foreign ATM transactions.[78]  On the other hand, card

13   issuers would be expected to decrease foreign fees significantly without fixed interchange, as they

14   Exh. 66 at BAC055792 (

15                                                                        ).

16   [73] Saveri Decl., Exh. 91 (12 C.F.R. Part 205 Electronic Funds Transfer - Regulation E).

17   [74] Dhar Decl. ¶¶ 11-15; Saveri Decl., Exh. 1 [Brashears Dep.] at 85:12-19, 163:6-10 (SunTrust
     does not disclose the reasoning behind the foreign fee to its cardholders; Brashears agrees that it
     is easier for a consumer to understand the surcharge than to understand the foreign fee); *see also*

18   Saveri Decl., Exh. 67 at ST 0008812 (
                                                                                  ).

19   [75] Bam. Decl. ¶¶ 4-16; Pohlman Decl. ¶¶ 7, 54-64.

20   [76] Bam. Decl. ¶¶ 4-16; Pohlman Decl. ¶¶ 7, 54-64.  Cardholders also face lower transaction costs
     in choosing between surcharges – they can just change ATMs – than between foreign fees – they
21   must change bank accounts.  Saveri Decl., Exh. 74 (Steven C. Salop, Deregulating Self-Regulated
     Shared ATM Networks, 1 Econ. Innov. New Techn. 85, 93, n. 1 (1990)).

22   [77] Bam. Decl. ¶¶ 15-16; Saveri Decl., Exh. 59 at 6-54 ("ATM operators are prevented from
     charging excessive fees by the competitive market to provide cash access to consumers."); *see*
23   *also* Saveri Decl., Exh. 68 at PLTF-042153 (Plus Serves ATM Surcharging Issue into Cirrus'
     Court, Bank Network News (Nov. 13, 1995) ("ATM deployers have complained because
24   interchange is the same for all transactions, although the cost of deploying an ATM varies.
     Eliminating interchange would solve that problem, but present deployers with a new one:
25   recovering their cost plus profit in an up-front charge at the ATM.  'A lot of deployers may not
     care for that scenario,' says Liam Carmody, president of the Carmody & Bloom consultancy.
26   'But it would be healthy in the sense that it would force true price competition.'"); Saveri Decl.,
     Exh. 1 [Brashears Dep.] at 106:8-19 (SunTrust would not automatically increase surcharges if
27   interchange fees were eliminated.).

     [78] Bam. Decl. ¶ 15; Saveri Decl., Exh. 1 [Brashears Dep.] at 52:15-22; 57:12-25 (modeling has
28   shown that an increase in surcharges results in a decrease in transactions).

1    would experience an across-the-board decrease in their marginal costs for foreign ATM

2    transactions.[79]  Indeed, competition might drive foreign fees out of existence, as more card

3    issuing banks might seize the opportunity to advertise that they do not charge their own

4    cardholders ATM fees at all.[80]  The result would be a decrease in the total price for consumers of

5    foreign ATM transactions.[81]

6           **2.      Benefits to Financial Institutions of Fixed Interchange.**

7                 Defendants argue that large financial institutions – including the Bank Defendants

8    – have no incentive to agree to fix interchange fees that inflate revenues to ATM deployers.[82]

9    However, Bank Defendants are in fact significant ATM deployers.[83]

10

11                                          [84]  The major financial institutions, including the Bank Defendants, would

12   lose all, or almost all, of the revenues they derive from fixed interchange fees if as ATM owners

13   they were to receive only surcharges on Star foreign ATM transactions.[85]  On the other hand,

14   interchange fees paid by the Bank Defendants provide the basis for the foreign fees they charge to

15

16

---

17   [79] Bam. Decl. ¶¶ 22-26 ("[A]n interchange fee is a marginal cost to a card-issuing bank" and "the
18   elimination of a marginal cost would be expected to reduce the level of fees charged by banks for
     foreign ATM transactions."); Saveri Decl., Exh. 69 at 3 (Valley Bank of Nevada Reveals Results
19   of Branch Surcharges, Fin. Serv. Rep., Vol. 9, No. 1, Jan. 8, 1992. ("Once you have surcharging
     permitted, there's really no need for an interchange fee.  Any fee that the ATM owner wants to
20   get he can get with a surcharge," said Steven Salop, professor of economics and law at
     Georgetown University Law Center. "And foreign fees would also adjust if you get rid of the
21   interchange fee." He agreed that the issuing bank may still charge some sort of foreign fee to
     encourage their customers to use their own ATMs, but believes that it would drop by an amount
22   equivalent to the amount of the interchange.")).
     [80] Saveri Decl., Exh. 70 at CBW0054859 (
23            ); see also Saveri Decl., Exh. 1 [Brashears Dep.] at 85:1-7 (SunTrust only charges a
     foreign fee if there is an interchange fee on that transaction).
24   [81] Bam. Decl. ¶ 16.
     [82] Bank Def.'s Mot. at 19.
25   [83] Saveri Decl., Exh. 71 at B1-0081227-1231 (2007 EFT Data Book shows Bank Defendants as
26   "Top 50 U.S. ATM Owners").
     [84] Saveri Decl., Exh. 58  / Ex. 638] at STAR00124640 (                                    ); Saveri
27   Decl., Exh. 4 [Congemi Dep.] at 138:7-140:3 (Confirming ISO deployment and transaction
     figures from the 2006 Deployer Study).
28   [85] Bam. Decl. ¶¶ 16-27.

1    their cardholders.[86]  Through the foreign fee, they recover most, or even all, of the interchange

2    fees they pay.[87]

### 3.    Alternatives to Fixed Interchange Fees.

4              Defendants argue that card issuers and ATM owners cannot as a practical matter

5    engage in bilateral negotiations to set interchange fees, and that fixing them network-wide is the

6    only feasible alternative.[88]  But if Defendants are correct regarding bilateral negotiations, it means

7    only that interchange fees would disappear if they were not fixed.  That would not prevent Star

8    from eliminating its rule requiring payment of fixed interchange fees.[89]  It could continue to

9    perform all of the functions that are actually necessary to maintain an ATM network and

10   guarantee universal acceptance – *e.g.*, facilitating reimbursement of ATM owners for the cash

11   they dispense to cardholders and for surcharges and setting the terms and timing for this

12   reimbursement.[90]  ATM owners could readily rely exclusively on competitively set surcharges to

13   compensate them for foreign ATM transactions.[91]



---

19   [86] Bam. Decl. ¶¶ 6-10; Pohlman Decl. ¶¶ 54-60; s*ee also supra* note 36.

20   [87] Indeed, if foreign fees would disappear entirely without fixed interchange fees, Bank
     Defendants actually profit on transactions in which they pay interchange fees because they mark
21   them up and charge foreign fees to their cardholders.  If without interchange fees there would be
     no foreign fees, the banks would lose the mark-up. *See also* Saveri Decl., Exh. 72 at WFB004275

22   ).

23   [88] Bank Def.'s Mot. at 26; Network Def.'s Mot. at 20.

24   [89] Saveri Decl., Exh. 14 at PLTF-039676 (Analysis of the Impact of ATM Double-Charges on
     Consumers and Competition: Hearing Before S. Banking Comm., 105th  Cong. (1997)
25   (Testimony of Donald Baker:  "It would be theoretically possible to finance ATM operations with
     lower interchange fees through the networks and surcharges, too.  There's no particular rule that
26   says any of us has to be charged.")).

     [90] Pohlman Decl. ¶¶ 73-75; Bam. Decl. ¶¶ 40-48; *see infra* Part VI.A.
27   [91] Pohlman Decl. ¶¶ 81-86.

     [92] For example, throughout 1997, the Independent Bankers Association of America ("IBAA") and
28   America's Community Bankers ("ACB") urged Visa and MasterCard to modify their operating

4.      **The Alleged Benefits of Fixed Interchange Fees.**

Defendants make various claims as to the purposes of Star's fixed interchange fees, *e.g.*, they balance the interests of issuers and ATM owners, they maximize output, they are necessary for Star to compete for members, and the like. All of these claims rely on the assumption that fixed interchange fees increase revenues to ATM owners.[94] But Defendants do not explain why they have that effect.[95] In a market with perfect information and no transaction costs, one would expect interchange fees to have no effect at all.[96] But the evidence establishes that fixed interchange fees do in fact have an economic impact because they shift the price of a foreign ATM transaction away from surcharges, which are displayed on the ATM screen at the time of a withdrawal, and toward foreign fees, which are buried in bank notices and bank statements.[97] The ultimate result is to increase the total price of foreign ATM transactions above competitive levels.[98]

---

rules to permit ATM owners "to collect either an ATM surcharge or an interchange fee, but not both on the same transaction." Saveri Decl., Exh. 80 at ICBA007525 (

). *See also* Saveri Decl., Exh. 83 at ICBA004810 ("

); Saveri Decl. Exhs. 84, 85 [2330]) (

); Saveri Decl., Exh. 47)(

); *see also* Saveri Decl., Exh. 78 at PLTF-042093. (Is it the End of Interchange Fees, Bank Network News (Aug. 14, 1996) (President of the Exchange Network and former Visa-Plus board member Danny Dumler said allowing surcharging "does raise the question about the legitimacy of an interchange fee."); *see also* Saveri Decl., Exh. 79 (In 1994, while Dumler was the President of Plus, the Plus board recommended prohibiting ATM owners from collecting both surcharges and interchange. "Our feeling is that some ATM owners are being double compensated,." Dumler said at the time.); *see also infra* Part VIA.

[93] Saveri Decl., Exh. 86[46069] at WACHB178022 (

); *see also infra* Part VIA.

[94] Bam. Decl. ¶ 30.

[95] Bam. Decl. ¶ 31.

[96] Bam. Decl. ¶¶ 12, 29-30.

[97] Bam. Decl. ¶¶ 12-16; Dhar Decl. ¶¶ 12-16.

[98] Bam. Decl. ¶¶ 2, 4, 16; Pohlman Decl. ¶¶ 54-64.

1    Moreover, the evidence does not support Defendants' claim that fixed interchange

2    fees have beneficial effects.  The fact that Star's interchange fees have remained static belies the

3    claim that Defendants adjust interchange fees to serve any purpose.  In 1990, Star's interchange

4    fees were 45 cents (on-premises) and 55 cents (off-premises) and those rates remained constant

5    until 2003, when they changed by only one cent to 46 cents and 54 cents, respectively.[99]

6    Nor are fixed interchange fees necessary for networks to compete.  The evidence

7    shows that networks, including Star, vie for members based on considerations other than

8    interchange fee levels.[100] ███████████████████████████████████████████████████

9    ████████████████████████████████████████████████████[101]  In choosing a network,

10   banks place more weight on factors other than ATM interchange.[102]  Star competes on switch fees

11   (the fees card issuers pay to Star for foreign ATM transactions), POS interchange fees and

12   monetary payments made directly to financial institutions.  Ronald Congemi, the founder and

13   former CEO of Star, testified at his deposition in this case that massive signing bonuses – or

14   "checks written for large sums of money that were delivered in duffel bags" – were the deciding

15   competitive factor in at least some prominent cases.  As Mr. Congemi testified, "If you are going

16   to be in the industry, sometimes you are required to respond to that form of competition."[103]  As

17   one Bank Defendant witness testified, ████████████████████████████████████████████

18   ████████████████████████████████████.[104]  Additionally, ISOs participate in every

19   network they can, regardless of fixed interchange levels.  Michael Clinard, CEO of Cardtronics,

20

21

22   [99] Lynn Decl. ¶ 14.

     [100] Saveri Decl., Exh. 1 [Brashears Dep.] at 47:21-48:18 (ATM owners within a network do not
23   compete for customers based on interchange fees; the interchange fees are the same to all
     members, so there is no competition based on that price).

24   [101] Saveri Decl., Exh. 73 (████████████████████████████).

25   [102] Brashears testified that the interchange fee was not a significant factor in SunTrust's decision
26   to leave the Star network.  Saveri Decl., Exh. 1 [Brashears Dep.] at 32:22-33:5.

     [103] Saveri Decl., Exh. 4 [Congemi Dep.] at 91:16-92:14.

27   [104] Saveri Decl., Exh. 10 [Pearl. Dep.] at 141:4-22, 247:21-248:19; *see also* Saveri Decl., Exh. 1
     [Brashears Dep.] at 32:22-33:5, 191:21-192:21; Saveri Decl., Exh. 4 [Congemi Dep.] at 51:2-
28   52:24. (banks focus on switch fee levels in making network membership decisions).

743379.1                                    - 24 -

1   Star's largest ISO participant and the second largest ATM deployer in the United States,[105]

2   testified that his company never has, and never would, join or leave a network based on the

3   amount of its interchange fees.[106]



7   [107]

8   **IV.    HORIZONTAL PRICE-FIXING IS NOT PROCOMPETITIVE – AND IS *PER SE***

9   **ILLEGAL – UNLESS IT IS NECESSARY TO A JOINT VENTURE FOR SOME**
    **REASON OTHER THAN IT PROVIDES SUPRA-COMPETITIVE PRICES**

10      **A.     *Freeman* and Other Precedent Supply the Appropriate Framework for**
            **Evaluating Defendants' Price-Fixing Arrangement.**

12              Business conduct is *per se* illegal if it falls within one of the categories of practices

13  that judicial experience establishes has a "pernicious effect on competition and lack[s] . . . any

14  redeeming virtue." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958).  One such category is

15  horizontal price-fixing. *Id.*; Maricopa, 457 U.S. at 351; Freeman, 322 F.3d at 1144 ("No antitrust

16  violation is more abominated than the agreement to fix prices").

17              Judicial hostility to horizontal price-fixing extends to joint ventures.[108]  In

18  Freeman, the Ninth Circuit held that horizontal price-fixing by a joint venture is not

19  procompetitive – and is *per se* illegal – unless each of two conditions is met:  (1) the price-fixing

20  arrangement is necessary – or reasonably ancillary – to the functioning of the joint venture, and

21  (2) the reason the price-fixing is necessary is not that it raises prices above competitive levels.

22  Freeman, 322 F.3d at 1150, 1151 (to fall within "very narrow" exception to *per se* rule, price-

23  _____

24  [105] *See supra* note 42.

    [106] Saveri Decl., Exh. 2 [Clinard Dep.] at 41:9-12.

25  [107] Saveri Decl., Exh. 4 [Congemi Dep.] at 87:24-92:14; Saveri Decl., Exh. 8 [Lynch Dep.] at
    186:11-189:19.

26  [108] Defendants admit that Star ceased operating as a joint venture in February 2001. *See* Bank
    Def.'s Mot. at 5. At that point, they were no longer entitled to rely on doctrine that applies only to

27  joint ventures and their horizontal price-fixing became simply *per se* illegal.  Nevertheless, since
    the Court asked the parties to address the competitive effects of Defendants' conduct, Plaintiffs

28  assume for purposes of the motion that legal principles pertaining to joint ventures apply.

fixing must be "reasonably ancillary to the legitimate cooperative aspects of the venture"); *id*. at

1152 ("Defendants seek to justify not only the forbidden practice (price fixing) but its forbidden

effect (supra-competitive prices), and this they may not do."); *see also* <u>Broadcast Music</u>, 441 U.S.

at 23 (cooperative arrangements involving price not unlawful "where the agreement on price is

necessary to market the product at all"); <u>Nat'l Soc'y of Prof'l Eng'rs v. United States</u>, 435 U.S.

679, 693 (1978) (horizontal price-fixing by a joint venture cannot be justified on the basis that

competition itself is harmful); *see also* <u>Brennan</u>, 369 F. Supp. 2d at 1135 (holding unnecessary

price-fixing by a joint venture is *per se* illegal).

   In <u>Freeman</u>, several real estate associations established a joint venture in the form

of a new corporation, Sandicor, to manage a multiple listing service ("MLS"). <u>Freeman</u>, 322 F.3d

at 1140-41. Sandicor collected support fees from realtors who used the MLS and it distributed

those fees to the individual real estate associations. At issue in <u>Freeman</u> was whether Sandicor's

fixing of uniform support fees was a *per se* violation of federal antitrust law. Applying relevant

Supreme Court precedent (including <u>Broadcast Music</u> and <u>NCAA</u>), the Ninth Circuit concluded it

was. *Id*. at 1150-52. <u>Freeman</u> held that because the real estate associations competed with one

another to provide listing services to realtors, the uniform support fees constituted horizontal

price-fixing. *Id*. at 1144-45. The court further held that horizontal price-fixing by a joint venture

is not procompetitive – and is *per se* illegal – unless it is necessary to the legitimate,

procompetitive purposes of the joint venture. *Id.* at 1151. The court firmly rejected an argument

– echoed by Defendants in this case – that because the companies were involved in a venture with

"inherent cooperative aspects" a "more deferential review" than the *per se* rule was appropriate.

*Id.* at 1151. Instead, the Ninth Circuit concluded the price-fixing agreement was *per se* illegal for

two reasons. First, it was unnecessary because compensation to the real estate associations could

have been set competitively without disrupting the functioning of the joint venture. *Id.* at 1151.

Second, defendants' justification for price-fixing – it enabled smaller real estate associations to

join Sandicor, expanding the listings of the MLS – was the consequence of their setting prices

above competitive levels. *Id*. at 1152. Horizontal price-fixing cannot be justified by the benefits

of supra-competitive prices. *Id*.

1    <u>Freeman</u> provides the framework for assessing Star's fixed interchange fees.

2    Star's members agree to charge a fixed interchange fee[109]– a classic form of horizontal price-

3    fixing – when the compensation to ATM owners could be set competitively through surcharges

4    alone.[110]  Fixed interchange fees are thus unnecessary to the functioning of the network.

5    Moreover, as in <u>Freeman</u>, the justifications Defendants offer for Defendants' fixed interchange

6    fees all depend on the asserted benefits of providing ATM owners supra-competitive revenues,[111]

7    and are thus not cognizable as a matter of antitrust policy.

8               B.       **Defendants Mischaracterize *Freeman*.**

9               From the outset of this litigation, Defendants have sought to divert this Court's

10   attention from binding precedent, including <u>Freeman</u>.  In their moving papers to dismiss and for

11   judgment on the pleadings, they failed to cite or discuss <u>Freeman</u> at all.  See *e.g.* Defs.' Motion to

12   Dismiss for Failure to State a *Per Se* Claim (Dkt. 29) (Aug. 9, 2004); First Data Corp.'s Reply in

13   Support of Motion to Dismiss (Dkt. 113) (March 7, 2005).  Judge Walker's reliance on <u>Freeman</u>

14   and related cases has left them undaunted.  <u>Brennan</u>, 369 F. Supp. 2d at 1135 (summarizing the

15   holdings of <u>Freeman</u>, <u>Broadcast Music</u>, <u>NCAA</u>, <u>Topco</u>, and other cases: "The law is this:

16   Horizontal restraints in the context of a procompetitive joint venture remain unlawful *per se*

17   unless they are necessary to (or, in certain formulations, 'reasonably ancillary to') the

18   achievement of the joint venture's procompetitive benefits.").  Now, once again Defendants are

19   attempting to circumvent the established principles articulated in <u>Freeman</u>, making, in essence,

20   four legal arguments at odds with controlling precedent.

21               1.       **Horizontal Price-Fixing Remains *Per Se* Illegal.**

22               *First*, Defendants take the remarkable position that horizontal price-fixing is not

23   subject to the *per se* rule – even arguing that, in light of the recent <u>Leegin</u> and <u>Dagher</u> Supreme

24

25   ―――――――――――――――
     [109] *See supra* notes 35, 37.

26   [110] Pohlman Decl. ¶¶ 3, 11-13; Bam. Decl. ¶ 10, n. 12; *see generally* Saveri Decl., Exh. 74
     (Steven C. Salop, <u>Deregulating Self-Regulated Shared ATM Networks</u>, 1 Econ. Innov. New

27   Techn. 85, 94-95 (1990) (arguing that ATM interchange should be eliminated in favor of
     competitive prices set through surcharges)); *see also supra* notes 77-81.

28   [111] Bam. Decl. ¶¶ 28-59.

1   Court decisions, "agreements as to 'price' are not inherently suspect." Bank Def.'s Mot. at 15

2   (referencing <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 127 S. Ct. 2705 (2007), and

3   <u>Texaco Inc. v. Dagher</u>, 547 U.S. 1 (2006) ("<u>Dagher</u>")).  But the law on this point remains clear –

4   unlike other restraints of trade, horizontal price-fixing is *per se* illegal, with the "very narrow"

5   exception identified in <u>Freeman</u>.  Agreements between competitors as to the prices they charge

6   have long been, and remain, the restraint of trade most suspect under the antitrust laws.[112]

7           <u>Leegin</u> and <u>Dagher</u> confirmed judicial condemnation of horizontal price-fixing.

8   <u>Leegin</u> involved a challenge to a *vertical* resale price agreement between a manufacturer and its

9   distributor.  127 S. Ct. at 2710.  In determining that economic analysis and experience did not

10   favor the *per se* rule for resale price maintenance, the Supreme Court distinguished horizontal

11   price-fixing, which the Court stressed remains *per se* illegal:

12              The rule of reason does not govern all restraints.  Some types are
                 deemed unlawful *per se*.  The *per se* rule, treating categories of

13              restraints as necessarily illegal, eliminates the need to study the
                 reasonableness of an individual restraint in light of the real market

14              forces at work; and, it must be acknowledged, the *per se* rule can
                 give clear guidance for certain conduct.  **Restraints that are *per se***

15              **unlawful include horizontal agreements among competitors to**
                 **fix prices**. . . .

16

17   <u>Leegin</u>, 127 S. Ct. at 2713 (citing <u>Dagher</u>, 547 U.S. at 5) (internal citations and quotations

18   omitted) (emphasis added).  <u>Leegin</u> further stated that "[a] horizontal cartel among competing

19   manufacturers or competing retailers that decreases output *or reduces competition in order to*

20   *increase price* is, and ought to be, *per se* unlawful." *Id.* at 2717 (citing <u>Dagher</u>, 547 U.S. at 5)

21   (emphasis added).

22           <u>Dagher</u> also stressed that horizontal price-fixing is subject to a *per se* analysis,

23   although it recognized a narrow exception when participants in a joint venture cease competing

24   with one another and become, in effect, a single entity.  547 U.S. at 5-7.  <u>Dagher</u> involved

25   Equilon, a joint venture through which Texaco and Shell Oil combined their production,

26

---

[112] As the Ninth Circuit noted in <u>Freeman</u>, "One manual captures the principle nicely in question
and answer format: '[Q.] May competitors agree to fix prices?  [A.]  Duh.  What do you think?'"
<u>Freeman</u>, 322 F.3d at 1144 n.10 (quoting Eliot G. Disner, *Antitrust Law for Business Lawyers*
§ 4.06, at 82 (2001)).

1    transportation, research, storage, sales, and distribution facilities for gasoline for sale in the

2    western United States, in effect becoming a single entity.  *Id.* at 4, 6.  As the Court made clear,

3    two related characteristics of Equilon were essential, neither of which has a parallel in this case.

4    First, Texaco and Shell Oil did not compete with one another in selling Equilon gasoline.  *Id.* at 5-

5    6 ("Texaco and Shell Oil did not compete with one another in the relevant market.").  Second,

6    Equilon itself sold the gasoline at issue.  *Id.* at 7-8 (holding the case involved "the pricing of the

7    very goods produced and sold by Equilon").  In short, Texaco and Shell Oil acted essentially as

8    one entity and the only appropriate challenge to Equilon would have been to its formation:

9
10
11
12
13
> Texaco and Shell Oil did not compete with one another in the
> relevant market—namely, the sale of gasoline to service stations in
> the western United States—but instead participated in that market
> jointly through their investments in Equilon.  In other words, the
> pricing policy challenged here amounts to little more than price
> setting by a single entity—albeit within the context of a joint
> venture—and not a pricing agreement between competing entities
> with respect to competing products.

14   *Id.* at 1279-80 (footnote omitted).[113]

15           Star is different from Equilon with respect to both of the key characteristics the

16   Court identified in Dagher:  (1) the ATM owners who are members of Star compete to sell

17   foreign ATM services to cardholders;[114] and (2) Plaintiffs are not challenging Star's setting of the

18   *switch fee* that Star itself charges for foreign ATM transactions,[115] but instead are challenging the

19   fixed interchange fees, which ATM owners (*i.e.*, competitors) all agree to charge[116] and from

20   which Star does not derive any revenue.[117]  Dagher noted that, under these sorts of circumstances,

21   "horizontal price-fixing agreements" are "per se unlawful," *id.* at 1279, unless "the agreement on

22

23   [113] Defendants, in the brief regarding Dagher they submitted at the request of this Court,
     suggested that Plaintiffs' analysis along these lines inappropriately drew a parallel between
24   Dagher and price-fixing by single entity, which they claimed is a separate doctrine governed by
     Copperweld.  (Concord's Reply Brief Concerning The Impact Of Dagher, Doc. # 356 at 6, filed
25   Oct. 20, 2006).  In fact, the Supreme Court in Dagher itself drew that comparison, indicating that
     Copperweld applied.  *Id.* at 1280, n. 1.
26   [114] Pohlman Decl. ¶¶ 11-13; *see also supra* note 68.
27   [115] *See supra* note 45.
     [116] *See supra* notes 35, 37-38.
28   [117] *See supra* note 44.

1  price is necessary to market the product at all." *Id.* at 1281 (quoting <u>Broadcast Music</u>, 441 U.S. at

2  23).  The courts have not become less skeptical of horizontal price-fixing since <u>Freeman</u>.[118]

### 2. Defendants' Need to Cooperate as to Some Matters Cannot Justify Unnecessary Horizontal Price-Fixing

5  *Second*, Defendants argue that their fixing of interchange fees is not subject to *per*

6  *se* treatment because it "is a central feature of legitimate joint economic activity."  (Bank Def.'s

7  Mot. at 16.)  Although Defendants' use of the term "central" is vague, they seem to be suggesting

8  that, because they may legitimately coordinate their behavior in some regards as part of Star, they

9  have leeway to engage in unnecessary horizontal price-fixing.  <u>Freeman</u> squarely rejected this

10 argument, as Judge Walker recognized.  <u>Brennan</u>, 369 F. Supp. 2d at 1132.  The real estate

11 associations in <u>Freeman</u> argued that "the inherent cooperative aspects of the MLS" allowed them

12 to fix prices among competitors.  <u>Freeman</u>, 322 F.3d at 1151.  But, as the Ninth Circuit explained,

13 "any elements of novelty and cooperation in the MLS are irrelevant to whether support fees are

14 fixed or set competitively."  *Id.  See also* <u>United States v. Nat'l Ass'n of Real Estate Bds.</u>, 339

15 U.S. 485, 489 (1950) (finding *per se* illegal one aspect (adoption of price schedule) of legitimate

16 cooperative endeavor (real estate board)); <u>Goldfarb</u>, 421 U.S. at 782 (finding illegal one aspect

17 (adoption of fee schedule) of legitimate cooperative endeavor (bar association)).[119]

---

21 [118] On the *single occasion* that either of Defendants' briefs mentions <u>Freeman</u>, the Bank Defendants appear to suggest that it was overturned by <u>Dagher</u>.  Bank Def.'s Mot. at 17, note 15.

22 But <u>Dagher</u> did not license every legitimate joint venture to engage in horizontal price-fixing, no matter how unnecessary and no matter the harmful effects on competition.  Defendants say so

23 little about <u>Freeman</u> because they cannot distinguish the case in any persuasive way.

[119] The cases Defendants cite confirm the principles set forth in <u>Freeman</u> and other precedent.

24 *See* <u>Fraser v. Major League Soccer L.L.C.</u>, 284 F.3d 47, 59 (1st Cir. 2002) (rejecting challenge by soccer players to employment restrictions by Major League Soccer (MLS) because "the extent of

25 real economic integration" among MLS members is "obvious" and, without the challenged restrictions, "MLS might not exist"); <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 36 F.3d 958, 964 (10th

26 Cir. 1994) ("Key to the analysis of 'the competitive significance of the restraint,' [citing <u>NCAA</u>], is the Court's appreciation that the horizontal restraint may be essential to create the product in

27 the first instance"); <u>Buffalo Broadcasting Co., Inc. v. Am. Soc'y of Composers, Authors and Publishers</u>, 744 F.2d 917, 932 (2d Cir. 1984) (rejecting plaintiffs' challenge to blanket license

28 because "it has not been shown on this record that the blanket license . . . is not necessary").

1

### 3.    Courts Scrutinize Horizontal Price-Fixing, Regardless of Context or Industry.

2

3    *Third*, Defendants argue that *per se* treatment is not proper in this case because

4    there is "no judicial experience finding network-wide interchange fees plainly anticompetitive."

5    (Bank Def.'s Mot. at 17.)  But this mistakes the type of judicial experience necessary for *per se*

6    treatment:  relevant judicial experience is with the type of restraint at issue, not with its

7    application in a particular setting.  Over half a century of judicial experience with horizontal

8    price-fixing places Defendants' fixed interchange fees squarely in *per se* territory.

9    Freeman, again, illustrates the point.  The Ninth Circuit did not condemn the

10    defendants' price-fixing based on judicial experience involving cooperation as part of a multiple

11    listing service.  The Court relied on extensive judicial experience with *horizontal agreements to*

12    *fix prices*.  Freeman, 322 F.3d at 1144 (noting that "[n]o antitrust violation is more abominated").

13    Leegin also drew this distinction.  Leegin, 127 S. Ct. at 2713 (noting that "the *per se* rule is

14    appropriate only after courts have had considerable experience with the *type of restraint* at issue"

15    and that one such "restraint" is "horizontal agreements among competitors to fix prices")

16    (emphasis added).

17    Arizona v. Maricopa County Medical Society, 457 U.S. 332 (1982), which

18    Defendants cite (Network Def.'s Mot. at 13 and 15; Bank Def.'s Mot. at 15 and 17), also

19    contradicts their position.  Maricopa involved horizontal price-fixing in an unusual economic

20    setting:  competing physicians set, by majority vote, the maximum fees they could claim in full

21    payment for health services provided to policyholders of specified insurance plans.  *Id.* at 335.

22    The defendants argued that their price-fixing had various procompetitive effects, including

23    limiting the amount physicians charged and containing costs in a way that saved patients and

24    insurers millions of dollars.  *Id.* at 342.  The Supreme Court held that the alleged procompetitive

25    effects were irrelevant because the conduct at issue fell into a category that was *per se* illegal:

26    > The respondents' principal argument is that the *per se* rule is
    > inapplicable because their agreements are alleged to have
27    > procompetitive justifications.  The argument indicates a
    > misunderstanding of the *per se* concept.  The anticompetitive
28    > potential inherent in all price-fixing agreements justifies their facial

1
2

> invalidation even if procompetitive justifications are offered for
> some.  Those claims of enhanced competition are so unlikely to
> prove significant in any particular case that we adhere to the rule of
> law that is justified in its general application.

3
4

*Id.* at 351.  *See also* <u>Catalano Inc. v. Target Sales, Inc.</u>, 446 U.S. 643, 650 (1980) ("Since [the

5

challenged agreement] is merely one form of price fixing, and since price-fixing agreements have

6

been adjudged to lack any 'redeeming virtue,' it is conclusively presumed illegal without further

7

examination under the rule of reason."); <u>Real Estate Boards</u>, 339 U.S. at 489 ("Price fixing is *per*

8

*se* an unreasonable restraint of trade.").  Much like the defendants in <u>Maricopa</u>, Defendants in this

9

action misunderstand the *per se* concept – it applies to a category of conduct and does not vary

from case to case.

10

The many cases that Defendants cite involving restraints of trade *other than*

11

*horizontal price-fixing* are inapposite for that reason alone.  <u>Leegin</u>, as noted, analyzed *vertical*

12

resale price maintenance.  <u>Continental T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36 (1977),

13

analyzed a *vertical*, *non-price* restraint, as did <u>Business Electronics Corp. v. Sharp Electronics</u>

14

<u>Corp.</u>, 485 U.S. 717 (1988).  <u>California Dental Ass'n v. FTC</u>, 526 U.S. 756, 771 (1999), involved

15

a challenge to advertising restrictions, which the Court deemed unlike "restrictions on

16

advertisement of price and quality generally."[120]  <u>Northrop Corp. v. McDonnell Douglas Corp.</u>,

17

705 F.2d 1030 (9th Cir. 1983), involved a challenge to "Government prompted contractor

18

teaming agreements" in the military industry, 705 F.2d at 1051-52, which it deemed not to be an

19

ordinary market allocation agreement.

20

Defendants also rely heavily on inapposite cases addressing various forms of

21

"boycotts" or "concerted refusals to deal," which are not uniformly subject to *per se*

22

condemnation.[121]  *See* <u>FTC v. Indiana Fed'n Of Dentists</u>, 476 U.S. 447 (1986) (policy of dentist

23

---

24

[120] Defendants' reliance on <u>California Dental</u> is particularly ironic, as their price-fixing raises
prices above competitive levels by exploiting imperfect consumer knowledge, while in <u>California</u>

25

<u>Dental</u>, in contrast, the Supreme Court hesitated to condemn the restraint at issue – limitations on
potentially misleading advertising – citing consumers' interest in accurate information.  *Id.* at 771

26

(noting restrictions at issue were, "at least on their face, designed to avoid false or deceptive
advertising").

27

[121] Cases involving "group boycotts" frequently require a court to consider the likely impact on
competition to determine how to analyze the business practice at issue, as "the term 'group

28

boycott' can be applied to divergent types of concerted activity, not all of which have a pernicious

1   federation challenged as group boycott); Northwest Wholesale Stationers, Inc. v. Pacific

2   Stationery & Printing Co., 472 U.S. 284, 285-86 (1985) (considering whether "a cooperative

3   buying agency comprising various retailers [may] expel[] a member without providing any

4   procedural means for challenging the expulsion"); Paladin Assoc. v. Montana Power Co., 328

5   F.3d 1145, 1151 (9th Cir. 2003) (addressing "unremarkable business practices" including group

6   boycott and tying claims); Bhan v. NME Hosps., Inc., 929 F.2d 1404 (9th Cir. 1991) (addressing

7   boycott by physicians and hospital); Supermarket of Homes, Inc. v. San Fernando Valley Bd. of

8   Realtors, 786 F.2d 1400 (9th Cir. 1986) (granting summary judgment as to group boycott and

9   other claims; no agreement to fix prices found); Ron Tonkin Gran Turismo, Inc. v. Fiat

10  Distributors, Inc., 637 F.2d 1376, 1378 (9th Cir. 1981) (dispute "center[ed] upon the rejection of

11  appellant's application for a Fiat dealership" analyzed as group boycott or concerted refusal to

12  deal).[122]

13          Defendants' boycott cases themselves draw the distinction between horizontal

14  price-fixing, which remains *per se* illegal, and restraints such as group boycotts, which must be

15  more closely considered.  *See Bhan*, 929 F.2d at 1410 (noting "practices which are illegal per se

16  including horizontal price-fixing" and "some, *but not all*, boycotts are considered illegal per se")

17  (emphasis added); Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1091 (noting that, although

18  the *per se* approach is limited to certain classes of boycotts, "As shown by the Supreme Court's

19

20  effect on competition or lack any redeeming value."  Ron Tonkin, 637 F.2d at 1383.  *See also*
    Rothery Storage, 792 F.2d at ("it has always been clear that boycotts are not, and cannot ever be,

21  *per se* illegal").  As Maricopa, Freeman, and countless other cases make clear, horizontal price-
    fixing is not subject to such case-by-case analysis.

22  [122] *See also* Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 763 (8th Cir. 2004)
    (allegation that defendants conspired to prevent plaintiff from "advertising in the limousine

23  industry's two trade publications and from attending trade shows" considered a group boycott);
    Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1093 (6th Cir. 1996) ("While the alleged

24  agreement among the OB/GYNs could conceivably be characterized as a boycott, the
    anticompetitive concerns and other economic hazards that surround boycotts. . . are simply not

25  present in this case."); Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C.
    Cir. 1986) (policy of Atlas and carrier agents challenged as group boycott); The Mid-South

26  Grizzlies v. The Nat'l Football League, 720 F.2d 772 (3d Cir. 1983) (refusal to grant sports
    franchise challenged as a boycott); Sewell Plastics, Inc. v. The Coca-Cola Co., 720 F. Supp. 1186,

27  1195 (W.D.N.C. 1988) (analyzing various claims including group boycott and rejecting *per se*
    treatment of price-fixing claim because there was "no evidence" that the joint venture

28  "maintain[ed] prices at a higher than market level").

1  ruling in <u>Maricopa County</u>, *supra*, it is quite true that price restraints warrant application of the

2  *per se* rule").

3  In any case, courts (and economists) now have decades of experience with ATM

4  and other interchange fees. *See, e.g.,* <u>NaBanco</u>, 779 F.2d at 605 (assessing credit card

5  interchange in 1986); <u>SouthTrust Corp. v. Plus Sys.</u>, 913 F. Supp. 1517, 1525 (N.D. Ala. 1995)

6  (assessing ATM interchange in 1995); Saveri Decl., Exh. 96 (condemning MasterCard credit card

7  and Maestro debit card interchange). It has been almost twenty years since economists rejected

8  the arguments Defendants now make, concluding that fixed interchange fees are unnecessary and

9  could be displaced by surcharges. *See* Saveri Decl., Exh. 74 (Steven C. Salop, <u>Deregulating Self-</u>

10  <u>Regulated Shared ATM Networks</u>, 1 Econ. Innov. New Techn. 85, 94-95 (1990) (arguing that

11  ATM interchange should be eliminated in favor of competitive prices set through surcharges));

12  *see also* Saveri Decl., Exh. 75 Affidavit of William F. Baxter, <u>In the Matter of the Arbitration</u>

13  <u>Between First Texas Savings Ass'n v. Financial Interchange, Inc.</u>, ¶ 10 (1988) (admitting that

14  rationales for credit card interchange do not apply to ATM interchange). This experience more

15  than suffices to recognize fixed ATM interchange as an unnecessary horizontal restraint that

16  inflates prices – and to condemn it as *per se* illegal.

17  **4.   The Credit Card Interchange Cases Do Not Support
         Defendants' Position.**

18

19  The cases that Defendants cite involving joint ventures are not binding on this

20  court and, in any case, confirm the principles set forth in <u>Freeman</u>. <u>National Bancard Corp.</u>

21  <u>(NaBanco) v. Visa U.S.A., Inc.</u>, 596 F. Supp. 1231 (S.D. Fla. 1984), <u>aff'd</u>, 779 F.2d 592 (11th

22  Cir. 1986), involved fixed interchange fees for credit card transactions. The Eleventh Circuit set

23  forth a standard that is essentially the same as the one in <u>Freeman</u>, holding that horizontal price-

24  fixing by a joint venture is subject to the rule of reason *only if*:

25  > it is no greater than reasonably necessary to achieve a legitimate
   > commercial objective (*i.e.*, has a procompetitive purpose), has no

26  > substantial anticompetitive impact, and is no broader than necessary
   > to accomplish its procompetitive objectives.

27

28  779 F.2d at 601 (citations omitted).

1          The reasoning in <u>NaBanco</u> *supports* application of the *per se* rule in this case.  The

2     credit card transactions in <u>NaBanco</u> involved four parties – (1) a merchant that accepted a credit

3     card; (2) a merchant bank that reimbursed the merchant for the amount of the sale (less a

4     "merchant discount" fee); (3) a card-issuing bank that reimbursed the merchant bank for the

5     amount of the sale (less an interchange fee); and (4) a cardholder that paid the card-issuing bank

6     for the amount of the sale.  779 F.2d at 594-95.  Visa, the credit card network, fixed the amount of

7     the interchange fee.  The Eleventh Circuit concluded that fixed interchange fees were necessary

8     for the network to function, and that they *decreased* prices.  *Id.* at 595, 602, 605.  *See* <u>Brennan</u>,

9     369 F. Supp. 2d at 1134 (noting that <u>NaBanco</u> district court deemed Visa interchange fees a

10    "necessary term" after a nine-week bench trial).  The opposite is true here.

11          In credit card cases such as <u>NaBanco</u>, there is an argument that fixed interchange

12    fees are useful because there are two "purchasers" – the cardholder and the merchant – and two

13    "sellers" – the merchant bank and the card-issuing bank.[123]  The card-issuing bank cannot readily

14    negotiate a fee with the merchant; the merchant bank cannot readily negotiate a fee with the

15    cardholder.  Credit card interchange arguably is necessary to allow the card-issuing bank to

16    receive a payment from the merchant.  ATM transactions differ in that there is only one

17    purchaser, the cardholder, and both "sellers" negotiate fees directly with that purchaser – the

18    ATM owner through surcharges and the card issuer through foreign fees.[124]  There is no need for

---

19    [123] Plaintiffs do not agree that this argument justifies credit card interchange, but it simply has no
20    proper application at all to ATM interchange.

      [124] Defendants' expert Richard Schmalensee fails to address this crucial distinction.  Credit card
21    transactions involve a "two-sided market" with *a separate entity on each side*.  There are two
      ultimate "purchasers" of a credit card transaction:  a merchant and cardholder.  Bam. Decl. ¶¶ 41-
22    43.  According to the <u>NaBanco</u> court, credit card interchange fees served as the only practical
      way to allow a card-issuing bank to receive some of the price a merchant pays on a credit card
23    transaction, and to shift some of the price from the cardholder to the merchant (or so the Eleventh
      Circuit reasoned).  779 F.2d at 602-03.  While this reasoning is flawed, even it cannot justify
24    Defendants' price-fixing in this action.  This case involves only one purchaser – a cardholder –
      who can and does negotiate the price for an ATM transaction directly with a card-issuer (a
25    foreign fee) and an ATM owner (surcharge).  Charts produced by Defendants during litigation
      illustrate the single-purchaser ATM transaction.  Saveri Decl., Exh. 46 at B1-0072951(
26
      ); Saveri Decl., Exh. 45 at
27    STAR00124827 (

28    ); *see also supra* note 44.  There is no legitimate basis for inflating that overall

1 interchange to substitute for a direct negotiation.  For this reason, among others, Professor

2 William F. Baxter, whose expert opinion formed the rationale for the <u>NaBanco</u> decision,

3 subsequently confirmed that his reasoning in that case does not justify fixed ATM interchange:

> As I stressed in my testimony in the <u>NaBanco</u> case, the four party system involves economic peculiarities that I have not encountered in many industries.  Perhaps most importantly, as I see now more clearly than I saw then, its complexity made interparty communication difficult.  In contrast, an ATM transaction involves only three parties – cardholder, ATM owner and card issuer – and there is no problem of coordination between two enterprises to determine how to distribute cost and revenues.  The ATM owner provides a service entailing the use of its machines, to consumers holding cards issued by numerous other institutions, i.e. card-issuing members.  The ATM owner must be paid for this service, but there is no apparent reason why each machine owner cannot unilaterally set its own price.  There is no apparent opportunism problem of the sort that I identified with respect to credit card systems, and no need on that account for advance, systemwide bank-to-bank agreements with regard to the pricing of machine owner services.  As long as each ATM owner's price is disclosed to the cardholder before the machine is used, the cardholder can decide for himself whether that machine owner's service is worth the price the owner has set for it.  The card-issuing bank need not play a role.[125]

15 *See* <u>Brennan</u>, 369 F. Supp. 2d at 1134 ("Though similar in name, the interchange fees in the two

16 industries [credit card and ATM] are structurally rather different."); *see also* <u>Reyn's Pasta Bella,</u>

17 <u>LLC v. Visa U.S.A., Inc</u>., 259 F. Supp. 2d 992 (N.D. Cal. 2003) (challenge to *credit card*

18 interchange fees; no reference to <u>Freeman</u>).[126]  Thus, the credit cases confirm the <u>Freeman</u>

19 standard.

---

price through the use of fixed interchange fees – it makes no sense to say that they shift part of the price of a foreign ATM transaction from a cardholder to the very same cardholder.  *See* Bam. Decl. ¶¶ 43-46.

[125] Saveri Decl., Exh. 75 at ¶ 10.  Elsewhere Defendants' expert Richard Schmalensee has praised William Baxter.  *See* Saveri Decl., Exh. 76 (Richard Schmalensee, <u>Bill Baxter in the antitrust arena: an economist's appreciation</u>, 51 Stan. L. Rev. 1317 (1999).).

[126] Defendants also cite <u>SouthTrust Corp. v. Plus Sys.</u>, 913 F. Supp. 1517 (N.D. Ala. 1995).  Although Concord misleadingly suggests that <u>SouthTrust</u> upheld a challenge to "interchange fees" in an ATM Network (Network Def.'s Mot. at 16), the Bank Defendants correctly acknowledge that the court upheld the Plus ATM Network's *no-surcharge rule* (Bank Def.'s Mot. at 18).  It is hard to see how this helps Defendants.  The court upheld a *refusal* to allow a bank to charge surcharges in addition to interchange because this would harm consumer welfare by allowing "opportunistic pricing."  *Id.* at 1525.  Defendants want this Court to bless just what <u>SouthTrust</u> found would hurt consumers.

**V.     AT SUMMARY JUDGMENT, ANY GENUINE ISSUE OF MATERIAL FACT REQUIRES DENIAL OF DEFENDANTS' MOTION**

The standards governing summary judgment are clear:  for Defendants to prevail there must be no genuine issue regarding the material facts necessary to support their position, including (1) whether fixed interchange fees are necessary to Star's functioning, and (2) whether fixed interchange fees benefit Star and its members in a manner other than by raising prices above competitive levels.  *See* Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000) (discussing summary judgment standard under Adickes and Celotex).  *See supra* Part IV.

Yet Defendants take the extraordinary position that these well-established rules do not apply to their motion.  They contend that they have made a sufficient factual showing to avoid the *per se* rule if they have proffered *any* plausible procompetitive justification for their horizontal price-fixing arrangement – no matter how improbable that justification is, no matter if it rests on disputed facts.  *See, e.g.* Bank Def.'s Mot. at 13 (arguing that court should grant summary judgment if "the effects of the practice on competition are *potentially ambiguous* and not plainly anticompetitive") (emphasis added).

Defendants err on this point because they conflate two issues:  (1) judicial experience with the particular category into which Defendants' conduct falls – *i.e.*, horizontal price-fixing by a joint venture – which case law condemns as *per se* illegal, with only a narrow exception; and (2) resolution of factual issues specific to this case, which must be left to the jury.  As to the first issue, as discussed above judicial experience warrants skepticism about horizontal price-fixing by a joint venture.  Freeman, 322 F.3d at 1150-51.

As to the second issue – whether Defendants have made a sufficient evidentiary showing to prevail at summary judgment – there is no special exemption to the Federal Rules of Civil Procedure in antitrust cases.  White Motor Co. v. United States, 372 U.S. 253, 261-64 (1963).  *Cf.* Freeman, 322 F.3d at 1144 (granting summary judgment for *plaintiffs* only because "[n]one of the relevant facts [wa]s disputed").

The Supreme Court made clear long ago that summary judgment is inappropriate when disputed facts specific to a particular business practice must be resolved to determine whether the *per se* rule applies.  White Motor addressed an agreement between a truck manufacturer and its distributors and dealers, *inter alia*, to allocate sales by territory and customer class.  372 U.S. at 256-57.[127]  The trial court granted summary judgment on the basis that these practices were *per se* illegal and defendant appealed.  *Id.*  Applying the operative approach to summary judgment at the time,[128] the Supreme Court held that a trial was necessary to determine whether to apply the *per se* rule or the rule of reason.  *Id*. at 261-64.  Defendant offered various arguments for why its behavior was procompetitive.  *Id*. at 256-57.  The Court held, however, that merely proffering a possible procompetitive justification for a restraint of trade does not warrant application of the rule of reason.  *Id*. at 263-64.  *See also* TransWorld Airlines, Inc. v. American Coupon Exchange, Inc., 913 F.2d 676, 684 (9th Cir. 1990) ("Emphasizing the importance of the facts. . . , the [White Motor] Court declined to address the *legal* question of whether the practices were subject to the 'rule of reason' or the *per se* approach under the Sherman Act.  'We hold only that the legality of the territorial and customer limitations should be determined only after trial.'") (quoting White Motor, 372 U.S. at 264) (italics in original).

This approach is consistent with the seminal cases establishing the legal standard for assessing whether price-fixing by a joint venture is illegal.  Each determined the applicable legal standard only after extensive proof *at trial*.  *See, e.g.,* Broadcast Music, 441 U.S. at 6 (relying on factual record developed during eight-week trial); NCAA, 468 U.S. at 94 (relying on factual record from a "full trial"); *see also* NaBanco, 779 F.2d at 593, 597 (identifying appropriate legal standard after bench trial); Brennan, 369 F. Supp. 2d at 1133-34 (noting the relevant legal standard in this action should be determined after "proof by defendants" and that

---

[127] The manufacturer and its distributors and dealers also agreed to fix the prices at which the distributors and dealers would resell the trucks, conduct which the trial court found to be *per se* illegal.  *Id*.  at 256.  The defendant did not appeal from that ruling.  *Id*.

[128] At the time of the trial court ruling, Rule 56 allowed a party to oppose summary judgment without submitting an affidavit setting forth the facts it intended to prove.  White Motor, 372 U.S. at 254.

1    Broadcast Music and NCAA both determined the applicable legal standard only after facts were

2    developed at trial).

3            Indeed, even when a court is charged with finding facts, as it is in equity, if those

4    same facts are pertinent to claims that will be resolved by a jury, the Seventh Amendment

5    generally requires the court to await the jury's findings.  Dairy Queen, Inc. v. Wood, 369 U.S.

6    469, 479 (1962) ("[T]he legal claims involved in the action must be determined [by a jury] prior

7    to any final court determination of [the] equitable claims."); Beacon Theatres, Inc. v. Westover,

8    359 U.S. 500, 510-11 (1959) (holding party retained right to have legal claims arising under

9    antitrust law tried to jury before similar factual issues were addressed in equity by court).

10   Accordingly, Plaintiffs' right to "a trial by jury of all the issues in th[is] antitrust controversy," id.

11   at 506, applies to any factual issues relevant to choosing the appropriate category of analysis.[129]

12   Plaintiffs are entitled to try such issues – including whether fixed interchange fees are truly

13   necessary to Star's operations and whether fixed interchange fees function by raising ATM owner

14   revenues above competitive levels – to a jury.

15           The cases which Defendants cite in attempting to avoid the summary judgment

16   rules do not support their position.  Aside from the boycott cases discussed above, Defendants

17   rely on Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57 (1st Cir.

18   2004), and United States v. Brown, 936 F.2d 1042 (9th Cir. 1991).  In Stop & Shop, the First

19   Circuit explicitly adhered to established summary judgment rules in assessing whether allegedly

20   anticompetitive conduct constituted a *per se* violation of the antitrust laws.  As the court made

21   clear, it was only because the essential facts were uncontested that partial summary judgment on

22   the appropriate legal standard was appropriate:

23           Because the defendants moved for summary judgment, the
             complaint allegations did not have to be taken as true, but the
24           plaintiffs were entitled to the benefit of the doubt:  specifically,

25   _____

26   [129] As the Supreme Court observed in Beacon Theatres, "the right to trial by jury applies to treble
     damage suits under the antitrust laws and is, in fact, an essential part of the congressional plan for
     making competition rather than monopoly the rule of trade."  Beacon Theatres, 359 U.S. at 504
27   (citing Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 29 (1916).  *See also* Standard Oil
     Co. of Cal. v. Arizona, 738 F.2d 1021, 1025 (9th Cir. 1984) (Seventh Amendment provides for
28   jury trials in treble damage antitrust actions).

1

2

3

4

> reasonable inferences were to be drawn in their favor and germane factual disputes were properly reserved for trial so far as plaintiffs' sworn version of the facts conflict with the defendants' sworn version. *See* Fed. R. Civ. P. 56(c). However, broadly speaking what happened in this case is largely undisputed, although some of the details are obscure.

*Id.* at 61. Similarly, <u>Brown</u> affirmed a jury verdict, holding, as a matter of law, that market

allocation between competitors is *per se* illegal where defendants raised no material factual

disputes about whether their behavior fit within this categorical rule. 936 F.2d at 1045.

Finally, Defendants improperly rely on <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574 (1986), in support of their argument. <u>Matsushita</u> held that plaintiffs

had to provide a plausible economic explanation to survive summary judgment in a predatory

pricing case in which there was *no explicit agreement* to fix prices and plaintiffs asked the court

to infer an agreement from circumstantial evidence. *Id.* at 587-88; *see also* <u>Bell Atlantic Corp. v.</u>

<u>Twombly</u>, 127 S.Ct. 1955, 1964 (2007) (discussing <u>Matsushita</u> and applying a similar standard on

a motion to dismiss where plaintiffs alleged *no explicit agreement* to restrain trade). <u>Matsushita</u>

does not support granting Defendants' position for two reasons. First, the Bank Defendants admit

they have each entered into an *explicit* agreement to charge fixed interchange fees.[130] Since the

inception of the Star network, the Star Operating Rules have mandated that the card issuer pay a

fixed interchange fee to the ATM owner.[131]

The second reason <u>Matsushita</u> does not support Defendants is that their price-

fixing agreement makes economic sense as a means to inflate ATM prices above competitive

levels. As Dr. Bamberger explains, Defendants' agreement benefits ATM owners by providing

them supra-competitive revenues: in addition to the competitively set surcharge, they receive the

fixed interchange fee.[132] Also, the agreement benefits the large card-issuing banks because as

ATM owners they receive those same supra-competitive revenues and as card issuers they can

---

[130] Network Def.'s Mot. at 7-8 ("If a cardholder withdraws cash from an ATM operated by another member of the network, then the issuing bank is required by Star to pay an interchange fee and a switch fee.").

[131] *See supra* notes 34, 37-38.

[132] Bam. Decl. ¶¶ 19-21; *see also supra* notes 48-52.

1   recoup interchange fees through higher foreign fees.[133]  Finally, a fixed interchange fee benefits

2   Star because it is able to offer supra-competitive revenues to its members.[134]  Thus, not only is

3   Defendants' agreement actual (not merely plausible), but it has an economic explanation.

4   **VI.   DEFENDANTS' MOTION FAILS BECAUSE FIXED INTERCHANGE FEES ARE
         NOT NECESSARY AND RAISE PRICES ABOVE COMPETITIVE LEVELS.**

5

6            Even if Plaintiffs ultimately have the burden of proof at trial, Defendants have the

7   initial burden in moving for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 160

8   (1970) (holding party fails to carry initial burden at summary judgment when its evidence fails to

9   preclude a possible basis for liability); Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,

10  Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000) (same).  For Defendants to meet their initial burden,

11  they had to submit their own evidence challenging an essential element of Plaintiffs' position.[135]

12  Id. at 1102 ("A moving party without the ultimate burden of persuasion at trial—usually, but not

13  always, a defendant—has both the initial burden of production and the ultimate burden of

14  persuasion on a motion for summary judgment.  In order to carry its burden of production, the

15  moving party must either produce evidence negating an essential element of the nonmoving

16  party's claim or defense or show that the nonmoving party does not have enough evidence of an

17  essential element to carry its ultimate burden of persuasion at trial.") (citation omitted) (emphasis

18  added).  Defendants have argued only that their conduct is plausibly procompetitive and therefore

19  not per se illegal. [136]  They have not denied that they have engaged in horizontal price-fixing.[137]

20

21  _____

    [133] Bam. Decl. ¶¶ 19-20; see also supra note 36.

22  [134] Bam. Decl. ¶¶ 36, 52.  However, it is clear from the testimony that the fixed interchange fee
    was far from the driving force behind network choice. See supra notes 98-105.

23  [135] Alternatively, Defendants could have attempted to show Plaintiffs lack evidence on one or
    more such elements, but they made no effort to do so.

24  [136] See Network Def.'s Mot. at 1 (moving "for summary judgment dismissing plaintiffs' per se

25  claim because there are plausible procompetitive justifications for a system-wide interchange
    fee."); see also Bank. Def.'s Mot. at 1 (moving for summary judgment "on the grounds that the

26  FAC does not challenge a naked, obviously anticompetitive restraint to which the per se rule
    applies, and that there are plausible procompetitive justifications for establishing a network-wide

27  default interchange fee.").

    [137] See, e.g., Bank Def.'s Mot. at 5, note 4.  See also In re ATM Fee Antitrust Litigation (May 23,

28  2007), No. C04-2676 CRB, 5: 10-11 ("there's no question we price fix").

1          Freeman determines the facts relevant to whether horizontal price-fixing by a joint

2    venture is procompetitive and thereby can escape the *per se* rule.  The Freeman framework and

3    summary judgment rules taken together mean that, for Defendants to carry their initial burden at

4    summary judgment, they must show (1) their price-fixing is necessary to their joint venture and

5    (2) the price-fixing benefited the participants in the joint venture other than by increasing prices

6    above competitive levels.  They have not done so.  Moreover, the evidence shows that Star's

7    fixed interchange is unnecessary and that it raises prices to cardholders above competitive levels.

8            **A.**    **Eliminating Star's Fixed Interchange Fees Is Viable.**

9          Star's fixed interchange fees are not procompetitive – and therefore are *per se*

10   illegal – unless Defendants submit evidence that they are necessary to Star's operations.[138]  Yet

11   Defendants address only one alternative to fixed interchange fees – bilateral negotiations –which

12   they argue (at length) would not be feasible.[139]  Even if that were true, it would not establish that

13   fixed interchange fees are necessary.  Star could retain all of the network rules that actually

14   facilitate foreign ATM transactions and guarantee universal acceptance – rules for the timing of

15   reimbursement, the form of transmission of information, and the like.[140]  The evidence shows that

16   with those rules in place, Star could run efficiently without an additional rule requiring the

17   payment of fixed interchange fees.[141]

18         ATM owners are able to obtain revenue on foreign ATM transactions without

19   fixed interchange.  Even if Star's interchange fees would disappear without price-fixing, as

20   Defendants suggest, ATM owners would be compensated for foreign ATM transactions – at

21   competitively set prices – through surcharges.  Surcharging is already a widespread practice.

22   According to the 2006 ATM Deployer Study, commissioned by Star, 97 percent of ATM owners

23

24

25   ────────────────

26   [138] *See supra* Part IV.
     [139] *See* Bank Def.'s Mot. at 26-30; Network Def.'s Mot. at 20-23.

27   [140] Pohlman Decl. ¶¶ 5, 73-75; Bam. Decl. ¶¶ 47-48.
     [141] Pohlman Decl. ¶¶ 11-13, 73-75; Bam. Decl. ¶¶ 41-52.

28

impose a surcharge on at least a portion of their network transactions.[142]   Surcharges allow ATM

owners to charge cardholders whatever price the market bears.[143]

Defendants' only argument on this point is the sophism that elimination of fixed

interchange fees is the same as fixing those fees at zero, and thus Defendants may fix prices at

whatever amount they want.[144]   But that is untrue.   Defendants' Orwellian rhetoric

notwithstanding, *ceasing* to fix prices is not the same as *agreeing* to fix prices.   Nor do all ATM

owners need to agree to charge any fixed ATM interchange.   And refraining from imposing fixed

fees would not be the same as fixing those fees at zero.

As admitted by Ronald Congemi, founder and former CEO of Star, "Zero is a

number but it is not a price."[145] SunTrust Vice President Kerry Brashears similarly testified that

he understood "eliminating" interchange fees to mean "[t]here is no fee mandated by the network

that – that is established in an exchange. . . ."[146]



[147]

[148]   An executive of Barnett Bank, the twelfth-largest

---

[142] *See supra* note 65.

[143] Pohlman Decl. ¶¶ 11-13, 67-68; *see also supra* note 68.

[144] S*ee generally*  Bank Def.'s Mot. at 30-32; *see* Bank Def.'s Mot. at 31 ("If the current system – a default of 46 cents, with the ability to negotiate a different amount bilaterally – represented price-fixing, then a mandated network fee of zero would surely be price-fixing as well."); *see* Network Def.'s Mot. at 23 ("For if it is a violation of the antitrust laws for Star to set a system-wide interchange fee – it is legally irrelevant whether that fee is 'zero' or some other amount.").

[145] Saveri Decl., Exh. 4 [Congemi Dep.] at 42:1-7.

[146] Saveri Decl., Exh. 1 [Brashears Dep.] at 97:1-8.

[147] Saveri Decl., Exh. 12 [Schmal. Dep.] at 151:17-152:6.

[148]



Saveri Decl., Exh. 80 at ICBA007525 (

). *See also* Saveri Decl., Exh. 83 at ICBA004810 (

1   ATM card issuer in the country at the time, said in March 1996 that "[i]t would be hard to justify

2   paying 40 cents in interchange when machine owners are getting $1 in surcharges."[149]  In 2001,

3   Pulse network president and CEO Stan Paur admitted that interchange fees "may be an

4   anachronism" and that his network had considered eliminating them.[150]  As recently as 2005, the

5   NYCE Network Oversight Board considered an initiative with regard to Electronic Benefits

6   Transactions ("EBT") wherein ATM owners who surcharge would not receive interchange.

[Redacted]

9   [151]

[Redacted]

12   [152]

[Redacted]

17                                                                                  Saveri Decl.

18   Exhs. 84, 85 [2330]) (                                                    ); Saveri Decl., Exh. 47

(

19   ); *see also* Saveri Decl., Exh. 78 at PLTF-

042093.  (Is it the End of Interchange Fees, Bank Network News (Aug. 14, 1996) (President of

20   the Exchange Network and former Visa-Plus board member Danny Dumler said allowing

surcharging "does raise the question about the legitimacy of an interchange fee."); *see also* Saveri

21   Decl., Exh. 79 (In 1994, while Dumler was the President of Plus, the Plus board recommended

prohibiting ATM owners from collecting both surcharges and interchange.  "Our feeling is that

22   some ATM owners are being double compensated,." Dumler said at the time.).

23   [149] Saveri Decl., Exh. 77 at 1.

[150] Saveri Decl., Exh. 81 at 1 ("Is ATM interchange an anachronism." ATM Marketplace.com

24   News article, Oct. 12, 2001); *see also* Saveri Decl., Exh. 82 at B1-0080540 (

25                                                       ").

[151] Saveri Decl., Exh. 87 at CBW0056827; *see also* Saveri Decl., Exh. 88 at B1-0073830

26   (

27                                          ); Saveri Decl., Exh. 89 at ST0011624 (

).

28   [152] Saveri Decl., Exh. 86 at WACHB178022.



[154] Most telling, however, is that Star's counterpart in Australia, the Cashcard ATM network, is doing exactly that which the parent First Data refuses to acknowledge – eliminating fixed interchange and instead directly charging consumers through surcharges.[155]

Defendants' refusal to address the possible elimination of fixed interchange fees defies this Court's instructions. This Court made clear that the parties should address the underlying economics of Star's fixed interchange fees: "the parties must address the plausible procompetitive justifications for the fixed interchange fee *in the context of evidence about the actual character of the agreement*."[156]   Instead, once again Defendants' analysis "cloud[s]" the fundamental issue in this case:  whether "procompetitive justifications really do exist for the fixed interchange fee." *Id.* at 5.

Having failed to address the possibility of eliminating Star's fixed interchange fees, Defendants have not carried their initial burden to show that those fixed fees are necessary. That means, for purposes of the pending motion, that their horizontal price-fixing is *per se* illegal. Freeman, 322 F.3d at 1150-51; Brennan, 369 F. Supp. 2d at 1135.

---

[153] Saveri Decl., Exh. 49 at WFB004032. ████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████ Saveri Decl., Exh. 18 at
WFB044341.
[154] Saveri Decl., Exh. 51 at STAR00124391 (█████████████████████████
███████████).
[155] Saveri Decl., Exh. 93; Saveri Decl., Exh. 94 (Cashcard's submission to the Reserve Bank of Australia in support of direct charging regime).
[156] Memo. and Order (Dkt. 360) at 6 (Nov. 30, 2006) (emphasis added).

1          **1.      Universal Acceptance Is Possible Without Fixed Interchange.**

2          Defendants' position cannot be salvaged based on their claim that fixed

3   interchange fees are essential for "universal acceptance" – *i.e.*, the consumer's certainty that his

4   or her card issued by a member bank will be honored by all ATMs that carry the network's

5   logo.[157]  Fixed interchange fees and universal acceptance are two separate matters:  Star could

6   maintain all of the rules necessary to settle foreign ATM transactions without playing any role in

7   setting or facilitating payment of interchange fees.  *See also* Bam. Decl. ¶¶ 56-61.

8          Star's argument, then, reduces to the following position:  because an agreement on

9   some uniform terms is essential, Star can impose any uniform terms it wants, even if those terms

10   involve horizontal price-fixing.  The Ninth Circuit rejected this argument in <u>Freeman</u> – the need

11   for members of a joint venture to coordinate on some matters is not a license to engage in

12   horizontal price-fixing.  <u>Freeman</u>, 322 F.3d at 1151.  Moreover, in <u>Freeman</u>, the Ninth Circuit

13   found that compensation to the individual real estate associations could be set in a competitive

14   manner.  *Id.*  The same holds true for Star.  ATM networks, like Star, involve various forms of

15   cooperation.  However, the fixed interchange fee is not a necessary part of Defendants'

16   cooperative conduct.[158]  As Dr. Steven Salop recognized almost twenty years ago:

17              [ATM] interchange fees are not necessary at all.  Instead of
              interchange fees, the network could permit each ATM owner
18              unilaterally and independently to set user surcharges for its ATMs.
              Independently determined foreign fees would continue to be
19              permitted.  In this way, free market price competition among ATM
              owners would replace collective price fixing.

20
              This free market approach to ATM pricing would not
21              increase negotiation costs because no interbank pricing negotiations

22   ─────────────────────────
     [157] *See generally*  Bank Def.'s Mot. at 21-22, 28-30; *see also* Bank Def.'s Mot. at 2 ("A default
23   network interchange fee is necessary in order to retain the 'universal acceptance' principle that is
     critical to the functioning of the network."); *see* Network Def.'s Mot. at 17 ("In my experience,
24   universal acceptance would not be possible without an interchange fee.") (citing Congemi Decl.
     ¶ 16).  *See also* Bank Def.'s Mot. at 20 ("An individual ATM network transaction is, by
25   definition, a cooperative, interdependent product created by the card-issuing bank and the ATM
     owner within the overarching structure of the network.  That interdependence is a definitional
26   characteristic of every network ATM transaction. Schmal. Decl. ¶ 26; *see* <u>NaBanco</u>, 779 F.2d at
     603. Given the need for cooperation, there must be an understanding between the issuer and the
27   deployer as to the terms on which they agree to engage in transactions with each other, *i.e.*,
     interchange.").
28   [158] Pohlman Decl. ¶¶ 75; Bam. Decl. ¶¶ 47-48.

> would be necessary.  The user surcharge would be clearly disclosed on the ATM machine and each consumer would decide individually whether or not to pay the posted price at a particular ATM.  At the same time, the benefits of universal acceptance and ubiquity would be preserved:  every card would work in every ATM on the network.

*See* Saveri Decl., Exh. 74 (Steven C. Salop, <u>Deregulating Self-Regulated Shared ATM Networks</u>, 1 Econ. Innov. New Techn. 85, 91 (1990)).

### 2. **Defendants' Position Is Internally Inconsistent.**

Defendants' effort to impose an artificial constraint on the inquiry into the economic effects of their price-fixing creates irreconcilable inconsistencies in their position.  On one hand, Defendants in essence admit to engaging in horizontal price-fixing, the most condemned of antitrust violations.  <u>Freeman</u>, 322 F.3d at 1144.  But, Defendants argue, that is merely a formal category, and the Court should look at the underlying economics of their behavior and assess whether it is procompetitive or anticompetitive.[159]  On the other hand, Defendants' price-fixing is obviously anticompetitive, particularly when compared to the elimination of fixed interchange fees.[160]  But, Defendants argue, for purely formalistic reasons, the Court cannot even consider the very practical alternative of eliminating fixed interchange.[161]

Defendants cannot have it both ways.  If form is what matters, they are engaging in horizontal price-fixing, which is *per se* illegal.  If substance is what matters, the possibility of ATM owners setting their prices competitively through surcharges means Defendants' price-fixing is unnecessary and therefore *per se* illegal.  Either way, their conduct is *per se* illegal.

### 3. **Defendants' Position Contradicts The Law And Common Sense.**

Defendants' position is also contrary to the law and common sense.  If charging no fee were the same as fixing a fee of zero, and if that allowed market participants to charge whatever fixed fee they wanted, the consequences would be absurd.  Consider <u>Freeman</u>.  The Ninth Circuit held that real estate associations could not charge support fees fixed by Sandicor,

---

[159] S*ee generally* Bank Def.'s Mot. at 22-25.
[160] Bam. Decl., ¶¶ 8-22, 28-31; Pohlman Decl. ¶¶ 11-13, 75.
[161] S*ee generally*  Bank Def.'s Mot. at 30-32.

1    the joint venture, but rather had to negotiate those fees individually with realtors.  <u>Freeman</u>, 332

2    F.3d at 1154.  But according to Defendants' logic, the real estate associations in <u>Freeman</u> would

3    in effect be charging individually negotiated support fees – *plus a zero fee fixed by Sandicor*.

4    And if Sandicor could fix a fee at zero, it could fix that fee at any other amount, even though the

5    Ninth Circuit held that doing so is *per se* illegal.  In other words, Defendants' position conflicts

6    with settled law.[162]

7           Nor do Defendants cite to a single case holding that eliminating a fixed fee is the

8    same as fixing a fee at zero.  They rely on <u>Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball</u>

9    <u>Ass'n</u>, 95 F.3d 593 (7th Cir. 1996) – which held only that if the NBA was permitted to charge a

10   basketball team a fee for broadcasting a game on television, courts should not be involved in

11   setting the amount of the fee.  *Id*. at 597.  The court did not suggest that charging no fee would

12   have been the same as charging a fee of zero – to the contrary, it recognized the distinction

13   between the two and overruled the trial court's decision that the NBA could not charge such a fee

14   at all.  *Id.  See also* <u>Nat'l Elec. Contractors Ass'n, Inc. v. National Contractors Ass'n</u>, 678 F.2d

15   492, 501 (4th Cir. 1982) (holding the imposition of a surcharge on electrical contracting work by

16   a trade union was *per se* illegal – *not* that charging no surcharge is the same as a zero surcharge,

17   so the trade union could impose a surcharge in any amount).

18         **4.    Defendants Cannot Avoid The *Per Se* Rule By Pretending Star's Fixed**
            **Interchange Fees Are A "Default."**
19

20         The Bank Defendants use the term "default" throughout their brief to describe

21   Star's current fixed interchange fees.[163]  Notably Star does not do so.  The banks' strategy is

22   unclear.  Perhaps they are seeking to blur the distinction between Star's current mandated

23

---

24   [162] Nor can Defendants prevail by relying on obiter dicta from Judge Walker before Plaintiffs had
     properly briefed this issue.  Defendants have not repeated their incorrect argument that Judge

25   Walker's dicta is law of the case.  Indeed, Defendants have asked this Court to reconsider Judge
     Walker's *holding* on their motions to dismiss and for judgment on the pleadings.  *See* Suntrust's

26   Motion for Reconsideration of Order Denying Motion to Dismiss or, in the Alternative, for
     Judgment on the Pleadings (Dkt. 348) (filed Oct. 6, 2006).

27   [163] *See* Bank Def.s' Mot. at 2, 3, 4, 10, 14, 19, 20, 22, 28, 31; *see also* Bank Def.s' Mot. at IVC
     titled  "There Are Plausible Procompetitive Justifications for Setting a Network-Wide Default

28   Interchange Fee")

1    interchange fees and what would occur if Star eliminated its rule requiring fixed interchange fees

2    and allowed card issuers and ATM owners to negotiate the fee, if any, one would pay the other.

3    If this – or some similar – strategy lies behind use of the term "default," it fails.

4            The evidence is conclusive that Star's mandated interchange fees are not merely a

5    "default."[164]  Star's fixed interchange fees have always been mandatory, not "default" or

6    "presumptive" amounts from which members may deviate.[165]

7                                                                              [166]

8            The term "default" interchange appears in no document drafted by a fact witness.

9    Defendants' expert, Richard Schmalensee, uses the term in his declaration.[167]

10

11            .[168]  Similarly, the other declarants on whom Defendants rely had never heard of or used

12    the term "default interchange fee" as part of Star's ATM network.

13            The Bank Defendants nevertheless cite to Star's operating rules themselves and

14    assert – without quotation or explanation – that interchange fees are merely "presumptive."  *See*

15    Bank Def.'s Mot. at 10, note 9.

16                                                                              [169]

17                                                                              [170]

18

19

---

20    [164] Indeed, Star does *not* refer anywhere in its moving papers to a "default" interchange.  The reason for this reticence is unclear – perhaps it wants to reserve the right to enforce its interchange fees as mandatory or perhaps it thinks the argument is too implausible on the evidence to be pursued.  Whatever the reason, Star's position casts serious doubt on the Bank Defendants' use of the term.

21

22

23    [165] Saveri Decl., Exh. 4 [Congemi Dep.] at 95:21-96:6.

      [166] Saveri Decl., Exh. 8 [Lynch Dep.] at 148:17-149:23; *see also supra* note 38.

24    [167] Schmal. Decl. ¶20 ("[I]f ATM networks are not permitted to set a default interchange fee, they almost certainly will be unworkable.").

25    [168] Saveri Decl., Exh. 12 [Schmal. Dep.] at 105:3-14 (                                   ).

26    [169] *See supra* notes 34, 37-43.

27    [170] Saveri Decl., Exh. 90 at BAC071871 (                                   ).

28                                                                              ).

1    Further, even if Star's fixed interchange fees were a default, it would not matter.

2    Fixing prices as a default is *per se* illegal, even if some of the prices actually charged deviate

3    from the default price.  Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 990 n.8 (9th Cir.

4    2000) ("To constitute horizontal price fixing, the agreement among competitors need not involve

5    the ultimate price."); Plymouth Dealers' Ass'n of N. Cal. v. United States, 279 F.2d 128, 132 (9th

6    Cir. 1960) (finding *per se* liability for distribution of price list among members of association:

7    "The competition between the Plymouth dealers and the fact that the dealers used the fixed

8    uniform price list in most instances only as a starting point, is of no consequence.  It was an

9    agreed starting point; it had been agreed upon between competitors; it was in some instances in

10   the record respected and followed; it had to do with, and had its effect upon, price.").[171]

11        **B.        Defendants Fail To Explain Why Fixed Interchange Fees Have an Economic**
12                    **Effect Other Than by Raising Prices Above Competitive Levels.**

13   To establish that fixed interchange fees are procompetitive – and therefore are not

14   *per se* illegal – Defendants must show that they benefit Star and its members in some way other

15   than by raising prices above competitive levels.[172]  On this crucial issue, too, Defendants have

16   provided no meaningful argument or evidence.  And the evidence in fact reflects that fixed

17   interchange fees inflate ATM fees above competitive levels.

18   To carry their initial burden on this issue, Defendants would have to explain why

19   Star's fixed interchange fees have an economic impact at all.  If the fixed fees have no effect, they

20   cannot have a procompetitive effect.[173]  To be sure, Defendants assume such an economic

21   impact.[174]  It underlies the various economic consequences Defendants claim for fixed

22

23   [171] Similarly, courts have found that purchasers have suffered antitrust injury from fixed list
     prices in industries in which negotiations are based on those list prices.  *See, e.g.,* In re Rubber
24   Chemicals Antitrust Litig., 232 F.R.D. 346, 352 (N.D. Cal. 2005) ("class-wide impact is usually
     found to exist where the defendants are shown to have used collusively-set list prices for the
25   product at issue"); In re Hydrogen Peroxide Antitrust Litig., 240 F.R.D. 163, 174 (E.D. Pa. 2007)
     (same); In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 383 (S.D.N.Y. 1996) (same); *see*
26   *also* Catalano, 446 U.S. 643 (holding that fixing part of a price – the terms for credit – is *per se*
     illegal, even though it does not set an overall price).
27   [172] *See supra* Part IV.
     [173] Bam. Decl., ¶¶ 29-30.
28   [174] *Id.*

interchange fees:  encouraging ATM deployment, maximizing output, and the like.[175]  But they do not explain why there is such an impact nor, *a fortiori*, do they demonstrate that the impact is the result of something other than supra-competitive prices.[176]

In particular, for Defendants' position to succeed at summary judgment, they have to address the fact that in a purely efficient market, one would expect interchange fees to have no effect at all, a phenomenon known in the economics literature as "neutrality."[177]  In such a market, fixed interchange fees would be expected to be neutral.  This is so because competition would ordinarily force ATM owners to reduce surcharges by the amount of interchange fees and allow card issuers to increase foreign fees by the same amount.[178]  But Defendants fail to provide any meaningful account of *why* interchange fees are not neutral.[179]

Once again, Defendants have failed to address the obvious explanation, in this instance the most likely reason fixed interchange fees are not neutral:  they increase revenues to ATM owners above competitive levels by allowing ATM owners to share a portion of foreign fees rather than obtaining all of their revenues from surcharges.[180]  This matters because the market for foreign fees is much less competitive than the market for surcharges.  The main reason for this disparity is that foreign fees are "hidden" and surcharges are displayed on the ATM screen at the time of a foreign transaction.[181]

Defendants' failure to address this issue leaves a gaping hole in their moving papers.  It is remarkable that Defendants' expert declaration, which provides the foundation for

---

[175] *Id.*

[176] *Id.* ¶ 31.

[177] *Id.* ¶¶ 29-30.

[178] *Id.* ¶¶ 12, 29-31.

[179] The closest Defendants come to addressing this issue is by reference to a controversial – and irrelevant – economic literature that addresses two-sided markets *with separate purchasers on either side*.  An example is a newspaper – the reader buys the newspaper, but so in a sense do the advertisers.  Each may pay some portion of the price to the publisher.  In these circumstances, the seller's efforts to "balance" how much to charge each side in light of different demand curves can explain how varying pricing structures can affect the seller's overall revenues.  But this literature has no legitimate application to foreign ATM transactions, in which there is *only one purchaser*: the cardholder pays both the surcharge and the foreign fees.

[180] Bam. Decl. ¶¶ 8-16.

[181] Dhar Decl. ¶¶ 11-16; Bam. Decl. ¶¶ 12-16.

their motion, assumes – but does not explain – non-neutrality.[182]  Indeed, Defendants' expert,

Richard Schmalensee, analyzes the effect of fixed interchange fees only on surcharges, even

though he admits that foreign fees are also a component of the total price of foreign ATM

transactions.[183]  Without considering foreign fees, he cannot assess the impact of interchange fees

on consumers, which he has admitted must be the starting point for analyzing a potential antitrust

violation by a joint venture.[184]  As a result, his analysis is woefully incomplete, Defendants have

not carried their initial burden, and their motion for summary judgment should be denied.

## VII.   DEFENDANTS' JUSTIFICATIONS FOR FIXING INTERCHANGE FEES ARE NOT PROCOMPETITIVE AND REST ON DISPUTED FACTUAL ASSERTIONS

### A.   Defendants Do Not Explain How Fixed Interchange Fees "Balance" the Interests Of Card-Issuers and ATM Owners in A Procompetitive Manner.

Defendants claim that fixed interchange fees somehow "balance" the interest of

card-issuers and ATM owners – although they have not explained precisely what they mean by

that term.[185]  The use of that term in the economics literature makes sense only for two-sided

markets with *two different purchasers*, one on each side of a transaction, not for a market with *a

single purchaser* on both sides.[186]  Further, other potential meanings of "balancing" would not

qualify as procompetitive justifications and would in fact be anticompetitive.

#### 1.   The Ordinary Use Of "Balancing" In Two-Sided Markets Does Not Apply In This Case.

Under limited circumstances, there is at least an argument that "balancing" can

help facilitate the proper setting of prices and thereby promote efficiency.  Whatever the merits of

that theory in general, it does not apply to ATM transactions.

---

[182] Bam. Decl. ¶¶ 29-31.

[183] *Id*. ¶¶ 23-27.

[184] Saveri Decl., Exh. 95 Howard H. Chang, David S. Evans, and Richard Schmalensee, Some Economic Principles for Guiding Antitrust Policy Toward Joint Ventures, 1998 Colum. Bus. L. Rev. 223, 227 (1998) ("we show that it is essential that any inquiry begin with an assessment of whether the practice in question imposes significant consumer harm").

[185] (Bank Def.s' Mot. at  Section IV.C.2.a) titled "A Network Interchange Fee Balances the Conflicting Interests of Network Members to Increase the Network's Output"); (Network Def.'s Mot. at 9 ("In determining the level at which to set its interchange fee, Star seeks to balance the needs of all its members, including issuers and ATM owners.")).

[186] Bam. Decl. ¶¶ 41-46.

1     The concept of balancing as a justification for fixed interchange has validity, if at

2     all, only in markets involving two sellers and two purchasers of a single product, circumstances

3     that complicate pricing.  Credit card transactions provide one – perhaps the only – possible

4     example.[187]  Saveri Decl., Exh. 75 (Affidavit of William F. Baxter, In the Matter of the

5     Arbitration Between First Texas Savings Ass'n v. Financial Interchange, Inc., ¶ 10 (1988)). The

6     price of a credit card transaction is apportioned between the cardholder and the merchant.  But the

7     card issuing bank does not negotiate with the merchant and the merchant bank does not negotiate

8     with the cardholder.  Under these circumstances, there is at least the possibility of interchange

9     "balancing" the transaction by allowing, for example, the card issuing bank in effect to charge the

10    merchant.  This is done through an interchange that the card issuing bank receives from the

11    merchant bank.  Dr. Schmalensee himself explained in an article, balancing in a two-sided market

12    is necessary only where sellers must "coordinate the demands of *two distinct groups of*

13    *customers*."[188]

14        In foreign ATM transactions, in contrast, there is only one purchaser – the

15    cardholder – who negotiates prices directly with two different sellers – the ATM owner and card

16    issuer.  Under these circumstances, the concept of balancing makes no sense.[189]  There is no need

17    for an interchange fee to allow the card issuer to charge the cardholder.  Card issuers can – and

18    do – negotiate a fee for a foreign ATM transaction directly with a cardholder in the form of a

19    foreign ATM fee.[190]

20        Balancing may be able to explain non-neutrality in the credit card context.

21    Without an interchange, it might not be possible for a card issuing bank to receive a payment

22    from a merchant for a credit card transaction, a payment that the merchant might be willing to

23

24    _____

25    [187] Plaintiffs do not agree that the concept of balancing is valid with regard to credit card
      interchange, but merely acknowledge economists have addressed that concept in that market.

26    [188] Saveri Decl., Exh. 92 (David S. Evans and Richard Schmalensee, "The Economics of
      Interchange Fees and Their Regulation: An Overview," *Proceedings – Payments System*

27    *Research Conferences*, Federal Reserve Bank of Kansas City, May 2005.) (emphasis added).
      [189] Bam. Decl. ¶¶ 41-46.

28    [190] *Id.* at ¶ 46.

1  make.[191]   And the transaction might not occur at all.  But the same argument does not apply to

2  two-sided markets with the *same purchaser* on both sides.  In particular, it does not explain why a

3  cardholder, as a purchaser, would be willing to pay more for a foreign ATM transaction if a larger

4  part of the price shows up on the foreign fee side than the surcharge side.  Cardholder demand at

5  the same total price should be the same regardless of how much of the price appears on each side,

6  at least in a market with perfect information[192] and no transaction costs.[193]

7          Dr. Schmalensee relies on the concept of "balancing" in an attempt to justify

8  Defendants' price-fixing.[194]  But he does not resolve the difficulties of applying that concept to

9  ATM transactions.[195] He does not explain why there is a need to "balance" two fees paid by the

10  very same cardholder,[196] nor does he explain why that "balancing" would have any effect on the

11  prices paid to card issuers or ATM owners.[197]  Indeed, Schmalensee's analysis proceeds from the

12  assumption that "balancing" through interchange fees would be necessary if ATM owners could

13  *not* surcharge, when in fact ATM owners *can* and *do* surcharge.[198]  Correcting for these

14  inadequacies, Schmalensee's reasoning in fact supports the conclusion that fixed ATM

15  interchanges are not necessary to "balance" foreign ATM transactions.[199]

16

17

18

---

19  [191] *Id*. at ¶ 43.

    [192] *Id.* ¶ 12.

20  [193]   Of course, that does not mean ATM interchange fees are neutral.  Again, there is an obvious

21  alternative to the inapposite "balancing" theory.  It is that cardholders have a different demand
    curve regarding foreign fees and surcharges because foreign fees are hidden and surcharges are

22  displayed.  *See* Bam. Decl. ¶ 12-22.  But if that is what Defendants mean by "balancing," it is
    fatal to their case.  It is just another way of saying that Star and its members exploit imperfect

23  information among cardholders to raise ATM owner revenues above competitive levels by fixing
    prices. That explanation cannot justify horizontal price-fixing by a joint venture.  *See supra* Part

24  IV.

    [194] Bam. Decl. ¶ 41.

25  [195] *Id.* ¶¶ 42-46.

26  [196] *Id.* ¶¶ 44-45.

    [197] *Id.* ¶¶ 30-31, 44.

27  [198] *Id.* ¶ 46.

    [199] *Id.*

28

743379.1                                     - 54 -

2.      **Any Novel Notion Of "Balancing" Would Violate The Antitrust Laws.**

If Defendants mean by "balancing" some concept other than the promotion of efficiency, it cannot justify horizontal price-fixing.  Indeed, the Ninth Circuit in <u>Freeman</u> rejected defendants' reliance on a concept that was similarly foreign to antitrust doctrine.  The real estate associations in <u>Freeman</u> argued that fixed support fees were necessary to achieve "fairness" – uniform compensation for the support efforts that real estate associations provided to realtors.  <u>Freeman</u>, 322 F.3d at 1151.  The Ninth Circuit rejected this argument, among other reasons, because "fairness" is not relevant in an antitrust case.  *Id.*

The same is true if Defendants are relying on some vague notion of "balance" between issuers and acquirers.  The antitrust laws are designed to ensure that competition benefits consumers, not that "balance" is achieved between market participants.  Nor do Defendants cite a single case in support of such a novel approach to antitrust law.

B.      **Defendants Have Not Provided Evidence that Fixed Interchange Fees Encourage ATM Deployment, Promote Star's Operation and Growth, Maximize its Output, or Enable Star To Compete in a Procompetitive Manner.**

Defendants also assert that Star's fixed interchange fees have various procompetitive effects:  *i.e.*, they encourage ATM deployment (*see* Network Def.'s Mot. at 18), they help to promote the network's operation and growth (*see* Network Def.'s Mot. at  17-19), they maximize Star's output (*see* Bank Def.'s Mot. at  22-23, section IV.C.2.a); (*see* Network Def.'s Mot. at 19-20), and they enable Star to compete with other networks (*see* Bank Def.'s Mot. at 23-25, section IV.C.2.b); (*see* Network Def.'s Mot. at 24-25).  These asserted effects cannot save Defendants from *per se* liability for several reasons.

1.      **Defendants Cannot Justify Price-Fixing by the Beneficial Effects of Supra-Competitive Prices.**

First, and foremost, Defendants have not explained how fixed interchange fees have any economic effect other than by increasing ATM revenues above competitive levels.[200]

---

[200] Bam. Decl. ¶ 31.

1    To the contrary, the beneficial effects that Defendants allege all flow directly from those supra-

2    competitive revenues.[201]  But the antitrust laws reject any justification for price-fixing based on

3    supra-competitive profits.  Freeman, 322 F.3d at 1151, 1152.  ("We reject some justifications as a

4    matter of antitrust policy, even though they might show that a particular restraint benefits

5    consumers.  Among these are theories that depend on power over price for their efficacy.")

6    (internal quotation marks and citation omitted).

7           **2.      The Antitrust Laws Promote Price Competition to Benefit Consumers,
                      Not Price-Fixing to Benefit Competitors.**

8

9           Star's efforts to promote its own operation and growth, and to serve the interests of

10   its members, are irrelevant under antitrust law.  It has long been a fundamental principle that the

11   antitrust laws were enacted for the "protection of *competition*, not *competitors*."  Brunswick

12   Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 488 (1977).  It might well be true that Star's profits

13   would suffer well if it could not fix prices, or that some of its members would abandon marginal

14   ATMs that they could not operate profitably under competitive conditions.  But that is the point

15   of competition – as the Ninth Circuit said in Freeman, "Inefficiency is precisely what the market

16   aims to weed out.  The Sherman Act, to put it bluntly, contemplates some roadkill on the turnpike

17   to Efficiencyville."  322 F.3d at 1154.  Thus, taken by itself, the fact that Star and its members

18   will enjoy higher profits from fixing prices does not count under the antitrust laws.

19          Similar problems beset Defendants' argument that fixed interchange fees enable

20   Star to compete more effectively with other networks.  This contention is in effect a "meeting

21   competition" defense.  But that is not a valid defense to a claim of horizontal price-fixing, for

22   obvious reasons.[202]  Courts reject the principle that if one actor behaves badly, others have a

23   license to do so as well.  *See* In re Lovable Company, 67 F.T.C. 1326 (1965) ("the fact that an

24   unfair method of competition is widespread in an industry is not a defense on the merits to an

25   action brought against a single competitor. . . .");  In re Liggett & Myers Tobacco Company, Inc.,

26   56 F.T.C. 221 (1959) (noting that even though a defendant's "acts and practices may have been

27   _____

[201] *Id.* ¶ 30.

28   [202] In contrast, such a defense does exist under the Robinson-Patman Act.

1    engaged 'in good faith' to meet the similar acts and practices of (that defendant's) competitors is

2    not a defense"); *see also* Compaq Computer Corp. v. Packard Bell Electronics Inc., 163 F.R.D.

3    329, 337 n.20 (N.D.Cal.1995) (rejecting "argument, to the effect that 'everybody's doing it, so

4    it's unfair to punish me'" in non-antitrust case).

5            The law is similarly clear that Defendants cannot justify horizontal price-fixing

6    among ATM owners within Star by arguing that its harmful effects are ameliorated by

7    competition between ATM networks.  As Judge Walker noted in this action, United States v.

8    Topco Associates, Inc. precludes just this sort of effort to defend *intra*band horizontal price-fixing

9    as a way to promote *inter*brand competition.  Brennan v. Concord EFS, Inc., 369 F. Supp. 2d at

10   1135  (quoting Topco Assoc., Inc., 405 U.S. at 600, 608, 613)) (holding interbrand competition

11   cannot justify price-fixing among competitors).[203]

12           Indeed, reliance on interbrand competition would be particularly inappropriate in

13   this case – where the cumulative effect is for all networks to exploit imperfect consumer

14   knowledge to raise prices above competitive levels.[204]

15           Along similar lines, widespread use by ATM networks of fixed interchange fees

16   does not prove they are efficient, as Defendants contend.  Bank Def.'s Mot. at 23-24.  Plaintiffs'

17   explanation for their widespread use – the only economically sound one any party has offered – is

18

19

_____

20   [203] Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643 (1980), similarly rejected an argument in
     defense of a horizontal agreement that it would encourage others to compete and therefore would
21   do no harm.  The Court explained in condemning as *per se* illegal an agreement among
     wholesalers of beer not to give favorable credit terms to beer retailers:
22

23                   But in any case in which competitors are able to increase the price
                     level or to curtail production by agreement, it could be argued that
24                   the agreement has the effect of making the market more attractive
                     to potential new entrants.  If that potential justifies horizontal
25                   agreements among competitors imposing one kind of voluntary
                     restraint or another on their competitive freedom, it would seem to
26                   follow that the more successful an agreement is in raising the price
                     level, the safer it is from antitrust attack.  Nothing could be more
27                   inconsistent with our cases.

     *Id*. at 649.
28   [204] Bam. Decl. ¶¶ 49-52.

1    that all networks have an incentive to increase the price for foreign ATM transactions above

2    competitive levels and to allow their members to share inflated revenues.  *See* Bam. Decl. ¶ 50.

3               Further, particularly odd is Defendants' focus in this context on proprietary

4    networks.  Defendants claim that proprietary networks – by which they mean networks not owned

5    by their members – will enjoy a competitive advantage if they are allowed to engage in price-

6    fixing but non-proprietary networks are not.[205]  Of course, as already noted, there is no "meeting

7    competition" defense to price-fixing, so this argument cannot help Defendants.  But it is far more

8    damaging to their case than that.  A proprietary network – which Defendants claim Star became

9    in February, 2001 (*see* Bank Def.'s Mot. at 9) – engages in horizontal price-fixing when all of its

10   members agree to charge fixed fees.[206]  *See* <u>United States v. Masonite Corp.</u>, 316 U.S. 265, 276

11   (1942) ("Prices are fixed when they are agreed upon."); <u>United States v. Nat'l Ass'n of Real</u>

12   <u>Estate Bds.</u>, 339 U.S. 485, 488-89 (1950); <u>Goldfarb v. Virginia State Bar</u>, 421 U.S. 773, 782

13   (1975).  Moreover, this Court recognized in terminating Defendants' previous motion for

14   summary judgment that even if Star became a proprietary network, it engages in illegal price-

15   fixing if its fixed interchange fees are anticompetitive.  Nov. 30, 2006 Memo and Order at 5-7.

16   The Bank Defendants in effect admit as much:  "Nor does it make any economic sense that the

17   form of ownership of the two networks [propriety versus non-proprietary], which provide

18   precisely the same product to consumers, should dictate which succeeds and which fails."  Bank

19   Defs' Mot. at 25, ll. 1-3.  Thus, the Bank Defendants have the right principle but the wrong

20   conclusion.  Because fixing ATM interchange is anticompetitive even if undertaken by a

21   "proprietary" network, it is *per se* illegal.

---

[205] *See* Bank Def.'s Mot. at 24.

[206] (*See e.g.* Bank Def.'s Mot. at 2, 23 (referring to Star's fixed price as a "common interchange fee" and the "network-wide interchange fee") (*see e.g.* Network Def.'s Mot. at 2 (Star network establishes "system-wide interchange fees"); Network Def.'s Mot. at 6 ("virtually all ATM networks have set a system-wide interchange fee")).

3. **The Antitrust Laws Do Not Seek To Maximize Output Through Inefficient Price-Fixing.**

Nor would it matter, by itself, if Star could prove that fixed interchange fees maximize its output.  It is illegal to restrain trade to increase fees above competitive levels, even if doing so somehow increases output.  <u>Freeman</u> is dispositive on this point as well – the fixed support fees in <u>Freeman</u> may well have been necessary to attract the smaller real estate associations and maximize the total number of MLS listings, but increased output cannot legally be achieved by fixing prices above competitive levels.  <u>Freeman</u>, 322 F.3d at 1152-53.[207]  This general rule makes particular sense in this case because Defendants have caused consumers to pay more for a good or service than they would in a market with complete information, which is inefficient and harmful to competition.[208]

4. **Defendants Have Not Shown that Fixed Interchange Increases Output.**

In any case, Defendants have not shown that fixed interchange in fact increases – much less maximizes – output.  Fixed interchange provides ATM owners with supra-competitive revenues, but that may not increase output.  The interchange may raise ATM owner prices so high that output – whether measured by number of ATMs, number of ATM transactions, or some other metric – decreases or stays constant.[209]  Indeed, Defendants' economist, Richard Schmalensee, merely speculates that fixed interchange *may* increase output, but he has not opined that it *does*.[210] This disputed fact, if material at all, precludes summary judgment.

C. **The Evidence Contradicts Star's Claim That Defendants Adjust Fixed Interchange Fees to Serve Any Purpose.**

Defendants' argument that they finely calibrate interchange fees to achieve balance, maximize output, compete with other networks or pursue some other goal fails on the

---

[207] *See also* <u>Leegin</u>, 127 S. Ct. at 2717 ("A horizontal cartel among competing manufacturers or competing retailers that decreases output *or reduces competition in order to increase price* is, and ought to be, *per se* unlawful.")  (emphasis added).

[208] *See* Bam. Decl. ¶¶ 33-34.

[209] *See* Bam. Decl. ¶¶ 32-40.

[210] Bam. Decl. ¶ 40.

1   evidence.  First, Star's interchange fees have been far too static to reflect any meaningful effort to

2   achieve balance, maximize output, or the like.[211]  Economic circumstances, Star's membership,

3   and network technology have changed since 1990, and yet Star's interchange fees budged only

4   once and then by a single penny.[212]  Indeed, the tendency of fixed prices to remain frozen in time

5   – as has occurred with Star's fixed interchange fee – is one reason why price-fixing agreements

6   are condemned as *per se* illegal without consideration of whether fixed prices are "reasonable"

7   (or "balanced").  The Supreme Court held long ago:

8   > The reasonable price fixed today may through economic and
   > business changes become the unreasonable price of tomorrow.

9   > Once established, it may be maintained unchanged because of the
   > absence of competition secured by the agreement for a price

10  > reasonable when fixed.  Agreements which create such potential
   > power may well be held to be themselves unreasonable or unlawful

11  > restraints, without the necessity of minute inquiry into whether a
   > particular price is reasonable or unreasonable as fixed. . . .

12

13  United States v. Trenton Potteries, Co., 273 U.S. 392, 397 (1927).

14         The evidence also contradicts Defendants' position that they need fixed

15  interchange fees to compete with other networks.  The evidence shows Star uses other terms, such

16  as the amount of switch fees, membership fees, and signing bonuses, in negotiations with actual

17  and potential members.[213]

18         **D.      There Is No Inherent Value To "Surcharge Free" Networks**

19         Defendants argue that the elimination of fixed interchange would be harmful

20  because those fixed fees are necessary to maintain surcharge free networks.  But surcharge free

21  networks have no intrinsic value.[214]  Consumer welfare depends on the total cost of foreign ATM

22  transactions – the foreign fee plus the surcharge.  For example, if surcharge free networks have

23  sufficiently high foreign fees, then they do not benefit consumers.  And that is just what one

24  would expect:  because consumers are more sensitive to surcharges than to foreign fees, the total

25

26  [211] Bam. Decl. ¶ 39.

27  [212] Lynn Decl. ¶ 14; *see also supra* note 99.

    [213] *See supra* notes 100-107.

28  [214] Bam. Decl. ¶¶ 53-55.

1  price for a foreign ATM transaction would ordinarily be higher in a foreign ATM transaction with

2  an interchange fee but no surcharge than in a similar transaction with a surcharge but no

3  interchange fee.[215]  The more of the price allocated to the hidden, foreign fee side than the

4  displayed, surcharge side, the higher the total cost is likely to be.[216]

5  **VIII.   PLAINTIFFS ARE ENTITLED TO ADDITIONAL DISCOVERY BEFORE ANY**

6  **RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

7  Plaintiffs have not had an adequate opportunity for discovery in opposing the

8  pending motion.  Defendants produced over 450,000 pages of documents *after* they filed their

9  motion and have continued to produce documents up to the date Plaintiffs' opposition was

10  originally due (the opposition due date was extended by a week).  Saveri 56(f) Decl., ¶¶ 42, 46.

11  Plaintiffs were forced to take depositions without an adequate opportunity to review these

12  documents.  *Id*. at ¶ 43.

13  Nor did Plaintiffs have any meaningful opportunity to depose witnesses identified

14  during the first – and only – round of depositions relevant to summary judgment.  The witnesses

15  that provided declarations in support of Defendants' motion lacked personal knowledge on

16  various subjects, including those which they improperly addressed in their declarations.  *Id*.  For

17  example, Wells Fargo provided a witness who was familiar only with the card issuer side of ATM

18  transactions, not with the ATM owner side.  *Id*.  His declaration made claims that required

19  knowledge of surcharging, and yet he professed a lack of personal knowledge on the subject.  *Id*.

20  Moreover, none of the Bank Defendant declarants could testify about the decision to continue to

21  impose a fixed interchange upon the institution of surcharging.  *Id*.

22  Plaintiffs sought to cure these deficiencies by propounding a notice of deposition

23  pursuant to Rule 30(b)(6), but Defendants objected, refused or were unable to schedule the

24  depositions, and Plaintiffs have not had time to move to compel.  *Id*. at ¶ 44.  The deposition

25  topics were central to Defendants' putative justifications for fixed interchange fees, including the

26

27  ───────────────
[215] Bam. Decl. ¶ 55.

28  [216] Bam. Decl. ¶¶ 8-16, 55.

1    methodologies for calculating the amount of Star's fixed interchange, its justifications, the effects

2    of changes in foreign fees and surcharges, consumer responses to the fees, and the like.  *Id.*

3           Finally, Plaintiffs have been denied various categories of highly relevant discovery

4    – information from between 1985 and 1995 (leading up to the advent of surcharging), about ATM

5    networks in foreign countries (including in Australia where there has been a decision to abolish

6    ATM interchange), and from 2005 to the present.  *Id.* at ¶ 49.  And discovery has been stayed – or

7    truncated – in one form or another for almost the entire pendency of this action.  *Id.* at ¶ 2.

8           The above information is expected to support Plaintiffs claims that fixed

9    interchange is not necessary for Star to operate, that it raises the total price of foreign ATM

10   transactions to consumers, and that the benefits Defendants claim result from fixed interchange

11   are not supported by the evidence (e.g., that they do not maximize output, that networks can

12   compete effectively on other grounds).  *Id.* at ¶ 50.  The discovery to date – including Plaintiffs'

13   expert declarations – provides a basis for concluding that Plaintiffs would be better able to adduce

14   these facts with the additional discovery they have sought.

15          This Rule 56(f) application is timely, Plaintiffs have identified the facts they would

16   attempt to adduce from discovery, they have explained the basis for concluding these facts likely

17   exist, and the facts sought would assist Plaintiffs in opposing Defendants' motion.  As a result,

18   Defendants' motion should be denied.  <u>Burlington Northern Santa Fe Railroad Co. v.</u>

19   <u>Assisiniboine and Sioux Tribes</u>, 323 F.3d 767, 773 (9th Cir. 2003).  <u>See also id.</u> at 774-75

20   (reversing denial of Rule 56(f) request where  Plaintiffs were not provided adequate opportunity

21   to conduct discovery).[217]

22   _____

23   [217]  The Ninth Circuit has held that the non-moving party must be afforded time to conduct
     discovery:

24          Although Rule 56(f) facially gives judges the discretion to disallow
            discovery when the non-moving party cannot yet submit evidence

25          supporting its opposition, the Supreme Court has restated the rule as
            requiring, rather than merely permitting, discovery "where the nonmoving

26          party has not had the opportunity to discover the information that is
            essential to its opposition."

27   <u>Metabolife International, Inc. v. Wornick</u>, 264 F.3d 832, 846 (9th Cir. 2001) (quoting
     <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 n. 5 (1986)). <u>See also</u> <u>Teleflora LLC v.</u>

28   <u>Florists' Transworld Delivery, Inc.</u>, 2004 WL 2271602, at *1-2 (N.D. Cal. Oct. 5, 2004) (granting

## IX.   EVEN IF DEFENDANTS PREVAIL ON THEIR MOTION, PLAINTIFFS MAY PURSUE THEIR SECTION 1 CLAIM UNDER A QUICK LOOK OR RULE OF REASON ANALYSIS.

The only issue Defendants have put properly before the Court is whether their conduct is subject to the *per se* rule.  They have not attempted to argue or provide evidence that their conduct is legal under a quick look or rule of reason analysis.  As a result, the only relief they can seek is a grant of partial summary judgment on the *per se* issue.[218]

Plaintiffs have made clear that they will pursue quick look and rule of reason theories in support of their Section 1 claim if they are unable to proceed on a *per se* theory.  *See, e.g.,* Memorandum of Points and Authorities in Support of Motion for Entry of Pretrial Scheduling Order Setting Master Litigation Schedule at 5 (filed June 12, 2007).  Defendants have admitted that Plaintiffs may do so, In re ATM Fee Antitrust Litigation (May 23, 2007), No. C04-2676 CRB, 5: 10-21, which is consistent with Ninth Circuit law.

A plaintiff need merely state a general claim in a complaint, not a particular legal theory.  Crull v. GEM Ins. Co., 58 F.3d 1386 (9th Cir. 1995) (holding district court committed reversible error by refusing to consider legal theory plaintiffs presented in opposing summary judgment but not in original complaint); Platte Anchor Bolt, Inc. v. IHI, Inc., 352 F. Supp. 2d 1048, 1056 (N.D. Cal. 2004) ("The pleadings need not identify any particular legal theory on

---

Rule 56(f) where plaintiff did not make its initial document production until the day it moved for partial summary judgment); Pacific Gas & Electric Co. v. City of Union City, 220 F. Supp. 2d 1070, 1085 (N.D. Cal. 2002); Demile v. Belshe, 1994 WL 519457, at *15 (N.D. Cal. Sept. 16, 1994).

[218] The Bank Defendants make the false assertion that Plaintiffs informed the Court in this action that they intended to proceed only under a *per se* theory.  Bank Defs' Mot. at 4, n.2.  In fact, in the very portion of the hearing transcript that Defendants cite, Plaintiffs made no such commitment.  *See* January 26, 2005, Tr. at 12.  In any case, Defendants have not argued that Plaintiffs have waived a rule of reason or quick look theory.  It is too late for Defendants to do so in their reply brief.  The law is clear that "arguments not made by a party in its opening brief are deemed waived."  United States v. Romm, 455 F.3d 990, 997 (9th Cir. 2006) (citing Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999)); *see also* Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief."); Bazuaye v. INS, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived."); State of Nev. v. Watkins, 914 F.2d 1545, 1560 (9th Cir. 1990) ("[Parties] cannot raise a new issue for the first time in their reply briefs." (citations omitted)); Ass'n of Irritated Residents v. C & R Vanderham Dairy, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief."); United States ex rel. Giles v. Sardie, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

1  which recovery is sought.") (quoting <u>Crull</u>).[219] Thus, under <u>Crull</u>, Plaintiffs may pursue their

2  Section 1 claim under a quick look or rule of reason theory, even if the Court does not allow them

3  to pursue that claim under a *per se* theory.

4  **X.     CONCLUSION**

5         For the foregoing reasons, Defendants' motion for partial summary judgment

6  should be denied or, even if it is granted, Plaintiffs should be permitted to proceed under a quick

7  look or rule of reason theory.

8  Dated:  December 21, 2007          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

9

10                                  By:  _____*/s/ Joseph R. Saveri*_____
                                              Joseph R. Saveri
11
                                     Joseph R. Saveri (SBN 130064)
12                                   Hector Geribon (SBN 200410)
                                     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
13                                   275 Battery Street, 30th Floor
                                     San Francisco, CA  94111-3339
14                                   Telephone: (415) 956-1000
                                     Facsimile: (415) 956-1008
15
                                     Merrill G. Davidoff (Admitted *Pro Hac Vice*)
16                                   Bart D. Cohen (Admitted *Pro Hac Vice*)
                                     Michael J. Kane (Admitted *Pro Hac Vice*)
17                                   BERGER & MONTAGUE, P.C.
                                     1622 Locust Street
18                                   Philadelphia, PA 19103
                                     Telephone: (215) 875-3000
19                                   Facsimile: (215) 875-4604
                                     *Co-Lead Counsel for Plaintiffs*
20

21

22

23

24
   _____
25  [219] In <u>Crull</u>, the plaintiffs in opposing summary judgment sought to rely on ERISA, even though
    their original complaint relied only on state law claims that it turned out were *preempted* by
26  ERISA.  <u>Crull</u>, 58 F.3d at 1390-91.  The plaintiffs changed not only their legal theory, but also the
    statutory basis for their claims, yet the Ninth Circuit reversed a grant of summary judgment,
27  holding the plaintiffs were entitled to proceed.  *Id.*  In this action, in contrast, if Plaintiffs cannot
    proceed on a *per se* theory, their claim would still maintain the very same statutory basis –
28  Section 1 of the Sherman Act – and the very same gravamen – that Defendants have engaged in
    horizontal price-fixing to maintain ATM fees above competitive levels.