ROBERT S. STERN (SBN 68240)
W. STEPHEN SMITH (*admitted pro hac vice*)
GREGORY B. KOLTUN (SBN 130454)
MORRISON & FOERSTER LLP
555 West Fifth Street, Suite 3500
Los Angeles, California 90013-1024
Telephone: (213) 892-5200
Facsimile: (213) 892-5454
rstern@mofo.com

Attorneys for Defendant
JPMORGAN CHASE BANK, N.A.,
Successor-in-interest to BANK ONE, N.A.

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re ATM FEE ANTITRUST LITIGATION | Civil Case No. C 04 2676 CRB |
|---|---|
|  | **[REDACTED] SUPPLEMENTAL DECLARATION OF RICHARD SCHMALENSEE** |
|  | Date: March 7, 2008<br>Time: 10:00 a.m.<br>Courtroom: 8 |
|  | Honorable Charles R. Breyer |
| Relates to All Actions |  |

I.  **INTRODUCTION**

1.  I have been asked by counsel to assess the economic arguments made by plaintiffs' experts. Dr. Bamberger's claim that positive interchange fees are anticompetitive is flawed for many reasons, the most significant of which are discussed in this declaration. For example:

- Dr. Bamberger asserts, without any basis, that the competitive outcome requires a zero interchange fee. Real world experience has shown that competition among ATM networks consistently results in positive interchange fees.

- Positive network-wide interchange fees are ubiquitous in the competitive world of retail banking services and ATM services in particular. Dr. Bamberger does not challenge that fact. Instead, his theory of harm is based on his views about an absence of consumer information, not an absence of competition. Consumer information problems, however, generally are addressed through regulation, not the antitrust laws.

- Dr. Bamberger's theory relies critically on assumptions that are unsupported by theory or credible evidence, particularly his assumptions that interchange fees directly and predictably affect foreign fees and that surcharges are more constrained by consumer sensitivity than are foreign fees.

- Dr. Bamberger's proposed but-for world, in which all ATM networks – whether joint ventures or proprietary – are required to set zero interchange fees, would result in significant consumer harm. There would be fewer ATMs, lower output, and greater inefficiency in ATM networks. Surcharges would be higher for consumers, with no assurance of an offsetting decrease in foreign fees.

2.  My qualifications are as described in my prior declaration.

II. **Dr. Bamberger's Theory of Competitive Harm Is Flawed**

   A.  **Dr. Bamberger Asserts That the "Competitive" Outcome Requires a Zero Interchange Fee, But There Is No Theoretical or Factual Basis for That Assertion**

3.  In my prior declaration, I explained why there is a need for advance agreement between the ATM owner and the ATM card issuer in order for foreign ATM transactions to be viable. The ATM owner needs assurance that it will be reimbursed by the issuer, and the parties need to agree on the terms of such reimbursement (*e.g.*, amount, time, manner and risk allocation). I also explained why achieving this contractual certainty through bilateral negotiations among network members would be at best inefficient and almost certainly

unworkable for an ATM network of the size and breadth of Star. Dr. Bamberger also agrees with both of these conclusions.[1]

4. Although Dr. Bamberger states that he is addressing the effects of "network-mandated interchange fees,"[2] as an economic matter he simply is comparing network regimes with positive interchange fees to regimes with zero interchange fees. This is because there is no economic difference between network rules that explicitly state "the interchange fee shall be zero" and network rules that, by requiring only that ATM owners be paid for the cash they have disbursed plus any surcharges they have imposed, implicitly set the interchange fee at zero. In the latter case, as I explain in my original declaration, no rational issuing bank would ever pay a positive interchange fee since the network rules require all ATM owners to accept its cards regardless of whether it pays such a fee. Dr. Bamberger's primary disagreement with my conclusions is thus over the level of the interchange fee determined at the network level. Dr. Bamberger believes that, in effect, the ATM networks should have been required to set the interchange fee at zero because "positive network-mandated interchange fees can be expected to increase the price cardholders pay for foreign ATM transactions and increase the aggregate profits of members of ATM networks as compared to a but-for world in which ATM networks do not mandate interchange fees."[3] As I discussed above, by "do not mandate interchange fees," Dr. Bamberger means that the network does not require any party to pay a positive interchange fee, thus, given the infeasibility of bilateral negotiations, implicitly mandating an interchange fee of zero – that is, surcharges aside, if, for example, an ATM owner that pays out $100, it will receive $100 from the cardholder's bank.[4]

---

[1] Deposition of Gustavo E. Bamberger, February 1, 2008 ("Bamberger Deposition"), at 26:4-27:2. Dr. Bamberger takes as an assumption in his declaration my view that bilateral negotiations would be likely unworkable. Declaration of Gustavo E. Bamberger, December 21, 2007 ("Bamberger Declaration"), at fn. 1. He also stated in his deposition that he "tended to agree" with this position. Bamberger Deposition at 38:10-14.

[2] See, e.g., Bamberger Declaration at ¶ 2.

[3] Bamberger Declaration at ¶ 59 (footnote omitted).

[4] Bamberger Deposition at 26:24-29:6; 30:8-14.

5. There is no basis for Dr. Bamberger's position that "[n]etwork-mandated interchange fees can be expected to increase the price of a foreign ATM transaction above the competitive level."[5] A natural and standard approach to assessing the "competitive level" would be to examine what level of interchange fees actually has prevailed under competition. As I explained in my prior declaration, the existence of positive interchange fees for all ATM networks, proprietary networks as well as joint ventures, in the United States at all points in time is persuasive evidence of their efficiency benefits. The undisputed competition among ATM networks has led to their independent decisions to choose positive interchange fees. These facts provide convincing evidence that, contrary to Dr. Bamberger's claim, the competitive level of interchange fees is not zero.

6. The fact that proprietary networks set positive interchange fees confirms that such fees are the product of competition, not an agreement to lessen competition. Proprietary networks compete intensely with each other to attract card issuers and ATM owners; they set interchange fees independently of, and in competition with, each other. Dr. Bamberger recognizes that proprietary networks, in addition to joint ventures, set positive interchange fees.[6] Thus, while he recognizes that competition among ATM networks, even proprietary networks, results in positive interchange fees, he asserts that the "competitive level" of interchange fees is zero. Dr. Bamberger's conclusion makes sense only if he is not using the term "competitive" as economists normally do.

---

[5] Bamberger Declaration at ¶ 2. Dr. Bamberger refers to a network with a zero interchange fee as a network without an interchange fee.

[6] He states that "a proprietary network can be expected to adopt policies that increase the profits of its members (*i.e.*, because such policies increase the demand for the network's services)" and hence to adopt positive interchange fees. Bamberger Declaration at ¶ 52. Absent a conspiracy among ATM networks – which he does not allege (Bamberger Deposition at 221:6-24) – this is simply a description of a competitive market at work. The reason why each proprietary network employs positive interchange is because it increases "the demand for the network's services" – thus increasing network profits by making it more valuable to both ATM owners and cardholders.

### B. Dr. Bamberger's Theory of Competitive Harm Is Based on Flawed Assumptions

7. Dr. Bamberger's theory of harm is premised on consumer information, not competition, being deficient. Moreover, his theory and numerical examples rest on flawed assumptions.

#### 1. Information versus competition

8. In Dr. Bamberger's theory, the setting of positive interchange fees by competing ATM networks enables competing banks to better exploit the alleged manner in which consumers respond to surcharges as opposed to foreign ATM fees. This is not a theory in which consumer harm results from restricted competition. Although Dr. Bamberger claims that positive interchange fees are anticompetitive and reflect the exercise of market power, he does not define a relevant antitrust market within which such power is exercised.[7] He nowhere claims that banks or ATM networks compete less intensively with positive interchange fees than they would with zero interchange fees. Thus Dr. Bamberger cannot and does not allege that setting positive interchange fees almost always tends to restrict competition and decrease output.[8]

9. Antitrust is normally concerned with situations in which competition is restricted, not with what Dr. Bamberger alleges here – *i.e.*, that competition among banks and ATM networks does not serve consumers well because consumers lack information. Dr. Bamberger's analysis rests on the fact that ATMs display the surcharge, if any, that they would apply to a foreign transaction, but they do not display the foreign fee, if any, that the consumer's bank would charge. But if this is the problem, then an agreement between any two banks in an ATM network – even two small banks that could not possibly possess market power – to charge

---

[7] Dr. Bamberger attempts to justify his failure to define a market based on my not having done so in my declaration. But my analysis was concerned with the efficiencies associated with interchange fees, and that analysis does not require a market definition. Dr. Bamberger, in contrast, is claiming that positive interchange fees reflect an exercise of market power, and such a claim logically requires a discussion of the market or markets within which such power is claimed to be exercised.

[8] Indeed, in his deposition he admitted that output might fall in the absence of positive interchange fees. Bamberger Deposition at 180:11-12.

positive interchange fees will give rise to the harm Dr. Bamberger alleges.[9] And the remedy would be for legislation or regulation to require greater disclosure of foreign fees. The fact that a rule requiring the display of foreign fees at ATMs would be a complete remedy to the problem Dr. Bamberger alleges demonstrates that it is not a problem that flows from a restraint on competition.

### 2. Impact of interchange fees on foreign fees versus surcharges

10. Dr. Bamberger argues that if all networks' interchange fees were set at zero, consumers would pay less because foreign fees for ATM transactions would decrease by more than surcharges would increase. There is no theoretical or empirical foundation for this assertion, and it fails to take into account the complexity of bundled pricing associated with deposit accounts.

11. Banks offer bundles of services – *e.g.*, a checking account will commonly allow the consumer access to teller services at bank branches, check writing on her account, ATM services, debit card services, etc. Banks do not price each of these services separately, in part because much of the bank's revenue comes in the form of the difference between the return in earns on funds deposited versus the interest (if any) it pays, and in part because they set specific fees (and waive them) to attract and retain particular kinds of customers.

12. Decisions as to the level of foreign ATM fees and when to waive them are part of the bank's overall strategy in offering bundles of services to attract and retain customers.[10] Contrary to Dr. Bamberger's assumption, the interchange fee is not, in general, a cost item that is directly passed through to foreign fees.[11] One clear illustration of this is that foreign fees are waived for

---

[9] As I discuss below, I do not believe that Dr. Bamberger has shown the existence of any sort of problem here. Dr. Bamberger seems to believe it would be permissible for two small banks without market power to set positive interchange fees for transactions involving their cardholders and ATMs. Bamberger Deposition at 94:10-23. But he does not explain why the same positive interchange fee would be anticompetitive, as he argues, if it were set by a proprietary network composed entirely small banks that lack, individually or collectively, market power.

[10] Bamberger Deposition at 52:7-23; Declaration of Kerry Brashears, August 1, 2007, at ¶ 10.

[11] ████████████████████████████████████████

some types of accounts.[12]  More generally, because banks set the whole bundle of fees with a range of strategic objectives in mind, there is no reason to believe that a decrease in interchange fees would necessarily result in a greater or even a comparable decrease in foreign fees.  Banks that use foreign fees to discourage use of competitors' branches or as a revenue source might leave them at current levels for some or all customers.

13.  On the other hand, if all ATM network interchange fees are set at zero, surcharges will increase and the number of available ATMs will decline.[13]  ATM owners do not engage in bundled pricing to customers who are not account-holders; the ATM owners simply offer them specific services at specified prices.  There are only two significant revenue streams associated with foreign ATM transactions — surcharges and interchange fees.  Eliminating all interchange fee revenues would reduce these revenues by roughly a third and thus make current levels of ATM deployment unprofitable without corresponding increases in surcharges.  The Chief Operating Officer at Cardtronics, the largest ISO in the United States, testified that in response to a shift from a positive interchange fee to a zero interchange fee, Cardtronics would raise surcharges by at least the amount of the pre-existing interchange fee, and that if Cardtronics could not raise surcharges, it would be out of business.[14]  He stated that the increase might in fact be greater than the amount of the interchange fee to make up for the portion it would have to share in cases where it is contractually required to share the surcharge with the merchant at which the ATM is installed.[15]  If there were contractual prohibitions on raising the surcharge or if the ATM would not be profitable even with an increased surcharge, then Cardtronics would pull the ATM from the location.[16]

---

[12] See Schmalensee Declaration at ¶ 47.

[13] Dr. Bamberger presents no systematic analysis of what would happen to Star, the defendant banks, consumers, or the overall market if Star alone moved to zero interchange.  As I have shown, Star likely would have been forced out of business.

[14] Deposition of Michael H. Clinard, October 16, 2007 ("Clinard Deposition"), at 62:9-63:5.

[15] Clinard Deposition at 63:21-64:9.

[16] Clinard Deposition at 62:9-13.

14. Neither theory nor fact supports Dr. Bamberger's assertion that setting all ATM networks' interchange fees at zero would benefit consumers. If interchange fees decrease from 50 cents to zero, it is likely that surcharges will increase significantly. ATM deployment will also likely decline. On the other hand, because of the complex considerations involved in banks' pricing to depository customers (in contrast to ATM owners' pricing for foreign transactions), there is no theoretical or empirical support for the proposition that the decrease in foreign fees, if any, would exceed the increase in surcharges, as must be the case for Dr. Bamberger's theory of harm to hold. At a minimum, those customers who do not pay foreign fees would be harmed, as they would pay higher surcharges without any offset in foreign fees.

15. Dr. Bamberger's discussion of no-surcharge networks ignores this fact—he argues that consumers still would benefit from a change from a no-surcharge to a "low surcharge" network if there were a more-than-offsetting decrease in foreign fees. But consumers who do not pay foreign fees would be unambiguously worse off with a "low surcharge" network. Dr. Bamberger offers no support for his assumption that consumers whose banks participate in surcharge-free networks still pay foreign ATM fees, and this assumption is inaccurate.[17]

### 3. Cardholder sensitivity to foreign fees versus surcharges

16. Even accepting, for the sake of argument, Dr. Bamberger's flawed assumption that changes in interchange fees directly and predictably affect foreign fees, his theory of harm still lacks validity. Specifically, his theory depends critically on the assumption that consumers are more sensitive to ATM surcharges than to foreign fees and that, as a result, banks could not raise surcharges to recapture the revenue they would lose from the foreign fee reductions he hypothesizes. If, in fact, there were no clear difference in consumer sensitivity to foreign fees versus surcharges, or consumers were more sensitive to foreign fees, then, even accepting all of

---

[17] For examples of banking institutions that advertise free ATM withdrawals—no surcharge or foreign fees, see: http://www.monroebank.com/contact/allianceone.html; https://www.aacreditunion.org/checking-compare.asp; http://www.navyfcu.org/access/atmfee_rebates.html; http://www.jfcu.org/contact_ATM.asp; http://home.ingdirect.com/products/products.asp?s=ElectricOrange.

Dr. Bamberger's other assumptions, positive interchange fees would not result in a higher overall price for foreign ATM transactions.

17. Dr. Bamberger claims that "[b]ecause the surcharge amount is displayed with every potential transaction, but the foreign fee is not, cardholders can be expected to be more sensitive to changes in surcharges than to foreign fees."[18] This conclusion does not follow, however, for several reasons.

18. First, as Dr. Bamberger acknowledged in his deposition, awareness is not the same as sensitivity.[19] A consumer may be aware of the surcharge at a given ATM but be relatively insensitive to it, especially if the alternatives are unknown or costly. Standing in front of an ATM in an emergency in a strange city, for instance, one may be insensitive to the displayed surcharge level because one is not aware of any nearby alternative sources of cash, let alone of the surcharges they might impose. Being unwilling to incur the sometimes substantial transactions costs of searching for other ATMs and learning their surcharges, the consumer may be aware of but insensitive to the particular surcharge she faces. Finally, even if a consumer somehow were aware of the locations and surcharges of all nearby ATMs, her behavior might be insensitive to changes in the surcharge on any particular machine, simply because the cost in time and effort of traveling to an alternative machine could easily outweigh moderate differences in surcharges. Despite all these familiar facts, Dr. Bamberger's analysis of sensitivity to surcharges starts and stops with the consumer's awareness of the surcharge of a single machine.

19. The ▮ document that Dr. Bamberger relied on for his claim that cardholders were relatively unaware of foreign fees stated that ▮

---

[18] Bamberger Declaration at ¶ 13 (footnote omitted).

[19] Bamberger Deposition at 249:19-25. Professor Dhar's submission addresses only awareness of foreign fees versus surcharges. Professor Dhar assumes that awareness is the same as sensitivity but does not provide any support for this conclusion. For the reasons I discuss, consumers may be aware of surcharges but not necessarily be sensitive to them.

1  ███████████████████████████████████████[20] Similarly, while some cardholders might
2  have been aware of surcharges but not of foreign fees, they would not have been any more
3  sensitive to surcharges because they needed the money for an emergency.
4       20. Second, a review of the documents relied on by Dr. Bamberger illustrates the lack of
5  a sound empirical basis for his claim that cardholders are relatively unaware of ATM foreign
6  fees. The █████████ document Dr. Bamberger relied on for information █████████
7  ████████████████████████████████████████████████████████████████████
8  ████████████████████████████████████████████████████████████████████
9  ██████████████████████████████ It is well known that it is generally not necessary for
10 all consumers in a market to be well-informed regarding prices in order for the total market
11 demand to be price-sensitive and thus to discipline sellers' price determinations. If these
12 "heavy" users are aware of and sensitive to the level of foreign fees, total demand may well be
13 price-sensitive, even if some other consumers are unaware of and thus unresponsive to foreign
14 fees. Thus this document, relied on by Dr. Bamberger, does not imply a significant difference
15 between cardholder sensitivity to foreign fees versus surcharges.[21]
16      21. Third, one document relied on by Dr. Bamberger for his claim that cardholders are
17 more sensitive to surcharges than foreign fees clearly contradicts his claims. He cites the ██
18 █████████████ as stating that "'[a]lthough demand for ATM cash withdrawals has proved
19 relatively inelastic to date,' 55 percent of deployers experienced a decline in on-premise ATM
20 volume after a surcharge increase, and 50 percent experienced a decline in off-premise ATM

---

[20] ████████████████████████████████████████████████████████████████████
See also Bamberger Declaration at fn. 15.

[21] Dr. Bamberger also relies on a ████████████ which is a study of *awareness* of foreign fees and is therefore not necessarily informative on *sensitivity* to foreign fees. ████████████
████████████ Even as a study of awareness, it is flawed—while the relevant question was intended to be asked about an ATM network's (*e.g.*, ████████) signage on foreign ATM transactions, it is clear that many consumers thought instead that they were being asked about their bank's signage. Thus, what Dr. Bamberger took as a mistaken belief by consumers that foreign transactions on *their* bank's ATM network would not incur a foreign fee, may have been an accurate belief that a transaction on their own bank's ATMs would not incur a foreign fee.

volume."²² This study reaches the conclusion that demand has been "relatively inelastic"—that is, consumers are relatively insensitive to surcharges, the opposite of what Dr. Bamberger claims. The fact that there was some decline at a given ATM following an increase in surcharges says nothing more than that there is some cardholder sensitivity to surcharges, not that there is a greater sensitivity to surcharges than to foreign fees.²³

22. Fourth, the only document relied on by Dr. Bamberger regarding the sensitivity of cardholders to foreign fees was a ███████ document that he cited for the proposition that ███████²⁴ It does not support his assumption regarding differences in price sensitivity. He did not cite but acknowledged at deposition that this study showed that ███████ That is, consumers do use foreign ATMs less when foreign fees are higher. He offered no analysis to suggest that this sensitivity was less than the sensitivity of cardholders to surcharges.

23. Fifth, Dr. Bamberger fails to discuss that cardholder sensitivity to foreign fees has an important dimension not present in cardholder sensitivity to surcharges. In setting a foreign fee, banks need to and do consider the possibility that not only would a higher foreign fee discourage usage of foreign ATMs but also that the customer may terminate her account with the bank.²⁵ The likelihood that a consumer would terminate her account as a result of foreign fees may be relatively low, but the cost to the bank if she does is quite high because the bank then would lose all of the revenue associated with the account. This imposes a further constraint on the setting of

---

²² Bamberger Declaration at ¶15, *citing* ███████ [STAR 00124739, STAR 00124738].

²³ ███████ [STAR 00124738].

²⁴ Bamberger Declaration at ¶ 14.

²⁵ Dr. Bamberger acknowledged at deposition that this was a factor that banks would be expected to and do consider. Bamberger Deposition at 67:20-68:16. His analysis, however, ignores its implications.

foreign fees that does not apply generally to surcharges.[26] This consideration is important because banks typically waive foreign fees for the customers who on average they most want to attract and retain: those who maintain high account balances. Waiving foreign fees is rational only if these customers are sufficiently sensitive to the level of those fees.

24. Sixth, as I discussed above and as Dr. Bamberger recognizes, banks set a bundle of fees to their depository customers, not only the foreign fee in isolation. All else equal, if interchange fees were lowered to zero, banks' costs associated with customers who make foreign ATM transactions would be lower. If a bank wanted to change its pricing in response to such a change or, for example, to an increase in its tellers' wages, it likely would review the entire bundle of terms it offers its customers, including the interest rate it pays for deposits. Without knowing consumer responsiveness to these other terms, it is not possible to know the degree to which overall prices to depository account consumers would decrease, or to know whether that change would exceed or fall short of the likely increase in surcharges resulting from a decline in interchange fees.

25. Seventh, if Dr. Bamberger's assumptions about bank pricing behavior and consumers' relative sensitivity to foreign fees and surcharges were correct, we would expect foreign fees to exceed surcharges significantly on average.[27] In fact, we see the opposite. One estimate placed average foreign fees at $1.27 and average surcharges at $1.77 in 2005.

### 4. Dr. Bamberger's numerical examples depend critically on flawed assumptions

26. Dr. Bamberger's numerical example purporting to show that "individual network members—even 'net issuers'—can be expected to benefit from network-mandated interchange

---

[26] Surcharges are, by definition, paid by cardholders that are not customers of the bank setting the surcharge. The bank therefore does not have to worry about its customers terminating their accounts in response to its own surcharges.

[27] Ignoring bundled pricing, as Dr. Bamberger does, it is a basic textbook proposition that (a) the less price-sensitive are buyers and (b) the higher is the marginal cost, then the higher is the profit-maximizing price. Here, (a) Dr. Bamberger assumes that consumers are less sensitive to foreign fees than to surcharges and (b) interchange fees, coupled with the high fixed-cost nature of ATMs, mean that marginal cost is higher for foreign fees than for surcharges. For both of these reasons, Dr. Bamberger's theory predicts that foreign fees should exceed surcharges, but they do not.

fees" relies on the flawed assumptions discussed above.[28] If for the sake of argument we retain all of the assumptions of Dr. Bamberger's example but suppose that the impacts on foreign fees and surcharges are equal and less than the textbook ideal of full pass-through, then the conclusion of his example is reversed: His hypothetical bank is worse off because of the increase in interchange fees.[29]

27. Dr Bamberger goes on to argue that the existence of ISOs, which receive interchange fees but do not pay them, is not inconsistent with his assertion that Star's (non-ISO) members were nonetheless more profitable paying positive interchange fees than they would have been with zero fees. Plaintiffs claim that "While ISOs own or control approximately 50 percent of the ATM machines, they account for only 10 percent of the transactions at ATMs." Plaintiffs cite ▌ But the ISOs' share of foreign transactions alone is the measure that is relevant for assessing the importance of ISOs to ATM networks, as all *network* transactions are foreign transactions. That share is around ▌[30] Thus almost ▌ percent of interchange fee payments go to ISOs, and it is difficult to imagine any real-world cartel

---

[28] *See* Dr. Bamberger's example in Bamberger Declaration ¶¶ 19-20.

[29] The individual bank in Dr. Bamberger's example has revenues of $335,000 with a zero interchange fee, a foreign fee of $2.00 and a surcharge of $1.50. Increasing the interchange fee to $0.50, as Dr. Bamberger assumes, raises costs on the issuer side by $0.50 and effectively lowers costs on the ATM owner side by $0.50. If $0.25, or half of the change in costs, is passed through on each side, that would result in a foreign fee of $2.25 and a surcharge of $1.25. Under this assumption, the bank would have revenues of only $332,500 ($2.25 foreign fee * 100,000 transactions by its cardholders + $1.25 surcharge * 90,000 transactions by other banks' cardholder - $0.50 interchange fee * 100,000 transactions by its cardholders + $0.50 interchange fee * 90,000 transactions by other banks' cardholders). The bank would lose $2,500 from the change to a $0.50 interchange fee.

[30] The study provides estimates of the number of foreign transactions for three types of ATMs (bank-owned on-premise, bank-owned off-premise, and ISO-owned) and the number of each type of ATM. Multiplying these figures for each type of ATM gives an estimate of the total number of foreign transaction for each type. The percentage reported is the estimated number of foreign ATM transactions at ISOs divided by the total number of foreign ATM transactions for all ATM types. *See* ▌

conspiring to raise its own costs in order to send almost ■ percent of those costs to non-members.

### III. The Ability of an ATM Network to Set Non-Zero Interchange Fees Offers Significant Efficiencies, Which Would Be Lost in Dr. Bamberger's But-For World

#### A. Dr. Bamberger's Discussion of Neutrality Is Misleading and Flawed—The Ability of an ATM Network to Set Non-Zero Interchange Fees Allows It to Balance the Interests on Both Sides of the Network

28. Dr. Bamberger criticizes me for failing to discuss the concept of neutrality and why it does not hold in ATM networks. He defines "neutrality" as a world in which the level of interchange fees has no effect on the price of a foreign ATM transaction, the number of foreign ATM transactions, or the profits earned by each member of an ATM network.[31] I did not discuss neutrality expressly because it is an abstract notion, unrelated to observed realities. Indeed, Dr. Bamberger acknowledged that there are no real-world industries characterized by neutrality.[32]

29. Of course, a key point in my prior declaration is that interchange fees are important in allowing ATM networks to attract the right balance of issuers and ATM owners—in other words, that ATM interchange fees are not neutral. Dr. Bamberger acknowledged at deposition that there are many reasons (beyond the sole reason offered in his declaration) why neutrality does not hold in ATM networks.[33] The theoretical discussion of neutrality in Dr. Bamberger's declaration adds nothing to the economic analysis of network-wide interchange fees.

---

[31] Bamberger Declaration at ¶¶ 29-30. I would add to his definition that the level of interchange fees do not affect any relevant economic variables (besides surcharges and foreign fees), including the number, location and ownership of ATMs.

[32] Bamberger Deposition at 227:2-5.

[33] Dr. Bamberger argued in his declaration that non-neutrality flows solely from consumers allegedly being more sensitive to surcharges than foreign fees. At deposition he acknowledged a wide range of additional conditions in ATM networks that violate neutrality: *e.g.*, the possibility there is no one-for-one pass-through of interchange fees; foreign fee waivers; bundled pricing of depository accounts; differential attractiveness of ATM locations; search costs for consumers in finding ATMs; and transactions costs for consumer in comparing surcharges. *Compare* Bamberger Declaration at ¶31 *with* Bamberger Deposition at 165:16- 167:1, 42:12-17, 139:9-16, 102:3-7, 103:17-25 & 104:1-6.

30. Dr. Bamberger also criticizes my discussion of how interchange fees serve as an instrument ATM networks use to balance the two sides of the network. He argues that while the economic literature concerning two-sided markets may apply to credit card networks, it does not apply to ATM networks.[34] That is incorrect. First, as Dr. Bamberger acknowledges, interchange fees play a role in attracting members to the network (that is why, he believes, proprietary systems set positive interchange fees).[35] Dr. Bamberger contends that interchange fees are, nevertheless, not important to a network in balancing the interests of issuers and ATM owners because ATM owners can obtain compensation through surcharges. Surcharges, however, are set independently by ATM owners. They cannot be used by the network to balance interests. Second, Dr. Bamberger is incorrect in claiming that the economic literature on two-sided markets—and the economic rationale of using interchange fees to balance the two sides—does not apply to ATM networks because "both 'sides' of the transaction levy a fee on the same economic actor . . . the cardholder for the same transaction." The economic literature on two-sided platforms recognizes many industries in which the two sides ultimately levy all fees on the same economic actors. Computer operating systems, for example, are widely agreed to be two-sided platforms because they connect end users of computers and third-party vendors that sell products (such as application software or peripherals) that depend on the operating system. Other examples of two-sided platforms where there is only one ultimate end user include media such as magazines or newspapers (which connect readers and advertisers), shopping malls (which connect shoppers and retailers) and video game systems (which connect gamers and video game developers). In this case, some banks (especially those with fewer of their own ATMs) may wish to pay interchange fees to ATM owners in order to lower the surcharges their consumers face, and to increase the ATMs available to them, even though there is only one end user.

---

[34] Bamberger Declaration at ¶¶ 41-46.
[35] Bamberger Declaration at ¶ 52.

**B.    Dr. Bamberger Ignores the Importance of Inter-Network Competition by Simply Assuming That No ATM Network Could Ever Legally Adopt a Positive Interchange Fee**

31. Dr. Bamberger states in his declaration that "I understand that plaintiffs contend that proprietary networks that set a positive interchange fee facilitate collective price setting by network members."[36] It is not clear whether he agrees with this contention, but he assumes for the purposes of his analysis that no ATM network, regardless of ownership structure, can adopt a positive interchange fee. By doing so, he simply assumes away the importance of inter-network competition. When this competition is taken into account, it is clear that a positive interchange fee offers significant procompetitive benefits because it allows ATM networks to attract ATMs and thereby expand output. Two examples illustrate this general point.

32. First, an ATM network that is unable to offer attractive interchange fees to ATM owners would likely have significant difficulty attracting ATMs to the network. Specifically, a network with zero interchange fees would be substantially less attractive to an ATM owner if other networks were permitted to offer positive interchange fees. If Star were required to set its interchange fee at zero, while other ATM networks were allowed to freely set interchange fees, it would be difficult if not impossible for Star to attract ATM owners, especially ISOs. It does not seem likely that Star thus handicapped could survive.

33. Second, Dr. Bamberger ignores the evidence that ATM networks use interchange fees to compete with each other in attracting ATM deployers generally, and ISOs in particular. Dr. Bamberger gives no weight to evidence that ATM networks view higher interchange fees as more attractive to ISOs. The ███ ATM network, for example, adopted a "split" interchange fee structure in 2000, with different fees for on-premises and off-premises machines, in order to encourage ISOs to join its network.[37] More recently, Plus made a substantial adjustment to its interchange fee levels to encourage the deployment of advanced-function ATMs.[38] Dr. Bamberger also ignores evidence that, contrary to his hypothesis, lower interchange fees

---

[36] Bamberger Declaration at fn. 58.

[37] ███

[38] Declaration of Alan Pohlman, December 20, 2007, at fn. 35.

were more attractive to net issuers (at least when considering small changes not likely to affect ATM deployment significantly).[39] Plaintiffs' own expert, Mr. Pohlman, stated in 1997 that the interchange fee structure "can have a significant impact on the competitive environment between regional networks."[40]

### C. Dr. Bamberger's Proposed World Would Eliminate the Significant Procompetitive Benefits of Positive Interchange Fees

34. In Dr. Bamberger's proposed world, no ATM network would be permitted to set a positive interchange fee. We have no experience with this world. In the actual world, competing ATM networks, all with positive interchange fees, have provided enormous benefits to consumers. Dr. Bamberger would seek to change the structure of this industry fundamentally by mandating zero interchange fees for all ATM networks. Such a world would have fewer ATMs available to consumers than there are today, and output would be lower.

35. Business practices that, under competition, increase output should be viewed as presumptively procompetitive. In his declaration, Dr. Bamberger argued that I did not conclude that interchange fees increased output.[41] In fact, I clearly stated and explained why positive interchange fees *are* likely to increase output.[42] Having more ATMs, for example, offers consumers greater convenience. While those ATMs come with additional costs, just as competition among banks may result in more branches that come with additional costs, it is not generally desirable to use the antitrust laws to regulate the competitive choices of firms, especially when they increase output.

36. Along with fewer ATMs and lower output, Dr. Bamberger's but-for world would also have higher surcharges to consumers (*see* paragraphs 13-14 above). A move from no-surcharge networks to the "low-surcharge" networks posited by Dr. Bamberger also would harm consumers of those networks who do not pay foreign fees. Any ATM networks that existed

---

[39] ■■■■■■■■■■■■■■■■■■■■■■
[40] Deposition of Alan Pohlman, February 10, 2008, Exhibit 718, "Surcharge Speech," at 6 [PLTF-044705].
[41] Bamberger Declaration at ¶ 40.
[42] *See, e.g.*, Schmalensee Declaration, at ¶¶ 20, 51-60.

would be unable to offer depository customers the level of convenience, as ATM networks would be smaller; and it would have higher average costs, as ATM networks would lose scale efficiencies.[43] Banks that use foreign fees to discourage use of competitors' branches or as a revenue source might leave them at current levels for some or all customers, so their consumers would have no offsetting benefit from lower foreign fees. Dr. Bamberger's world of regulated interchange fees would therefore result in a significant, perhaps enormous, loss of consumer benefits.

37. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in San Diego, California on February 21, 2008.

*Richard Schmalensee*

965252

---

[43] Dr. Bamberger acknowledges the existence of scale economies in ATM networks. Bamberger Deposition at 234:23-25.