United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE ATM FEE ANTITRUST LITIGATION,

No. C 04-02676 CRB

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

/

The dispute before the Court in this case, an antitrust action aimed at eliminating the fixing of interchange fees in the Star ATM network, is relatively straightforward: should the setting of a fixed price by members of an ATM network be judged under the per se rule or under the so-called "rule of reason." Nevertheless, Defendants' motion for partial summary judgment requires the Court to delve into "one of the darkest corners of antitrust law" – the application of the per se doctrine to joint ventures – an area that is unsettled, unclear, unwieldy, and unequivocally complex. Joseph F. Brodley, The Legal Status of Joint Ventures Under the Antitrust Laws: A Summary Assessment, 21 Antitrust Bull. 453, 453 (1976). After substantial rumination on the legal issues presented, the Court concludes that because the price-fixing challenged by Plaintiffs is not the kind of "naked" horizontal restraint that "lack[s] . . . any redeeming virtue," Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289 (1985) (internal quotation marks omitted), application of the per se rule would be inappropriate. Accordingly, Defendants motion for partial summary judgment is GRANTED.

**BACKGROUND**

This case challenges the right of a non-proprietary network to set network-wide "interchange" fees that govern the amount of money paid by an ATM card issuer – generally a bank – to a foreign ATM owner when the ATM is used by the issuer's customer. Customers at most commercial banks receive ATM cards that allow them to make withdrawals from their accounts electronically. Typically, these ATM cards permit withdrawals not only from ATM machines at the bank where they hold their accounts, but also from ATM machines elsewhere. Such "foreign ATM transactions" involve four parties: (1) the "cardholder," i.e. the customer who retrieves money from the ATM machine; (2) the "card-issuer bank," i.e. that bank at which the customer holds an account and from which the customer has received an ATM card; (3) the "ATM owner," i.e. the entity that owns the ATM machine from which the customer withdraws money on his account; and (4) the "ATM network," i.e. the entity that administers the agreements between various card-issuer banks and ATM owners and thereby ensures that customers can withdraw money from one network member's ATM as readily as from another's.

Foreign ATM transactions involves multiple fees. Generally, a customer must pay two fees — one to the ATM owner for the use of that entity's ATM machine (known as a "surcharge"), and one to the bank at which he has an account (known as a "foreign ATM fee"). But that is not all. Out of the money that a customer pays directly to his own bank, the bank then also pays two fees. The first of the bank's fees is known as a "switch fee" and is paid directly to the ATM network. The second of the bank's fees — and the one at issue in this lawsuit — is known as an "interchange fee" and is paid directly to the owner of the foreign ATM.[1]

In this case, Plaintiffs contest the legality of only the interchange fee. They contend that the manner in which this fee is set and administered violates antitrust laws. In their Amended Complaint ("AC"), Plaintiffs initially alleged that certain members of the Star

---

[1] Since 2003, the interchange fee has been set at $.46 for on-premise transactions (i.e., transactions at ATMs deployed on a bank's premises), and $.54 for off-premise transactions. See Lynn Decl. ¶ 14.

2

ATM network had "fixed the interchange fee." AC ¶¶ 1, 62. They alleged that these network members had implemented this illegal agreement by controlling the conduct of the Board of Directors of Star Systems, Inc. ("Star"), the corporation that sets the interchange fee. See id. ¶ 56. They alleged that, prior to February of 2002, many of the member banks enjoyed power to appoint a member to Star's Board of Directors and thereby controlled Star's decisions regarding the interchange fee. See, e.g., id. ¶ 62 ("Plaintiffs are informed and believe that the Star Board of Directors met in August 1999, at which time its members agreed to maintain ATM Interchange Fees at their long-standing levels. In March 2000, Star disclosed that its Board of Directors changed its Interchange Fees . . . ."). They further alleged that, as of February of 2001, these member banks had asserted control over Star through an "advisory board" that had veto power over Star's decision to raise or lower the interchange fee. Id. ¶ 63. Plaintiffs contend that the banks enforced their illegal agreement by requiring all Star members — both banks and non-banks that own ATMs in the network — to abide by the fixed interchange fee. Id. ¶ 62.

On a motion to dismiss, this Court ruled that the Plaintiffs' allegations, if true, would establish that the Defendants had engaged in illegal price-fixing. See Brennan v. Concord EFS, Inc., 369 F. Supp.2d 1127 (N.D. Cal. 2005) (Walker, C.J.). In its ruling, the Court first noted that the Plaintiffs' objection is not to the existence of an interchange fee, but rather to its fixed nature. Id. at 1132. In other words, Plaintiffs do not contend that it would be impermissible for a card-issuing bank to compensate foreign ATM owners, but only that they may not decide collectively what compensation to render. Further, the court noted that the Complaint had described a "naked" attempt to fix prices, as opposed to an attempt to fix price that the Star network members determined was "ancillary" to a legitimate, procompetitive venture. Id. at 1133. In other words, Plaintiffs allege that Defendants fixed the interchange fee because they could, not because a fixed fee was necessary to sustain the ATM network. Because the Defendants could not defend against such allegations of "naked price fixing" without invoking evidence that was beyond the scope of the Complaint, the Court denied the motion to dismiss. Id. at 1138.

3

1    Shortly after the ruling on the motion to dismiss, Defendants filed a motion for partial
2 summary judgment on the ground that, as of February 2001, the Star Network ceased to be
3 owned by a group of banks but instead was operated by Concord as a proprietary network.
4 The Court issued a Memorandum and Order on November 30, 2006, terminating Concord's
5 motion and directing the parties to address the fundamental question of whether a per se
6 analysis applies to this case.

7    Defendants moved for summary judgment on August 3, 2007, having adduced
8 evidence bearing on the applicability of the per se rule.  For their part, Defendants have
9 submitted evidence that the interchange fee is designed to compensate the ATM owner for
10 making its ATMs available to the issuer's customers, and to provide an incentive for the
11 deployer of the ATM to incur the costs and risks of deployment.  See Schmalensee Decl. ¶
12 20; Lynn Decl. ¶ 6.  According to Richard Schmalensee, an Economics Professor at MIT, the
13 ability of an ATM network to set interchange fees is "central to the functioning of the
14 network," because an ATM owner would be unwilling to dispense cash to a customer
15 without an assurance of reimbursement.  See  Schmalensee Decl. ¶¶ 2, 22.  According to
16 Prof. Schmalensee, it is critical that Star impose a network fee because it would be too
17 cumbersome for card issuers and ATM owners to bilaterally negotiate an appropriate
18 interchange fee.  See id. ¶ 25.  Approximately 14.6 million separate bilateral agreements
19 would be needed to ensure an agreement between all 5,400 of Star's members, and "such an
20 approach would simply not work. . . ."  Id.; id. at ¶ 29.  Additionally, the defendants have
21 adduced evidence bearing on the procompetitive features of interchange fees, including that
22 such fees create an incentive for the deployment of ATMs and enable the Star Network to
23 compete with other ATM networks.  See, e.g., Schmalensee Decl. ¶ 45 (observing that
24 without an interchange fee, there would be less "incentive to install and maintain ATMs
25 generally").

26    In response, Plaintiffs forward their own expert, who states that "universal acceptance
27 . . . does not depend on the existence of a positive network-mandated interchange fee."  See
28 Bamberger Decl. ¶ 48.  The plaintiffs point to arguments made by commentators over fifteen

4

1  years ago that the need for interchange fees is eliminated when ATM owners are permitted –
2  as they now are – to impose surcharge fees directly on consumers. See Saveri Decl. Exh. 74
3  (Steven C. Salop, Deregulating Self-Regulated Shared ATM Networks, 1 Econ. Innov. New
4  Techn. 85, 91 (1990)).  Plaintiffs also dispute whether interchange fees do increase output,
5  pointing to a lack of evidence conclusively establishing such an effect. See Bamberger Decl.
6  ¶ 40.

## STANDARD OF REVIEW

Summary judgment is not warranted if a material fact exists for trial. See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). The underlying facts are viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). This can be done by either producing evidence negating an essential element of the plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to carry its ultimate burden at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. See id. at 324. In considering a motion for summary judgment, however, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Anderson, 477 U.S. at 250-51.

5

1    Although the Supreme Court once cautioned that summary judgment "should be used
2 sparingly in complex antitrust litigation where motive and intent play leading roles, the proof
3 is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot,"
4 Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962), any presumption
5 against the granting of summary judgment in complex antitrust cases has now disappeared.
6 See Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 308c2 (3d ed. 2007) (citing
7 Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 342 (8th Cir. 1995)). Hence, as in other
8 civil cases, the Court may grant summary judgment "unless the record would allow a
9 reasonable jury to find that the claimant has satisfied its proof burden as determined by the
10 governing substantive rule." Id. at ¶ 308a.

11    That said, the decision of what mode of analysis to apply – per se, rule of reason, or
12 otherwise – is entirely a question of law for the Court, even though the question might
13 involve factual disputes. See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of
14 R.I., 373 F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se
15 claim is normally a question of legal characterization that can often be resolved by the judge
16 on a motion to dismiss or for summary judgment."); Areeda ¶ 1909b (2d ed. 2005).

### DISCUSSION

18    Section 1 of the Sherman Antitrust Act of 1890, by its terms, prohibits every
19 agreement "in restraint of trade." 15 U.S.C. § 1. Because Congress could not have intended
20 a literal interpretation of the word "every," the Supreme Court has long recognized that § 1
21 only outlaws unreasonable restraints. See United States v. Joint Traffic Ass'n, 171 U.S. 505
22 (1898). As a consequence, most antitrust claims are analyzed under a "rule of reason,"
23 according to which the finder of fact must decide whether the questioned practice imposes an
24 unreasonable restraint on competition, taking into account a variety of factors, including
25 specific information about the relevant business, its condition before and after the restraint
26 was imposed, and the restraint's history, nature, and effect. State Oil Co. v. Khan, 522 U.S.
27 3, 10 (1997). Whether the businesses involved have market power is a further, significant
28 consideration. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768

6

1  (1984). The purpose of the rule of reason analysis is to distinguish between restraints with
2  anticompetitive effects that are harmful to consumers and restraints that stimulate
3  competition and are in the consumer's best interest. See <u>Leegin Creative Leather Prods., Inc.
4  v. PSKS, Inc.</u>, 127 S. Ct. 2705, 2713 (2007).

However, some restraints are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." <u>Nat'l Soc'y of Prof. Eng'rs v. United States</u>, 435 U.S. 679, 692 (1978). These types of restraints have such predictable and pernicious anticompetitive effects – and such limited potential for procompetitive benefit – that they are deemed unlawful "per se." <u>N. Pac. Ry. Co. v. United States</u>, 356 U.S. 1, 5 (1958). When courts apply the per se rule to a particular type of restraint, "there is a conclusive presumption that the restraint is unreasonable" under § 1. <u>Arizona v. Maricopa County Med. Soc'y</u>, 457 U.S. 332, 344 (1982). Because the per se rule is justified where the restraint has manifestly anticompetitive effects and lacks any redeeming virtue, the rule should be applied only after courts have had considerable experience with the type of restraint at issue. <u>Leegin</u>, 127 S. Ct. at 2713 (2007).

### A.  Horizontal Price Restraints

Courts have sufficient experience with horizontal price-fixing agreements between competitors that, generally speaking, such agreements are subject to per se condemnation. See <u>Costco Wholesale Corp. v. Maleng</u>, 514 F.3d 915, 939 n.19 (9th Cir. 2008) (citing <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150, 218 (1940)). "Horizontal price fixing is a per se violation regardless of whether the prices set are minimum or maximum." <u>Knevelbaard Dairies v. Kraft Foods, Inc.</u>, 232 F.3d 979, 988 (9th Cir. 2000) (citing <u>Arizona v. Maricopa County Med. Soc'y</u>, 457 U.S. 332 (1982)).

The fact that courts may not have experience with the <u>particular</u> restraint at issue is, for the most part, irrelevant. Thus, Defendants cannot defend their restraint on the ground that courts have limited experience with ATM interchange fees. See <u>Maricopa County</u>, 457 U.S. at 351 ("[T]he argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules,

7

which in part is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable.") (internal quotation and citation omitted).

However, well-settled doctrines of antitrust law do not always map smoothly onto the relatively contemporary concept of joint ventures. It is not appropriate to assume that a restraint imposed by members of a joint venture is per se unreasonable, merely because the same conduct by competitors would be judged under the per se rubric. See United States Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 594 (1st Cit. 1993). Indeed, the Supreme Court has set forth special rules for judging the conduct of joint ventures, which compel application of the rule of reason when applied to the facts of this case.

B.   Joint Ventures

A joint venture is "a form of organization in which two or more firms agree to cooperate in producing some input that they would otherwise have produced individually, acquired on the market, or perhaps done without." Areeda ¶ 2100(a). The seminal hornbook on antitrust law identifies agreements between operators of automated teller machines permitting customers to use their cards at numerous and otherwise unaffiliated merchants or banks as an exemplar joint venture. Id.

That courts would modify traditional antitrust rules in the context of joint ventures is unsurprising. Cooperation is the lynchpin of the value added by a joint venture. Therefore, courts must be cautious in condemning a joint venture's acts of cooperation as per se unreasonable, for fear of punishing the very conduct that society should aim to promote.

Although the intersection between antitrust law and joint ventures is still rapidly developing, it is possible to discern in the Supreme Court's jurisprudence certain principles that bear on this case. The following subsections attempt to set forth what the Court views as the law governing horizontal price restraints imposed by members of a joint venture, and how that law applies to the restraint challenged in this case.

*1. When Joint Venture Itself is Challenged*

When a plaintiff challenges the joint venture itself, the venture must be judged under the rule of reason standard. Citing to <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 768 (1984), the Supreme Court recently held that plaintiffs cannot utilize the per se rubric to challenge the creation of a joint venture. <u>See</u> <u>Texaco Inc. v. Dagher</u>, 547 U.S. 1, 6 n.1 (2006). In turn, the pinpoint in <u>Copperweld</u> cited by <u>Dagher</u> stands for the proposition that the rule of reason is used to analyze combinations such as mergers, joint ventures, and various vertical agreements because they hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. <u>See</u> <u>Copperweld Corp.</u>, 467 U.S. at 768.

The <u>Dagher</u> footnote does not control this case, however, because Plaintiffs do not challenge the creation of the Star Network as anticompetitive, but rather challenge a particular activity of the venture. When a plaintiff challenges a provision or practice of the venture as anticompetitive, then per se review may be appropriate depending on the circumstances. As the Supreme Court observed in <u>National Collegiate Athletic Assn. v. Board of Regents of University of Oklahoma</u>, 468 U.S. 85, 113-115 (1984) (hereinafter <u>NCAA</u>), one can have a "naked" restraint even though it is contained in a joint venture agreement that is, overall, quite competitive. Thus, the Supreme Court permits plaintiffs to disaggregate particular conduct from the venture as a whole, and submit that conduct to individual scrutiny. <u>See</u> Areeda ¶ 2100(f). The Court cannot therefore hold that because the interchange fee was established through a joint venture, ergo rule of reason applies. Rather, the Court must go further, and inquire into the nature of the venture and the role of the restraint.

*2. Economically Integrated Joint Ventures*

In the Supreme Court's recent <u>Dagher</u> decision, the Court also clarified that price-fixing agreements between members of an economically-integrated joint venture cannot be analyzed under the per se rubric. That is so because while price-fixing between competitors is per se unlawful, an economically-integrated joint venture amounts to a single entity, which is entitled under the antitrust laws to set its own prices. <u>See</u> <u>Dagher</u>, 547 U.S. at 6. When "persons who would otherwise be competitors pool their capital and share the risks of loss as

9

well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market," and as such, the venture's pricing policy may be price fixing in a literal sense, but it is not price fixing in the antitrust sense. Id. (quoting Maricopa County, 457 U.S. at 356).

The Ninth Circuit reached a similar conclusion in Freeman v. San Diego Association of Realtors, 322 F.3d 1133 (9th Cir. 2003). In an opinion by Chief Judge Kozinski, the court observed that "[w]here there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity" under the antitrust statutes. Id. at 1148. As single entities, such partnerships or ventures are categorically immune from liability under Section 1 of the Sherman Act. Id. at 1147.

In this case, there is good reason to conclude that Defendants are not categorically immune under Section 1. Several factors weigh against a finding of economic unity between the members of the Star network: members did not divide profits and losses derived from ATM deployments and transactions; members continued to act as actual and potential competitors in the offering of other financial products and services; and members did not owe each other a fiduciary obligation to act for each other's economic benefit. Thus, price fixing by members of the Star network is price-fixing in the literal sense, and might be price-fixing in the antitrust sense depending on whether or not the restraint is a core function of the network, or at least reasonably ancillary to the network's legitimate business purposes.

*3. Core Function of Joint Venture*

In Dagher, the Supreme Court explained that even where a joint venture is not immune from liability – presumably because it is not an integrated joint venture – the per se rubric is still not appropriate if plaintiffs challenge "the core activity of the joint venture itself." 547 U.S. at 7. The joint venture in Dagher was formed by two oil companies, which consolidated their operations in the western United States and agreed to sell gasoline cooperatively to downstream purchasers. Id. at 4. Plaintiffs challenged the companies'

agreement to set a unified price for their gasoline, a practice that the Supreme Court identified as the venture's core activity.

Pursuant to Dagher's "core function" test, the question for the Court is whether the setting of an interchange fee is the "core activity" of the Star network. If so, then the setting of the fee can only be subject to rule of reason analysis. In Dagher, the venture participants were engaged in the selling of a concrete product: gasoline. The inquiry is more complex in this case because the defendants' product is more abstract: acceptance of ATM cards by foreign banks. Nonetheless, the holding of Dagher applies because like the price of gasoline, the interchange fee represents the price that one party to the transaction pays the other party for the joint venture's product. That is to say, like the pricing at issue in Dagher, plaintiffs in this case challenge a joint venture's right to put a price on the good that the venture produces. Dagher teaches that such challenges must be analyzed under the rule of reason.

To be sure, there are differences between this case and Dagher. For example, the parties to the contract are both members of the joint venture, rather than the venture and a consumer. But that distinction cuts against the plaintiffs, because it evidences that Defendants' price-setting was not designed to gouge customers.

But even if the interchange fee was not a core activity of the Star network, plaintiffs challenge would still have to be analyzed under the rule of reason because, as explained below, in a situation – like the one presented by this case – involving a complex network joint venture in which horizontal restraints are necessary if the product is to be marketed "at all," restraints that are reasonably ancillary to the legitimate cooperative functions of the venture qualify for rule of reason treatment. See Areeda ¶ 1910(d) (citing NCAA, 468 U.S. at 101-02).

*4. Reasonably Ancillary Restraints*

In NCAA, the Supreme Court held that where horizontal agreements are necessary for the functioning of a joint venture, all horizontal agreements among members of that venture, even those as egregious as price-fixing, should be subject to rule of reason analysis. See Law v. NCAA, 134 F.3d 1010, 1018-19 (10th Cir. 1998) (citing NCAA, 468 U.S. at 101-03).

11

In NCAA, two Universities that were members both of the NCAA and the College Football Association ("CFA"), challenged an NCAA plan which limited the total number of televised intercollegiate football games and the number of games that any one college could televise under § 1 of the Sherman Act. The CFA had negotiated a contract with a television network which would have allowed a more liberal number of television appearances for each college and would have increased the CFA revenues. The NCAA notified the CFA that it would take disciplinary action against any members who did not comply with the NCAA plan.

The Supreme Court recognized that because the NCAA "is an association of schools which compete against each other to attract television revenues, not to mention fans and athletes," an express limitation on televised games constituted "a horizontal restraint--an agreement among competitors on the way in which they will compete with one another." 468 U.S. at 99. The Court acknowledged that horizontal restraints creating a limitation on output "[have] often been held to be unreasonable as a matter of law," and that by precluding price negotiation between broadcasters and institutions, the NCAA was effectively horizontally price fixing, "perhaps the paradigm of an unreasonable restraint of trade." Id.

Despite the fact that horizontal price fixing and output limitation are ordinarily condemned as unreasonable per se, the Supreme Court declined to apply the per se analysis to the restraint at issue. The deciding factor in the Court's decision was not "a lack of judicial experience with this type of arrangement, . . . the fact that the NCAA is organized as a nonprofit entity, or . . . our respect for the NCAA's historic role in the preservation and encouragement of intercollegiate athletics," but rather, what was critical was that the case "involve[d] an industry in which horizontal restraints on competition are essential if the product is to be available at all." Id. at 101. The Court observed that the NCAA plays a vital role in enabling the particular product – college football – to be marketed. By enacting rules such as those affecting the size of the field, the number of players on a team, and the nature of permissible physical contact, the NCAA preserves the integrity of the product. Thus, according to the Supreme Court, competition is enhanced, not diminished. Id. at 101-02.

The Court concluded that, although the NCAA's plan restrained the ability of member institutions to compete in terms of price and output, in light of the NCAA's role, a per se approach was not warranted. Id. at 103.

Although the Court recognized that certain restraints – such as field size – were necessary to the functioning of the NCAA, the Court did not limit the rule of reason analysis to such restraints. See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 595 (7th Cir. 1984) ("[T]he Court in NCAA did not condition the applicability of the Rule of Reason on proof that the particular restriction that had been challenged was necessary if the product was to be brought to market at all."). To the contrary, the Court accepted the district court's conclusion that "NCAA football could be marketed just as effectively without the television plan." 468 U.S. at 114. The critical point is that the NCAA was entitled to a rule of reason analysis on its television limitation not because the limitation itself was necessary to the venture's operation – it was not, see id. at 114 – but because "the great majority" of the NCAA's other regulations did enhance competition among member institutions. Id. at 103. The clear implication of NCAA is that when the defendants are members of a joint venture that depends on "a certain degree of cooperation" if the type of competition that the venture seeks to market is to be preserved, and most of the venture's "regulatory controls" are procompetitive, any horizontal restraint imposed by the venture is subject to rule of reason analysis. Id. at 117.

If NCAA presented the last word on the subject, the rule of reason would clearly apply. That is so because there can be no doubt that for a joint venture such as the Star network to survive, it "must collectively adopt and enforce uniform rules" to operate. Regents of University of California v. American Broadcasting Companies, 747 F.2d 511, 517 (9th Cir. 1984). ATM networks are the type of venture that require a certain degree of cooperation among members in order to operate, and most of the horizontal restrains imposed by ATM networks are undoubtedly procompetitive. The setting of horizontal restraints such as the switch fee, and rules establishing hours of availability, ATM functionality standards,

13

and ATM card standards, is central to the functioning of an ATM network. See Schmalensee Decl. ¶ 2.

However, the analysis is not so simple because the Ninth Circuit has since limited the reach of the NCAA decision. In Freeman, the Ninth Circuit held that to fall under the protection of NCAA, the particular restraint at issue must be "reasonably ancillary to the legitimate cooperative aspects of the venture." In essence, Freeman imposed an additional burden on defendants, who must now prove not only that their venture requires horizontal restraints, but also that the particular restraint challenged is ancillary to the venture's legitimate aspects.

Even under Freeman's more demanding standard, summary judgment must be granted to Defendants. That is so because the fixing of the interchange fee is reasonably ancillary to the Star network's legitimate cooperative aspects. A price-fixing restraint is "ancillary" if it "achieve[s] purposes unrelated to price formation." Nat'l Bancard Corp. v. VISA U.S.A., Inc., 779 F.2d 592, 599 (11th Cir. 1986) (quotation omitted) (hereinafter NaBANCO). In contrast to the defendants in Freeman, who offered no explanation for how the challenged subscription fee improved efficiency or had "any effect" on the venture other than raising prices, the interchange fee at issue in this case – which is levied on members of the Star network, not consumers – serves not just to generate profits for the recipient, but to promote deployment of additional ATMs and to compensate ATM owners for allowing consumers to use their product. By promoting additional ATMs, the interchange fee actually promotes, rather than diminishes, competition.[2]

"For a payment system like [the Star network] to function, rules must govern" how the transaction between the cardholder, the cardholder's bank and the ATM owner will proceed. Id. at 602. The interchange fee represents one such rule, apportioning the costs of using the ATM among the ATM owner and the cardholder's bank. Apportionment of costs

---

[2] It also bears noting that whereas the venture at issue in Freeman was designed to exclude competition from the market by combining competing MLS databases into one comprehensive database, the Star Network competes with other ATM networks in any given geographical region. Although not legally dispositive, this distinguishing feature provides one more reason why the interchange fee does not "facially appear" to be anticompetitive. See infra. at Part C.

14

is undoubtedly a legitimate purpose, ancillary to the operation of the Star network, and the evidence is unrebutted that such apportionment must be fixed. As in NaBANCO, there are too many potential entities involved in the transaction that all efficiencies would be lost if the cardholder's bank and the ATM owner were required to engage in bi-lateral negotiations every time a cardholder attempted to get money from a foreign ATM. See Schmalensee Decl. ¶¶ 25, 29.

Plaintiffs argue that the interchange fee is not ancillary to the network's legitimate cooperative aspects because ATM owners can profit from servicing foreign customers through a surcharge fee. Thus, Plaintiffs claim, the interchange fee is not "necessary" to the functioning of the network at all. But Plaintiffs argument goes to whether the amount of the interchange fee is appropriate, not to whether the fee should be fixed, which is the only question before the Court. It may be that the interchange fee is higher than it needs to be for the Star network to survive. Even so, the fee promotes cooperation between the venture's members and cannot be set individually. Under the circumstances, that is all Defendants must show to avoid a per se analysis.

### C. Star Network's Facial Appearance

It should not be forgotten that in deciding what rubric to apply, the Court is engaged more in art than science. An overly-formalistic and literal approach is to be avoided. Broadcast Music, Inv. v. Columbia Broadcasting, 441 U.S. 1, 9 (1979). Thus, while precedent and rigid categories of analysis help guide the Court, the ultimate inquiry is whether a per se approach is appropriate because the challenged restraint "facially appears to be one that would always or almost always tend to restrict competition and decrease output." Id. at 19-20. The Court's conclusion that the rule of reason applies is buttressed by the fact that the defendants' interchange fee is not a restraint that facially appears to be anticompetitive.

As antitrust experts have recognized now for years, the more integrated a joint venture is, the more likely it is that the venture's agreements "bring[] about some efficiency that would be foregone in the absence of the agreement." Charles F. Rule, The Administration's

Views on Joint Ventures, 54 Antitrust L.J. 1121, 1122 (1985). Thus, when a venture is highly integrated, the cost to society in terms of lost efficiencies from applying a per se rule of illegality to its conduct is likely to be greater. See id. That principle seems to be the driving force behind decisions like BMI, NCAA and Northwest Wholesale Stationers v. Pacific Stationary and Printing Co., 472 U.S. 284 (1985), in which the Supreme Court refused to apply the per se rule to a joint venture's decision to exclude. This case concerns a joint venture that – although not economically integrated – is highly integrated in the sense that members create a new market by fusing complementary resources. Because the Star network is a valid joint venture – rather than a mere cartel cloaked in the guise of a joint venture – one would expect that it is responsible for creating significant and beneficial efficiencies that could not otherwise be accomplished. Under the circumstances, it seems inappropriate to the Court to subject such a venture's conduct to a per se analysis, which assumes that the venture's conduct is anticompetitive.

Further, it is significant to the Court that Plaintiffs challenge a fee imposed by members of a joint venture on each other, rather than one imposed directly on consumers.[3] To the extent that the Court must determine whether the purpose and effect of the restraint is to restrict competition and decrease output, BMI, 441 U.S. at 19-20, the fact that the fee is not automatically passed on to consumers weighs against the propriety of a per se approach. In Plaintiffs' view, the interchange fee is a gouging mechanism that provides banks with a justification for levying fees on their customers through a foreign ATM fee. But the fact that certain banks do not pass such costs on to their customers suggests that perhaps the fee plays

---

[3] In recent briefing, Defendants argue that because Plaintiffs do not directly pay the interchange fee, Plaintiffs lack standing to challenge the fee under the Sherman Act. Defendants find some support in the Ninth Circuit's decision in Kendall v. Visa U.S.A., Inc., 2008 WL 613924 (9th Cir. Mar. 7, 2008), in which the court held that merchants challenging a credit-card interchange fee lacked standing to sue because the plaintiffs "have no contractual relationship with the Consortiums directly, nor are they charged the interchange fee directly." Id. at *5 (emphasis added) (relying on Illinois Brick v. Illinois, 431 U.S. 720, 746 (1977)). Without deciding the issue, the Court notes that an exception to Illinois Brick would apply if there is no realistic possibility that the Star Network's members – who both pay and receive the interchange fee – would sue the network for antitrust violations. See Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980). Either way, the Court declines to resolve the standing issue here, because it would be more properly addressed after adequate briefing and after Plaintiffs have reframed their claim under the rule of reason.

a different and perhaps procompetitive role, and counsels in favor of taking a deeper look at the purpose and effect of the interchange fee by way of a rule of reason analysis.

## CONCLUSION

The Court concludes that Plaintiffs' challenge to Defendants' setting of a fixed interchange fee must be analyzed under the rule of reason for two reasons, both of which are individually sufficient: (1) Plaintiffs have challenged a "core activity" of the defendants' joint venture, Dagher, 547 U.S. at 7; and (2) the interchange fee is reasonably ancillary to the legitimate cooperative aspects of a joint venture that requires horizontal restraints if the venture's product is to be available at all, NCAA, 468 U.S. at 101; Freeman, 322 F.3d at 1151.

The Court recognizes that despite the Supreme Court's recent focus on the nexus between antitrust law and joint ventures in cases like Dagher, there remains "serious doctrinal confusion over the proper analysis of cooperative arrangements among competitors." Thomas A. Piraino, Jr., Beyond Per Se, Rule of Reason or Merger Analysis: A New Antitrust Standard for Joint Ventures, 76 Minn. L. Rev. 1, 18 (1991). The Court is "of the opinion that [this] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate outcome of the litigation." 28 U.S.C. § 1292(b). Accordingly, although Defendants' motion for partial summary judgment is GRANTED, the Court will certify to the Ninth Circuit Court of Appeals upon request the question whether Plaintiffs' antitrust claim should be adjudicated under the per se or rule of reason rubric.

**IT IS SO ORDERED**.

Dated: March 24, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE