1   Joseph R. Saveri (SBN 130064)
    Brendan P. Glackin (SBN 199643)
2   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
3   San Francisco, CA  94111-3339
    (415) 956-1000
4
    Merrill G. Davidoff (Admitted Pro Hac Vice)
5   Bart D. Cohen (Admitted Pro Hac Vice)
    Michael J. Kane (Admitted Pro Hac Vice)
6   BERGER & MONTAGUE, P.C.
    1622 Locust Street
7   Philadelphia, PA 19103
    (215) 875-3000
8
    Co-Lead Counsel for Plaintiffs
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12
    In re ATM FEE ANTITRUST LITIGATION          Master File No. C 04-2676 CRB
13

14   _____         **CLASS ACTION**

15   PAMELA BRENNAN, TERRY CRAYTON, and
16   DARLA MARTINEZ, on behalf of themselves      **THIRD AMENDED COMPLAINT
     and all others similarly situated,           FOR DAMAGES AND
17                                                 EQUITABLE RELIEF**
                      Plaintiffs,
18
19                    vs.                         **DEMAND FOR JURY TRIAL**

20   CONCORD EFS, INC., FIRST DATA CORP.,
     BANK OF AMERICA, N.A., JPMORGAN             **FILED UNDER SEAL**
21   CHASE BANK, N.A., BANK ONE, N.A.,
     CITIBANK, N.A., CITIBANK (WEST), FSB,
22   SUNTRUST BANKS, INC., WACHOVIA
     CORPORATION, WELLS FARGO BANK, N.A.,
23   SERVUS FINANCIAL CORP.,

24                    Defendants,
25

26
27              **DOCUMENT SUBMITTED UNDER SEAL
                         (REDACTED)**
28

# TABLE OF CONTENTS

**Page**

I.    JURISDICTION ............................................................................ 2

II.    VENUE ....................................................................................... 2

III.    PLAINTIFFS ............................................................................. 3

IV.    DEFENDANTS ........................................................................... 3

      A.    Concord ................................................................................ 3

      B.    First Data .............................................................................. 3

      C.    Bank of America ................................................................... 5

      D.    Chase ................................................................................... 5

      E.    Citibank ............................................................................... 6

      F.    Suntrust ............................................................................... 7

      G.    Wells Fargo/Wachovia ......................................................... 7

V.    AGENTS AND CO-CONSPIRATORS ...................................... 8

VI.    DEFINITIONS ........................................................................... 8

VII.    CLASS ACTION ALLEGATIONS ......................................... 10

COUNT I (VIOLATION OF SECTION ONE OF THE SHERMAN ACT, 15 U.S.C. § 1) (AGAINST ALL DEFENDANTS) ..................................... 13

      A.    Interstate Trade And Commerce .............................................. 13

      B.    Development Of ATM Networks .............................................. 13

      C.    Star ..................................................................................... 14

           1.    Star's Origins ............................................................. 14

           2.    Star Growth Through Consolidations and Mergers ..................... 14

      D.    Star Is Not and Has Never Been an Economically Integrated Joint Venture ............................................................................... 15

      E.    Star's Fixed ATM Interchange Fees Serve No Pro-Competitive Purpose ............................................................................... 16

      F.    Star's Illegal Fixed Interchange Fees ........................................ 18

      G.    Harm To Competition ............................................................ 21

      H.    Relevant Product And Geographic Markets .............................. 22

           1.    Provision of Foreign ATM Transactions Routed Over ATM Networks ................................................................. 22

           2.    Provision of Foreign ATM Transactions Routed Over Star ........ 22

      I.    Star's Member Banks Have No Ability Or Incentive To Seek Redress For Star's Fixed Interchange Fees ............................... 29

PRAYER FOR RELIEF ............................................................................ 29

DEMAND FOR JURY TRIAL .................................................................. 31

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

843796.1

1    Plaintiffs Pamela Brennan and Darla Martinez, by and through their undersigned

2    attorneys, bring this action on behalf of themselves and all other similarly situated members of

3    the proposed California classes seeking damages and injunctive relief under the United States

4    antitrust laws against Defendants Concord EFS, Inc., First Data Corp., Bank of America, N.A.,

5    JPMorgan Chase Bank, N.A., Citibank, N.A., Citibank (West), FSB, SunTrust Banks, Inc.,

6    Wachovia Corp., Wells Fargo Bank, N.A., and Servus Financial Corp., and demand a trial by

7    jury.

8    Plaintiff Terry Crayton, by and through his undersigned attorneys, brings this

9    action on behalf of himself and all other similarly situated members of the proposed non-

10   California classes seeking damages and injunctive relief under the United States antitrust laws

11   against all Defendants and demands a trial by jury.

12   For their Complaint against Defendants, Plaintiffs allege the following:

13   1.    Since the inception of the Star ATM Network ("Star"), Defendants have

14   fixed the interchange fee ("Interchange Fee") paid to ATM Owners on Automated Teller Machine

15   ("ATM") transactions over the network.  Bank Defendants mark up the fixed Interchange Fee,

16   and charge it to most of their cardholders as the Foreign ATM Fee.

17   2.    The original purported purpose for the fixed Interchange Fee was to

18   compensate ATM Owners for the additional cost of providing cash to other Banks' customers.

19   However, fixed Interchange Fees have been unnecessary for that purpose, or for the efficient

20   operation of an ATM Network, since at least 1996, when Star eliminated its rules that effectively

21   prohibited "Surcharges."  By virtue of Surcharging, ATM Owners have been able to unilaterally

22   recover their additional costs, and to set the amount of compensation they receive from

23   cardholders when they withdraw cash from their ATMs.  Since the wide-spread implementation

24   of Surcharges, consumers have been paying twice for the same transaction to withdraw their own

25   funds:  Surcharges paid to ATM owners and Foreign ATM Fees to their own Banks, the latter of

26   which are artificially inflated by fixed – and unnecessary – Interchange Fees.

27   3.    Figure A below depicts a typical transaction involving a cardholder's cash

28   withdrawal from an ATM not owned by his/her Bank:

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

**FIGURE A**



**FOREIGN ATM TRANSACTION FEE FLOW**

Amounts of fees shown are representative examples.

4. Defendants' fixing of Star's Interchange Fee is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

**I. JURISDICTION**

5. Plaintiffs bring this antitrust class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover for injuries they have suffered as a result of Defendants' continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs seek treble damages, injunctive relief, and the costs of suit, including reasonable attorneys' fees, for themselves and for the members of the classes that they seek to represent. This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. §§ 15 and 26.

**II. VENUE**

6. Venue is proper in this judicial district under 15 U.S.C. §§ 22 and 28 U.S.C. §§ 1391(b) and (c) because each of the Defendants resides, or is licensed to do business or is doing business, or is found or transacts business, in this district, or the claims arose in this district.

1   **III.   PLAINTIFFS**

2              7.      Plaintiff Pamela Brennan is a resident of San Francisco, California.

3   Ms. Brennan has paid "Foreign ATM Fees," as that term is defined herein, to one or more of the

4   Defendants named herein during the Relevant Period.

5              8.      Plaintiff Terry Crayton is a resident of Wichita, Kansas.  Mr. Crayton has

6   paid "Foreign ATM Fees," as that term is defined herein, to one or more of the Defendants named

7   herein during the Relevant Period.

8              9.      Plaintiff Darla Martinez is a resident of Alta Loma, California.

9   Ms. Martinez has paid "Foreign ATM Fees," as that term is defined herein, to one or more of the

10  Defendants named herein during the Relevant Period.

11  **IV.   DEFENDANTS**

12      **A.     Concord**

13             10.     Defendant Concord EFS, Inc. ("Concord") is a Delaware corporation with

14  its principal place of business in Memphis, Tennessee.  In 2001, Concord acquired Star Systems,

15  Inc., at which time Concord succeeded to and assumed all rights and obligations of Star.  Star

16  Systems, Inc. was itself the result of a 1999 merger between Honor Technologies, Inc. ("Honor")

17  and Star Systems, Inc.

18             11.     Prior to acquiring Star Systems, Inc., Concord had purchased two other

19  ATM networks, MAC in 1999 and Cash Station in 2000.  Throughout the Relevant Period, an

20  ATM Network operated under the name Star.  Star is the largest ATM Network in the United

21  States.   Prior to February 1, 2001, officers of the other Defendants and their co-conspirators

22  served on Star's Board of Directors.  Concord presently is a wholly-owned subsidiary of

23  Defendant First Data Corporation.

24      **B.     First Data**

25             12.     Defendant First Data Corporation ("First Data") is a Delaware corporation

26  with its principal place of business in Greenwood, Colorado.  In February 2004, First Data

27  acquired Concord.  Plaintiffs are informed and believe that First Data has succeeded to the

28  liability for the acts, omissions and unlawful conduct of Concord and Star.  Under the terms of a

merger agreement dated April 1, 2003, Monaco Subsidiary Corporation ("Monaco"), a wholly-owned subsidiary of First Data, merged with and into Concord, and Concord, as the surviving corporation, succeeded to and assumed all the rights and obligations of Monaco and Concord.

13.     Pursuant to the merger, First Data acquired Concord through an exchange of stock.  Concord shareholders received 0.365 of a share of First Data common stock for every share of Concord common stock.  Following the consummation of the merger, First Data reorganized its business segments and fully integrated the businesses and assets of Concord, including Star, into the newly modified First Data segments.  As a result of this transaction, First Data now owns and operates Star.  Concord no longer owns or operates Star.

14.     In connection with the merger, Concord's sales forces and product lines, as well as several operating centers and administrative departments, were completely integrated into First Data.  Richard Kiphart, the Chairman of Concord, also became a director of First Data and Ronald Congemi, the president and founder of Star, became the CEO of First Data Debit Services, the business segment controlling Star.  On March 31, 2005, Mr. Congemi became First Data's senior vice president for strategic industry relations.  Plaintiffs also are informed and believe that Star acts as the agent of First Data.  In press releases, on its website and in other public filings, First Data has held itself out as the owner and operator of Star.  First Data itself also enters into contracts, including contracts with a number of other Defendants, regarding participation in Star.  First Data now reports income from Star.  Before the merger, Concord reported assets that included $500 million in cash.  After the merger, Concord ceased reporting this amount in its balance statements.  At all relevant times, First Data exercised such dominion and control over Concord and Star that it is liable for the acts of Concord and Star.

15.     The transaction between Concord and First Data constitutes a *de facto* merger or consolidation.  There is a continuation of the enterprise of Concord, including continuity of management, personnel, physical location, assets, and operation of Star.  There is a continuity of shareholders.  On information and belief, Concord has ceased operations, liquidated and/or dissolved.  First Data has assumed the obligations of Concord necessary for uninterrupted continuation of Star and its other ongoing business operations.

16.     The transaction between Concord and First Data also constitutes a continuation of the business of Concord, including Star.  Concord and First Data have continued to produce the same products and services, including those of Star.  First Data and Concord have continued to employ Star's employees and supervisory personnel and maintained Star's physical location and other operations.  Concord and First Data have retained the Star name.  They have continued Star's general business operations.  First Data holds itself out as a continuation of Concord.

### C.     Bank of America

17.     Defendant Bank of America, N.A. ("Bank of America") is a national banking association incorporated in North Carolina and with its principal place of business in Charlotte, North Carolina.  It is a wholly-owned subsidiary of NB Holdings Corporation, which in turn is wholly-owned by Bank of America Corporation.  During the Relevant Period, Bank of America, N.A. has offered deposit accounts and other banking services, including ATMs, to the general public.

18.     Bank of America Corporation represented to the Federal Reserve Board that it (along with certain other Defendants named herein) would conduct Star's activities, and would own more than five percent of Star's voting shares.  Prior to February 1, 2001, Bank of America was entitled to appoint outside directors to Star's Board of Directors.  During the Relevant Period, Bank of America has been a member of Star.

### D.     Chase

19.     Defendant JPMorgan Chase Bank, N.A., a national banking association with its principal place of business in Columbus, Ohio, is a wholly-owned subsidiary of JPMorgan Chase & Co.  JPMorgan Chase Bank, N.A. is an interstate bank that has offered deposit accounts and other banking services to the general public.

20.     Defendant Bank One, N.A. was a Delaware corporation with its principal place of business in Chicago, Illinois.  In 2001, Bank One, N.A. acquired Bank One of Arizona, N.A. ("Bank One Arizona"), which was also a wholly-owned subsidiary of Bank One Corporation, and entitled to appoint outside directors to Star's Board of Directors prior to

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

1  February 1, 2001.  In 2004, Bank One Corporation and Bank One, N.A. merged into Chase.

2  Plaintiffs are informed and believe that Chase succeeded to the liability or assumed the liability

3  for the acts, omissions and unlawful conduct of Bank One, N.A. which in turn did the same with

4  respect to Bank One Arizona.  During the Relevant Period, Bank One N.A. and Bank One of

5  Arizona, N.A., offered deposit accounts and other banking services, including ATMs, to the

6  general public.

7          21.     Defendants JPMorgan Chase Bank, N.A. and Bank One, N.A. are

8  collectively referred to as "Chase."  During the Relevant Period, Chase has been a member of

9  Star.

10         **E.      Citibank**

11         22.     Defendant Citibank, N.A. is a bank with its principal place of business in

12  New York, New York, and is a subsidiary of Citigroup, Inc.  Citibank, N.A., through Defendant

13  Citibank (West), FSB, had a representative on Star's Board prior to February 1, 2001.  During the

14  Relevant Period Citibank, N.A., has offered deposit accounts and other banking services,

15  including ATMs, to the general public.  Citibank, N.A., also succeeded to the liabilities of

16  California Federal Bank, another member of Star.

17         23.     During the Relevant Period Defendant Citibank (West), FSB was a federal

18  savings bank with its principal place of business in San Francisco, California.  In 2002, Citibank

19  (West), FSB acquired California Federal Bank, FSB, a Star member entitled to appoint outside

20  directors to Star's Board of Directors prior to February 1, 2001.  On October 1, 2006, Citibank

21  (West), FSB became a national bank named West, National Association ("West").  Immediately

22  following the conversion, West was merged with and into Citibank, N.A. with Citibank, N.A.

23  constituting the surviving institution.  Plaintiffs are informed and believe that Citibank, N.A.

24  succeeded to the liability or assumed the liability for the acts, omissions and unlawful conduct of

25  Citibank (West), FSB.  During the Relevant Period, Citibank (West), FSB offered deposit

26  accounts and other banking services, including ATMs, to the general public.

27

28

843796.1

- 6 -

24.     Defendants Citibank N.A. and Citibank (West), FSB are collectively referred to herein as "Citibank."  During the Relevant Period, Citibank has been a member of Star.

**F.     Suntrust**

25.     Defendant SunTrust Banks, Inc. ("SunTrust") is a Georgia corporation with its principal place of business in Atlanta, Georgia.  During the Relevant Period, SunTrust was a Star member and represented to the Federal Reserve Board that it (along with certain other Defendants named herein) would conduct Star's activities, and would own more than five percent of its voting shares.  Crestar Financial Corporation (a subsidiary that subsequently merged into SunTrust) was entitled to appoint outside directors to Star's Board of Directors prior to February 1, 2001.   The Crestar appointee represented the interests of SunTrust on Star's Board. During the Relevant Period, SunTrust has offered deposit accounts and other banking services, including ATMs, to the general public.

**G.     Wells Fargo/Wachovia**

26.     Defendant Wachovia Corporation ("New Wachovia") is a North Carolina corporation, with its principal place of business in Charlotte, North Carolina.  In 2001, another entity, also named Wachovia Corporation ("Old Wachovia"), merged into First Union Corporation ("First Union"), which subsequently renamed itself Wachovia Corporation ("New Wachovia").  During the Relevant Period, Old Wachovia and New Wachovia offered deposit accounts and other banking services, including ATMs, to the general public.  Both First Union and Old Wachovia represented to the Federal Reserve Board that they (along with certain other Defendants) would conduct Star's activities, and would own more than five percent of its voting shares.  Prior to February 1, 2001, both First Union and Old Wachovia were entitled to appoint outside directors to Star's Board of Directors.  On December 31, 2008, New Wachovia merged with Defendant Wells Fargo & Co.  Wells Fargo & Co. emerged as the surviving corporation and succeeded to all of the businesses, assets and obligations of Old Wachovia and New Wachovia.

27.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank"), a federally chartered bank with its principal place of business in San Francisco, California, is a wholly-

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

owned subsidiary of Wells Fargo & Co.  During the Relevant Period Wells Fargo Bank offered deposit accounts and other banking services, including ATMs, to the general public.  Prior to February 1, 2001, Wells Fargo Bank, N.A. was entitled to appoint outside directors to Star's Board of Directors.

28.   Defendant Servus Financial Corporation ("Servus Financial"), a corporation with its principal place of business in Herndon, VA, is a wholly-owned subsidiary of Wells Fargo & Co.  First Security Corporation, which in 2003 merged into Servus Financial Corporation, was entitled to appoint outside directors to Star's Board of Directors.

29.   Defendants New Wachovia, Wells Fargo Bank and Servus Financial are collectively referred to herein as "Wells Fargo."  During the Relevant Period, Wells Fargo has been a Star member.

## V.   AGENTS AND CO-CONSPIRATORS

30.   Each Defendant committed the acts alleged in this Complaint through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.

31.   Defendants' unlawful and intentional concerted actions have severely damaged and will continue to damage Plaintiffs and the members of the classes they seek to represent.

32.   Various other firms or corporations not named Defendants in this lawsuit, including but not limited to other Banks whose representatives have served on Star's Board of Directors prior to February 1, 2001, have participated as co-conspirators with Defendants in the offenses charged herein and have performed acts and made statements in furtherance thereof.

## VI.   DEFINITIONS

33.   "Automated Teller Machine" or "ATM" is a device consisting principally of a computer, cash dispensing equipment, a card reader, and security that enable the electronic processing or dispensing of banking services such as cash withdrawals, balance inquiries, account transfers and deposits.

843796.1

1          34.     "ATM Card" means a card, generally made of plastic with a data-encoded

2  magnetic strip, capable of initiating transactions at ATMs.

3          35.     "ATM Network" means a group of multiple ATMs and multiple Banks

4  which are interconnected by electronic or telecommunications means, to one or more computers,

5  processors or switches for the purpose of providing ATM services to the customers of member

6  Banks.  Only Foreign ATM Transactions are routed over ATM Networks.

7          36.     "ATM Owner" means an entity that owns and operates one or more ATMs.

8  An ATM Owner may be a Bank or a non-Bank, such as a retailer or other operating company.

9          37.     "ATM Switch Fee" means a fee paid to an ATM Network to compensate

10  the network for processing Foreign ATM Transactions.

11         38.     "Bank" means a financial institution in which customers deposit and/or

12  keep funds.  "Banks" include savings banks, thrifts, credit unions and all other financial

13  institutions.

14         39.     "Bank Defendants" are Defendants Bank of America, Chase, Citibank,

15  SunTrust, and Wells Fargo.  They hold themselves out as horizontal competitors, for purposes

16  including the provision of deposit accounts and other banking services, such as ATMs, to the

17  general public and in regulatory filings with various governmental entities.

18         40.     "Cardholder" is a holder of an ATM Card issued by a Bank.

19         41.     "Cash Withdrawal" means a transaction in which a Cardholder withdraws

20  funds from his or her deposit account via an ATM.  Cash Withdrawals comprise the vast majority

21  of ATM transactions.

22         42.     "Foreign ATM" means an ATM owned by an ATM Owner other than the

23  Cardholder's Bank.

24         43.     "Foreign ATM Fee" means a transaction fee imposed by a Bank on its own

25  customer for a Cash Withdrawal at a Foreign ATM.

26         44.     "Foreign ATM Transaction" means a Cash Withdrawal in which a

27  Cardholder uses an ATM owned by an entity other than his or her own Bank.

28

45.     "Interchange Fee" means a fee paid to the ATM Owner for a Foreign ATM Transaction.

46.     "Issuer" means a Bank that issues ATM Cards to Cardholders.

47.     "On-Us ATM Transaction" means a Cash Withdrawal at an ATM owned by the Cardholder's Bank.  On-Us ATM Transactions are not routed over Star.

48.     "Relevant Period" means the time period beginning July 2, 2000.  The Relevant Period has not yet ended, as Defendants' actions described herein are ongoing.

49.     "Star" means the Star ATM Network, currently owned by First Data Corporation.

50.     "Surcharge" means a fee imposed by the ATM Owner on a Cardholder for a Cash Withdrawal at a Foreign ATM.  Banks sometimes refer to it as a "convenience fee."

## VII.    CLASS ACTION ALLEGATIONS

51.     Plaintiffs Pamela Brennan and Darla Martinez bring this action under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of themselves and the two California classes.

a.      The first California class, "the California Damages Class," seeks only damages and is defined as:

> All persons, firms, corporations, partnerships, or other business entities, who (1) opened a deposit account with a Bank Defendant at a branch office in California and (2) paid a Foreign ATM Fee directly to one of the Bank Defendants, or any subsidiary or affiliate thereof, during the Relevant Period.  This Class does not include the Defendants, their parents, subsidiaries and affiliates, other co-conspirators, governmental entities, the judge in this action, or the judge's immediate family members.

b.      the second California class, "the California Injunctive Relief Class," seeks only injunctive relief and is defined as:

> All persons, firms, corporations, partnerships, or other business entities, who (1) opened a deposit account with a Bank Defendant at a branch office in California and (2) currently have an ATM card linked to a deposit account with a Bank Defendant.  This Class does not include the Defendants, their parents, subsidiaries and affiliates, other co-conspirators, governmental entities, the judge in this action, or the judge's immediate family members

52.     Plaintiff Terry Crayton brings this action under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of himself and the two non-California classes.

a.     The first non-California class, "the Non-California Damages Class," seeks only damages and is defined as:

> All persons, firms, corporations, partnerships, or other business entities, who (1) opened a deposit account with a Bank Defendant at a branch office in the United States outside of California and (2) paid a Foreign ATM Fee directly to one of the Bank Defendants, or any subsidiary or affiliate thereof, during the Relevant Period. This Class does not include the Defendants, their parents, subsidiaries and affiliates, other co-conspirators, governmental entities, the judge in this action, or the judge's immediate family members.

b.     The second non-California class, "the Non-California Injunctive Relief Class," seeks only injunctive relief and is defined as:

> All persons, firms, corporations, partnerships, or other business entities, who (1) opened a deposit account with a Bank Defendant at a branch office in the United States outside of California and (2) currently have an ATM card linked to a deposit account with a Bank Defendant. This Class does not include the Defendants, their parents, subsidiaries and affiliates, other co-conspirators, governmental entities, the judge in this action, or the judge's immediate family members.

53.     Plaintiffs do not know the exact size of the Classes, since such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, class members are so numerous and geographically dispersed as to render joinder of all class members impracticable.

54.     There are questions of law or fact common to the Classes, including, but not limited to the following:

a.     Whether Defendants engaged in a contract, combination and conspiracy to fix, raise, maintain, or stabilize Interchange Fees in California and throughout the United States;

b.     Whether Defendants collectively adopted and enforced an operating rule mandating payment of Star's Interchange Fees, whether Star members agreed to abide by this rule, and all other Star operating rules as a condition of membership of Star;

- 11 -

1              c.      Whether Defendants' contract, combination and conspiracy to fix,

2     raise, maintain or stabilize Interchange Fees is an unreasonable restraint of trade;

3              d.      The relevant product and geographic market for assessing

4     Defendants' conduct;

5              e.      Whether Defendants' conduct caused Foreign ATM Fees to be set

6     at artificially high and supra-competitive levels;

7              f.      Whether Defendants' conduct injured Plaintiffs and the other

8     members of the Classes; and

9              g.      For the Injunctive Relief Classes, whether Plaintiffs and other

10     members of the Classes are entitled to injunctive relief.

11          55.     These and other questions of law and fact are common to the Classes and

12     predominate over any questions affecting only individual class members.

13          56.     Plaintiffs' claims are typical of the claims brought on behalf of the Classes

14     because they paid Foreign ATM Fees directly to one or more of the Defendants.

15          57.     Plaintiffs will represent the interests of the Classes fairly and adequately in

16     that Plaintiffs are members of the Classes they seek to represent and their interests do not conflict

17     with those of any other members of the Classes.  Furthermore, Plaintiffs have retained competent

18     counsel experienced in antitrust and other class action litigation.

19          58.     The prosecution of separate actions by individual members of the Classes

20     would create a risk of inconsistent or varying adjudications, establishing incompatible standards

21     of conduct for Defendants.

22          59.     Defendants have acted, and refused to act, on grounds generally applicable

23     to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a

24     whole.

25          60.     Class certification is superior to alternative methods for the fair and

26     efficient adjudication of this controversy.  Prosecution as a class action will avoid repetitious

27     litigation.

28

## COUNT I
### (Violation of Section One of the Sherman Act, 15 U.S.C. § 1)
### (Against All Defendants)

61.     Plaintiffs incorporate by reference and reallege each and every allegation contained in paragraphs 1 through 60 above as though fully set forth herein.

**A.     Interstate Trade And Commerce**

62.     During the Relevant Period, Defendants and their co-conspirators engaged in various business activities, including activities related to Foreign ATM Transactions, throughout the United States.  Star is the largest ATM Network in the country, processing approximately 69 million Foreign ATM Transactions per month throughout the United States.

63.     At all relevant times, Defendants have operated in interstate commerce, and their practices at issue in this litigation have affected interstate commerce.

**B.     Development Of ATM Networks**

64.     Banks introduced ATMs in the 1970s to dispense cash on bank premises and give customers greater access to their deposit accounts while cutting costs, especially on human tellers.  Subsequently, Banks introduced off-premises ATMs.

65.     Banks later established so-called "regional" shared ATM Networks, such as Star, Honor, MAC, Cash Network, NYCE and Pulse, in various states and regions throughout the country.  Banks did so to provide customers with greater access to ATMs via Foreign ATM Transactions.  Through the end of the 1980s, over 150 regional shared ATM Networks were established.

66.     The geographic scope of the regional networks was generally circumscribed by the geographic area in which their member Banks operated.  To provide their customers with nationwide access to ATMs, certain Banks established, and many others joined, the Plus and CIRRUS ATM Networks, which were national in scope.  ATM transactions were routed through the national networks when cardholders' transactions occurred outside the geographic area serviced by their respective regional networks.  For that reason, the national networks were deemed the ATM Network of last resort.

67.     An ATM Network, such as Star, can have several thousand members or participants, including both Banks and non-Bank ATM Owners.  Banks may own ATMs and issue ATM Cards while non-Banks may own ATMs but do not issue ATM Cards.  Membership in the network is typically open only to Banks.  Non-Bank ATM Owners are typically not network members and have virtually no role in establishing network policies, but are bound by those policies.

68.     Banks participate in ATM Networks, such as Star, so that the Banks' customers are able to use ATMs at many more locations than one Bank alone could deploy.

69.     As a result of industry consolidation, there are now approximately 25 ATM Networks with the market dominated by a few networks, of which Star is the largest.

### C.     Star

#### 1.     Star's Origins

70.     In approximately 1984, twelve California Banks established Star.  Star provided ATM Network services, including the ability to make Cash Withdrawals at Foreign ATMs, in several western states, including California and Arizona.  Each of those Banks owned shares of Star stock, but membership was open to all Banks.  Upon information and belief, shares in Star were issued to additional member Banks.

71.     Star grew exponentially in membership size, transaction volume and geographic coverage primarily through mergers with other regional ATM Networks, and not as a result of unique product development or superior competitive practices.

#### 2.     Star Growth Through Consolidations and Mergers

72.     Star's first significant merger was consummated on or around February 1, 1999, when Star merged with the Honor ATM Network.  As result of that merger, Star's geographic area of operation expanded to include the southeastern United States, including Florida and Georgia.  In addition, Star significantly increased its numbers of member Banks and Cardholders.

73.     Just two years later, on February 1, 2001, Concord – the owner of the MAC and Cash Station ATM Networks – acquired Star by purchasing all of the member Banks'

843796.1

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

ownership interests in Star.  As a result of that acquisition, Star's geographic area of operation expanded significantly to include the mid-Atlantic and mid-western United States.  In addition, Star again increased its numbers of Banks and Cardholders.

74.     Star now comprises approximately 306,000 ATMs and over 5,400 members nationwide.  Star processes far more Foreign ATM Transactions than any other ATM Network.

**D.     Star Is Not and Has Never Been an Economically Integrated Joint Venture**

75.     Star has never been an economically integrated joint venture:

a.     at all relevant times, Star's member Banks have competed with each other to offer deposit accounts to consumers, and in several other relevant contexts as well;

b.     Star's member Banks have never transferred any of their ATM-related assets to Star;

c.     Star's member Banks have never pooled their revenues or expenses associated with Star Foreign ATM Transactions, as either ATM Card Issuers or ATM Owners. They have never divided their profits and losses generated by Foreign ATM Transactions and ATM deployment;

d.     significantly, since Concord's acquisition of Star, Star's member Banks have never shared the risk of loss, as well as the opportunities to profit, from Star's business; and

e.     at all relevant times, Star's member Banks have not owed each other a fiduciary duty to act for each others' economic benefit.

76.     Moreover, Star's fixed Interchange Fee is not a fee for the service that Star sells.  Star sells ATM Network processing services (authorization, clearance and settlement) to its members and participants.  Star does not receive *any* portion of the Interchange Fee.   It has merely, in collusion with the Bank Defendants, established and maintained an illegal rule requiring that its co-conspirators pay *each other* Interchange Fees.  Star is paid only Switch Fees for its services, by Cardholders' Banks.  Those fees are legal, and entirely separate and apart from Interchange Fees.  Setting Interchange Fees is not a core activity of Star.

- 15 -

1    **E.    Star's Fixed ATM Interchange Fees Serve No Pro-Competitive Purpose**

2          77.    Defendants' fixed Interchange Fees are not necessary to accomplish any

3    procompetitive benefit of Star.  Even if some procompetitive benefit were achieved through fixed

4    Interchange Fees, that benefit is outweighed by the anticompetitive effects of fixed Interchange

5    Fees.

6          78.    Interchange Fees were, and are, fixed by Star and its members.  The

7    original alleged purpose of Interchange Fees was to compensate ATM Owners for the costs of

8    providing cash to other Banks' customers.  Some ATM Networks even retained third parties, such

9    as accounting firms, to attempt to determine the amount of those costs.

10         79.    Cardholders' Banks initially considered ATMs to be primarily a source of

11   costs savings, and fixed Interchange Fees to be a lesser cost of achieving those savings.

12   However, Banks soon began to charge their Cardholders for Interchange Fees, by marking up

13   Interchange Fees and renaming them "Foreign ATM Fees."  They applied Foreign ATM Fees to

14   Cash Withdrawals at ATMs other than their own.  Cardholders could withdraw their own money

15   without charge only at their own Banks' ATMs (On-Us ATM Transaction).

16         80.    Foreign ATM Fees were, and are, imposed by every Bank Defendant Star

17   member, and Foreign ATM Fees were and are markups of Interchange Fees.

18         81.    Until 1996, fixed Interchange Fees and Foreign ATM Fees were the sole

19   sources of revenue on Foreign ATM Transactions for Bank Issuers and ATM Owners.  That is

20   because ATM Owners were effectively prohibited from Surcharging for Cash Withdrawals as a

21   result of rules imposed by the networks.

22         82.    The networks, including Star, dropped their long-standing bans against

23   Surcharges in April 1996.  This effectively permitted Surcharging on Foreign ATM Transactions

24   over any network, including Star.

25         83.    As a result, ATM Owners quickly imposed Surcharges.  For example, in

26   January 1997, Bank of America and Wells Fargo imposed Surcharges of $1.50 per transaction on

27   non-customers at their combined 12,000-plus ATMs.  That month, Bank Network News reported

28   that ATM Owners were imposing Surcharges at 35 percent of ATMs nationwide.  Since then,

1   Surcharge rates have risen dramatically.  Between April 1999 and October 2008, the percentage

2   of ATM Owners imposing surcharges increased from 95 to 99 percent, and the average Surcharge

3   amount rose from $1.37 to $1.97.  Today all Bank Defendants impose Surcharges at their ATMs

4   and their average charge exceeds two dollars, with Bank of America and Citibank charging three

5   dollars.

6          84.     With the advent of Surcharges, ATM Owners have been able to

7   independently set the level of their compensation, and not only recover the costs of Foreign ATM

8   Transactions, but earn profits as well.  Unlike Interchange Fees, these Surcharges are set

9   independently and competitively, rather than collusively fixed.

10          85.     Because fixed Interchange Fees were no longer necessary to compensate

11   ATM owners as of 1997, the Plus ATM Network (owned by Visa) proposed eliminating them

12   that year.  Similarly, the Pulse ATM Network considered eliminating Interchange Fees and in

13   2001, the president and CEO of Pulse suggested that Interchange Fees "may be an anachronism."

14          86.     In approximately 1999, a senior Star employee also proposed eliminating

15   Star's fixed Interchange Fee to Star's founder and President Ron Congemi.

16          87.     Other industry participants, including the Bank Defendants, have suggested

17   that fixed Interchange Fees are unnecessary.  For example, in 1999, Wells Fargo considered

18   several alternatives to the then-existing fee structure in the ATM industry, including eliminating

19   network-fixed Interchange Fees and Foreign ATM Fees.

20          88.     Yet no ATM Network has eliminated Interchange Fees because Banks do

21   not want to lose the significant revenue that they earn through Foreign ATM Fees, which would

22   be significantly lower or non-existent absent Interchange Fees.  In fact, Tony Hayes, a senior

23   associate of a Bank consulting firm that serves several networks including Star, NYCE, and

24   Pulse, was quoted in the March 26, 1998 edition of Bank Network News as saying, "No one is

25   talking seriously about getting rid of interchange.  Why endanger both incomes?"

26          89.     Mandatory fixed Interchange Fees are unnecessary to the efficient

27   operation of Star.  Interchange Fees neither enhance nor promote competition between ATM

28

843796.1

- 17 -

1   Networks, or within Star's membership.  Neither Star nor any other ATM Network uses

2   Interchange Fees as a competitive tool.

3          90.    Mandatory fixed Interchange Fees are not necessary to the efficient

4   operation of an ATM Network.  Defendant First Data's Australian subsidiary Cashcard ATM

5   Network is in the process of eliminating Interchange Fees.  In that network, ATM Owners will

6   recoup their costs and earn profits on Foreign ATM Transactions via Surcharges only.

7          91.    In December 2007, the European Commission held that MasterCard's

8   Interchange Fees for credit and debit card transactions were illegal under the European Union's

9   equivalent to the Sherman Act, finding that MasterCard's payment card network could operate

10  efficiently without them.  *See* Commission Decision (E.C.) COMP/34/579 of 19 December 2007

11         **F.     Star's Illegal Fixed Interchange Fees**

12         92.    Beginning before the Relevant Period, Defendants and their co-

13  conspirators engaged in a continuing contract, combination and conspiracy to restrain trade and

14  commerce unreasonably in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The

15  unlawful contract, combination and conspiracy continue to the present.

16         93.    The contract, combination and conspiracy in violation of Section 1 of the

17  Sherman Act consists of a continuing agreement among the Defendants and their co-conspirators

18  to fix, raise, maintain, or stabilize at artificially high levels the Interchange Fees that the Bank

19  Defendants charge for Foreign ATM Transactions.  Those transactions have resulted in the

20  payment of artificially-inflated Foreign ATM Fees directly from Cardholders to Defendants and

21  their co-conspirators.

22         94.    Bank Defendants, acting through Star's Board of Directors, collectively

23  adopted and enforced Star's Operating Rules mandating payment of Interchange Fees.  All Star

24  members agree to abide by this rule, and all other Star Operating Rules, as a condition of

25  membership in Star.

26         95.    From Star's inception through January 31, 2001, Star and its Board of

27  Directors conspired to fix, through a concert of action, Star's Interchange Fees.  Pursuant to this

28  illegal agreement, each member Bank agreed to pay the fixed Interchange Fees.

1    96.    For example, on October 27, 1989, the Board of Directors, including

2    representatives of Citibank and Bank of America, fixed Star's Interchange Fees at $0.45 for "on-

3    premise" transactions and $0.55 for "off-premise" transactions.

4    97.    The Board repeatedly re-affirmed and extended its price-fixing, including

5    in the instances when Star acquired new networks.  For example, according to notes from an

6    April 8, 1999, Executive Committee Meeting of H&S Holding Company, Star's President and

7    CEO, Ronald Congemi, advised the Committee that "interchange fee structure was a matter

8    reserved for decision by the full [Star] board."

9    98.    At a meeting on February 9-10, 2000, the Board, comprised of employees

10   and agents of the Banks that controlled Star, voted again to fix Interchange Fees:  at $0.45 for on-

11   premise transactions and $0.55 for off-premise transactions, effective December 1, 2000. That

12   vote raised Interchange Fees for transactions at ATMs connected to the recently-acquired Honor

13   network, which had previously been set at $0.40 for both on- and off-premises transactions.

14   99.    At that time, each of the Bank Defendants had representatives on Star's

15   Board.  Each of the Bank Defendants agreed to the price fix and agreed to abide by it.

16   100.



22   In other words, even after the Star-

23   Concord merger, the Bank Defendants effectively controlled Star/Concord's setting of

24   Interchange Fees.

25   101.    Indeed, in consideration of the Star-Concord merger, the Bank Defendants

26   and their principals, and their co-conspirators received approximately ten percent of the voting

27   stock in Concord.

28

102.    Defendants have perpetuated and maintained the price-fixing mechanism that has been in place since Star's inception.

103.    Until February 1, 2001, Defendants agreed that they would pay Interchange Fees at the price fixed by the Board of Directors.  Since February 1, 2001, that same price-fixing agreement effectively remains in place, as Star's members have continued to fix Star's Interchange Fees.  For example, the Star Advisory Board, consisting of member Banks, not only "recommended, reviewed and approved" "revised fees" for the 2004 fee schedule, the Advisory Board also determined that these "revised fees" should be delayed due to industry conditions.  Moreover, Star's former President Ron Congemi solicited the input of Star's Advisory Board members – consisting of Star's member Banks – in analyzing and considering changes to Interchange Fees and other network fees, rules (including Operating Rules), and procedures.

104.    At all relevant times, Bank Defendants knew that Star contemplated that each card-issuing member Bank would agree to charge and to pay the same fixed Interchange Fees.  Banks Defendants also knew that Star invited them to agree to charge the same fixed Interchange Fees.

105.    At all relevant times, Bank Defendants have agreed to pay, and do pay, fixed Interchange Fees as required by Star's Operating Rules.  Moreover, at all relevant times, the Bank Defendants knew that the other members of Star agreed to pay the fixed fees, and each, with that knowledge, continued to agree to participate and did participate in the price-fixing.

106.    At all relevant times, the Defendants continued to participate in the conspiracy and reap the benefits of supracompetitive Interchange Fees.  At no time did any of the Defendants take the steps necessary to withdraw publicly from the conspiracy or otherwise abandon it.  To the contrary, Interchange Fee levels, as fixed by Defendants before the acquisition, remained the same until 2003, when they were modified by a mere penny.  Since then, their levels have not changed.

107.    At all relevant times, Star's fixed Interchange Fees have been set in stone:

- 20 -

1   they are immutable and non-negotiable.  They are not "default" fees.  No Star member has ever

2   paid an Interchange Fee for even a single transaction that deviated from the fixed Interchange

3   Fees set forth in Star's schedule of fees.

4          108.    The aforesaid contract, combination and conspiracy had the following

5   anticompetitive effects, among others:

6                  a.      Foreign ATM Fees have been maintained at artificially high levels;

7                  b.      ATM Cardholders who have used Foreign ATMs have been

8   deprived of the benefits of free and open competition;

9                  c.      Price competition has been unreasonably restrained and suppressed;

10  and

11                 d.      The Defendants' conduct has injured the Plaintiffs in their business

12  and property.

13         109.    The Defendants' conduct, undertaken for the purpose of fixing prices and

14  restraining competition, unreasonably restrains trade in violation of  Section One of the Sherman

15  Act, 15 U.S.C. § 1.

16     **G.    Harm To Competition**

17         110.    Despite being unnecessary to compensate ATM Owners, or for the efficient

18  operation of Star, Defendants have continued to impose fixed Interchange Fees because the Bank

19  Defendants mark them up to set Foreign ATM Fees, which generate substantial revenues for

20  Bank Defendants.

21         111.    The imposition of a mandatory fixed Interchange Fee directly impacts the

22  price that consumer Cardholders pay for Foreign ATM Transactions.   If Defendants had not

23  collusively imposed and fixed Interchange Fees, free and open competition in the marketplace

24  would have resulted in significant reductions to, or the elimination of, Foreign ATM Fees, and the

25  price consumers paid to get their own money would have been substantially reduced.

26         112.    Fixed Interchange Fees have not incentivized or promoted the deployment

27  of additional ATMs since 1996.  Rather, according to industry experts, Surcharging, and not

28  Interchange Fees, facilitated the quantum leap in ATM deployment.  In fact, Surcharging led to

843796.1                                                    THIRD AMENDED COMPLAINT FOR
                                                            DAMAGES AND EQUITABLE RELIEF

1   the deployment of an additional 250,000 ATMs. Dove Consulting's 2006 ATM Deployer Study,

2   sponsored in part by Star, shows that "ATM deployment growth exploded" as a result of

3   Surcharging.

4       **H.       Relevant Product And Geographic Markets**

5               **1.       Provision of Foreign ATM Transactions Routed Over ATM Networks**

6               113.    One relevant product market for assessing Defendants' collusive conduct is

7   the provision of Foreign ATM transactions routed over ATM networks. The Defendants should

8   compete in this market, and but for their agreement they would compete by lowering or

9   eliminating Interchange Fees and Foreign ATM Fees. The agreement on Interchange fees has

10  artificially increased, maintained, or stabilized Star's Interchange Fee, resulting in the Bank

11  Defendants' Foreign ATM Fees being set at supra-competitive levels. Defendants are liable for

12  this conduct regardless of whether they possess "market power" in the market for the provision of

13  Foreign ATM transactions routed over ATM networks. Nevertheless, they do have market

14  power, as evidenced by their ability to raise prices above competitive levels.

15              **2.       Provision of Foreign ATM Transactions Routed Over Star**

16              114.    Another relevant product market for assessing Defendants' collusive

17  conduct is the provision of Foreign ATM Transactions routed over Star.

18              115.    The Bank Defendants, which are some of the largest Banks in the United

19  States, compete directly with each other to offer deposit accounts to consumers. A substantial

20  feature of such accounts is consumers' ability to access and withdraw their own funds upon

21  demand. Upon opening deposit accounts with Bank Defendants, consumers are given ATM

22  cards, which are linked to those accounts, to use at Star-branded ATMs to withdraw funds. Upon

23  information and belief, consumers cannot obtain ATM Cards without first opening deposit

24  accounts.

25              116.    Because ATM Cards are issued primarily for withdrawing funds from or

26  depositing funds into deposit accounts, the relevant product market for Foreign ATM

27  Transactions routed over the Star Network would not exist without the primary market for deposit

28

1    accounts.  The relevant product market is wholly derivative from and dependent on the market for

2    deposit accounts.

3              117.    ATM Cards allow consumers to withdraw their own funds at ATMs other

4    than those owned by the Bank that issued the card, *i.e.*, to initiate Foreign ATM Transactions.

5    However, the Bank Defendants, and not consumers, determine that those transactions will be

6    routed over Star.  The Bank Defendants and Star fix Interchange Fees that consumers

7    unknowingly pay for Foreign ATM Transactions routed over Star.  When Interchange Fees are

8    increased, Foreign ATM Fees are increased as well.

9              118.    When consumers withdraw their own funds from Foreign ATMs, they

10   cannot choose: (1) the ATM Network over which those transactions are routed or (2) to avoid

11   paying or limiting fixed Interchange Fees associated with the transactions.  Consumers are locked

12   into both using Star and paying fixed Interchange Fees for those transactions.

13             119.    Consumers withdrawing their own funds through Foreign ATM

14   Transactions routed over Star have no adequate substitute when they seek to withdraw cash from

15   their deposit accounts.  Foreign ATM Transactions over Star provide consumers with access to

16   cash at all times, regardless of where those consumers are located.  Consumers' ability to

17   withdraw cash at a particular Bank Defendant's branches is limited both by the Bank's business

18   hours and branch locations.  Similarly, consumers' ability to withdraw cash at ATMs owned by a

19   particular Bank Defendant is circumscribed by the geographic locations where the Bank's ATMs

20   are deployed.  Although consumers can get cash back on PIN debit transactions at many retail

21   establishments, those transactions require a purchase and are limited by the establishment's

22   business hours and rules which limit the amount of cash back they may give to a consumer for

23   such transactions.

24             120.    To avoid paying Star's supra-competitive Interchange Fees, consumers

25   must switch their deposit accounts to banks which do not route their foreign ATM transactions

26   over Star.  Switching banks, however, does not guarantee that consumers will avoid paying Star's

27   fixed Interchange Fee.  Due to market imperfections, consumers cannot determine the ATM

28   network over which their foreign ATM transactions will be routed upon opening new deposit

accounts.  Banks, including Bank Defendants, generally do not disclose this information to consumers and it is generally neither disclosed on Banks' web sites nor in literature describing various deposit accounts.  Moreover, many consumers are unaware of a Banks' Foreign ATM Fees, again due to market imperfections.  Accordingly, when consumers switch their deposit account from one Bank Defendant to another, or to one of the approximately 5,400 other member Banks of Star, they may unknowingly continue to pay Star's fixed Interchange Fees.  In fact, in some geographic areas Star is dominant to the point that consumers would be hard-pressed to avoid paying Star's fixed Interchange Fee.

121.    Consumers are economically locked into their deposit accounts because the costs of switching to a new bank exceed the amounts they pay in overcharges on the Foreign ATM Fees.  These switching costs are both monetary and non-monetary.

122.    Monetary switching costs and impediments include, but are not limited to: (1) maintenance fees that Banks charge when consumers do not maintain minimum amounts in their deposit accounts, which Banks may waive for consumers who have multiple accounts within the same Bank; (2) forfeiture of "reward points" given to consumers for having linked credit or debit accounts; (3) fees to obtain checks for new accounts; (4) funds that must remain in existing accounts to ensure that outstanding checks and recurring automated payments clear; (5) funds that must remain in both existing and new accounts to satisfy minimum deposit amount requirements necessary to avoid monthly account fees; and (6) funds tied up in a new account placed on hold, up to one business day for amounts up to $5,000 and up to eight business days for amounts over $5,000.  *See* 12 U.S.C. § 4003.

123.    Non-monetary switching costs include, but are not limited to, the cost of time expended to: (1) investigate options and open new accounts, including the additional time that consumers must spend to verify their identities as required by the Patriot Act, 31 U.S.C. § 5318(l), 31 C.F.R. § 103.121; (2) close existing accounts; (3) notify parties (*e.g.*, monthly billers) to whom recurring payments are payable; (4) notify employer(s) and others to re-route direct deposits; and (5) learn the new Bank's online banking system.

124.     Consumers are aware that they also face a risk that mistakes or problems could occur when opening new accounts.  For example, Banks may make mistakes establishing and processing new accounts, which must be resolved before consumers have access to their funds.  Errors occur in the processing of automated payments to billers who fail to act promptly and accurately in processing new banking information from their customers.

125.     Even consumers who take steps to avoid these switching costs subject themselves to risks.  For example, consumers who leave insufficient funds in their existing accounts to clear outstanding checks and/or automated recurring payments are charged penalties by Banks and whoever presents the dishonored checks for payment.   Thus, while it is possible for consumers to switch Banks, the costs of and risks associated with  switching are significant, and generally exceed any amounts saved in the short term by avoiding supra-competitive Foreign ATM Fees.

126.     In addition, consumers -- including Bank customers -- are often reluctant to switch from a product and/or service to which they are accustomed and about which they are knowledgeable, a phenomenon known as "cognitive lock-in" among behavioral economists.  For example, customers who learn to use a Bank's online banking web site efficiently become "cognitively loyal" to that site, and will resist having to master a new one.   Thus, even when consumers are dissatisfied with a particular Bank's services, real and perceived habits developed from repeat usage of those services significantly limit the likelihood that those consumers will switch Banks.  Banks are well aware of cognitive switching costs and exploit them to retain customers.

127.     Switching costs and cognitive lock-in increase the price differentials that consumers will tolerate before changing Banks.  Because switching costs are high compared to the lower transaction price that consumers pay for each Foreign ATM Transaction by switching Banks, consumers are economically locked into their Bank.  Cognitive lock-in has a similar effect.  Star's fixed Interchange Fee can thus be set at a level that is both profitable to the Bank Defendants and supra-competitive, even if some of the Bank Defendants' customers are willing and able to overcome switching costs and cognitive lock-in effects to change Banks.  Once locked

- 25 -

1  into their deposit accounts, class members are required to pay Star's fixed Interchange Fee as part

2  of its Foreign ATM Fee.

3         128.  ATM Networks other than Star are not substitutes for Foreign ATM

4  Transactions routed over Star.  When withdrawing cash at Foreign ATMs, consumers have no

5  choice regarding the ATM Networks over which the transactions are routed.  The Bank

6  Defendants alone dictate that those transactions are routed over Star.

7         129.  The existence of other ATM Networks does not discipline the level at

8  which Star's Interchange Fees are fixed.  Star does not compete with other ATM Networks as to

9  Interchange Fees.  As a result, and as a consequence of switching costs, cognitive lock-in and

10 limited disclosure of Foreign ATM Fees, Star is able to sustain a small but significant, non-

11 transitory increase in Interchange Fees without forfeiting Foreign ATM Transactions to other

12 networks.  Indeed, Star has for years maintained Interchange Fees at artificially stable and supra-

13 competitive levels.

14       130.  The Defendants have market power in the market for Foreign ATM

15 Transactions routed over Star.  Star's members are able to raise the price of a Foreign ATM

16 Transaction to a supra-competitive level through fixed Interchange Fees.

17       131.  The total price consumers pay for Foreign ATM Transactions routed over

18 Star is comprised of Foreign ATM Fees (the marked-up fixed Interchange Fee), plus Surcharges.

19 However, consumers are informed only of the level of the Surcharge at the time of the

20 transaction.  When consumers are informed of Surcharges, they have the option of cancelling

21 their transactions and shopping for machines with better prices.  In stark contrast, consumers are

22 not informed about fixed Interchange Fees, or marked-up Foreign ATM Fees at the time of the

23 transaction, and therefore do not have the option to cancel their transaction and shop for machines

24 with better prices.  Consumers are informed about Foreign ATM Fees only in monthly

25 statements, well after their transaction dates.  Consumers are more sensitive to information,

26 including prices, when it is transparent.  Accordingly, consumers are generally more sensitive to

27 changes in Surcharges than changes in Foreign ATM Fees.

28

843796.1

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF

132.    Because consumers are more sensitive to changes in Surcharges than to changes in Foreign ATM Fees, relatively large increases in Foreign ATM Fees would reduce the demand for ATM transactions by a relatively small amount, while relatively small increases in Surcharges would decrease the demand for ATM transactions by a relatively large amount.  As a result, Star's members have increased the prices of Foreign ATM Transactions, and, in the aggregate, increased their profits, through collusively set and imposed mandatory Interchange Fees.  The effect has been to shift consumer payments from transparent Surcharges to opaque and hidden Foreign ATM Fees.  Thus, Defendants have exercised market power by raising the total price of Foreign ATM Transactions to a supra-competitive level.

133.    Defendants' fixed Interchange Fees are not subject to normal competitive pressures.  Consumers cannot exert any downward pressure on Interchange Fees, and hence cannot exert any downward pressure on Foreign ATM Fees.  At the time of their transactions, they have no freedom to choose the ATM Network over which the transaction is routed.  They tend to be unaware that they are paying Interchange Fees or that Defendants have fixed the amounts of those fees.  Consumers have no freedom to avoid paying fixed Interchange Fees. Absent providing consumers with the total cost (including the marked-up Interchange Fee) of Foreign ATM Transactions at the time of the transactions, consumers cannot make the most rational decisions which would lead to the most economically efficient outcome.   Consumers therefore cannot and do not constrain the levels of Star's Interchange Fees.

134.    During the Relevant Period, Defendants have also jointly controlled price, and thereby exercised market power, by fixing Star's Interchange Fees at supra-competitive levels without regard to costs.

135.    Star's fixed Interchange Fees have never been based on natural market forces or the costs of providing cash to other Banks' customers.  When the fees were originally fixed at $.40 for on-premises and $.60 for off-premises ATMs in 1984, they were set based on cost data and the Banks' limited understanding of difference in costs, if any, related to on- and off-premises machines.  Star has never determined or had an independent party analyze the costs associated with Foreign ATM Transactions.  When, in 1990, Star and its Bank members fixed

1    Interchange Fees at $.45 for on-premises and $.55 for off-premises ATMs, they did not do so

2    based on any cost study.  Cost has never been a consideration in the levels of Star's fixed

3    Interchange Fees.

4          136.    STAR's Interchange Fees have continued to be fixed at a price far above

5    the costs of providing cash to other Banks' customer.  As of 1993, at least one ATM Network

6    estimated that cost to be approximately 25 cents per transaction.  That cost has only decreased

7    over time as the costs of technology – especially telecommunications costs – have declined

8    rapidly.

9          137.    Nevertheless, Star's fixed Interchange Fees remained static through 2002.

10   In 2003, Star's fixed Interchange Fees were adjusted by a mere penny, to $.46 for on-premises

11   ATMs and $.54 for off-premises ATMs.  Cost was not a reason for this *de minimis* change.  Star's

12   fixed Interchange Fees have been set well above and without regard to costs.

13         138.    Defendants' control over price is further evidenced by the significant

14   increase in the fixed Interchange Fees charged on the former Honor and MAC networks.  In

15   approximately February 2000, Star's Board of Directors voted and agreed to fix and raise Honor's

16   Interchange Fees from a flat $.40 per transaction to Star's then prevailing rates of $.45 for on-

17   premises ATMs and $.55 for off-premises ATMs effective December 2000.  This price increase

18   was unrelated to cost.

19         139.    Similarly, in 2002, Interchange Fees on the former MAC network were

20   fixed and raised significantly from a flat $.38 to Star's then prevailing rates of $.45 for on-

21   premises ATMs and $.55 for off-premises ATMs.  This price increase was unrelated to costs.

22         140.    Moreover, because consumers pay fixed Interchange Fees, no Bank

23   Defendant or other Bank members of the former Honor or MAC ATM networks left Star because

24   of these increases in Interchange Fees.

25         141.    The structure of the banking/ATM Network industry encourages

26   consolidation and discourages new entrants.  Banks require high start-up costs (for example,

27   capitalization, regulatory compliance, and brick-and-mortar branches) and have relatively low

28   marginal costs.  ATM Networks exhibit economies of density or economies of ubiquity within a

1   geographic area (that is, the more ubiquitous, the more valuable the network).  This encourages

2   consolidation and inhibits new entrants, because a new entrant is at a substantial disadvantage to

3   an established, wide-spread network (such as Star).  In fact, the market has significantly

4   consolidated, from 127 ATM networks in 1984, to 40 in 2002, to 25 in 2006.

5            142.    The geographic dimension of both alleged relevant product markets is any

6   location in the United States where a consumer has been able to conduct a Foreign ATM

7   Transaction over Star during the Relevant Period.

8            143.    For the purpose of forming and effectuating the aforesaid contract,

9   combination and conspiracy, the Defendants and their co-conspirators did those things which they

10  combined and conspired to do, including, among other things, fixing and maintaining Interchange

11  Fees.

12  **I.      Star's Member Banks Have No Ability Or Incentive To Seek Redress For
           Star's Fixed Interchange Fees**

13

14           144.    There is no realistic possibility that any member Bank that both issues

15  ATM Cards and owns ATMs, which is the vast majority of members including all Bank

16  Defendants, would sue Star over fixed Interchange Fees, because they both pay and receive

17  Interchange Fees.  The Bank Defendants also mark-up the Interchange Fees to compute Foreign

18  ATM Fees, which are a significant source of their revenue.  Accordingly they benefit from fixed

19  Interchange Fees.  They are also co-conspirators.[1]

20                          **PRAYER FOR RELIEF**

21           WHEREFORE, Plaintiffs pray for the following relief:

22           1.      That the Court determine that each class should be certified under Rules

23  23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of

24  this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the members of

25  the Damages Classes;

26           2.      That the Court adjudge and decree that Defendants' actions violate Section

27  1 of the Sherman Act, 15 U.S.C. § 1;

28  ---

[1] Pursuant to *Parrino v. FHP, Inc*., 146 F.3d 699, 704 (9th Cir. 1998), Plaintiffs preserve all appealable rights relating to dismissed claims and parties.

1          3.      That the Court adjudge and decree that Plaintiffs and each member of the

2    Damages Classes have sustained damages, and that the Court enter judgment in favor of Plaintiffs

3    and each member of the Damages Classes and against Defendants, and each of them, for damages

4    sustained;

5          4.      That the Court enjoin Defendants from combining or conspiring to fix,

6    raise, maintain or stabilize Interchange Fees, and from engaging in the wrongful practices alleged

7    in this Complaint;

8          5.      That the Court award Plaintiffs and other members of the Classes their

9    costs of suit, including reasonable attorneys' fees, as provided by law; and

10         6.      That the Court grant Plaintiffs and the other members of the Classes such

11   other, further and different relief as the nature of the case may require or as may seem just and

12   proper to this Court.

13

14

    Dated:  October 16, 2009          Joseph R. Saveri (SBN 130064)
15                                     Brendan P. Glackin (SBN 199643)
                                       LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
16                                     275 Battery Street, 30th Floor
                                       San Francisco, CA  94111-3339
17                                     (415) 956-1000

18                                     By:_____/s/ Joseph R. Saveri_____
19                                                     Joseph R. Saveri

                                       Merrill G. Davidoff
20                                     Bart D. Cohen
                                       Michael J. Kane
21                                     BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
22                                     Philadelphia, PA 19103
                                       (215) 875-3000
23

24
                                       By:_____/s/ Merrill G. Davidoff_____
25                                                Merrill G. Davidoff

26                                     Co-Lead Counsel for Plaintiffs

27

28

1

### DEMAND FOR JURY TRIAL

2

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

3

Civil Procedure, of all issues triable as of right by jury.

4

Dated:  October 16, 2009          Joseph R. Saveri (SBN 130064)

5                                  Brendan P. Glackin (SBN 199643)
                                   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

6                                  275 Battery Street, 29th Floor
                                   San Francisco, CA  94111-3339

7                                  (415) 956-1000

8                                  By:_____/s/ _Joseph R. Saveri_____
                                                     Joseph R. Saveri

9
                                   Merrill G. Davidoff

10                                 Bart D. Cohen
                                   BERGER & MONTAGUE, P.C.

11                                 1622 Locust Street
                                   Philadelphia, PA 19103

12                                 (215) 875-3000

13

14                                 By:_____/s/ _Merrill G. Davidoff_____
                                                Merrill G. Davidoff

15
                                   Co-Lead Counsel For Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF