IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ATM FEE ANTITRUST LITITGATION | No. C 04-2676 CRB<br>**ORDER** |
| _____/ | |

In this antitrust action, Plaintiffs challenge the legitimacy of the fixed interchange fee that one member of the Star ATM Network charges another member when a customer of the second member uses an ATM owned by the first. Now pending before the Court is Defendants' joint motion to dismiss Plaintiffs' Third Amended Complaint ("TAC") on the ground that Plaintiffs have again failed to allege a legally adequate "relevant market."[1]

Having held oral argument on May 14, 2010 and carefully considered the submissions of the parties, the Court hereby GRANTS in part and DENIES in part Defendants' joint motion. The Court finds that Plaintiffs' alleged single-brand, derivative aftermarket is not a legally cognizable relevant market. At the same time, the Court finds that Plaintiffs' "all ATM Networks" market is both legally cognizable and adequately pled. Plaintiffs' TAC is therefore sufficient to survive the pleadings stage.

///

///

---

[1] Bank of America, N.A. ("BANA") has also filed a motion to dismiss on grounds unique to it. The Court will address BANA's motion in a separate order.

**BACKGROUND**

I. The Star Network[2]

This case challenges the right of a non-proprietary network to set network-wide "interchange" fees that govern the amount of money paid by an ATM card issuer – generally a bank – to a foreign ATM owner when the ATM is used by the issuer's customer. Customers at most commercial banks receive ATM cards that allow them to make withdrawals from their accounts electronically. Typically, these ATM cards permit withdrawals not only from ATM machines at the bank where they hold their accounts, but also from ATM machines elsewhere. Such "foreign ATM transactions" involve four parties: (1) the "cardholder," *i.e.* the customer who retrieves money from the ATM machine; (2) the "card-issuer bank," *i.e.* that bank at which the customer holds an account and from which the customer has received an ATM card; (3) the "ATM owner," *i.e.* the entity that owns the ATM machine from which the customer withdraws money on his account; and (4) the "ATM network," *i.e.* the entity that administers the agreements between various card-issuer banks and ATM owners and thereby ensures that customers can withdraw money from one network member's ATM as readily as from another's.

Foreign ATM transactions involves multiple fees. Generally, a customer must pay two fees — one to the ATM owner for the use of that entity's ATM machine (known as a "surcharge"), and one to the bank at which he has an account (known as a "foreign ATM fee"). But that is not all. Out of the money that a customer pays directly to his own bank, the bank then also pays two fees. The first of the bank's fees is known as a "switch fee" and is paid directly to the ATM network. The second of the bank's fees — and the one at issue in this lawsuit — is known as an "interchange fee" and is paid directly to the owner of the foreign ATM. Since 2003, the interchange fee has been set at $0.46 for on-premise transactions (*i.e.*, transactions at ATMs deployed on a bank's premises), and $0.54 for off-premise transactions.

---

[2] The basic facts pled in the Plaintiffs' TAC are identical to those pled in Plaintiffs' SAC. As a result, the following overview of the Star Network is taken from the Court's September 4, 2009 Order Dismissing Plaintiffs' SAC.

2

In this case, Plaintiffs contest the legality of only the interchange fee. They contend that the manner in which this fee is set and administered violates antitrust laws. In their TAC, Plaintiffs allege that certain members of the Star ATM network had "fixed the interchange fee." TAC ¶ 1.

The Star Systems, Inc. ("Star") network of ATM services was founded by a number of banks over twenty years ago. TAC ¶ 70. Star has over 5,400 members nationwide. TAC ¶ 74. It is one of approximately twenty-five ATM networks in the country. TAC ¶ 69.

Until 1996, interchange fees and foreign ATM fees were the sole sources of revenue on foreign ATM transactions for bank issuers and ATM owners. TAC ¶ 81. In 1996, Star and other ATM networks dropped their bans against customer surcharges. TAC ¶ 82. As a result, ATM owners began imposing surcharges, with banks now charging users of foreign ATMs around one to three dollars per foreign transaction. TAC ¶ 83. Plaintiffs allege that those surcharges are artificially inflated because the Star network continues to impose an arbitrary interchange fee, which gets passed on to customers through the foreign ATM fees. TAC ¶ 93. Plaintiffs further allege that the interchange fee was set through an illegal agreement of the Defendants, who controlled Star's Board of Directors. TAC ¶¶ 92-109. Plaintiffs contend that the banks enforced their illegal agreement by requiring all Star members — both banks and non-banks that own ATMs in the network — to abide by the fixed interchange fee. TAC ¶ 67.

II.     Procedural History

On a previous motion to dismiss, this Court ruled that the Plaintiffs' allegations, if true, would establish that the Defendants had engaged in illegal price-fixing. *See Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127 (N.D. Cal. 2005) (Walker, J.). In its ruling, the Court first noted that the Plaintiffs' objection is not to the existence of an interchange fee, but rather to its fixed nature. *Id.* at 1132. In other words, Plaintiffs did not contend that it would be impermissible for a card-issuing bank to compensate foreign ATM owners, but only that they may not decide collectively what compensation to render. Further, the court noted that the Complaint had described a "naked" attempt to fix prices, as opposed to an attempt to fix

3

price that the Star network members determined was "ancillary" to a legitimate, procompetitive venture. *Id.* at 1133. In other words, Plaintiffs alleged that Defendants fixed the interchange fee because they could, not because a fixed fee was necessary to sustain the ATM network. Because the Defendants could not defend against such allegations of "naked price fixing" without invoking evidence that was beyond the scope of the Complaint, the Court denied the motion to dismiss. *Id.* at 1138.

Shortly after the ruling on the motion to dismiss, Defendants filed a motion for partial summary judgment on the ground that, as of February 2001, the Star network ceased to be owned by a group of banks but instead was operated by Concord as a proprietary network. Taking a different tack, the Court issued a Memorandum and Order on November 30, 2006, terminating Concord's motion and directing the parties to address the fundamental question of whether a per se analysis applies to this case. The Court observed that "if Defendants can set forth evidence to support plausible, procompetitive justifications for their agreement to fix the interchange fee," then the per se rule would not apply. Mem. & Order at 5 (Docket No. 360).

Defendants moved for summary judgment on August 3, 2007, having adduced evidence bearing on the applicability of the per se rule. In an order issued on March 24, 2008, the Court granted Defendants' motion and held that rule of reason analysis applies to this case, thereby determining that the price-fixing challenged by Plaintiffs is not the kind of naked horizontal restraint that lacks any redeeming virtue. *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1016-17 (N.D. Cal. 2008).

Given substantial uncertainty in the law regarding which mode of analysis to apply, the Court subsequently certified for appeal the issue of whether the per se or rule of reason rubric should be employed in this case. The Ninth Circuit declined to take the matter up, which led to Plaintiffs' SAC.

After Plaintiffs' filed their SAC, Defendants moved to dismiss it on a number of grounds, including that Plaintiffs had failed to properly allege a relevant market, as required by antitrust law. In their SAC, Plaintiffs had defined the relevant market as the "provision of

4

Foreign ATM Transactions routed over Star," which they identified as "wholly derivative from and dependent on the market for deposit accounts." SAC ¶¶ 119, 121. Defendants maintained that this single-brand, derivative aftermarket failed as a matter of law because the SAC lacked any allegations that consumers were locked into their deposit account relationship. Such lock-in was, in Defendants' view, a prerequisite to a finding that a derivative aftermarket exists.

In an order issued September 2009, the Court granted Defendants' motion to dismiss the SAC. The Court agreed with Defendants that the existence of customer "lock-in" was a crucial component of a derivative aftermarket theory and that Plaintiffs had failed "to plead a viable theory suggesting that once a customer signs up for a bank account, he is 'locked in' to that bank's services." Order at 18. Because Plaintiffs informed the Court at oral argument that they could add such allegations to a subsequent complaint, the Court granted Defendants' motion with leave to amend. *Id.*

III.     Plaintiffs' Third Amended Complaint

In response to the Court's Order, Plaintiffs submitted a Third Amended Complaint. In their TAC, Plaintiffs attempt to correct the deficiencies in their "relevant market" allegations by doing two things. First, they allege a second, broader relevant market, composed of all "ATM Networks," rather than just the Star Network. TAC ¶ 113.

Second, in an effort to bolster their previously alleged relevant market – i.e., the derivative aftermarket composed over only those transactions routed over the Star Network – they identify a number of alleged "monetary and non-monetary" switching costs that "economically lock[] in [bank customers to] their deposit accounts." TAC ¶ 121. According to Plaintiffs, the monetary costs that impede customers from switching banks include: (1) "maintenance fees that Banks charge when consumers do not maintain minimum amounts in their deposit accounts"; (2) "forfeiture of 'rewards points'"; (3) "fees to obtain checks for new accounts"; (4) "funds that must remain in existing accounts to ensure that outstanding checks and recurring automated payments clear"; (5) "funds that must remain in both existing and new accounts to satisfy minimum deposit amount requirements"; and (6)

5

1  "funds tied up in a new account placed on hold."  TAC ¶ 122.

2  The non-monetary costs include time expended to (1) "investigate options and open
3  new accounts"; (2) "close existing accounts"; (3) "notify parties . . . to whom recurring
4  payments are payable"; (4) "notify employer(s) and others to re-route direct deposits"; and
5  (5) "learn the new Bank's online banking system."  TAC ¶ 123.

6  Now pending before the Court is Defendants' joint motion to dismiss Plaintiffs' TAC.
7  Defendants maintain that Plaintiffs have again failed to plead a legally cognizable relevant
8  market.

## LEGAL STANDARD

10  A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests
11  the legal sufficiency of the pleadings.  *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.
12  1978).  A complaint may be dismissed for failure to state a claim where the factual
13  allegations do not raise the right to relief above the speculative level.  *Bell Atlantic v.*
14  *Twombly*, 550 U.S. 544, 555 (2007).  Conversely, a complaint may not be dismissed for
15  failure to state a claim where the allegations plausibly demonstrate that the pleader may be
16  entitled to relief.  *Id.*  In ruling on a Rule 12(b)(6) motion, a court must construe the
17  pleadings in the light most favorable to the plaintiff, and must accept as true all material
18  allegations in the complaint, as well as any reasonable inferences to be drawn from them.
19  *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

20  The allegations in the complaint may not evade antitrust requirements by merely
21  alleging a bare legal conclusion.  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729,
22  736 (9th Cir. 1987).  "[A] district court must retain the power to insist upon some specificity
23  in pleading before allowing a potentially massive factual controversy to proceed,"
24  particularly in light of the fact that "antitrust discovery can be expensive."  *Twombly*, 550
25  U.S. at 558 (internal citation and quotation omitted).  Plaintiffs alleging antitrust claims must
26  set forth enough "factual matter" to "nudge[] their claims across the line from conceivable to
27  plausible."  *Id.* at 570.

28  ///

6

**DISCUSSION**

The Defendants have collectively moved to dismiss Plaintiffs' TAC on the ground that neither of Plaintiffs' two alleged relevant markets are legally cognizable under antitrust law. The Court agrees with Defendants that Plaintiffs' single-brand, derivative aftermarket theory fails as a matter of law. However, the Court also finds that Plaintiffs' "all ATM Networks" market is both plausible and sufficiently pled. In particular, the Court finds that Plaintiffs have sufficiently alleged that the Defendants and Star possess market power in this broader market. The Court therefore GRANTS Defendants' motion to dismiss with respect to Plaintiffs' single-brand "relevant market," but DENIES the motion with respect to the broader "all ATM Networks" market.

A.   "Relevant Market" Principles

Under rule of reason analysis, "the plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the area of effective competition where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (internal citation and quotations omitted).

"There is no requirement that [the market definition] elements of the antitrust claim be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* The existence of a "relevant market" is typically a factual inquiry for the jury. *Id.* However, a complaint may be dismissed if the market definition is "facially unsustainable." *Id.*; *see, e.g., Tanaka*, 252 F.3d at 1063 (affirming dismissal where plaintiffs failed to identify an appropriate product market); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999) (affirming dismissal of monopolization claim where plaintiffs did not "sufficiently identify the markets affected by Defendants' alleged antitrust violations");

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1203 (N.D. Cal. 2008) (dismissing claim because plaintiff's assertion of a relevant market "contravenes the pertinent legal standards").

"For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered.'" *Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) (citation omitted). "[T]he relevant market must include the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Newcal*, 513 F.3d at 1045 (citation omitted). Plaintiffs must plead facts showing that their product market "bear[s] a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (citation omitted).

### B. Plaintiffs First Relevant Market: "Foreign ATM Transactions Routed Over the Star Network"

As in their SAC, Plaintiffs allege in their TAC that one "relevant product market for assessing Defendants' collusive conduct is the provision of Foreign ATM Transactions routed over Star." TAC ¶ 114. They define this market as "wholly derivative from and dependent on the market for deposit accounts." TAC ¶ 116. Thus, Plaintiffs allege that a single-brand, derivative market exists for "Star Network" foreign ATM transactions.

"[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue." *Newcal*, 513 F.3d at 1048. However, "[s]ingle brand markets are, at a minimum, extremely rare." *Psystar*, 586 F. Supp. 2d at 1198. "[C]ourts have usually rejected the claim that one brand is its own market when there are competing brands." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1073, 1078 n.6 (C.D. Cal. 1999). For the reasons explained below, the Court finds that this is not one of the "extremely rare" instances in which a valid single-brand market exists.

Plaintiffs' "Star Network"-only derivative aftermarket theory can be summarized in the following way: After entering the market for bank demand deposit accounts, consumers

8

choose a particular bank and open an account. The bank then issues its new customer an ATM card. If the customer's bank uses the Star Network, then the foreign ATM transactions that the customer conducts are routed over Star and the customer's bank incurs Star's supracompetitive interchange fee.

Per Plaintiffs' theory, the market for demand deposit accounts is a "foremarket" that gives rise to a "derivative aftermarket" consisting of foreign ATM transactions that are routed over the network that the customer's new bank has chosen. Moreover, because customers are "economically locked into" their chosen bank, they are "locked-in" to their bank's choice of foreign ATM network providers, which, in some cases, will be the Star Network. In other words, according to Plaintiffs, once a customer selects a bank that uses the Star Network to route foreign ATM transactions, that customer is "locked into" the Star Network because it would cost the customer too much to switch to a new bank that uses a different ATM network. In such cases, then, the other ATM networks are not "reasonably interchangeable" with the Star Network and the Star Network is its own "relevant market."

Although Plaintiffs' theory seems plausible at first glance, it suffers from a fatal defect: the market for demand deposit accounts and the market for ATM Network services involve two different sets of consumers. Individuals, businesses, and others purchase deposit accounts; *banks* purchase ATM Network services. As a result, the market for Star's services, as well as the market for ATM networks generally, is not a derivative aftermarket, in the anti-trust sense, of the market for demand deposit accounts. It is entirely separate.

Two seminal single-brand, aftermarket cases, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992), and *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), illustrate the contours of an appropriate single-brand, derivative aftermarket theory and reveal the error in Plaintiffs' approach. The *Kodak* case arose as a result of the initial purchase by consumers of Kodak brand photocopiers. *See Kodak*, 504 U.S. at 458. Because photocopiers, like many durable goods, require servicing and replacement parts, a consumer who purchased a Kodak copier was forced to participate in the "derivative aftermarket" for replacement parts and services for the copier. In other words,

9

the foremarket for photocopiers begot an aftermarket in replacement parts and services. Moreover, "[b]ecause service and parts for Kodak equipment [were] not interchangeable with other manufacturers' services" and because the consumer could not respond to unappealing prices for Kodak replacement and services by returning to the foremarket and purchasing a different brand of copier, "the relevant market from the Kodak equipment owner's perspective [was] composed of only those companies that service Kodak machines." *Kodak*, 504 U.S. at 455. Under these conditions, the Supreme Court concluded that the market for replacement parts and services for a single brand of copiers, Kodak, was a cognizable relevant market. *See id.*

Similarly, the Ninth Circuit held in *Newcal* that plaintiffs had stated a valid "relevant market," where plaintiffs alleged a single-brand market for "lease-buyouts" and "lease-end services" for IKON brand photocopiers. *Newcal*, 513 F.3d 1045-50. As in *Kodak*, customers who had leased IKON photocopiers (in the foremarket for photocopier leases) were thrust into the "derivative aftermarket" for "replacement copiers and lease-end services." *Id.* at 1049. In addition, the "unique contractual relationship" between IKON and the lessees of its equipment (1) allegedly created switching costs that prevented lessees from returning to the foremarket for photocopier leases if they were unhappy with IKON's "lease-buyout" and "lease-end services" and (2) rendered IKON's "lease-buyout" and "lease-end services" unique and not interchangeable with other brands in the aftermarket. *Id.* at 1050-51. The Court therefore concluded that Plaintiff had stated a plausible single-brand market composed of "lease-end services" for IKON copiers. *Id.* at 1051.

As these two cases show, a valid single-brand, derivative aftermarket follows a particular model: First, a consumer purchases a particular brand of a good or service. Second, the nature of that good or service requires the *same* consumer to purchase a follow-on good or service in a derivative aftermarket. In *Kodak*, the "derivative aftermarket" was replacement parts and services for photocopiers, while, in *Newcal*, it was lease buy-out and lease-end services for photocopiers. Third, a "single brand" market exists in the derivative aftermarket if something about the good or brand of good purchased by the consumer in the

10

foremarket (1) prevents the consumer from returning to the foremarket and switching to a different brand if the consumer is unhappy with the price of the follow-on good in the aftermarket and (2) the particular brand's follow-on good is not reasonably interchangeable with follow-on goods of other brands.  In *Kodak*, for instance, the cost of a new photocopier precluded a customer from responding to supracompetitive prices in the market for replacement Kodak parts and services by returning to the foremarket and purchasing a copier from a different manufacturer.  In addition, Kodak-brand replacement parts and services were not "reasonably interchangeable" with non-Kodak brand replacement parts and services.  In *Newcal*, the unique contractual relationship between IKON and its lessees made it difficult for those lessees both to return to the foremarket for photocopier leases and switch to another brand of photocopier and to choose any brand other than IKON for "lease-buyout" and "lease-end services" in the aftermarket.

The "derivative aftermarket" identified by Plaintiffs in this case – i.e., the market for transactions routed over the Star Network – does not follow this pattern.  Under Plaintiffs' theory, the foremarket consists of the market for demand deposit accounts purchased by consumers and the aftermarket consists of foreign ATM transactions.  Plaintiffs are correct that foreign ATM transactions are an aftermarket of the demand deposit market in that consumers who open deposit accounts are, in essence, thrust into the market for foreign ATM transactions.

Plaintiffs' theory breaks down, however, with its allegation that the Star Network is the single-brand to which consumers are "locked-in."  Consumers purchase and own a Bank A-brand deposit account, not a Star Network-brand deposit account.  Thus, to the extent that a single-brand, derivative aftermarket exists for foreign ATM transactions from a consumer's perspective, it exists for each *individual bank* brand, not for the particular ATM Network that the individual bank has chosen.  In other words, just like the purchase of a Kodak brand copier leads to a single-brand aftermarket in Kodak brand replacement parts, the purchase of a Bank A demand deposit account would lead to an aftermarket in Bank A foreign ATM transaction services.  If anything, then, Bank A, with whom the consumers have a contractual

11

relationship, would be the single-brand, not the Star Network.

To put this point another way, banks, not consumers, purchase foreign ATM Network services, such as those offered by Star.  In order for a single-brand, derivative aftermarket to exist for Star's services, a bank, not the bank's customers, would have to be locked-in to the purchase of Star's services as a result of a purchase that the bank had made in some foremarket, just as purchasers of Kodak brand copiers are locked in to the purchase of Kodak brand replacement parts.  Here, there is no foremarket purchase that constrains a bank's choice of network providers to the Star Network.  Banks are presumably free to choose the foreign ATM Network provider that makes the most economic sense for it.  Moreover, viewed from the bank's perspective, it is obvious that a customer's choice of a particular bank does not limit the bank's choice of network providers.

The error inherent in Plaintiffs' theory is further underscored by the fact that, if the Court were to accept Plaintiffs' theory, the number of potential single-brand, derivative aftermarkets would be substantial.  For example, a single brand market would also exist for the particular computer software package that each bank uses to process a customer's foreign ATM transactions and for the particular individual each bank employs to monitor those transactions.  A bank's customer is locked-in to these choices (and their associated costs) in the same manner that the customer is locked-in to his or her bank's decision to use the Star Network (and pay its associated interchange fee).  The Court cannot accept such an expansive interpretation of the single-brand, aftermarket theory.

In sum, the market for Star services is not a single-brand, derivative aftermarket of the market for demand deposit accounts.  The consumers who purchase demand deposit accounts do not participate in the market for Star's services.  Moreover, the entities that do participate in the market for Star's services, banks, are not locked into Star's services as a result of the purchase of some previous product and are certainly not limited to Star's product by virtue of a customer's decision to open a deposit account.

For all of the above reasons, Plaintiffs' "derivative aftermarket" theory fails as a matter of law.  Accordingly, Defendants' motion is GRANTED with respect to this theory.

C.  Plaintiffs' Second Relevant Market: "Foreign ATM Transactions Routed Over ATM Networks"

Defendants concede that Plaintiffs' "'all ATM networks' market set forth in their TAC at least is theoretically plausible." Mtn. at 3. But, they maintain, this alleged "relevant market" is insufficient to support Plaintiffs' antitrust claims because Plaintiffs "do not, and cannot, allege any facts credibly supporting the conclusion that Star has market power in [the] highly competitive [all ATM Networks] market." *Id.* For the reasons discussed below, the Court disagrees.

An antitrust defendant possesses market power when the defendant "(1) can profitably set prices above its costs and (2) enjoys some protection against rival's entry or expansion that would erode such supracompetitive prices and profits." Areeda et al., *Antitrust Law*, ¶ 501 (2d ed. 2005). As the Ninth Circuit explained in *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995),

> Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run. *See Ryko Mfg. Co. v. Eden Serv.*, 823 F.2d 1215, 1232 (8th Cir.1987), cert. denied, 484 U.S. 1026 (1988); *Ball Memorial Hosp.*, 784 F.2d at 1335.

*Id.* at 1434.

In this case, Plaintiffs allege, in detail, that Defendants have set interchange fees at a level that is well above their costs and have maintained these supracompetitive prices (and the resulting profits) for many years. For instance, Plaintiffs allege that "[w]hen fees were originally fixed at $.40 for on-premises and $.60 for off-premises ATMs in 1984, they were set based on cost data. . . ." TAC ¶ 135. They also aver that "[a]s of 1993, at least one ATM Network estimated the cost [of providing cash to other Banks' customers] to be

13

approximately 25 cents per transaction" and that the "cost has only decreased over time as the costs of technology – especially telecommunications costs – have declined rapidly." TAC ¶ 136.

These plausible factual allegations, which the Court must accept as true, lead to the reasonable inference that the cost to a bank of providing cash to another bank's customer has declined substantially since 1984 and is now well-below $0.25 per transaction. Yet, according to other allegations in the Plaintiffs' TAC, Star's Interchange Fee has not dropped accordingly. In fact, Star's current Interchange Fee of $0.46 per on-premises transaction is 15% *higher* than the fee Star charged in 1984. TAC ¶ 135-37. It is also higher than the $0.45 fee that Star charged in 1990 and substantially higher than the estimated 1993 cost of $0.25 per transaction.

These facts, taken together, indicate that the Defendants, acting through Star, have been able to establish a fee for providing cash to other banks' customers that is well above their costs, and have done so since at least 1993. If true, this prolonged period of substantially-above-cost pricing provides a strong indication that the Defendants and Star possess market power in the ATM Networks market. *See* Areeda ¶ 501 ("For antitrust purposes, therefore, market power is the abilities (1) to price substantially above the competitive level *and* (2) to persist in doing for a significant period of time without erosion by new entry or expansion.").

Plaintiffs also allege that the ATM Networks market "exhibit[s] economies of density or economies of ubiquity within a geographic area" that "inhibit new entrants, because a new entrant is at a substantial disadvantage to an established, wide-spread network (such as Star)." TAC ¶ 141. These alleged barriers to entry help explain why Star and the Defendants have managed to reap supracompetitive profits for an extended period and thereby provide further support for Plaintiffs' allegation that Star possesses market power in the all ATM Networks market. *See Rebel Oil*, 51 F.3d at 1434 (noting that the existence of significant barriers to entry in a market provide circumstantial evidence of the defendants' market power within that market).

14

In addition, Plaintiffs assert that Star is "the largest ATM Network in the United States," that "Star processes far more Foreign ATM Transactions than any other ATM Network," and that "in some geographic areas Star is dominant to the point that consumers would be hard-pressed to avoid paying Star's fixed Interchange Fee." TAC ¶¶ 11, 69, 74, 120. Though these allegations fall short of demonstrating that Star owns a "dominant share of [the all ATM Networks] market," *Rebel Oil*, 51 F.3d at 1434, they nonetheless would, if true, establish that Star has become the largest competitor in the all ATM Networks market, even though it has charged supracompetitive prices for many years. These allegations therefore also provide circumstantial evidence of Star's market power.

Defendants argue that Plaintiffs' "market power" allegations fail because Plaintiffs have not alleged that the Defendants and Star have the ability to affect marketwide prices and output in the all ATM Networks market. Mtn. at 11; Reply at 6. Though Plaintiffs do not expressly allege that Defendants' conduct has had an affect on marketwide prices and output, that conclusion can be reasonably inferred from the allegations Plaintiffs do make.

First, Plaintiffs allege that Star is the largest competitor in the "all ATM Networks" market. TAC ¶¶ 11, 69, 74. Star is therefore not, according to Plaintiffs' factual allegations, a niche player whose actions have little impact on the overall market.

Second, and crucially, Plaintiffs assert that Defendants and Star have charged an interchange fee that is well-above their costs for at least two decades. If Defendants and Star lacked market power, such appealing profit margins would attract competition from new or existing competitors and lead to a decline in prices and average profits. *See* Areeda ¶ 501. Yet, that has not occurred. In fact, Star has maintained the same interchange fee for 20 years, despite steep declines in costs. These facts are not consistent with a highly competitive market in which Star lacks market power. Moreover, because price and output are inversely correlated, the fact that Star, the market leader, has charged supracompetitive interchange fees for two decades implies that marketwide output – i.e., the number of foreign ATM transactions – has been lower than it would have been had Star charged a competitive interchange fee. Thus, Plaintiffs have implicitly alleged that Defendants' conduct has had an

15

adverse impact on marketwide prices and output.

In sum, Plaintiffs plausibly allege that Defendants and Star have been able to "profitably set prices above . . . costs" for a prolonged period of time due to entry barriers and other factors. Because such an ability is the hallmark of market power, *see* Areeda ¶ 501, the Court finds that Plaintiffs have adequately pled that Defendants and Star possess market power in the relevant market.

## CONCLUSION

Based on the foregoing, the Court hereby:

(1) GRANTS Defendants' joint motion to dismiss with respect to Plaintiffs' single-brand, derivative aftermarket theory;

(2) DENIES Defendants' motion with respect to Plaintiffs' "All ATM Networks" relevant market theory.

**IT IS SO ORDERED.**

Dated: June 21, 2010

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE