1   Joseph R. Saveri (SBN 130064)
      *jsaveri@lchb.com*
2   Brendan P. Glackin (SBN 199643)
      *bglackin@lchb.com*
3   Andrew S. Kingsdale (SBN 255669)
      *akingsdale@lchb.com*
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6
    Merrill G. Davidoff (Admitted *Pro Hac Vice*)
7     *mdavidoff@bm.net*
    Bart D. Cohen (Admitted *Pro Hac Vice*)
8     *bcohen@bm.net*
    Michael J. Kane (Admitted *Pro Hac Vice*)
9     *mkane@bm.net*
    BERGER & MONTAGUE, P.C.
10  1622 Locust Street
    Philadelphia, PA  19103
11  Telephone:  (215) 875-3000

12  *Co-Lead Counsel for Plaintiffs*

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                SAN FRANCISCO DIVISION

16

17  In re ATM FEE ANTITRUST              Master File No. C04-2676 CRB
    LITIGATION
18                                       **CLASS ACTION**

19  This Document Relates To:            **DECLARATION OF GUSTAVO**
    ALL ACTIONS                          **BAMBERGER IN OPPOSITION TO**
20                                       **DEFENDANTS' MOTION FOR**
                                         **SUMMARY JUDGMENT PURSUANT TO**
21                                       **THE COURT'S ORDER OF JUNE 21, 2010**

22                                       Date: Not        Set
                                         Time: Not        Set
23                                       Courtroom:   8
                                         The Honorable Charles R. Breyer
24

25

26              **DOCUMENT SUBMITTED UNDER SEAL**

27                        **(REDACTED)**

28

**Declaration of Gustavo Bamberger**


**August 20, 2010**

**I.      QUALIFICATIONS.**

1.      I am a Senior Vice President of Compass Lexecon, an economics consulting firm that specializes in the application of economics to legal and regulatory issues.  I received a B.A. degree from Southwestern at Memphis, and M.B.A. and Ph.D. degrees from the University of Chicago Graduate School of Business.  I have studied economics issues relating to the payment card industry since the early 1990s, and I previously filed a declaration in this matter.  I also have previously provided expert opinions in payment card industry cases to U.S. federal courts and the High Court of New Zealand.  In addition, I have provided expert testimony on a variety of other economics issues to federal courts, the U.S. Senate, the U.S. Federal Energy Regulatory Commission, the U.S. International Trade Commission, the U.S. Department of Transportation, U.S. state regulatory agencies, the Canadian Competition Tribunal, the New Zealand Commerce Commission and the High Court of New Zealand.  A copy of my curriculum vita, which lists my publications and testimonial experience, is attached as Appendix A to this report.  The materials I relied on in my analysis are listed in Appendix B.  Compass Lexecon bills for my time at the rate of $695 per hour.

**II.      INTRODUCTION.**

2.      Holders of Automated Teller Machine ("ATM") cards can use those cards to withdraw cash from ATMs owned by the bank that issued the card.[1]  If a card-issuing bank is connected through an ATM network to ATMs it does not own, a customer that holds an ATM card issued by that bank may also withdraw cash from those "foreign" ATMs (i.e., ATMs not owned by the card-issuing bank).[2]  In the ATM industry, a "foreign ATM transaction" refers to a

---

1.   In many cases, ATM cards also can be used for other purposes, such as balance inquiries, deposits and transfers across accounts.
2.   The ATM owner can be another bank, or an "Independent Service Organization" ("ISO"), that owns ATMs but does not issue ATM cards.

cardholder's use of an ATM card at an ATM not owned by the bank that issued the card.[3]  A

foreign ATM transaction thus involves three parties: the cardholder, the bank that issued the

card, and the ATM owner (as well as the network that facilitates the transaction).[4]  In the case of

a foreign ATM withdrawal, an ATM owner provides cash to the cardholder, and is reimbursed by

the card issuer out of funds deposited by the cardholder at the issuer bank.[5]

      3.     Both the ATM owner and the issuing bank can, and often do, charge the

cardholder for each foreign transaction.  The ATM owner may levy a surcharge for a foreign

ATM transaction.  Similarly, the issuing bank for such a transaction may levy a foreign

transaction fee, or "foreign fee."[6]  The price paid for a foreign ATM transaction by a customer is

the sum of these two fees.

      4.     In ATM networks, an interchange fee is paid by card-issuing banks and received

by ATM owners when a cardholder makes a foreign ATM transaction.  Because an interchange

fee is paid by card-issuing banks to ATM owners, the use of an interchange fee affects the per-

transaction payments received by both parties.  The total payment received by an ATM owner

for a foreign ATM transaction equals:

---

3.  By definition, withdrawals from ATMs owned by ISOs are foreign transactions.

4.  Foreign ATM transactions also involve relatively small "switch" and other fees that are paid to the ATM network (i.e., fees that are not paid to the ATM owner).

5.  In certain cases, a bank may offer "overdraft" protection to its ATM cardholders.

6.  Some banks offer cardholders one or more "free" foreign ATM transactions per month. However, these offers often are available only under certain conditions, and may involve other "service fees."  Thus, consumers likely indirectly pay for the "free" foreign transactions (and potentially other services).  For example, on its web site, JP Morgan Chase & Co offers four checking accounts, which it calls Chase Checking; Chase Better Banking Checking; Chase Premier Checking; and Chase Premier Platinum Checking.  The Chase Checking and Chase Better Checking accounts charge foreign ATM fees of "$2 each for any non-Chase ATM withdrawal, balance inquiry or transfer.  $3 per ATM withdrawal outside the U.S."  The Chase Premier Checking account offers "No Chase fee for the first four non-Chase ATM withdrawals each statement period."  However, the Chase Premier Checking account imposes a $20 monthly service fee unless "a combined average monthly balance of $15,000 or more in linked deposit, loan and investment accounts" is maintained.  The holder of a Chase Premier Platinum Checking account pays no foreign ATM fees, but must pay a $25 monthly service fee unless "a combined average monthly balance of $75,000 or more in linked deposit, loan and investment accounts" is maintained (Chase web site, visited August 5, 2010).

*Surcharge + Interchange Fee*

Similarly, the net payment received by the card-issuing bank for a foreign ATM transaction equals:

*Foreign Fee – Interchange Fee*

Note that the price paid by a cardholder for a foreign ATM transaction equals the sum of the payment received by the ATM owner and the payment received by a card-issuing bank:

*(Surcharge + Interchange Fee) + (Foreign Fee – Interchange Fee)*

=      *Surcharge + Foreign Fee*

=      *Price*

5.      Plaintiffs in this matter claim that the imposition of interchange fees by the Star Network ("Star") harms consumers by increasing the foreign fees charged by card-issuing banks:

> The imposition of a mandatory fixed Interchange Fee directly impacts the price that consumer Cardholders pay for Foreign ATM transactions.  If Defendants had not collusively imposed and fixed Interchange Fees, free and open competition in the marketplace would have resulted in significant reductions to, or the elimination of, Foreign ATM Fees, and the price consumers paid to get their own money would have been substantially reduced.[7]

Plaintiffs also claim that "Foreign ATM Fees were, and are, imposed by every Bank Defendant Star member, and Foreign ATM Fees were and are markups of Interchange Fees."[8]

6.      Defendants claim that more than ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████

---

7.   Third Amended Complaint for Damages and Equitable Relief ("Third Amended Complaint"), ¶111.
8.   Third Amended Complaint, ¶80.
9.   See Defendants' Notice of Motion and Motion for Summary Judgment: Memorandum of Points and Authorities in Support Thereof ("Defendants' Motion"), at 11.

███████████████████████████████████████████████████████████████████████

███████████████████████████████[10]   Defendants appear to be claiming that, if plaintiffs'

allegations are true, pure and net payors of interchange fees would be harmed by the existence

of interchange fees and so would be expected to challenge the imposition of those fees.

7.      I have been asked by plaintiffs' counsel to evaluate, from an economic

perspective, defendants' claim that if plaintiffs' allegations are true, pure and net payors of

interchange fees would have an incentive to challenge the imposition of interchange fees.  I

conclude that:

- Defendants fail to show that any ATM card issuer is harmed by the imposition of interchange fees.  It is not possible to provide an appropriate economic analysis of this issue by analyzing only the payment and receipt of interchange fees.  Instead, an appropriate economic analysis must also evaluate the effect of interchange fees on foreign fees and surcharges.

- The bank defendants' behavior establishes that they are not harmed by—and likely benefit from—the imposition of interchange fees.  The economic evidence shows that the bank defendants—including bank defendants that are net payors of interchange fees—for many years determined the amount of Star's interchange fees and yet made no effort to abolish those fees.  The failure of those banks to eliminate interchange fees when they had the ability to do so is economic evidence that interchange fees serve the bank defendants' interests.

- Economic theory and evidence explains how the imposition of interchange fees increases the price paid by a cardholder for a foreign ATM transaction.  Because interchange fees allow ATM owners to display lower surcharges on ATM screens, and because consumers are more sensitive to surcharges than to foreign fees, the imposition of interchange fees would be expected to increase the total price consumers pay per foreign ATM transaction and total ATM profits.

## III.   IT IS NOT POSSIBLE TO DETERMINE THE EFFECT OF INTERCHANGE FEES ON ATM CARD ISSUERS WITHOUT EVALUATING THE EFFECT OF THOSE FEES ON FOREIGN FEES AND SURCHARGES.

8.      Defendants focus only on whether issuers of ATM cards are pure or net payors of

interchange fees.  For example, the Declaration of ██████████████████████████████

███████████████████████████████████████████████████████████████

---

10. Defendants' Motion, at 11.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████[11]   However,

the foreign ATM transactions entered into by an issuer's cardholders generate surcharges and

foreign fees.  It is therefore not possible to determine whether the imposition of interchange fees

benefits or harms an ATM card issuer by evaluating only whether the issuer is a net payor or net

receiver of interchange fees.  For example, an ATM card issuer's profit margin would rise due to

the imposition of an interchange fee if its profit-maximizing response to such fees is to raise its

foreign fee by an amount greater than the interchange fee.  Under those circumstances, an ATM

card issuer that is a "net payor" of interchange fees—or even a "pure payor" of interchange

fees—would have no economic incentive to bring a legal action to stop the imposition of

interchange fees, because those fees increase its profits.

      9.      Consider an ATM card issuer that owns no ATMs.  This issuer only pays

interchange fees and is therefore a "pure payor."  Suppose that the interchange fee is $0.50 on

every foreign ATM transaction, and that the average foreign fee is $1.75 per foreign ATM

transaction.[12]  Then the average "net revenue" received by the ATM card issuer is $1.25 per

foreign ATM transaction (i.e., $1.75 foreign fee minus $0.50 interchange fee).  If the ATM card

issuer's per-transaction incremental costs (e.g., switch fees) are less than $1.25, then the ATM

issuer benefits from its ATM card business, even though it is a pure payor of interchange fees.

      10.     In contrast, the elimination of interchange fees would reduce the profit margin of

ATM card issuers.  For example, if in response to the elimination of interchange fees of $0.50

---

11. ████████████████████████████

12. The figures in this example are for illustrative purposes only.  However, foreign fees typically
are substantially larger than interchange fees.  For example, Star interchange fees have
been approximately $0.45 to $0.55 per transaction for many years (see, for example, Third
Amended Complaint, ¶¶135, 137).  In contrast, foreign fees typically are $1.50 per
transaction or more.  As I have discussed, Chase foreign fees are currently $2.00 per
transaction (for U.S. transactions).  Similarly, Bank of America foreign fees are $2.00 per
U.S. transaction (Bank of America web site, visited August 16, 2010); Citibank foreign fees
are $1.50 per U.S. transaction (Citibank web site, visited August 16, 2010); and Wells Fargo
foreign fees are $2.50 per U.S. transaction (Wells Fargo web site, visited August 16, 2010).

per transaction, average foreign fees for an issuer fall from $1.75 to $0.75 per transaction, the average net revenue per transaction falls from $1.25 to $0.75.  That is, the ATM card issuer no longer pays interchange fees, but its savings from no longer paying those fees are more than outweighed by a decline in revenues from foreign fees.[13]

11.      In general, foreign ATM transactions generate three types of payments: (1) interchange fees from ATM card issuers to ATM owners; (2) foreign fees from ATM cardholders to ATM card issuers; and (3) surcharges from ATM cardholders to ATM owners.  The total profits derived from foreign ATM card transactions by an ATM card issuer depend on all three types of payments (or the first two if the issuer owns no ATMs).   For pure and net payors of interchange fees, the first component (i.e., net interchange fee payments) is negative, but it is not possible to evaluate the profitability of foreign ATM transactions for any particular ATM card issuer without evaluating the contribution of foreign fees and surcharges.  Thus, it is not possible to evaluate whether the imposition of interchange fees costs any ATM card issuer "many millions of dollars" without evaluating the effect of interchange fees on foreign fees and surcharges.

**IV.     THE AVAILABLE ECONOMIC EVIDENCE ABOUT THE BANK DEFENDANTS' BEHAVIOR SHOWS THAT THEY ARE NOT HARMED BY—AND LIKELY BENEFIT FROM—THE EXISTENCE OF INTERCHANGE FEES.**

12.      As I have discussed, it is not possible to evaluate whether ATM card issuers benefit from the imposition of interchange fees by determining only whether an issuer is a pure or net payor of such fees.  In this section of my declaration, I establish that the available economic evidence shows that the bank defendants, including net payors of interchange fees, are not harmed by—and likely benefit from—the imposition of those fees.

13.      Defendants claim that, ███████████████████████████████

████████████████████████████████████████████████████████████

---

13. If the number of foreign ATM transactions falls or remains unchanged when interchange fees are eliminated, total profit for the issuer falls.  If the number of foreign ATM transactions increases when interchange fees are eliminated, total profits may increase or fall.



[14] The existence of many pure and net payors among Star's members is possible because Star includes a number of ISOs, which are "pure receivers" of interchange fees.  Defendants explain that:



14.     A central tenet of economics is that firms maximize their profits, so I base my analysis on the standard assumption that the bank defendants are profit-maximizing entities.[18] I understand that until 2001, Star's interchange fee policy was collectively set by its member banks, including the bank defendants.[19]  Thus, bank defendants could have eliminated interchange fees if it was in their interest—that is, they could have eliminated interchange fees if

14. ████████████████████████████████████████████████████████

15. ██████████████████████████
16. ██████████████
17. ██████
18. See, for example, George J. Stigler, *The Theory of Price*, 3rd ed., at 176 ("Quite clearly, we are judging the 'appropriateness' of an entrepreneur's decisions by whether they maximize his profits").
19. I understand that Star was established by 12 banks in about 1984.  I understand that until 2001, when Star was acquired by Concord EFS, Inc. ("Concord"), Star was owned and controlled by its member banks.  See Third Amended Complaint, ¶¶10, 70.   I understand that ISOs did not have a role in setting interchange fees.

doing so would have increased their profits.  Put differently, standard economic principles imply that the banks that collectively set the level of Star's interchange fees before its acquisition in 2001 would not have maintained those fees unless they benefited from them[20]  The fact that those banks did not eliminate interchange fees when they had the ability to do so is direct economic evidence that imposing interchange fees did not reduce—and likely increased—their profits.  Furthermore, defendants provide no basis to assume that bank defendants ceased to benefit from interchange fees after Star was acquired by Concord.[21]  Thus, the economic evidence shows that bank defendants benefit from the imposition of interchange fees.

## V.   WHEN CARDHOLDERS ARE MORE SENSITIVE TO SURCHARGES THAN TO FOREIGN FEES, THE IMPOSITION OF INTERCHANGE FEES INCREASES THE TOTAL PRICE OF A FOREIGN ATM TRANSACTION.

15.     As I have discussed, the economic evidence shows that the bank defendants benefit from the imposition of interchange fees.  In this section of my report I analyze the economic effects of imposing interchange fees in an ATM network.  My analysis consists of three steps.

- First, I explain that interchange fees in the ATM industry are not "neutral"—that is, interchange fees can be expected to have economic effects.  I also explain that defendants concede that interchange fees are not neutral.

- Second, I explain that an important reason why interchange fees in the ATM industry are not neutral is because cardholder demand for foreign ATM transactions is more sensitive to surcharges than to foreign fees.

---

20. For the purpose of my analysis, I assume that ATM owners are able to impose surcharges. I understand that Star eliminated its rules prohibiting surcharging in 1996.  See Third Amended Complaint, ¶2.

21. Plaintiffs allege a "continuing agreement among the Defendants and their co-conspirators to fix, raise, maintain, or stabilize at artificially high levels the Interchange Fees that the Bank Defendants charge for Foreign ATM Transactions" (Third Amended Complaint, ¶93). The owner of an ATM network does not receive interchange fees from foreign ATM transactions over its network.  That is, a network owner that does not issue ATM cards (e.g., like Concord) has no direct financial interest in the level or existence of interchange fees.

- Third, I discuss the economic implications of the non-neutrality of interchange fees caused by the greater sensitivity of cardholders to surcharges than to foreign fees.  In particular, because cardholders are more sensitive to surcharges than to foreign fees, interchange fees reduce surcharges but profit-maximizing banks have an economic incentive to raise foreign fees (received by the ATM card issuer) on a foreign ATM transaction by more than the reduction in surcharges (received by the ATM owner).  As a result, the total price of a foreign ATM transaction is higher.

### A.    The ATM Industry Is Not Characterized by "Neutrality."

16.    As I have previously discussed, the price paid by a cardholder for a foreign ATM transaction equals the sum of the payment received by the ATM owner and the payment received by the ATM card-issuing bank (i.e., *Surcharge + Foreign Fee = Price).*  A key characteristic of foreign ATM transactions is that both fees (i.e., the surcharge and the foreign fee) are paid by the same economic entity—that is, both fees are paid by the cardholder.[22]  If cardholders were equally sensitive to both types of fees, then only the total price of a foreign ATM transaction is relevant to cardholders, and how the total price is divided between foreign fees and surcharges has no economic effect.

17.    Consider the following example.  Suppose that interchange fees are $0.50 per transaction; average foreign fees are $1.75 per transaction; and surcharges are $1.50 per transaction.  Then the total price per foreign ATM transaction is $3.25; the ATM owner receives $1.50 + $0.50 = $2.00 per transaction; and the ATM card issuer receives $1.75 - $0.50 = $1.25 per transaction.  Now suppose that interchange fees are eliminated and, as a result, surcharges increase to $2.00 per transaction and foreign fees fall to $1.25 per transaction.  Then the total price paid by a cardholder for an ATM transaction is unchanged (i.e., it remains $3.25 per

22. Foreign ATM transactions thus differ from credit-card and debit-card transactions, where cardholders do not pay both fees (e.g., a cardholder may pay an "annual fee" and a merchant pays a "merchant discount" fee).

transaction); the net amount received by an ATM owner per transaction is unchanged (i.e., it remains $2.00); and the net amount received by a card-issuing bank per transaction is unchanged (i.e., it remains $1.25).  If only the total price of a foreign ATM transaction is relevant to the cardholder, the number of foreign ATM transactions remains unchanged because the total price remains the same.

18.     This type of outcome is often referred to as "neutrality"—i.e., the introduction of an interchange fee has a "neutral" competitive effect.[23]  Defendants in this case do <u>not</u> claim that the ATM industry is characterized by neutrality.  Instead, defendants concede non-neutrality.  Defendants claim that the imposition of interchange fees is procompetitive, which is inconsistent with neutrality.  In particular, defendants do not assert that interchange fees have no effect on the participants in ATM networks, but rather assert, for example, that interchange fees increase the deployment of ATMs by making foreign ATM transactions more profitable for ATM owners.[24]  But if interchange fees were neutral, they would not alter the net amount received by ATM card issuers or ATM owners, and so would have no effect on ATM deployment.

---

23. The concept of "neutrality"—and the conditions under which it can occur (e.g., perfect competition)—is widely discussed in the economics literature on payment card industries.  For examples of such discussions, see Joshua S. Gans and Stephen P. King, "The Neutrality of Interchange Fees in Payment Systems," *Topics in Economics Analysis & Policy*, Vol. 3, Issue. 1, Article 1, 2003, at 2 ("Carlton and Frankel (1995) demonstrate that if issuing, acquiring and merchant level interaction are perfectly competitive then the interchange fee may have no impact on cardholder or merchant behaviour.  Similarly, in the context of their specialized model, Rochet and Tirole (2002) demonstrate that when surcharging is possible, any change in the interchange fee will be ultimately passed through to cardholders in the form of higher surcharges directly offsetting any reduction in cardholder fees.  Again, any change to the interchange fee is neutral").  See also Steven C. Salop, "Deregulating Self-Regulated Shared ATM Networks," *Economics of Innovation and New Technology*, 1990, vol. 1 ("Salop"), at 87 ("Assuming that foreign fees and user surcharges [in ATM networks] are set independently and perfectly competitively, the interchange fee is redundant")

24. See, for example, ████████████████████████████████████████
██

**B.      Cardholders Are More Sensitive to Surcharges Than to Foreign Fees.**

19.      In general, neutrality does not hold if cardholders, in the aggregate, respond not just to the total price of a foreign ATM transaction, but to how the total price is divided between foreign fees and surcharges.  If cardholders were completely informed (i.e., if cardholders had "perfect information") about the price of a foreign ATM transaction, they would be expected to be indifferent as to how the price of a transaction was divided between a surcharge and a foreign fee.  That is, a completely informed cardholder would respond only to the total price of a foreign ATM transaction.  However, although the price of a foreign ATM transaction to a cardholder consists of two components, only one of those components—the surcharge—is displayed to cardholders at the point in time when they make a foreign ATM transaction.  This difference has important economic implications.  In particular, the economic evidence shows that, in the aggregate, consumers are more sensitive to surcharges than to foreign fees.

20.      Cardholders who make a foreign ATM transaction are informed of the surcharge amount on the ATM's screen, and given an opportunity to continue or terminate the transaction after seeing the surcharge.  In contrast, the foreign fee amount is not displayed at the time of the transaction, and the cardholder may not know the foreign fee associated with any particular transaction.[25]  Because the surcharge amount is displayed with every potential transaction, but

---

25.  ████████████████████████████████████████

the foreign fee amount is not, cardholders in the aggregate would be expected to be more sensitive to changes in surcharges than to foreign fees.[26]

21.    For example, an internal Bank of America analysis of ATM foreign fees concluded that:



_____

(...continued)



26. See also the Report of Professor Ravi Dhar filed earlier in this matter.  Professor Dhar concludes that "it is my considered opinion that consumer awareness of the Foreign ATM Fee is likely to be significantly lower than consumer awareness of the ATM surcharge. Consequently, it is also my opinion that due to this lack of awareness, consumers will be significantly less sensitive to the Foreign ATM Fee than to the surcharge they see on the screen during each foreign ATM transaction" (¶21).  For the bases for Professor Dhar's conclusion, see ¶¶12-20 of his report.

27.

22.     Consumer studies suggest that many cardholders respond to increases in surcharge rates.  For example, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[29]

**C.     The Imposition of Interchange Fees Increases the Profitability of Foreign ATM Transactions to ATM Card Issuers, Including Pure and Net Payors of Interchange Fees.[30]**

23.     Because cardholders are more sensitive to changes in surcharges than to changes in foreign fees, consumers respond not just to the total price of a foreign ATM transaction, but also to how the price is divided between foreign fees and surcharges.  As a result, the total price of a foreign ATM transaction could be increased without affecting the total number of transactions, thus allowing an increase in foreign fees and in the profitability of foreign ATM transactions to ATM card issuers.

24.     To see why this is the case, consider the following example.

---

(...continued)



28. █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

29. ███████████████████████████████████████████████████████

30. My analysis assumes that the business of issuing ATM cards is characterized by some degree of market power.

- 14 -

- Suppose that in a particular network, the total price of a foreign ATM transaction is $2.75 per transaction, made up of a surcharge of $2.00 per transaction and foreign fees of $0.75 per transaction.

- Suppose also that consumers are twice as sensitive to changes in surcharges as they are to changes in foreign fees.

- If surcharges were reduced from $2.00 to $1.50, the number of foreign ATM transactions would increase.[31]  In particular, assume that this reduction in surcharges (all else held equal) would increase the number of foreign ATM transactions on the network by 10 percent.

- Because cardholders are less sensitive to foreign fees than to surcharges, a change in foreign fees of a particular amount must have a smaller effect on the number of transactions than a change in surcharges of the same amount.  So if a $0.50 per transaction reduction in surcharges increases foreign ATM transactions by 10 percent, a $0.50 increase in foreign fees must reduce foreign ATM transactions by less than 10 percent.  In particular, if consumers are twice as sensitive to surcharges as they are to foreign fees, then the effect of a $0.50 per transaction change in foreign fees would be only half the size of a $0.50 per transaction change in surcharges.  Because I assume that a $0.50 reduction in surcharges increases the number of foreign ATM transactions by 10 percent, it follows that a $0.50 increase in foreign fees reduces the number of foreign transactions by only half as much, or five percent.

- Because a $0.50 increase in foreign fees in my example reduces total transactions by only five percent, the increase in foreign fees needed to reduce transactions twice as

---

31. It is a standard economic assumption that an increase in price, all else equal, reduces the quantity demanded (i.e., an increase in price implies a move down a demand curve).  See, for example, Gary S. Becker, *Economic Theory*, at 11 ("Perhaps the most fundamental finding in economics is the 'law' of the negatively sloped demand curve.  Other variables held constant, an increase in the relative price of any good would decrease the amount consumed of that good").

much (i.e., 10 percent) is twice as large (i.e., $1.00 per transaction).  So if surcharges fell by $0.50 per transaction <u>and</u> foreign fees went up by $1.00 per transaction, the two effects would cancel each other and the total number of transactions would remain unchanged—the $0.50 reduction in surcharges increases total transactions on the network by 10 percent, while the $1.00 increase in foreign fees reduces total transactions on the network by an offsetting 10 percent.

- Note that as a result of the changes in foreign fees and surcharges, the total price of a foreign ATM transaction to a cardholder goes up by $0.50 per transaction (i.e., an increase in foreign fee of $1.00 minus a reduction in surcharge of $0.50).

- Because the price of a foreign ATM transaction is higher by $0.50, but the total number of transactions on the network are unchanged, total system profits must be higher—total revenue goes up, but total costs are unchanged (because the number of transactions is unchanged).

- Thus, when cardholders are more sensitive to surcharges than to foreign fees, members of a network can increase their revenue and profits by reducing surcharges and increasing foreign fees by more than the decline in surcharges.

25.     As my prior example shows, network actions that reduce surcharges but increase foreign fees by a larger amount while leaving the number of foreign ATM transactions unchanged will increase the total profits of network members.  As I now explain, the imposition of interchange fees by a network will reduce surcharges and increase foreign fees by a larger amount.

- For example, if the deployment of ATMs is a competitive industry, the introduction of an interchange fee of $0.50, all else equal, would be expected to reduce surcharges by $0.50.[32]  Suppose that, without interchange fees, surcharges would be $2.00 per

---

32. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

transaction, so that the introduction of an interchange fee of $0.50 per transaction would reduce surcharges to $1.50 per transaction.[33]

- If the introduction of an interchange fee of $0.50 per transaction reduced surcharges by $0.50 per transaction, the profit-maximizing response by ATM card issuers would be an increase in foreign fees of more than $0.50 per transaction.[34]  Thus, each foreign ATM transaction becomes more profitable, and the total number of foreign ATM transactions can be maintained.[35]  Note that this analysis applies even to pure payors of interchange fees (and therefore to net payors).  That is, even a pure payor would benefit from the introduction of interchange fees because foreign ATM transactions become more profitable.

26.     The same economic analysis implies that the elimination of interchange fees reduces profits from issuing ATM cards.  As I have discussed, the fact that the bank defendants maintained interchange fees is economic evidence that eliminating interchange fees would have harmed those banks.  If interchange fees were eliminated and the ATM-deployment business is competitive, surcharges would be expected to increase.[36]  If foreign fees were not changed in

---

(...continued)

███████████

33. Historically, interchange fees were used in the ATM industry before surcharging was introduced.

34. Without interchange fees, a network might not have foreign fees.  The imposition of interchange fees could then result in ATM card issuers introducing per-transaction foreign fees that are larger than the interchange fee.

35. Introducing—or eliminating—interchange fees could also change the number of foreign ATM transactions that occur.  In general, changes in "output" that are a response to price signals are economically efficient.  For example, ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████  As I have discussed, a completely informed cardholder would respond only to the total price of a foreign ATM transaction, and an increase in total price would reduce—not increase—the number of transactions.  An increase in output that occurs because the price of a product increases but consumers are not fully informed about that price increase is generally not economically efficient.

36. ███████████████████████

response, the number of foreign ATM transactions would fall.  The fall in foreign ATM transactions could be offset by a reduction in foreign fees.  Indeed, a profit-maximizing issuer of ATM cards would be better off (i.e., its profits would fall less) if it reduced foreign fees by more than the increase in surcharges.[37]

     27.    Although the imposition of interchange fees increases profits from foreign ATM transactions, further increases in interchange fee levels will not, in general, be profitable.  For example, as foreign fee levels rise, cardholders are likely to become more aware of and more sensitive to those fees.  If foreign fees approach a level at which cardholders become sensitive to increases in those fees, an increase in the level of interchange fees would likely not allow ATM card issuers to profitably increase foreign fees by more than the amount of the decline in surcharges.[38]

_Gustavo Bamberger_

Gustavo Bamberger

August 20, 2010

---

37. Reducing foreign fees in response to an elimination of interchange fees would offset some of the harm to ATM card issuers, but would not allow those issuers to retain the total profit level achievable with interchange fees.  For this reason, bank defendants would not have an incentive to eliminate interchange fees.

38. For example, as I have discussed, an internal Bank of America analysis of ATM foreign fees suggested that cardholders became substantially more sensitive to foreign fees at levels above $2.00 per transaction.  Indeed, above a certain level, cardholders might become more sensitive to changes in the foreign fees than to changes in surcharges.  Cardholders could become sufficiently well informed to start taking into account the full price of foreign ATM transactions (i.e., the foreign fee plus the surcharge), which could cause a drop in the volume of foreign ATM transactions.

Appendix A

**GUSTAVO E. BAMBERGER**                                          **July 2010**
**Economist**

Business Address:      Compass Lexecon
                       332 S. Michigan Ave.
                       Suite 1300
                       Chicago, IL  60604                          (312) 322-0276

Home Address:          5134 S. Woodlawn Ave.
                       Chicago, IL  60615                          (773) 955-5836


## EDUCATION

Ph.D., UNIVERSITY OF CHICAGO, 1987, GRADUATE SCHOOL OF BUSINESS

M.B.A., UNIVERSITY OF CHICAGO, 1984, GRADUATE SCHOOL OF BUSINESS

B.A., SOUTHWESTERN AT MEMPHIS, 1981


## EMPLOYMENT

COMPASS LEXECON (formerly Lexecon), Chicago, Illinois (3/87-Present): Senior Vice
      President

UNIVERSITY OF CHICAGO, (1984, 1986): Lecturer

GOVERNORS STATE UNIVERSITY, (1986): Community Professor

UNIVERSITY OF CHICAGO, (1982-1986): Teaching Assistant

UNIVERSITY OF CHICAGO, (1982-1986): Research Assistant


## ACADEMIC HONORS AND FELLOWSHIPS

University of Chicago Fellowship, 1981-1984

H.B. Earhart Fellowship, 1985-1986


## RESEARCH PAPERS

"Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?"
      co-authored with D. Carlton and R. Epstein, RAND Journal of Economics, (Vol. 26, No.
      1, Spring 1995, pp. 131-147).

"Antitrust and Higher Education: MIT Financial Aid (1993)," co-authored with D. Carlton, in <u>The Antitrust Revolution: Economics, Competition, and Policy</u>, John Kwoka and Lawrence White, eds., 1998.

"Airline Networks and Fares", co-authored with D. Carlton, in <u>Handbook of Airline Economics</u>, 2nd ed., Darryl Jenkins, ed., 2003.

"Revisiting Maximum Resale Price Maintenance: State Oil v. Khan (1997), in <u>The Antitrust Revolution: Economics, Competition, and Policy</u>, John Kwoka and Lawrence White, eds., 2004.

"An Empirical Investigation of the Competitive Effects of Domestic Airline Alliances," co-authored with D. Carlton and L. Neumann, <u>Journal of Law and Economics</u>, (Vol. 47, No. 1, April 2004, pp. 195-222).

"Predation and the Entry and Exit of Low-Fare Carriers," co-authored with D. Carlton, in <u>Advances in Airline Economics: Competition Policy and Antitrust</u>, Darin Lee, ed., 2006.


## TESTIMONIAL EXPERIENCE

Direct, Rebuttal and Cross-Examination Testimony of Gustavo E. Bamberger on behalf of Producer - Marketers Transportation Group, before the Illinois Commerce Commission in Docket No. 90-0007, April 24, 1990 (Direct); July 6, 1990 (Rebuttal); and May 30, 1990 and August 3, 1990 (Cross-Examination).

Testimony of Gustavo E. Bamberger in Re: <u>United States of America v. Irving A. Rubin</u>: In the U.S. District Court for the Northern District of Illinois, Eastern Division, No. 91 CR 44-2, December 3, 1993.

Testimony of Gustavo E. Bamberger in Re: <u>Center for Public Resources Arbitration, E. Merck and EM Industries, Incorporated, against Abbott Laboratories</u>, February 8, 1994.

Deposition and Testimony of Gustavo E. Bamberger in the Matter of: <u>Michael R. Sparks, Debtor</u>: In the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, No. 92 B 21692, May 9, 1994 (Deposition and Testimony).

Joint Affidavit and Joint Reply Affidavit of John P. Gould and Gustavo E. Bamberger in Re: <u>In the Matters of Review of the Pioneer's Preference Rules and Amendment of the Commission's Rules to Establish New Personal Communications Services</u>: Proceedings before the Federal Communications Commission, ET Docket 93-266, Gen. Docket 90-314, July 26, 1994 (Affidavit); and August 8, 1994 (Reply Affidavit).

Statement of John P. Gould and Gustavo E. Bamberger on Implementing Legislation for the Uruguay Round of GATT (S. 2467) (Pioneer Preference Provisions) Before the Senate Commerce Commission, November 14, 1994.

Report and Deposition of Gustavo E. Bamberger in Re: <u>Khan, et al. v. State Oil Company</u>; In the U.S. District Court for the Northern District of Illinois, Eastern Division, No. 94 C 00035, May 30, 1995 (Report); and July 27, 1995 (Deposition).

Statement and Supplemental Statement of Alan O. Sykes and Gustavo E. Bamberger in Re: <u>Fresh Tomatoes and Bell Peppers</u>, Investigation No. TA-201-66, United States International Trade Commission, June 3, 1996 (Statement); and June 10, 1996 (Supplemental Statement).

Testimony of Gustavo E. Bamberger in Re: <u>Wisconsin Public Service Corporation; WPS Energy Services, Inc.; and WPS Power Development, Inc.</u>: Before the Federal Energy Regulatory Commission, Docket No. ER96-1088-000, July 22, 1996.

Pre-Filed Direct, Rebuttal and Re-Direct Testimony of Gustavo E. Bamberger in Re: <u>Disapproval of Rate Filings for American Casualty Company of Reading, Pennsylvania, and Continental Casualty Company</u>, Before the State Office of Administrative Hearings (Texas), SOAH Docket No. 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, September 10, 1996 (Direct); September 16, 1996 (Rebuttal); and September 27, 1996 (Re-Direct).

Affidavit of Gustavo E. Bamberger in Re: <u>Summit Family Restaurants Inc., a Delaware Corporation; HTB Restaurants Inc., a Delaware Corporation; and CKE Restaurants Inc., a Delaware Corporation vs. HomeTown Buffet, Inc., a Delaware Corporation; and Buffets, Inc., a Minnesota Corporation</u>: In the U.S. District Court for the District of Utah, Central Division, No. 96 CV 0688B, September 17, 1996.

Report, Supplemental Report, Affidavit, Deposition and Affidavit of Gustavo E. Bamberger in Re: <u>Blue Cross & Blue Shield United of Wisconsin, and Compcare Health Services Insurance Corporation v. The Marshfield Clinic and Security Health Plan of Wisconsin, Inc.</u>: In the U.S. District Court for the Western District of Wisconsin, No. 94-C-0137-C, December 19, 1996 (Report with William J. Lynk); February 10, 1997 (Supplemental Report William J. Lynk); March 10, 1997 (Affidavit with William J. Lynk); March 18, 1997 (Deposition); and April 4, 1997 (Affidavit).

Affidavit of Dennis W. Carlton and Gustavo E. Bamberger in Re: <u>Pacific Gas & Electric Company, San Diego Gas & Electric Company, and Southern California Edison Company</u>:  United States of America Before the Federal Energy Regulatory Commission, FERC Docket No. ER96-1663-000, January 16, 1997.

Testimony and Prepared Statement of Gustavo E. Bamberger on behalf of Sacramento Municipal Utility District in Re: <u>Pacific Gas and Electric Company, San Diego Gas & Electric Company and Southern California Edison Company</u>: Before the Federal Energy Regulatory Commission Technical Conference on Structural Mitigation Options, Docket No. ER96-1663-000, January 17, 1997.

Affidavit, Report, Rebuttal Report and Deposition of Gustavo E. Bamberger in Re: <u>Henry & Joann Rozema, Island Sports Center, Inc., Mark McKay, Lawrence Halida, Harriet Halida, and Kathleen Malek, on behalf of themselves and all others similarly situated v. The Marshfield Clinic, Security Health Plan of Wisconsin, Inc., North Central Health Protection Plan, and Rhinelander Medical Center, S.C.</u>: In the U.S. District Court for the Western District of Wisconsin, No. 94-C-592-C, July 11, 1997 (Affidavit); July 23, 1997 (Report with William J. Lynk); September 2, 1997 (Rebuttal Report); and September 11-12, 1997 (Deposition).

Deposition, Testimony and Surrebuttal Testimony of Gustavo E. Bamberger in Re: <u>Deltic Farm & Timber, Co., Inc. vs. Great Lakes Chemical Corporation</u>: In the U.S. District Court for the Western District of Arkansas, El Dorado Division, No. 95-1090, November 13, 1997 (Deposition); December 9, 1997 (Testimony); and December 10, 1997 (Surrebuttal Testimony).

Report, Deposition and Testimony of Gustavo E. Bamberger in Re: <u>In the Arbitration of Bandag, Incorporated, Claimant, v. Treadco, Inc., Respondent; Treadco, Inc., Counter-Claimant and Claimant, v. Bandag, Incorporated, Martin Carver, William Sweatman, J.J. Seiter, Ronald Toothaker, and Ronald Hawks, Counter-Respondent and Respondents</u>: American Arbitration Association, Chicago, Illinois, No. 51 114 0038 95, May 21, 1998 (Report); August 18, 1998 (Deposition); and November 12 and 16, 1998 (Testimony).

Testimony, Affidavit, Affidavit, Report, Deposition, Affidavit and Testimony of Gustavo E. Bamberger in Re: <u>Hamilton, et al. v. Accu-Tek, et al.</u>: In the U.S. District Court for the Eastern District of New York, No. 95 CV 0049, July 27, 1998 (Testimony before Magistrate Judge Cheryl L. Pollak); August 13, 1998 (Affidavit); October 2, 1998 (Affidavit); October 16, 1998 (Report); November 13, 1998 (Deposition); December 12, 1998 (Affidavit); and December 29, 1998 and January 27-28, 1999 (Testimony).

Expert Report of Robert H. Gertner and Gustavo E. Bamberger in Re: <u>BDPCS, INC., d/b/a BEST DIGITAL, and BDPCS Holdings, Inc., formerly known as Questcom, Claimants, v. U S WEST, Inc. and U S WEST Communications, Inc., Respondents</u>: American Arbitration Association, Denver Office, No. 77 181 00204 97, July 31, 1998.

Statement of Dennis W. Carlton and Gustavo E. Bamberger in Re: <u>Enforcement Policy Regarding Unfair Exclusionary Conduct in the Air Transportation Industry</u>: Before the Department of Transportation, Office of the Secretary, Washington, D.C., Docket OST-98-3713, September 24, 1998.

Responsive Direct Testimony and Cross-Examination Testimony of Gustavo E. Bamberger for Intervenor Oklahoma Gas and Electric Company in Re: <u>Joint Application of American Electric Power Company, Inc., Public Service Company of Oklahoma and Central and South West Corporation Regarding Proposed Merger</u>: Before the Corporation Commission of the State of Oklahoma, Cause No. PUD 980000444, March 29, 1999 (Responsive Direct Testimony with Dennis Carlton); and April 21, 1999 (Cross-Examination).

Prepared Answering Testimony and Exhibits of Gustavo E. Bamberger and Dennis W. Carlton on Behalf of Oklahoma Gas and Electric Company in Re: <u>American Electric Power Company, Inc. and Central and South West Corporation</u>: United States of America Before the Federal Energy Regulatory Commission, FERC Docket Nos. ER98-40-000, ER98-2770-000, ER98-2786-000, April 28, 1999.

Affidavit of Gustavo E. Bamberger on Behalf of Allegheny Energy in Re: <u>Dominion Resources, Inc. and Consolidated Natural Gas Company</u>: United States of America Before the Federal Energy Regulatory Commission, FERC Docket No. EC99-81-000, August 5, 1999.

Rebuttal Report of Dennis W. Carlton and Gustavo E. Bamberger; Reply Report of Dennis W. Carlton and Gustavo E. Bamberger; Rebuttal Report of Dennis W. Carlton and Gustavo E. Bamberger to Professor Michael Ward; Testimony of Dennis W. Carlton and Gustavo E. Bamberger; Critique of the Memorandum of Fact and Law of the Commissioner of Competition by Gustavo E. Bamberger in Re: The Commissioner of Competition and Superior Propane Inc. and ICG Propane Inc.: Before The Competition Tribunal, No. CT-98/2, September 14, 1999 (Rebuttal Report); September 19, 1999 (Reply Report); September 27, 1999 (Rebuttal Report to Professor Michael Ward); December 13-14, 1999 (Testimony); and January 31, 2000 (Critique).

Declaration and Reply Declaration of Robert H. Gertner and Gustavo E. Bamberger in the Matter of: Application by New York Telephone Company (d/b/a Bell Atlantic - New York), Bell Atlantic Communications, Inc., NYNEX Long Distance, and Bell Atlantic Global Networks, Inc., for Provision of In-Region, InterLATA Services in New York: Before the Federal Communications Commission, CC Docket No. 99-295, September 29, 1999 (Declaration) and November 8, 1999 (Reply Declaration).

Statement of Gustavo E. Bamberger and Hans-Jürgen Petersen in the Matter of: Proceeding on Motion of the Commission to Investigate Performance-Based Incentive Regulatory Plans for New York Telephone Company – Track 2: Before the State of New York Public Service Commission, Case 92-C-0665, November 30, 1999.

Report and Deposition of Gustavo E. Bamberger In Re: Northwest Airlines Corp. et al., Antitrust Litigation: In the U.S. District Court for the Eastern District of Michigan, Master File No. 96-74711, March 31, 2000 (Report); and July 21, 2000 (Deposition).

Testimony and Cross-Examination of Gustavo E. Bamberger on Behalf of Sacramento Municipal Utility District Regarding Public Interest Issues Raised by Alternative Methods of Valuation In Re: Application of Pacific Gas & Electric Company to Market Value Hydroelectric Generating Plants and Related Assets Pursuant to Public Utility Code Sections 367(b) and 851: Before the Public Utilities Commission of the State of California, Application No. 99-09-053, June 8, 2000 (Testimony); and June 27, 2000 (Cross-Examination).

Comments on the SEC's Proposed Auditor Independence Standards, SEC File No. S7-13-00, filed with the Securities and Exchange Commission, on behalf of Arthur Andersen, Deloitte & Touche, KPMG and the American Institute of Certified Public Accountants (with Charles C. Cox and Kenneth R. Cone), September 25, 2000.

Joint Reply Declaration, Joint Supplemental Declaration and Joint Supplemental Reply Declaration of Robert H. Gertner and Gustavo E. Bamberger in the Matter of: Application by Verizon New England Inc., Bell Atlantic Communications, Inc. (d/b/a Verizon Long Distance), NYNEX Long Distance Company (d/b/a Verizon Enterprise Solutions), and Verizon Global Networks Inc., for Authorization To Provide In-Region, InterLATA Services in Massachusetts: Before the Federal Communications Commission, CC Docket No. 00-176 and CC Docket No. 01-9, November 3, 2000 (Reply Declaration); January 16, 2001 (Supplemental Declaration); and February 28, 2001 (Supplemental Reply Declaration).

Declaration of Robert H. Gertner and Gustavo E. Bamberger, submitted to the Federal Communications Commission, in Re: Bell Atlantic/NYNEX Merger Performance Monitoring Reports, November 30, 2000.

Testimony and Rebuttal Testimony of Gustavo E. Bamberger on Behalf of Sacramento Municipal Utility District In Re: <u>Application of Pacific Gas & Electric Company to Market Value Hydroelectric Generating Plants and Related Assets Pursuant to Public Utility Code Sections 367(b) and 851</u>: Before the Public Utilities Commission of the State of California, Application No. 99-09-053, December 5, 2000 (Testimony); and January 16, 2001 (Rebuttal Testimony).

Report, Rebuttal Report, Revised Damage Report, Deposition and Declaration of Gustavo E. Bamberger in Re: <u>Republic Tobacco, L.P. v. North Atlantic Trading Company, Inc., North Atlantic Operating Company, Inc. and National Tobacco Co., L.P.</u>: In the U.S. District Court for the Northern District of Illinois, Eastern Division, No. 98 C 4011, February 5, 2001 (Report); April 20, 2001 (Rebuttal Report); April 20, 2001 (Revised Damage Report); May 15-16 (Deposition); and November 5, 2001 (Declaration).

Joint Declaration of Robert H. Gertner and Gustavo E. Bamberger in the Matter of: <u>Application by Verizon New York Inc., Verizon Long Distance, Verizon Enterprise Solutions, Verizon Global Networks Inc., and Verizon Select Services Inc., for Authorization To Provide In-Region, InterLATA Services in Connecticut</u>: Before the Federal Communications Commission, CC Docket No. 01-100, April 23, 2001.

Direct, Supplemental and Cross-Examination Testimony of Gustavo E. Bamberger in Re: <u>Petition for Approval of a Statement of Generally Available Terms and Conditions Pursuant to §252(f) of the Telecommunications Act of 1996 and Notification of Intention to File a Petition for In-region InterLATA Authority With the FCC Pursuant to §271 of the Telecommunications Act of 1996</u>: Before the Alabama Public Service Commission, Docket No. 25835, May 16, 2001 (Direct); June 19, 2001 (Supplemental); and June 27, 2001 (Cross-Examination).

Affidavit of Robert H. Gertner and Gustavo E. Bamberger in the Matter of: <u>BellSouth Telecommunications, Inc.'s Entry into InterLATA Services PursuantTo Section 271 of the Telecommunications Act of 1996</u>: Before the Georgia Public Service Commission, Docket No. 6863-U, May 31, 2001.

Direct Testimony of Gustavo E. Bamberger in the Matter of: <u>Application of BellSouth Telecommunications, Inc. To Provide In-Region InterLATA Services Pursuant to Section 271 of the Telecommunications Act of 1996</u>: Before the North Carolina Utilities Commission, Docket No. P-55, Sub 1022, June 11, 2001.

Direct Testimony of Gustavo E. Bamberger in Re: <u>Consideration of the Provision of In-Region InterLATA Services By BellSouth Telecommunications, Inc. Pursuant to Section 271 of the Telecommunications Act of 1996</u>: Before the Mississippi Public Service Commission, Docket No. 97-AD-0321, June 15, 2001.

Direct, Rebuttal and Cross-Examination Testimony of Gustavo E. Bamberger in Re: <u>Application of BellSouth Telecommunications, Inc. to Provide In-Region InterLATA Services Pursuant to Section 271 of the Telecommunications Act of 1996</u>: Before the Public Service Commission of South Carolina, Docket No. 2001-209-C, June 18, 2001 (Direct); July 16, 2001 (Rebuttal); and July 26-27, 2001 (Cross-Examination).

Affidavit of Robert H. Gertner and Gustavo E. Bamberger in Re: <u>Consideration and review of BellSouth Telecommunication, Inc.'s pre-application compliance with Section 271 of the Telecommunications Act of 1996, including but not limited to, the fourteen requirements set forth in Section 271(c)(2)(B) in order to verify compliance with Section 271 and provide a recommendation to the Federal Communications Commission regarding BellSouth Telecommunications, Inc.'s application to provide interLATA services originating in-region:</u> Before the Louisiana Public Service Commission, Docket No. U-22252-E, June 21, 2001.

Joint Declaration and Joint Reply Declaration of Robert H. Gertner, Gustavo E. Bamberger and Michael P. Bandow in the Matter of: <u>Application by Verizon Pennsylvania Inc., Verizon Long Distance, Verizon Enterprise Solutions, Verizon Global Networks Inc., and Verizon Select Services Inc., for Authorization To Provide In-Region, InterLATA Services in Pennsylvania:</u> Before the Federal Communications Commission, CC Docket No. 01-138, June 21, 2001 (Declaration); and August 6, 2001 (Reply Declaration).

Direct Testimony of Gustavo E. Bamberger in Re: <u>BellSouth Telecommunications, Inc.'s Entry into Long Distance (interLATA Service) in Tennessee Pursuant to Section 271 of the Telecommunications Act of 1996:</u> Before the Tennessee Regulatory Authority, Docket No. 97-00309, July 30, 2001.

Expert Report and Testimony of Gustavo E. Bamberger in Re: <u>In the Arbitration of Legend Healthcare, Inc. v. United Healthcare Services, Inc.,et al.:</u> American Arbitration Association, Commercial Arbitration No. 65 Y 193 00194 00, August 1, 2001 (Report); and September 27, 2001 (Testimony).

Reply Declaration of Dennis W. Carlton, Hal S. Sider and Gustavo E. Bamberger in the Matter of: <u>Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services:</u> Before the Federal Communications Commission, CC Docket No. 01-337, April 22, 2002.

Expert Preliminary Report, Supplemental Expert Report, Rebuttal Expert Report, Deposition, Declaration, Supplemental Declaration and Declaration of Gustavo E. Bamberger in Re: <u>Nobody in Particular Presents, Inc., v, Clear Channel Communications, Inc., Clear Channel Entertainment, Inc., Clear Channel Radio, Inc., Clear Channel Broadcasting Inc., KBCO-FM, KBPI-FM, KFMD-FM, KRFX-FM, and KTCL-FM,</u> In the U.S. District Court for the District of Colorado, Civil Action No. 01-N-1523, May 3, 2002 (Preliminary Report); July 26, 2002 (Supplemental Report); August 20, 2002 (Rebuttal Report); September 17, 2002 (Deposition); October 31, 2002 (Declaration); January 24, 2003 (Supplemental Declaration); and July 21, 2003 (Declaration).

Comments Regarding Regulation of Broadband Internet Access Services in the Matter of: <u>Inquiry Concerning High-Speed Access to Internet Over Cable and other Facilities,</u> GN Docket No. 00-185; in the Matter of: <u>Deployment of Wireline Services Offering Advanced Telecommunications Capability,</u> CC Docket No. 98-147; in the Matter of: <u>Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services,</u> CC Docket No. 95-20; and in the Matter of: <u>1998 Biennial Regulatory Review: Review of Computer III and ONA Safeguards and Requirements,</u> CC Docket No, 98-10 (with Kenneth Arrow, Gary Becker, Dennis Carlton, Daniel Fischel, Robert Gertner, Joseph Kalt and Hal Sider), May 3, 2002.

Expert Report, Reply Expert Report and Declaration of William Landes, Hal Sider and Gustavo Bamberger, and Declaration, Deposition and Supplemental Declaration of Gustavo E. Bamberger in Re: <u>Vitamin Antitrust Litigation</u>: In the U.S. District Court for the District of Columbia, M.D.L. No. 1285, May 23, 2002 (Report); July 17, 2002 (Reply Report); August 1, 2002 (Declaration with Landes and Sider); August 5, 2002 (Declaration); August 9, 2002 (Deposition); and September 27, 2002 (Supplemental Declaration).

Deposition of Gustavo E. Bamberger in Re: <u>Devin Daniels, et al. v. Philip Morris Companies, Inc., et al.</u>: In San Diego Superior Court, Case No. 719446, June 10, 2002.

Declaration of Gustavo E. Bamberger and Michael P. Bandow in Re: <u>EB-01-1H-0352, Supplemental Response to Questions Posed by the Commission in its May 21, 2002 Letter re Verizon's Provisioning of Special Access Services</u>, submitted to the Federal Communications Commission, July 31, 2002.

Affidavit, Expert Report and Deposition of Gustavo E. Bamberger in Re: <u>National Association for the Advancement of Colored People (NAACP) and National Spinal Cord Injury Association (NSCIA) v. Acusport Corporation; Ellet Brothers, Inc., RSR Management Company, and RSR Group, Inc., individually and on behalf of similarly situated entities; and National Association for the Advancement of Colored People (NAACP) et al., v. American Arms, Inc., et al.</u>: In the U.S. District Court for the Eastern District of New York, CV 99-7037 and CV 99-3999, August 20, 2002 (Affidavit); February 19, 2003 (Report); and March 6, 2003 (Deposition).

Report of Gustavo E. Bamberger in Re: <u>Nevada Power Company v. Lexington Insurance Company et al.</u>: In the U.S. District Court for the Southern District of Nevada, CV-S-01-0045-PMP-PAL, October 23, 2002.

Deposition of Gustavo E. Bamberger in Re: <u>Firearm Cases</u>: In Superior Court of the State of California, County of San Diego, Judicial Council Coordination Proceeding No. 4095, November 6, 2002.

Expert Rebuttal Report, Expert Report and Deposition of Gustavo E. Bamberger in Re: <u>Baum Research and Development, Inc. and Steve Baum v. Hillerich & Bradsby Co., Inc.; Easton Sports, Inc.; Worth, Inc.; National Collegiate Athletic Association; and Sporting Goods Manufacturers Association</u>: In the U.S. District Court for the Eastern District of Michigan, 98-72946, January 13, 2003 (Expert Rebuttal Report and Expert Report); and May 28-29, 2003 (Deposition).

Declaration of Gustavo E. Bamberger and Michael P. Bandow in Re: <u>EB-01-1H-0352, Supplemental Response to Questions Posed by the Commission in its January 24, 2003 Letter re: Verizon's Provisioning of Special Access Services</u>, submitted to the Federal Communications Commission, March 14, 2003.

Dennis W. Carlton, Janice H. Halpern and Gustavo E. Bamberger, "Economic Analysis of the News Corporation/DIRECTV Transaction," and "Response to William P. Rogerson and Daniel L. Rubinfeld and Duncan Cameron," submitted to the Federal Communications Commission, MB Docket No. 03-124, July 1, 2003; and September 8, 2003.

Expert Report, Deposition, Declaration and Testimony of Gustavo Bamberger in Re: <u>Western Asbestos Company; Western MacArthur Company; and Mac Arthur Company, Debtors</u>: In United States Bankruptcy Court, Northern District of California, Oakland Division, Nos. 02-46284, 02-46285, 02-46286, September 15, 2003 (Expert Report); October 21, 2003 (Deposition); November 17, 2003 (Declaration); and November 21, 2003 (Testimony).

Expert Report, Deposition and Testimony of Gustavo E. Bamberger in the Matter of the Arbitration Between: <u>Rangemark Insurance Services, Inc., Petitioner vs. Claremont Liability Insurance Company, Respondent</u>, October 24, 2003 (Expert Report); November 14, 2003 (Deposition); and February 12, 2004 (Testimony).

Joint Declaration of Gustavo E. Bamberger and Bradley N. Reiff, Joint Reply Declaration of Gustavo E. Bamberger and Bradley N. Reiff, Deposition of Gustavo E. Bamberger, Joint Expert Report of Gustavo E. Bamberger and Bradley N. Reiff, Joint Expert Rebuttal Report of Gustavo E. Bamberger and Bradley N. Reiff and Deposition of Gustavo E. Bamberger in Re: <u>Currency Conversion Fee Antitrust Litigation</u>: In the U.S. District Court for the Southern District of New York, MDL Docket No. 1409, November 11, 2003 (Joint Declaration); December 18, 2003 (Deposition); April 2, 2004 (Joint Reply Declaration); December 22, 2004 (Joint Expert Report); April 15, 2005 (Joint Expert Rebuttal Report); and May 20, 2005 (Deposition).

Expert Report, Deposition and Reply Expert Report of Gustavo E. Bamberger in Re: <u>Marketing and Management Information, Inc. v. The United States</u>: In the U.S. Court of Federal Claims, No. 99-194C, March 16, 2004 (Expert Report); April 20-21, 2004 (Deposition); and May 6, 2004 (Reply Expert Report).

Joint Expert Witness Statement of Gustavo Bamberger, David Gillen, Margaret Guerin-Calvert, Andrew Hanssen, Jerry Hausman, Timothy Hazledine, Janusz Ordover, Robert Willig and Kieran Murray; Affidavit of Gustavo Ernesto Bamberger and Dennis William Carlton in Reply; Second Affidavit of Gustavo Ernesto Bamberger and Dennis William Carlton; Affidavit of Gustavo Ernesto Bamberger; and Testimony of Gustavo Bamberger in the Matter of: <u>An appeal from determinations of the Commerce Commission between Air New Zealand Limited, Qantas Airways Limited, Appellants and Commerce Commission, Respondents</u>: In the High Court of New Zealand Auckland Registry, CIV 2003-404-6590, May 21, 2004 (Joint Expert Witness Statement); June 4, 2004 (Reply Affidavit); July 2, 2004 (Second Affidavit); July 12, 2004 (Affidavit of Gustavo Bamberger); and July 13-16, 2004 (Testimony).

Expert Report, Supplemental Expert Report, Deposition and Rebuttal Expert Report of Gustavo Bamberger in Re: <u>Congoleum Corporation et al.</u>: In United States Bankruptcy Court, District of New Jersey, Case 03-51524 (KCS), July 9, 2004 (Expert Report); January 26, 2005 (Supplemental Expert Report); February 9, 2005 and March 18, 2005 (Deposition); and February 23, 2005 (Rebuttal Expert Report).

Statement and Letter of Gustavo Bamberger in the Matter of: <u>A La Carte and Themed Tier Programming and Pricing Options for Programming Distribution on Cable Television and Direct Broadcast Satellite Systems</u>: Before the Federal Communications Commission, MB Docket No. 04-207, July 15, 2004 (Statement); and November 4, 2004 (Letter with Michael G. Baumann, John M. Gale, Thomas W. Hazlett, Michael L. Katz, Kent W. Mikkelsen and Bruce M. Owen).

Expert Report, Supplemental Expert Report, Deposition and Testimony of Gustavo Bamberger in Re: <u>Braid Electric Company, Claimant vs. Square D Company / Schneider Electric, Respondent</u>: American Arbitration Association, Case No. 51 Y 181 01712 03, August 16, 2004 (Expert Report); October 8, 2004 (Supplemental Expert Report); October 29, 2004 (Deposition); and November 15, 2005 (Testimony).

Declaration, Deposition, Affidavit, Reply Declaration and Reply Report on Remand of Gustavo Bamberger in Re: <u>Issuer Plaintiff Initial Public Offering Antitrust Litigation</u> and <u>Public Offering Fee Antitrust Litigation</u>: In the U.S. District Court for the Southern District of New York, 00 Civ. 7804 (LMM) (DFE) and 98 Civ. 7890 (LMM), September 16, 2004 (Declaration); January 27, 2005 (Deposition); October 24, 2005 (Affidavit); October 17, 2007 (Reply Declaration); and March 6, 2008 (Reply Report on Remand).

Expert Report and Deposition of Gustavo Bamberger in Re: <u>Congoleum Corporation v. Ace American Insurance Company, et al.</u>: In the Superior Court of New Jersey, Law Division: Middlesex County, Docket No. MID-L-8908-01, December 17, 2004 (Expert Report); and March 18, 2005 (Deposition).

Declaration of Gustavo Bamberger in Re: <u>Gas Plus, a California Corporation; and Gas Plus San Marcos, Inc., a California Corporation vs. Exxon Mobil Corporation, a Corporation; Mark McEnomy, an individual; Anthony Moss, an individual; and Does 1-50, inclusive</u>: In the Superior Court of the State of California in and for the County of San Diego, North County Division, Case No. GIN 032455, February 14, 2005.

Declaration, Expert Report, Expert Rebuttal Report and Deposition of Gustavo Bamberger in Re: <u>Robert Ross and Randal Wachsmuth, on behalf of themselves and all others similarly situated vs. American Express Company, American Express Travel Related Services, Inc., and American Express Centurion Bank</u>: In the U.S. District Court for the Southern District of New York, 04 CV 05723, February 18, 2005 (Declaration); September 12, 2005 (Expert Report); November 14, 2005 (Expert Rebuttal Report); and December 14, 2005 (Deposition).

Expert Report of Gustavo E. Bamberger and Dennis W. Carlton, Testimony of Gustavo E. Bamberger and Rebuttal Report of Gustavo E. Bamberger in the Matter of: <u>EchoStar Satellite, L.L.C v. Fox Television Holdings, Inc., Fox/UTV Holdings, Inc. and News Corporation Limited</u>: American Arbitration Association, Case No. 71 472 E 00690 04, March 2, 2005 (Expert Report); March 12, 2005 (Testimony); and April 5, 2005 (Rebuttal Report).

Declaration, Reply Declaration and Ex Parte Submission of Gustavo E. Bamberger, Dennis W. Carlton and Alan L. Shampine in Re: <u>Verizon Communications Inc. and MCI, Inc., Applications for Approval of Transfer of Control</u>: Before the Federal Communications Commission, WC Docket No. 05-75, March 11, 2005 (Declaration); May 24, 2005 (Reply Declaration); and September 9, 2005 (Ex Parte Submission).

Statement of Gustavo Bamberger and Lynette Neumann, Further Statement of Gustavo Bamberger and Lynette Neumann, Updated Analysis of Effect of RSN Availability on DBS Penetration (with L. Neumann); Analysis of the Effect of "Clustering" on the Availability and Penetration of Digital Cable, High-Speed Data and Telephony Services (with L. Neumann); and Supporting Declaration of Gustavo Bamberger and Lynette Neumann in Re: Applications of Adelphia Communications Corporation, Comcast Corporation, and Time Warner Cable Inc., For Authority to Assign and/or Transfer Control of Various Licenses: Before the Federal Communications Commission, MB Docket No. 05-192, July 21, 2005 (Statement); March 1, 2006 (Further Statement); March 17, 2006 (Updated Analysis); March 30, 2006 (Effect of "Clustering"); and April 5, 2006 (Supporting Declaration).

Comments of Gustavo E. Bamberger, Dennis W. Carlton and Alan L. Shampine in the Matter of: The Joint Petition of Verizon Communications Inc., and MCI, Inc. for a Declaratory Ruling Disclaiming Jurisdiction Over, or, in the Alternative, for Approval of Agreement and Plan of Merger: Before the State of New York Public Service Commission, Case 05-C-0237, August 5, 2005.

Declaration of Gustavo Bamberger in Re: USG Corporation, a Delaware corporation, et al., Debtors, USG Corporation, et al., Movant v. Official Committee of Asbestos Personal Injury Claimants, Official Committee of Unsecured Creditors, Official Committee of Asbestos Property Damage Claimants and Legal Representative for Future Claimants, Respondents: In The U.S. District Court For The District Of Delaware, Chapter 11, Jointly Administered, Case No. 01-2094 (JKF), Civil Action No. 04-1559 (JFC) Civil Action No. 04-1560 (JFC), September 28, 2005.

Declaration, Deposition and Testimony of Gustavo Bamberger in Re: Marvin D. Chance, Jr., on behalf of himself and all other similarly situated Kansas residents, Thomas K. Osborn, on behalf of himself and all other similarly situated New York residents v. United States Tobacco Company, United States Tobacco Sales and Marketing Company, Inc., United States Tobacco Manufacturing Company, Inc., and UST, Inc.: In the District Court of Seward County, Kansas, Case No. 02-C-12, September 29, 2005 (Declaration); November 1, 2005 (Deposition); and January 19, 2006 and April 4, 2006 (Testimony).

Expert Report, Rebuttal Report and Deposition of Gustavo Bamberger in Re: Jame Fine Chemicals, Inc. (d/b/a JFC Technologies) v. Hi-Tech Pharmacal Co., Inc. v. MedPointe Inc. as successor in interest to and formerly known as Carter-Wallace, Inc., and ABC Corporation and XYZ, Inc., companies and/or corporations whose true identities are unknown to Third-Party Plaintiff: In the U.S. District Court for the District of New Jersey, Civil Action No. 00-3545 (AET), October 3, 2005 (Report); May 8, 2006 (Rebuttal Report); and June 15, 2006 (Deposition).

Deposition and second Deposition of Gustavo Bamberger in Re: John Crane, Inc. v. Admiral Insurance Company, et al., In the Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 04-CH-08266, October 17, 2005 (Deposition); and November 2, 2006 (Second Deposition).

Submission, Testimony and Additional Submission of Gustavo Bamberger for Unison Networks Limited to the New Zealand Commerce Commission, October 28, 2005 (Submission); December 6, 2005 (Testimony); and January 11, 2006 (Additional Submission).

Submission of Gustavo Bamberger for Transpower New Zealand Limited to the New Zealand
Commerce Commission, February 27, 2006.

Brief of Evidence of Gustavo Ernesto Bamberger and Testimony of Gustavo Bamberger in the
Matter of: The Commerce Commission, Plaintiff and New Zealand Bus Limited, First
Defendant and Blairgowrie Investments Limited, Copland Neyland Associates Limited,
Rhoderick John Treadwell and Kerry Leigh Waddell, Karyn Justine Cosgrave and Ian
Waddell, Second Defendants and Infratil Limited, Third Defendant: In the High Court of
New Zealand Wellington Registry, CIV 2006-485-585, May 17, 2006 (Brief of Evidence);
and May 30, 2006 (Testimony).

Rebuttal Testimony of Gustavo Bamberger on Damages and Deposition in Re: Tessera, Inc. vs.
Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies
AG, Infineon Technologies Richmond, LP, and Infineon Technologies North America
Corp. and Qimonda AG: In the U.S. District Court for the Eastern District of Texas,
Marshall Division, Case No. 2:05CV-94, June 23, 2006 (Rebuttal Testimony) and July
22, 2006 (Deposition).

Expert Report and Deposition of Gustavo Bamberger in Re: Electronic Data Systems
Corporation and EDS Information Services, L.L.C. v. MCI Communications Services,
Inc.: American Arbitration Association, Arbitration No. 13 181 00976 06, July 20, 2006
(Expert Report); and August 11, 2006 (Deposition).

Declaration, Revised Declaration and Deposition of Gustavo Bamberger in Re: Jason
Feuerabend, a Wisconsin resident, on behalf of himself and all others similarly situated
v. UST Inc., U.S. Smokeless Tobacco Brands Inc., U.S. Smokeless Tobacco Co., U.S.
Smokeless Tobacco Manufacturing Limited Partnership, and Does 1-20 inclusive: In the
Circuit Court of Milwaukee County, Wisconsin, Case No. 02CV007124, September 21,
2006 (Declaration); December 1, 2006 (Revised Declaration); and December 5, 2006
(Deposition).

Expert Report of Gustavo Bamberger in Re: Ronald Alcorn, d/b/a Highland Park Amoco; et al.
vs. BP Products North America, Inc.: In the United States District Court for the District of
Minnesota, Court File No. 04-120 (PAM/JSM), October 23, 2006.

Declaration of Gustavo Bamberger in Re: Smokeless Tobacco Cases I-IV: In the Superior Court
of the State of California, City and County of San Francisco, Judicial Council
Coordination Proceeding Nos. 4250, 4258, 4259 & 4262, March 21, 2007.

Testimony of Gustavo Bamberger before the Arkansas Oil and Gas Commission on behalf of
Great Lakes Chemical Corp. and Tetra Technologies, Inc., Subject: Approval of Royalty
Payment Procedure, Docket No. 173-2007-04, April 25, 2007.

Declaration of Gustavo Bamberger and Lynette Neumann in Re: In the Matter of National
Exchange Carrier Association, Inc.'s Proposed 2007 Modification of Average Schedule
Formulas: Before the Federal Communications Commission: WC Docket No. 06-223,
May 4, 2007.

Brief of Evidence of Gustavo Ernesto Bamberger, Reply Brief of Evidence of Gustavo Ernesto Bamberger, Bamberger, Evans, and Hausman Joint Propositions, Summary of Evidence of Gustavo Bamberger and Testimony in the Matter of: <u>The Commerce Commission, Plaintiff and Telecom Corporation of New Zealand Limited, First Defendant and Telecom New Zealand Limited, Second Defendant</u>: In the High Court of New Zealand Wellington Registry, CIV 2000-485-673, June 10, 2007 (Brief); August 13, 2007 (Reply Brief); September 17, 2007 (Joint Propositions); September 19, 2007 (Summary); and September 19-20, 2007 (Testimony).

Declaration of Gustavo Bamberger in Re: <u>Massachusetts Smokeless Tobacco Litigation</u>: In the Superior Court of the Commonwealth of Massachusetts, Superior Court Dept. Docket No. 03-0320, Case No. 02-5038 BLS, August 1, 2007.

Statement of Evidence, Reply Statement of Evidence and Testimony of Gustavo Ernesto Bamberger in the Matter of: <u>Each an appeal against a determination of the Commerce Commission between Woolworths Limited, Appellant and the Commerce Commission, Respondent, and Foodstuffs (Auckland) Limited, Foodstuffs South Island Limited, Foodstuffs (Wellington) Co-Operative Society Limited, Appellants and the Commerce Commission, Respondent, and The Warehouse Group Limited, Appellant and the Commerce Commission, Respondent</u>: In the High Court of New Zealand Wellington Registry, CIV 2007-485-1255, CIV 2007-485-1379 and CIV 2007-485-1731, September 20, 2007 (Statement); October 29, 2007 (Reply Statement); and October 29-31, 2007 (Testimony).

Affidavit of Gustavo Bamberger in Re: <u>United States of America v. Faust Villazan, Faustech Industries, Inc., Siemens Medical Solutions USA Inc., f/k/a Siemens Medical Systems, Daniel Desmond, and Ellen Roth</u>: In the U.S. District Court for the Northern District of Illinois, Eastern Division, No. 05 CR 792, October 11, 2007.

Declaration of Gustavo Bamberger in Re: <u>Burns & Roe Enterprises, Inc., et al., Debtors</u>: In the United States Bankruptcy Court, District of New Jersey, Case Nos. 00-41610(RG) and 05-47946(RG) (Consolidated), October 17, 2007.

Statement, Report and Deposition of Gustavo Bamberger in Re: <u>American Optical Corporation, Warner-Lambert Company, LLC, and W-L LLC v. Admiral Insurance Company, et al.</u>: In the Superior Court of New Jersey Law Division: Union County, Docket No. UNN-L-2505-01, December 13, 2007 (Statement); December 26, 2007 (Report); and February 12, 2008 (Deposition).

Declaration and Deposition of Gustavo E. Bamberger in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' Per Se Claim in Re: <u>ATM Fee Antitrust Litigation</u>: In the United States District Court, Northern District of California, Master File No. C04-2676 CRB, December 21, 2007 (Declaration); and February 1, 2008 (Deposition).

Declaration, Deposition, Reply Declaration and Deposition of Gustavo Bamberger in Re: <u>Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation</u>: In the United States District Court, Eastern District of New York, Master File No. 1:05-md-1720-JG-JO, May 8, 2008 (Declaration); July 30-31, 2008 (Deposition); January 29, 2009 (Reply Declaration); and May 27, 2009 (Deposition).

Statement of Janusz Ordover and Gustavo Bamberger, filed with the Securities and Exchange
Commission, Release No. 34-57917, on behalf of NASDAQ Stock Market, August 1,
2008.

Expert Report, Deposition, Expert Rebuttal Report, Testimony, Rebuttal Testimony,
Supplemental Expert Report, Supplemental Expert Rebuttal Report and Deposition of
Gustavo Bamberger in Re: <u>Valassis Communications, Inc. v. News America
Incorporated, a/k/a News America Marketing Group, News America Marketing FSI, Inc.
a/k/a News America Marketing FSI, LLC and News America Marketing In-Store
Services, Inc. a/k/a News America Marketing In-Store Services, LLC</u>: In the United
States District Court, Eastern District of Michigan, Southern Division, Case No. 2:06-cv-
10240 and State Court of Michigan, in the Circuit Court for the County of Wayne, Case
No. 07-706645-CZ, November 21, 2008 (Expert Report); December 23, 2008
(Deposition); February 6, 2009 (Expert Rebuttal Report); Testimony (June 11, 2009);
Rebuttal Testimony (July 16, 2009); Supplemental Expert Report (December 21, 2009);
Supplemental Expert Rebuttal Report (January 14, 2010); and Deposition (January 19,
2010) (Case No. 2:06-cv-10240 only for Supplemental Reports and second deposition).

Brief of Evidence of Dennis William Carlton and Gustavo Ernesto Bamberger, Affidavit of
Gustavo Ernesto Bamberger in support of amended notice of opposition by the
Commerce Commission to the amended notice of application by the bank defendants
and the notice of application by MasterCard for orders as to admissibility of evidence,
and Reply Brief of Evidence of Dennis William Carlton and Gustavo Ernesto Bamberger
in the Matter of: <u>The Commerce Commission, Plaintiff and Cards NZ Limited, First
Defendant and others</u> and <u>DSE (NZ) Limited, First Plaintiff and others and Card NZ
Limited, First Defendants and others</u>: In the High Court of New Zealand Auckland
Registry, CIV 2006-485-2535 and CIV-2006-485-2693, May 4, 2009 (Brief of Evidence);
May 20, 2009 (Affidavit); September 4, 2009 (Reply Brief).

Expert Report of Gustavo Bamberger in Re: <u>Valassis Communications, Inc. v. News America
Incorporated, a/k/a News America Marketing Group, News America Marketing FSI, Inc.
a/k/a News America Marketing FSI, LLC and News America Marketing In-Store
Services, Inc. a/k/a News America Marketing In-Store Services, LLC</u>: In the Superior
Court of the State of California for the County of Los Angeles, May 11, 2009.

Affidavit of Gustavo Ernesto Bamberger in opposition to application by plaintiff for stay of
execution, Brief of Evidence of Gustavo Ernesto Bamberger, Summary Statement of
Gustavo Bamberger and Testimony in the Matter of: <u>Todd Pohokura Limited, Plaintiff and
Shell Exploration NZ Limited, First Defendant and OMV New Zealand Limited, Second
Defendant</u>: In the High Court of New Zealand Wellington Registry, CIV 2006-485-1600,
November 4, 2009 (Affidavit); November 25, 2009 (Brief of Evidence); March 25, 2010
(Summary Statement); and March 25-26, 29-30 (Testimony).

Report of Gustavo Bamberger, Report of Gustavo Bamberger on the Revised January 6, 2010
Plan and Deposition in Re: <u>Pittsburgh Corning Corporation</u>: In the United States
Bankruptcy Court for the Western District of Pennsylvania, Case No. 00-22876 JKF,
November 13, 2009 (Report); January 28, 2010 (Report on Revised Plan); and February
22, 2010 (Deposition).

Report and Reply Report of Dennis W. Carlton and Gustavo E. Bamberger and Cross-Examination of Gustavo E. Bamberger in Re: <u>Air Canada and Toronto Port Authority and Porter Airlines Inc.</u>: Federal Court, File No. 10-T-6, February 5, 2010 (Report); May 18, 2010 (Reply Report); and June 15, 2010 (Cross-Examination).

Expert Report of Daniel R. Fischel and Gustavo E. Bamberger in Re: <u>Genetically Modified Rice Litigation</u>: In the United States District Court, Eastern District of Missouri, Eastern Division, Texana Rice Mill, Ltd., et al. v. Bayer CropScience, LP, et al., Case No. 4:07-cv-00416 CDP; Gulf Pacific Rice Co., Inc., et al. v. Bayer CropScience, LP, et al., Case No. 4:08-cv-1545-CDP; Phoenix Advisors Limited v. Bayer CropScience, LP, et al., Case No. 4:08-cv-1794-CDP; Farmers Rice Milling Co., Inc. v. Bayer CropScience, LP, et al., Case No. 4:07-cv-01780-CDP; Kennedy Rice Dryers, L.L.C. v. Bayer CropScience, LP, et al., Case No. 4:07-cv-01773-CDP; Planters Rice Mull, L.L.C. v. Bayer CropScience, LP, et al., Case No. 4:07-cv-01795-CDP; Beaumont Rice Mills, Inc. v. Bayer CropScience, LP, et al., Case No. 4:07-cv-00524-CDP; Master Case No. 4:06 MD 1811 CDP, April 23, 2010.

Expert Report of Daniel R. Fischel and Gustavo E. Bamberger in Re: <u>Genetically Modified Rice Litigation</u>: In the United States District Court, Eastern District of Missouri, Eastern Division, Tilda Ltd v. Riceland Foods, Inc., Producers Rice Mill, Inc., Bayer Cropscience Inc., and Bayer Cropscience LP; Producers Rice Mill, Inc. v. Bayer Cropscience LP and Bayer Cropscience Holding Inc., Bayer Corporation, Bayer Cropscience AG, Bayer AG, and Bayer Bioscience nv, Case No. 4:07-Cv-00457, Master Case No. 4:06 MD 1811 CDP, July 14, 2010.

Declaration of Gustavo Bamberger in Re: <u>Credit/Debit Card Tying Cases</u>: In the Superior Court for the State of California, City and County of San Francisco, J.C.C.P. No.: 4335, July 29, 2010.

Expert Report of Daniel R. Fischel, Gustavo E. Bamberger and David K.A. Mordecai in Response to the Reports of Professors Carter and Babcock in Re: <u>Genetically Modified Rice Litigation</u>: In the United States District Court, Eastern District of Missouri, Eastern Division, Master Case No. 4:06 MD 1811 CDP, July 30, 2010.

Expert Report of Daniel R. Fischel, Gustavo E. Bamberger and David K.A. Mordecai in Response to the Report of Dr. Ford in Re: <u>Genetically Modified Rice Litigation</u>: In the United States District Court, Eastern District of Missouri, Eastern Division, Master Case No. 4:06 MD 1811 CDP, July 30, 2010.

**Appendix B**

**Materials Relied On**

Third Amended Complaint for Damages and Equitable Relief

Defendants' Notice of Motion and Motion for Summary Judgment: Memorandum of Points and Authorities in Support Thereof

██████████████████████████████████████████████████████████████████

George J. Stigler, *The Theory of Price*, 3rd ed.

Gary S. Becker, *Economic Theory*

Joshua S. Gans and Stephen P. King, "The Neutrality of Interchange Fees in Payment Systems," *Topics in Economics Analysis & Policy*, Vol. 3, Issue. 1, Article 1, 2003

Steven C. Salop, "Deregulating Self-Regulated Shared ATM Networks," *Economics of Innovation and New Technology*, 1990, vol. 1

████████████████████████████████████

████████████████████████████████████████████████

Report of Professor Ravi Dhar (in this matter)

██████████████████████████████████████████████████████████████████

Internal Wells Fargo e-mail dated January 6, 2000

Wells Fargo, "ATM Surcharging Proposal," January 5, 2000

Prepared Testimony of Mr. Donald I. Baker, before the Senate Banking, Housing and Urban Affairs Committee

██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

Congressional Budget Office, "Competition in ATM Markets: Are ATMs Money Machines?", July 1998

Web sites of Chase; Bank of America; Citibank; and Wells Fargo