IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ATM FEE ANTITRUST LITIGATION, | No. C 04-02676 CRB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

In this longstanding antitrust action, Defendants have moved for summary judgment on the issue of whether Plaintiffs lack standing to bring an antitrust claim for damages under the rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). For the reasons explained below, the Court agrees with Defendants that Plaintiffs, as indirect purchasers of the allegedly fixed fee at issue in this case, lack standing to bring a claim for damages under *Illinois Brick*. Accordingly, the Court GRANTS Defendants' motion and dismisses Plaintiffs' damages claims.[1]

**BACKGROUND**

**A.    Overview**

This case concerns fees that are generated when a customer of one bank withdraws money from his or her account by using an automated teller machine ("ATM") owned by another bank or by an independent ATM operator. Such "foreign ATM transactions" involve

---

[1] In light of the Court's conclusion that Plaintiffs lack standing to bring a damages claim, Plaintiffs' Motion for Reconsideration of September 4, 2009 Order and Defendant Bank of America, N.A.'s Motion to Dismiss Plaintiffs' Third Amended Complaint, both of which concern the amount of damages Plaintiffs may seek from Bank of America, N.A., are DENIED as moot.

four parties: (1) the "cardholder," *i.e.*, the customer who retrieves money from the ATM machine; (2) the "card-issuer bank,"*i.e*, the bank at which the customer holds an account and from which the customer has received an ATM card; (3) the "ATM owner," *i.e.*, the entity that owns the ATM machine from which the customer withdraws money from his account; and (4) the "ATM Network," *i.e.*, an entity that owns a network that connects the ATM owners with the card-issuing banks. The ATM Network administers agreements between various card-issuer banks and ATM owners and thereby ensures that customers can withdraw money from one network member's ATM as readily as from another.

A single foreign ATM transaction generates up to four fees. Generally, a customer must pay two fees – one to the ATM owner for use of that entity's ATM machine (known as a "surcharge") and one to the bank at which he has an account (known as a "foreign ATM fee"). The card-issuer bank also pays two fees. It pays one of these fees, known as a "switch fee," to the ATM Network that routed the transaction. It pays a second fee, known as an "interchange fee," to the owner of the foreign ATM.

To illustrate the above concepts, assume that a Bank of America customer withdraws money from her account at a Wells Fargo ATM and that the transaction is routed over the Star ATM Network. Generally, Wells Fargo will charge Bank of America's customer a "surcharge" at the time of the transaction for using its ATM. Wells Fargo will also later collect an "interchange fee" from Bank of America for allowing Bank of America's customer to withdraw cash from its ATM. Bank of America also pays the Star Network a "switch fee" for routing the transaction. Lastly, Bank of America will, in some cases, charge its customer a "foreign ATM fee" for using a non-Bank of America ATM.

Only two of the four fees are involved in this case: the "interchange fee" that the card-issuing bank pays to the ATM owner and the "foreign ATM fee" that the customer pays to his or her bank for using a foreign ATM. Plaintiffs, a putative class of bank customers,

allege that Defendants, the Star ATM Network and several large banks[2], have conspired to illegally fix the interchange fee that the card-issuer bank pays to the ATM owner.

Critically, Plaintiffs do *not* allege that Defendants have conspired to illegally fix the foreign ATM fee that Plaintiffs pay to their bank when they use a foreign ATM. Instead, Plaintiffs assert that their banks pay an unlawfully inflated interchange fee and then pass the cost of the artificially high interchange fee along to them through foreign ATM fees.

The interchange fee, though paid by a card-issuing bank to an ATM owner, is established by the ATM Network that routes the foreign ATM transaction between the card-issuing bank and the ATM owner. Moreover, although there are as many as twenty-five such networks, Plaintiffs' lawsuit concerns only the largest one, the Star ATM Network. Plaintiffs allege that the bank Defendants, acting through Star's Board, have unlawfully fixed the interchange fee that members of the Star Network charge one another for each transaction routed over Star. Since 2003, Star has set the interchange fee at $0.46 for on-premises transactions (*i.e.,* transactions at ATMs deployed on a bank's premises) and $0.54 for off-premises ATM transactions.

To reiterate: Plaintiffs allege that several large banks have conspired with Star to fix the interchange fee that a card-issuing bank pays to an ATM owner when a foreign ATM transaction involving the card-issuing bank's customer is routed over the Star Network. As a result of this alleged "price fix," interchange fees are, Plaintiffs maintain, higher than they would otherwise be.

Plaintiffs, however, do not pay this allegedly unlawful fee directly (their banks do) and therefore are not directly harmed by it. Rather, Plaintiffs assert that their respective banks pass on this inflated fee to them in form of higher foreign ATM fees. Importantly, Plaintiffs do not allege that the Defendants or any other banks have conspired to fix the foreign ATM fee that the Plaintiffs must pay.

---

[2] The bank Defendants are Bank of America, N.A., JPMorgan Chase Bank, N.A., Citibank, N.A., Suntrust, and Wells Fargo Bank, N.A./Wachovia. Third Amended Complaint ¶¶ 17- 29.

3

As just described, Plaintiffs' case focuses on the interchange fee that members of the Star Network charge one another when the customer of one member uses an ATM owned by another member. Because Plaintiffs' case centers on the Star Network, a brief description of the Star ATM Network, which connects ATM owners and ATM card-issuers, is necessary.

The Star Network has 4,750 members who collectively own 380,000 ATMs nationwide. *See* Sawicki Decl. ¶ 3. These members can be roughly divided into three groups. The first group is made up of so-called "Independent Service Organizations" ("ISOs"). *Id.* at ¶¶ 8, 20. ISOs own ATMs, but they are not banks and do not issue ATM cards. Examples of ISOs include grocery stores and gas stations that have installed an ATM on their premises.

The second group is, in some sense, the polar opposite of the ISOs. This group consists of financial institutions that accept deposits and issue ATM cards, but do not own any ATMs themselves. *Id.* at ¶ 13. This group includes, for example, many credit unions and internet banks. *Id.* at ¶ 15. Approximately 1,000 Star members fall within this group. *Id.* at ¶ 15.

The third, and largest, Star Network member group are financial institutions, like the bank Defendants, that both issue ATM cards and own ATMs. At least 3,100 Star Network members are in this category. *Id.* at ¶ 16.

Interchange fees are, as already noted, paid by members of the Star Network to other members of the Star Network. Thus, among members of the Star Network, the payment and receipt of interchange fees is a zero sum game. Every dollar in interchange fees that is paid by one member is received by another, and vice versa.

Moreover, although the "net cost" of interchange is zero when aggregated across the Star Network membership (*i.e.*, total payments equal total receipts), the distribution of interchange fee payments and receipts is not evenly distributed between the three groups just discussed. For example, because ISOs own ATMs, but do not issue ATM cards, they *only* receive interchange fees. They never pay them. *Id.* at ¶ 8, 20. By contrast, the second group mentioned above *only* pays interchange fees because they do not own any ATM that would

4

generate fees. *Id.* at ¶ 13. In short, ISOs are "pure receivers" of interchange fees, while entities in the second group are "pure payers" of interchange.

The third and final group falls somewhere in between. Because financial institutions in this group both own ATMs and issue ATM cards to customers who use foreign ATMs, they both pay *and* receive interchange fees. According to evidence submitted by Defendants, however, most of the entities in this last group pay more in interchange fees than they receive. *Id.* at ¶ 16. In other words, they are "net payers" of interchange fees. *Id.* Interestingly, all of the banks named as defendants in this lawsuit who were members of the Star Network over the past two years are substantial "net payers" of interchange.[3] *Id.* at ¶ 17, 18. In fact, four of the five relevant bank Defendants are among the top-five "net payers" of interchange fees among Star Network members, and the fifth paid the eleventh most. *Id.* at ¶ 17. Collectively, these five banks paid approximately $120 million more in interchange fees than they received over the past two years.[4]

In sum, the Star Network is comprised of 4,750 members. Of these 4,750 members, approximately 4,100 pay more in interchange than they receive. By definition, the remaining 650 members receive more than they pay. The simplest way to view interchange fees therefore is as a transfer payment from 4,100 members of the Star Network to the 650 other members of the network. In other words, for 4,100 members of the Star Network, interchange fees are a cost, while for 650 members, interchange fees are a source of revenue.

**B.    Defendants' Motion for Summary Judgment**

---

[3] Suntrust is the only bank Defendant who was not a member of the Star Network over the past two years. Sawicki Decl. ¶ 17.

[4] As an aside, the Court notes that these data cast serious doubt on the central theory of Plaintiffs' case: namely, that the bank Defendants have conspired with the Star Network to fix interchange fees at artificially high levels. Third Amended Complaint ¶ 93. As the data indicate, the bank Defendants pay more in interchange fees than almost all other members of the Star Network and are therefore the entities most adversely affected by such fees. As a result, it strikes that Court as somewhat implausible that they would conspire to set the interchange fee at artificially high levels, in contravention to their financial interests. If anything, these entities would presumably conspire to ensure that interchange fees were set as low as possible. Because the Court does not reach the merits of Plaintiffs' claims, however, it need not address this interesting issue.

5

1    Through this lawsuit, Plaintiffs seek damages in the amount of the unlawful
2 interchange fee that their respective banks have passed through to them in the form of foreign
3 ATM fees. Plaintiffs therefore acknowledge that they are only indirect payers of the
4 interchange fee and that the banks are the direct payers.

5    In light of this concession, Defendants have moved for summary judgment, arguing
6 that the *Illinois Brick* rule barring indirect purchasers from recovering monetary damages in
7 an antitrust suit applies here and precludes Plaintiffs from seeking such damages. As
8 explained below, the Court agrees.

## LEGAL STANDARD

10   Summary judgment is proper when "the pleadings, depositions, answers to
11 interrogatories, and admissions on file, together with the affidavits, if any, show that there is
12 no genuine issue as to any material fact and that the moving party is entitled to a judgment as
13 a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient
14 evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a
15 dispute is "material" only if it could affect the outcome of the suit under governing law. *See*
16 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

17   The party moving for summary judgment bears the initial burden of establishing the
18 absence of a genuine issue of material fact and can satisfy this burden by presenting evidence
19 that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*,
20 477 U.S. 317, 322-23 (1986).

21   Once the moving party meets its initial burden, the non-moving party "may not rely
22 merely on allegations or denials in its own pleading," but must go beyond the pleadings and,
23 "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine
24 issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324; *Valandingham v.*
25 *Bojorquez*, 866 F.2d 1135, 1137 (9th Cir.1989). In its inquiry, the court must view any
26 inferences drawn from the underlying facts in the light most favorable to the nonmoving
27 party, but may not engage in credibility determinations or weigh the evidence. *Anderson*, 477
28

6

U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### A. The *Illinois Brick* direct purchaser rule

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only "direct purchasers," *i.e.*, those entities that directly pay the allegedly fixed price, may recover antitrust damages. *Id.* at 736. The Court reasoned that allowing "indirect purchasers," *i.e.*, those entities to whom the direct purchaser passes on all or part of the cost of the allegedly fixed price, to recover damages would introduce into antitrust litigation substantial "evidentiary complexities and uncertainties" over the apportionment of overcharges between direct and indirect purchasers. *Id.* at 732; *see also Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008). "However appealing this attempt to allocate the overcharge might seem in theory," the Court reasoned, "it would add whole new dimensions of complexity to [antitrust]-damages suits and seriously undermine their effectiveness." *Illinois Brick*, 431 U.S. at 737. The Court therefore concluded that, "on balance," the costs of permitting indirect purchasers to sue for antitrust damages outweighed the benefits. *Id.* at 746; *id.* at 735 ("[A]ntitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue . . . .").

The Supreme Court reaffirmed the direct purchaser rule in *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (2010). In the case, the states of Kansas and Missouri, acting on behalf of individual energy consumers, initiated suits against a pipeline company and five gas production companies, alleging that the companies had conspired to fix the price of gas. *Id.* at 204. The Court held that the direct purchaser barred the states from suing to recover damages because the consumers they represented were indirect payers of the allegedly inflated gas prices. *Id.* at 207. Because the utilities from whom the consumers bought their gas were the entities that had directly paid the purportedly inflated price, "any antitrust claim against the defendants [was] . . . for the utilities to assert." *Id.*

7

In this case, Plaintiffs do not dispute that they pay the purportedly unlawful interchange fee only indirectly. ATM card-issuing banks, such as the bank Defendants, pay the artificially inflated interchange fee directly and then, at least according to Plaintiffs, pass some portion of it on to the Plaintiffs as part of the foreign ATM fee Plaintiffs pay. In short, card-issuing banks, like the utilities in *UtiliCorp*, are the "direct purchasers" of allegedly unlawful fee, while Plaintiffs, like the consumers in *UtiliCorp*, are "indirect purchasers."

Given that Plaintiffs are not "direct purchasers" of the purportedly unlawful fee, their damages claims are barred by the *Illinois Brick* rule, unless an exception to the rule applies. As explained below, the Court finds that no exceptions apply and that Plaintiffs' damages claims are therefore barred.

### B. Exceptions to the direct purchaser rule

Courts have recognized three circumstances in which an indirect purchaser may sue for antitrust damages, despite the rule set forth in *Illinois Brick*. *See Delaware Valley*, 523 F.3d at 1123 n.1. The first situation occurs where the direct purchaser has entered into a "cost-plus" pricing contract with the indirect purchaser before the direct purchaser pays the allegedly inflated fixed price to the antitrust conspirators. *See UtiliCorp*, 497 U.S. at 217-18 (noting that "in a [pre-existing] cost-plus contract situation, . . . [t]he effect of the overcharge [to the indirect purchaser] is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination [of the amount of the pass-through] in the general case") (quotation marks and citations omitted).

This first exception is inapplicable here. Plaintiffs neither allege nor argue that they entered into a "cost-plus" pricing contract with their banks and that the banks pass along the interchange fee pursuant to such a contract.

A second "exception" to the direct purchaser rule applies where the direct purchaser has conspired with the producer to fix the price that the indirect purchaser pays. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984). This so-called "co-conspirator" exception was identified by the Ninth Circuit in *Shamrock Foods*. *Id.* In *Shamrock Foods*, the plaintiffs, a class of consumers, alleged that dairy producers had

8

conspired amongst themselves and with retail grocery stores to fix the retail price of milk. *Id.* The Ninth Circuit held that *Illinois Brick* did not apply because the retail price – *i.e.*, the price that the plaintiffs had paid – was the one purportedly fixed, and, as a result, plaintiffs' "theory of recovery [did] not depend on pass-on damages." *Id.* In short, *Illinois Brick* did not apply because Plaintiffs alleged that the price *they* paid was the one that had been unlawfully fixed. Hence, "there [was] no need to apportion [the overcharge resulting from the price fix] because it was not passed on to the consumers through any other level in the distribution chain." *Id.* at 1214.

Strictly speaking, the co-conspirator "exception" identified in *Shamrock Foods* is not an exception to the direct purchaser rule. *Shamrock Foods* stands for the proposition that a plaintiff may sue for damages when the price that they have paid directly is the one that was unlawfully fixed. That holding is fully consistent with *Illinois Brick*, which held that a plaintiff may not sue for damages when the plaintiff has only indirectly paid the unlawfully fixed price.

However described, the *Shamrock Foods* "exception" is inapplicable here. As already discussed, Plaintiffs in this case, unlike the plaintiffs in *Shamrock Foods*, do not allege that Defendants conspired to fix the price Plaintiffs paid (*i.e.*, the foreign ATM fee). Instead, Plaintiffs allege that Defendants fixed the interchange fee that Star Network pay one another and then passed along the artificially inflated fee to Plaintiffs. Thus, unlike in *Shamrock Foods*, Plaintiffs' theory of recovery expressly "depend[s] on pass-on damages." *Id.* at 1211. And, as a result, there exists a "need to apportion" any overcharge resulting from the inflated interchange fee between Plaintiffs and the direct purchasers, the card-issuing banks. In short, the *Shamrock Foods* exception applies where the Defendants have conspired to fix the price that Plaintiffs paid directly. That is not the case here.

The third and final circumstance in which an indirect purchaser may sue for damages is in a situation where "there is no realistic possibility that the director purchaser will sue its supplier over the antitrust violation." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003). The quintessential example of such a circumstance is one

where "the direct purchaser is a subsidiary or division of a co-conspirator." *See Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980). In such a case, the Ninth Circuit noted in *Royal Printing*, the parent-supplier is likely to "forbid its subsidiary or division [from] bring[ing] a lawsuit that would only reveal the parent's own participation in the conspiracy." *Id.* Applying the direct purchaser in such a case would therefore "effectively immunize the [unlawful conduct of the parent] from private antitrust liability," an outcome the court in *Royal Printing* considered "intolerable." *Id.* Thus, the court concluded, an indirect purchaser may sue a remote supplier where "as a practical matter the chance of a direct-purchaser suit" is nonexistent. *Id.*

The Ninth Circuit found this exception applicable in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d at 1145-46. In *Freeman*, eleven competing San Diego real estate agent associations agreed to combine their separately maintained databases of property listings into a single, San Diego-wide database. *Id.* at 1140. The database was maintained centrally by an entity named Sandicor, which the associations collectively created, owned, and controlled. *Id.* at 1140-41. The associations, however, remained individually responsible for performing certain support services, such as enrolling new subscribers to the database, billing and collecting payments, and answering subscribers' questions. *Id.* at 1141.

In forming Sandicor, the associations agreed that Sandicor would charge subscribers a database access fee of $44 per month. *Id.* at 1146. They further agreed that, out of this access fee, Sandicor would pay the associations $25 per subscriber per month to cover the cost of the support services the individual associations provided.

As it turned out, however, the cost of providing support services varied across the eleven associations. The largest association, for instance, paid only $10 per subscriber per month, while the smallest associations paid close to $50. *Id.* at 1141. The agreed-upon $25 reimbursement therefore provided a windfall to the larger associations and created a substantial loss for the smaller associations. To correct this problem, the larger associations agreed to pay cash subsidies to their smaller competitors. *Id.*

10

The plaintiffs in *Freeman*, two subscribers to the Sandicor database, objected to this arrangement, arguing that it amounted to unlawful price-fixing. They asserted that the eleven associations' unlawful agreement to the fixed reimbursement and subsidy system for support services resulted in artificially inflated database access fees. They argued, for instance, that, if the access fee incorporated only the largest associations' cost of services (*i.e.*, $10 per subscriber per month), rather than the $25 agreed-upon reimbursement rate, the access fee would be considerably lower. *Id.* at 1142.

In defending the suit, the associations argued that the direct purchaser rule barred plaintiffs' claim for antitrust damages. They noted that Sandicor, not the plaintiffs, paid the support services' fee and that, as only indirect payers of the fee, plaintiffs were barred from bringing a damages claim.

Relying on the exception to the direct purchaser rule set forth in *Royal Printing*, the court held that plaintiffs' claims were not barred. *See id.* at 1145-46. It concluded that because the associations owned Sandicor, appointed its board of directors, and conspired with it, there was "no realistic possibility Sandicor, [the direct purchaser,] will sue them." *Id.* Thus, plaintiffs' damages action could proceed.[5]

In this case, Plaintiffs argue that there is "no realistic possibility" that the direct purchasers of interchange fees – *i.e.*, the card-issuing banks – would file a lawsuit challenging the unlawful fixing of those fees, for several reasons. First, they argue that, because card-issuing banks that own ATMs receive interchange fees when a foreign customer uses one of the banks' ATMs, they would never sue to challenge the unlawful

---

[5] Though the court in *Freeman* relied on the "no reasonable possibility" exception to the direct purchaser rule in allowing the plaintiffs' suit to proceed, the situation in *Freeman* was more directly analogous to the one presented in *Shamrock Foods*. In essence, the associations jointly agreed that consumers would pay $44 per month for access to the database and, of that, $25 would be returned to the association that serviced the customer. *See Freeman*, 322 F.3d at 1146 (noting that, though "defendants nominally [sold] services through another entity rather than to consumers directly," they effectively "agree[d] among themselves . . . to fix [the] price[]" that subscribers paid for access to the database). Thus, as in *Shamrock Foods*, the defendants in *Freeman* conspired to fix the price that the plaintiffs paid. As a result, the plaintiffs in *Freeman*, like the plaintiffs in *Shamrock Foods*, paid the fixed price directly and therefore were not, in fact, indirect purchasers.

11

fixing of those fees at an artificially high level. In other words, in Plaintiffs' view, because banks receive interchange fees, as well as pay them, they have an incentive not to sue.

Plaintiffs' first argument fails because it ignores the critical fact that the overwhelming majority of ATM card-issuing banks pay more in interchange fees than they receive. Of Star's 4,750 members, approximately 4,100 pay more in interchange fees than they take in. *See* Sawicki Decl. ¶¶ 3, 14, 16. One thousand of these entities are, in fact, "pure payers" of interchange, meaning that they do not receive interchange fees at all. *Id.* at ¶ 14.[6] In short, several thousand members of the Star Network do not, on net, receive interchange fees and therefore do not receive the benefit Plaintiffs suggest.

Moreover, contrary to Plaintiffs' assertion, these 4,100 direct purchasers (including, incidentally, all but one of the bank Defendants) have a strong economic incentive to ensure that the interchange fee is set as low as possible. Because they pay more in interchange fees than they receive, the higher the interchange fee, the higher their costs. Thus, there is a very realistic possibility that these entities (or some subset of them) would file suit to challenge the fixing of interchange fees at artificially high rates.

Plaintiffs next argue that the direct payers of interchange fees would not sue to end the imposition of such fees because the paying of interchange fees justifies the decision to charge Plaintiffs a marked-up foreign ATM fee. Stated differently, Plaintiffs assert that, if interchange fees were abolished, card-issuing banks would be unable or unwilling to impose foreign ATM fees on their customers, from which they earn substantial revenues. Thus, because the elimination of interchange fees would mean the elimination of foreign ATM fees, card issuing banks have, in Plaintiffs' view, no incentive to challenge them.

Plaintiffs' argument is illogical. For the past several years, the Star Network has set interchange fees at $0.46 for on-premises ATM transactions and $0.54 for off-premises ATM transactions. According to Plaintiffs' complaint, card-issuing banks charge foreign ATM fees of around $2.00. Third Amended Compl., Figure A. Thus, per Plaintiffs' allegations,

---

[6] This group includes credit unions and other banks, such as some internet banks, that issue ATM cards but do not own ATMs. *Id.* at ¶ 13.

12

card-issuing banks mark-up the interchange fee by around $1.50 and then pass along the interchange fee and the markup to their customers.

Given that banks earn $1.50 on every foreign ATM fee that they charge ($2.00 minus the $0.50 interchange fee[7]), the Court is hard-pressed to understand why the banks would suddenly stop charging foreign ATM fees altogether if the cost of interchange was eliminated. Logic dictates that one of two things would happen instead. Either banks would continue to set foreign ATM fees at $2.00 and thereby earn $0.50 more per transaction. Or, perhaps more likely, banks would lower their foreign ATM fees by $0.50 and earn the same net profit ($1.50), but at lower prices. These lower prices would, in turn, spur additional sales volume, thereby increasing a banks' total profits. *See Illinois Brick*, 431 U.S. at 733 n.13 (noting that a direct purchaser is injured even where the direct purchaser can pass along the entire cost of a supplier's illegally fixed price because the direct purchaser suffers "a reduction in the volume of its sales caused by its higher prices").

As the two scenarios just described reveal, card-issuing banks are better-off if interchange fees are eliminated, even if they currently pass the entire cost of interchange fees along to their customers. Eliminating interchange fees would either allow card-issuing banks to earn more money per foreign ATM transaction or it would allow them to earn the same per transaction profit at lower prices. Thus, Plaintiffs' argument that card-issuing banks have no incentive to seek the elimination of interchange fees because those fees justify the imposition of foreign ATM fees is without merit.

Plaintiffs next assert that there is no realistic possibility that the direct payers of interchange fees would file suit because the direct payers are participants in the conspiracy to fix the interchange fee. Plaintiffs note that, when an entity joins the Star Network, that entity agrees to both pay and receive the fixed interchange fee. As a result, all members of the Star Network are, Plaintiffs maintain, co-conspirators and therefore unlikely to sue to end the conspiracy.

---

[7] Assuming banks pass on the full interchange cost to customers, rather than only a portion of it.

13

The Court disagrees with Plaintiffs' assessment of the members of the Star Network. It is true that all members of the network agree to charge other members the fixed interchange fee. But, as discussed, for the vast majority of card-issuing banks that join the Star Network, including the bank Defendants, this promise is meaningless. One thousand card-issuing banks do not receive interchange fees at all. Another 3,100 do receive interchange fees from other members, but these entities pay more in interchange fees than they charge. For these 3,100 entities, then, the agreement to charge and accept the fixed fee is equivalent simply to an agreement to pay a lower net interchange fee.

From an economic perspective, the 4,100 Star Network members who pay more in interchange fees than they receive are, at least with respect to interchange fees, essentially customers of the approximately 650 Star Network members who receive more in interchange fees than they pay. *See* Sawicki Decl. ¶¶ 3, 14, 16. One thousand of these entities pay the interchange "list price" (*i.e.*, $0.46 for on-premises transactions and $0.54 for off-premises transactions), because they receive no interchange payments. Thirty-one hundred pay something less than the list price, because they do receive some interchange fees. But, the point is that, for all 4,100 of these entities, interchange fees are a net cost that they have agreed to incur. To describe these entities as co-conspirators to an agreement to fix the price of interchange fees at artificially inflated levels is therefore, in the Court's view, inappropriate. Instead, these entities are tantamount to the customers of an illegal price-fixer. The entities agreement to pay the allegedly fixed price, like any customer's agreement to pay an unlawfully fixed price, does not render them co-conspirators.

Moreover, unlike the direct purchasers in *Royal Printing* and *Freeman*, these 4,100 entities are not owned by, nor do they own, the 650 entities to which they pay interchange fees. As a result, there is a realistic possibility that they would sue to end the illegal fixing of inflated interchange fees.

Put simply, for over 4,000 members of the Star Network interchange fees are a cost that they pay to be part of the network. In addition, these entities pay that cost to other, independent members of the Star Network. They do not pay it to a parent or a subsidiary.

14

1 These entities therefore have every incentive to make sure that interchange fees are set no
2 higher than necessary.

3 　　　　　In sum, the Court rejects Plaintiffs' argument that, by joining the Star Network and
4 agreeing to its terms, all 4,100 entities that are net payers of interchange fees have agreed to
5 join a conspiracy to fix interchange fees at artificially high rates and are therefore unlikely to
6 sue to challenge the conspiracy. To the contrary, these entities (or at some portion of them)
7 have a strong financial incentive to bring such a suit.

8 　　　　　In a final argument, Plaintiffs assert that it is unlikely that the card-issuing banks who
9 are net payers of interchange fees would file suit because they would not wish to disrupt their
10 access to the Star Network. This argument fails, for several reasons. First, there are over
11 4,000 members of the Star Network who are net payers of interchange fees. Even if some of
12 these entities would choose not to sue to challenge the unlawful fixing of interchange fees,
13 there is no structural reason to believe that all 4,000 would so behave. Second, ATM
14 network members have, in fact, sued ATM Networks in the past, indicating that such suits
15 are a realistic possibility. *See, e.g., SouthTrust Corp. v. Plus Sys., Inc.*, 913 F.Supp. 1517,
16 1524 (N.D. Ala. 1995).

17 　　　　　Third, and most importantly, the Supreme Court rejected this very argument in *Illinois*
18 *Brick*. *See* 431 U.S. at 745-46. In *Illinois Brick*, the Court "recognize[d] that direct
19 purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting
20 relations with their suppliers." *Id.* Nonetheless, the Court concluded that, "on balance," the
21 goal of vigorous enforcement of the antitrust laws is "better served by holding direct
22 purchasers to be injured to the full extent of the overcharge paid by them than by attempting
23 to apportion the overcharge among all that may have absorbed a part of it." *Id.* Thus,
24 Plaintiffs' argument that the direct purchasers would refraining from suing due to a fear of
25 disrupting relations with the Star Network, even if valid, would be insufficient to overcome
26 the *Illinois Brick* bar.

27 　　　　　For all the reasons discussed above, the Court finds that there is a "realistic
28 possibility" that one or more direct purchasers of an unlawfully inflated interchange fee

15

would bring an antitrust suit to challenge that fee. Accordingly, the Court finds that the exception to the direct purchaser rule described by the Ninth Circuit in *Royal Printing*, like the other exceptions to the rule, does not apply here.

### C. Summary

In *Illinois Brick*, the Supreme Court concluded that the "vigorous private enforcement of the antitrust laws" was best achieved by allowing only direct payers of an unlawfully fixed price to sue for antitrust damages. 431 U.S. at 745. In so concluding, the Court was particularly concerned with avoiding the "evidentiary complexities and uncertainties" involved in determining how much of the unlawfully fixed fee was passed on by the direct purchaser to the indirect purchaser. *Id.* at 732. In *Shamrock Foods* and *Royal Printing*, the Ninth Circuit concluded, sensibly, that the *Illinois Brick* rule against indirect purchaser suits should not apply where it is almost certain that direct purchasers would not bring an antitrust suit challenging an unlawfully fixed price. As the Ninth Circuit noted in *Royal Printing*, to apply the direct purchaser rule in such cases would "effectively immunize the [unlawful conduct] from private antitrust liability." *Royal Printing*, 621 F.2d at 326.

In the end, this case involves a fairly straightforward application of the rule set forth in *Illinois Brick*. Plaintiffs' theory of recovery is an indirect one that would require this Court to grapple with the very "evidentiary complexities and uncertainties" that the Court in *Illinois Brick* warned against. The Court would have to determine how much of the interchange fee each of several defendants passed on to their respective customers, requiring the Court to engage in the complicated task of "trac[ing] the effects of the overcharge on the [card-issuing banks'] prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." *Illinois Brick*, 431 at 725. In short, this case presents the very challenges that the *Illinois Brick* rule was designed to address.

Moreover, unlike in *Shamrock Foods* and *Royal Printing*, there is a realistic possibility that the direct payers of the interchange fee would sue to challenge an unlawfully fixed price. In this case, there are literally thousands of direct purchasers who have an economic incentive to ensure that interchange fees are set as low as possible. Even if a

16

subset of this group would choose not to sue for some reason, there is no structural or underlying fundamental reason, such as the ownership of the direct purchaser by the supplier, why all of these entities would refrain from filing suit. As a result, the Court finds that there is a realistic possibility that there are direct purchasers who would file an antitrust suit challenging the validity of unlawfully fixed interchange fee. Accordingly, the rule set forth in *Illinois Brick* bars Plaintiffs' claim for antitrust damages.

### D.    Rule 56(f)

Plaintiffs ask that, if this Court is inclined to grant summary judgment in favor of Defendants, it first permit Plaintiffs to conduct further discovery. Plaintiffs argue that Defendants have not "produced a complete, systematic set of data about interchange fees, foreign fees, or surcharges, either paid and received, for any period prior to 2008." Opp. at 18. Further, Plaintiffs argue that they have not had the opportunity to depose Mary Kim Sawicki, on whose declaration Defendants rely in their motion.

In order to justify a Rule 56(f) continuance a party must establish that the facts sought in further discovery are "essential to resist . . . summary judgment." California v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998) (quotation marks omitted). Plaintiffs have failed to meet this standard. First, while it is true that Plaintiffs do not have precise tabulations of the various fees that Defendants paid and received during the class period, these data are not necessary to oppose summary judgment. Plaintiffs do not dispute that there are members of the Star Network who do not own ATMs and therefore are pure payers of interchange fees. These parties are direct purchasers in that they pay interchange fees, but by virtue of the fact that they do not own ATMs, they never receive them. Further discovery would in no way change this dynamic, and Plaintiffs in fact conceded at the hearing that such parties exist.

Similarly, with regard to Plaintiffs' interest in deposing Mary Kim Sawicki, Plaintiffs have failed to establish that such a deposition is essential to oppose summary judgment. Sawicki's declaration provided precise figures regarding the payment of these fees for a two-year period, and Defendants have produced the underlying data. While Plaintiffs suspect that Sawicki's statements with regard to other periods of time are unfounded, the truth or falsity

of this suspicion is immaterial. Whether or not certain bank Defendants were or were not net-payers for various periods of time does not alter the pivotal conclusion: in <u>any</u> period of time, there existed direct purchasers who had sufficient incentive to bring an antitrust suit.

Because Plaintiffs have failed to identify any discovery that would be essential to oppose summary judgment, their request for further discovery is DENIED. All pending motions to compel are similarly DENIED.

## CONCLUSION

For the reasons discussed above, the Court GRANTS Defendants' motion for summary judgment and dismisses Plaintiffs' claim for antitrust damages.

Plaintiffs have also requested equitable relief, which is not barred by the *Illinois Brick* rule. *See Freeman*, 322 F.3d at 1145. It appears to the Court, however, that Plaintiffs' interest in obtaining injunctive relief did not motivate the filing of this lawsuit. Moreover, the Court finds that litigating the issue of Plaintiffs' entitlement to equitable relief before the issue of Plaintiffs' entitlement to damages is finally resolved would be highly inefficient. Accordingly, the Court will enter judgment in Defendants' favor, dismissing this case in its entirety. If, after all issues are finally resolved on appeal, Plaintiffs wish to pursue equitable relief, they may do so by notifying the Court within thirty days from the issuance of the mandate.

**IT IS SO ORDERED.**

Dated: September 16, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE